RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
KATE BERRY
Assistant Federal Public Defender
Nevada State Bar No. 14346
SEAN A. MCCLELLAND
Assistant Federal Public Defender
District of Columbia Bar No. 90001362
200 South Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451
Kate_Berry@fd.org
Sean_McClelland@fd.org

Attorneys for Triston Harris Steinman

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:22-CR-00068-ART-CLB |
| Plaintiff, | **MOTION TO DISMISS**[1] |
| v. | **[Hearing Requested]** |
| TRISTON HARRIS STEINMAN, | |
| Defendant. | |

## I.    INTRODUCTION

Triston Harris Steinman has been charged with possessing ammunition. ECF No. 24. That charge—Count One of the superseding indictment—fails constitutional muster under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Count One should therefore be dismissed.[2]

---

[1] This motion is timely filed. ECF No. 32.

[2] Mr. Steinman is also contemporaneously submitting a motion to suppress evidence collected in violation of his Fourth Amendment rights.

## II.   BACKGROUND[3]

As explained in Mr. Steinman's contemporaneously-filed motion to suppress, Mr. Steinman was pulled over in August 2022 for allegedly speeding on a highway near Wells, Nevada. During the stop, an officer allegedly observed a box of ammunition in Mr. Steinman's car. Officers eventually seized and then searched his vehicle. Inside, they discovered ammunition, firearms, and marijuana.

In October 2022, Mr. Steinman was charged by complaint with the sole count of being a felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count One). ECF No. 1. He had his initial appearance in November 2022 and was released pursuant to a personal recognizance bond under. ECF Nos. 3, 11. Mr. Steinman remains on pretrial release and is living in Utah with his family.

In December 2022, Mr. Steinman was charged by indictment with the same offense charged in the complaint. ECF No. 14. In March 2023, the government filed a superseding indictment adding an additional count—possession of unregistered firearms (silencers) in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 (Count Two). ECF No. 24. Calendar call is scheduled for May 30, 2023, and trial is scheduled for June 6, 2023. ECF No. 22.

## III.   ARGUMENT

Mr. Steinman moves to dismiss the ammunition charge (Count One) as unconstitutional under *Bruen*. That case fundamentally—and explicitly—abrogated prior circuit precedent on gun regulation. Under the new test, Mr. Steinman is part of "the people" entitled to own firearms and ammunition irrespective of any prior felony conviction. And the government cannot show

---

[3] The background facts discussed below are drawn from the discovery the government has thus far provided and are presented only for purposes of this motion. Mr. Steinman reserves the right to challenge and supplement these alleged facts with his own investigation and with any information that may be discovered at any evidentiary hearing held on the motion to suppress.

any historical tradition divesting him of those rights. This Court should therefore dismiss Count One.

### A.   *Bruen*'s New Approach to the Second Amendment Abrogated the Ninth Circuit's Framework and Must be Applied Here.

*Bruen* upended Second Amendment jurisprudence. It explicitly rejected the earlier test previously applied in every federal court of appeals, including the Ninth Circuit. This Court is therefore no longer bound by prior Ninth Circuit opinions on the subject. *Bruen* alone applies.

A district court is generally bound to follow prior decisions of the court of appeals for its corresponding geographic circuit. But that general rule gives way when the United States Supreme Court issues a decision that conflicts with then-applicable circuit law. If that "intervening Supreme Court authority" is "clearly irreconcilable" with prior circuit authority, "district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

To determine whether a prior opinion is irreconcilable, courts look to both "'the holdings of higher courts' decisions'" and those decisions' "'mode of analysis.'" *Id.* (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989)). If the Supreme Court decision "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable," then the Supreme Court decision controls. *Id.* The intervening Supreme Court opinion need not directly overrule prior circuit cases. *Id.* And the issue the Supreme Court resolves "need not be identical in order to be controlling." *Id.* So long as the approaches are "at odds," the newer Supreme Court opinion governs. *Id.*

*Bruen* rewrote the rules for determining whether a firearm law satisfies the Second Amendment. Previously, courts of appeals (including the Ninth Circuit) had evaluated such

3

laws under a two-step test: history-and-tradition *plus* means-end scrutiny. *United States v. Chovan*, 735 F.3d 1127, 1134–42 (9th Cir. 2013). In the pre-*Bruen* regime, courts first considered whether the law was consistent with analogous gun restrictions from the Nation's founding and early history. *Id.* at 1136–38. If it was, the law passed constitutional muster. *Id.* But if it was not, the law could still survive at the second step through a balancing test; if the government's interest in the restriction outweighed the infringement on the individual, step-two authorized it. *Id.*

Bruen changed the applicable analysis in at least two ways. First, *Bruen* got rid of the second means-end step entirely. *Bruen*, 142 S. Ct. at 2127 ("[I]t is one step too many."). And, second, it tinkered with the first history-and-tradition step. While some courts of appeals had imposed a defense-side burden to show a restriction's inconsistency with history, *Bruen* requires that the government "affirmatively prove that its firearms regulation is part of the historical tradition." *Id.* In the process, *Bruen* recommended considerations in the requisite historical analysis that were either unidentified in prior appellate decisions or irrelevant under those decisions' modes of analysis. *See id.* at 2131.

The analysis under *Bruen*, therefore, is a straightforward (if intensive) one-step history-and-tradition analysis: if the government cannot "identify an American tradition" justifying a firearms restriction, the law fails. *Id.* at 2138. No "means-end scrutiny" applies. *Id.* at 2125, 2138. Instead, absent a historical analogue, the inquiry ends, and the law is unconstitutional.

This new test effectively abrogates all prior Ninth Circuit decisions—indeed, all federal court of appeals decisions everywhere—about firearms restrictions. Like "every Court of Appeals to have addressed the question," the Ninth Circuit had previously applied the pre-*Bruen* "two-step framework" in "evaluating whether a firearm regulation is consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2174 (Breyer, J., dissenting); *id.* at 2125 (majority opinion identifying that the courts of appeals had "coalesced" around that mode of analysis); *see Chovan*, 735 F.3d at 1134–37 (applying that two-step test). And the Ninth Circuit had also

4

applied a presumption of lawfulness to certain statutes, concluding that some (like § 922(g)(1)) were protected from scrutiny even absent a full historical analysis. *See, e.g., United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (relying on *Heller*'s "presumptively lawful" language to reject a Second Amendment challenge to § 922(g)(1)).

Those moves are "clearly irreconcilable" with *Bruen*. *Gammie*, 335 F.3d at 900. There is no longer a two-step analysis. There is just one step. *Bruen*, 142 S. Ct. at 2127. And there are no presumptions in favor of certain statutes. The government must now "affirmatively prove" that each challenged statute complies with historical tradition. *Id.* Since Ninth Circuit law on the subject is "directly at odds" with those precepts, it is no longer binding on this Court. *Gammie*, 335 F.3d at 900.

*Bruen* abrogated *Chovan* and *Vongxay*. This Court should therefore apply *Bruen*'s test—not any pre-*Bruen* Ninth Circuit test—to Mr. Steinman's motion.

**B.      Section 922(g)(1)—Including its Bar on Ammunition Possession—Is Unconstitutional Under *Bruen*.**

Section 922(g)(1) fails scrutiny under *Bruen*. Individuals with felony convictions are not excluded from "the people" with the right to own firearms and attendant ammunition. And there is no historical tradition sufficient under *Bruen* to justify dispossessing them of that right. This Court should therefore dismiss Count One of the indictment.

**1.      The *Bruen* Framework Applies to Possession of Ammunition Irrespective of Prior Felony Convictions.**

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. Individuals have that right regardless of prior felony convictions. And the right includes the right to possess ammunition. The standard *Bruen* analysis therefore governs this case.

### a. Individuals with Prior Felony Convictions Remain Part of "the people" for Constitutional Purposes.

The Second Amendment right extends equally to individuals with prior felony convictions as to those without. As the Supreme Court identified in *Heller*, "the people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. And so, because "felons" are not "categorically excluded from our national community," they fall within the amendment's scope. *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting), *majority opinion abrogated by Bruen*, 142 S. Ct. 2111; *accord Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting). Individuals' prior misdeeds, in other words, do not permanently divest them of constitutional rights.

Comparison to other rights confirms as much. As *Heller* explained, "the people" is a "term of art employed in select parts of the Constitution," including "the Fourth Amendment, . . . the First and Second Amendments, and . . . the Ninth and Tenth Amendments." 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Mr. Steinman is, for instance, among "the people" whose "persons, houses, papers, and effects" enjoy Fourth Amendment protection. U.S. Const. amend. IV; *see, e.g.*, *United States v. Lara*, 815 F.3d 605, 609 (9th Cir. 2016). Mr. Steinman likewise enjoys "the right of the people" to "petition the government for redress of grievances." U.S. Const. amend. I; *see, e.g.*, *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017). If Mr. Steinman is one of "the people" protected by the First and Fourth Amendments, *Heller* and *Bruen* confirm that he is one of "the people" protected by the Second Amendment, too.

Concluding that ex-felons are part of "the people" aligns with the post-*Bruen* conclusions reached by some other courts, as well.

As to individuals accused of crimes, the Fifth Circuit, for instance, has held that individuals accused of domestic violence can assert the Second Amendment right. *United States*

6

*v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023) (emphasizing that an individual need not be "a model citizen" to be "entitled to the Second Amendment's guarantees"). The Western District of Texas has held that individuals under felony indictment can too. *United States v. Quiroz*, No. 22-CR-104, 2022 WL 4352482, at *8-10 (W.D. Tex. Sept. 19, 2022); *see also Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *6–9 (D. Minn. Mar. 31, 2023) (concluding that 18–20 year-olds are part of "the people" even though they generally could not vote for much of the nation's history).

As to individuals with criminal convictions, the Northern District of Iowa has held that individuals with prior domestic violence misdemeanor convictions can likewise assert the right. *United States v. Bernard*, No. 22-CR-03, 2022 WL 17416681, at *7 (N.D. Iowa Dec. 5, 2022). And although a panel of the Third Circuit held to the contrary with respect to ex-felons, that opinion is now vacated pending full review by the en banc court (and, in any event, overreads *Heller* for that proposition). *Range v. Att'y Gen. of the U.S.*, 53 F.4th 262, 284 (3d Cir. 2022), *vacated on reh'g en banc*, 56 F.4th 992 (3d Cir. 2023).[4]

The conclusion that individuals with felony convictions maintain their right to bear firearms and ammunition makes practical sense, too. These individuals "need arms for lawful self-defense just as much as the rest of us do." Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1499 (2009). That someone has been convicted of a crime in the past does not diminish that need; arguably, it could increase it.

---

[4] Specifically, the panel opinion in *Range* misunderstood the relevant inquiry under *Heller* and especially *Bruen*. As then-Judge Barrett put it: because ex-felons are not "categorically excluded from our national community," "the question is whether the government has the power to disable the exercise of a right that they otherwise possess"—not "whether they possess the right at all." *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting). That is, if § 922(g)(1) is constitutional, it is not because ex-felons wholly lack a constitutional right.

Individuals with prior felony convictions (like Mr. Steinman) are, in short, included in "the people" identified in the Second Amendment. A restriction like § 922(g)(1) is unconstitutional as applied to them.

### b. Ammunition Restrictions Amount to Firearm Restrictions for Second Amendment Purposes.

Second Amendment scrutiny applies with equal force to ammunition possession, the particular species of § 922(g)(1) offense that Mr. Steinman is charged with. The Second Amendment protects the right to possess ammunition on the same footing as it does the right to possess firearms. *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014). That is because, as the Ninth Circuit has identified: "A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Id.* "[W]ithout bullets, the right to bear arms would be meaningless." *Id.* And so if it would be unconstitutional to restrict access to a firearm, it is also unconstitutional to restrict access to the ammunition needed to use it. Because ammunition is part of the Second Amendment right, then, the ordinary Second Amendment analysis—now governed by *Bruen*—applies.

### 2. Categorically Criminalizing Ex-Felon Firearm Possession Fails under *Bruen*.

Under *Bruen*'s Second Amendment analysis, § 922(g)(1) fails. The government must show a comparable historical tradition of prohibiting felons from possessing ammunition. But there is none. The statute is therefore unconstitutional.

### a. *Bruen* Requires the Government to Prove a Comparable Historical Tradition of Regulation.

The relevant inquiry under *Bruen* is "whether 'historical precedent' from before, during, and even after the Founding evinces a comparable tradition of regulation." 142 S. Ct. at 2129. In conducting that analysis, "not all history is created equal." *Id.* at 2131–32. Because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the*

8

*people adopted them*," the during-Founding evidence is the most important. *Id.* at 2136 (quotations omitted) (emphasis in original). By contrast, earlier historical evidence "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* Similarly, post-ratification laws that "are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 2137 (quotations and emphasis omitted). The government bears the burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

*Bruen* provides guideposts for how to evaluate whether an appropriate condition exists, delineating two types of possible firearm regulations a court might confront. The first type "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131. With this first type, the historical inquiry "will be relatively straightforward." *Id.* When faced with such a general-societal-problem regulation, courts should begin by determining whether "a distinctly similar historical regulation address[ed] the problem." *Id.* If earlier generations did not regulate the problem, or if they regulated it "through materially different means," then the challenged regulation violates the Second Amendment. *Id.* Likewise, if earlier generations considered but then rejected comparable regulations as unconstitutional, "that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

The second type of possible firearm regulation concerns "unprecedented societal concerns," "dramatic technological changes," or problems "unimaginable at the founding." *Id.* at 2132. These are evaluated with "reasoning by analogy." *Id.* And when faced with these sorts of regulations, courts should determine whether the challenged regulation is "relevantly similar" to an earlier one, with special attention to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

*Bruen* itself is illustrative. There, the Court determined that New York's general bar on concealed-carry was designed to address a general societal problem: "handgun violence,

9

primarily in urban areas." *Id.* at 2131 (cleaned up). And so, for New York's restriction to pass constitutional muster, the state had to "demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Id*. at 2138. But the state failed to identify such a tradition. *Id.* At most, the state had shown historical restrictions on some "dangerous and unusual weapons" and "bearing arms to terrorize the people." *Id*. at 2143. Without on-point historical examples of public-carry limitations, the Court concluded, "no historical basis" contradicted "an otherwise enduring American tradition permitting public carry." *Id*. at 2145, 2154.

### b.   There Is no Historical Tradition of Prohibiting Felons from Possession Ammunition.

The government cannot meet its burden to establish the requisite historical analogues for § 922(g)(1). As with the restriction challenged in *Bruen*, § 922(g)(1) is unconstitutional.

The statute constitutes the first (and simplest) type of regulation under *Bruen*: a general-societal problem regulation. Like the urban-handgun-violence problem in *Bruen*, the "general societal problem" that § 922(g)(1) is designed to address—the purported risk from ex-felons accessing guns—is one "that has persisted since the 18th century." 142 S. Ct. at 2131. Thus, like any general-societal-problem regulation, § 922(g)(1) is presumptively unconstitutional unless the government "affirmatively prove[s]" a "comparable tradition" of "distinctly similar historical regulation." *Id.* at 2127, 2131, 2132.

There is no comparable historical tradition for § 922(g)(1). Neither the federal government nor a single state barred all people convicted of felonies until the 20th century.[5] *See*, *e.g.*, Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009). Indeed,

---

[5] The first state law to bar the possession of some firearms by ex-felons was enacted in 1914. Catie Carberry, *Felons and Persons with a Mental Impairment*, Second Thoughts: A Blog from the Center for Firearms Law at Duke University (June 27, 2019), https://sites.law.duke.edu/secondthoughts/2019/06/27/miniseries-part-iii-felons-and-persons-with-a-mental-impairment/. And even this first law only banned possession of certain weapons.

§ 922(g)(1) itself was adopted in 1968, 177 years after the Second Amendment was ratified. That timeline is too recent to have any value under *Bruen*. 142 S. Ct. at 2154 n.28 ("[L]ate-19th-century evidence" and all "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."). Blanket ex-felon dispossession of the sort at issue here is, in other words, a modern innovation—not a historical one.

Nor is § 922(g)(1) supported by any other regulatory tradition. To the contrary, it conflicts with the tradition in every period of relevant history identified in *Bruen*: "(1) . . . early modern England; (2) the American Colonies and the early Republic; (3) antebellum America [and] Reconstruction." 142 S. Ct. at 2135–36. And it also conflicts with (4) 20th-century history, too. None of these periods contain a sufficient § 922(g)(1) analogue. And without one, the statute fails under *Bruen*.

#### (1)   Depriving Ex-Felons of Their Right to Bear Arms Does Not Comport with Early Modern English History.

Early modern England did not ban ex-felons from possessing a firearm. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Policy 695, 717 (2009); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 260 (2020). Section 922(g)(1) therefore finds no support in this period.

To the extent that England sought to disarm individuals, those regulations generally required a more culpable mental state (generally something like specific intent) and made exceptions for self-defense, features absent from § 922(g)(1). In other words, these prior firearm possession laws are not "distinctly similar" to modern felon-in-possession laws. *See Bruen*, 142 S. Ct. at 2131. Although the government bears the burden to prove otherwise, three commonly cited historical examples—the going-armed common law offense, surety dispossession, and religious or political bars—warrant preemptive discussion.

11

First, going-armed laws required conduct beyond mere possession, and imposed heightened intent requirements. For example, it was a crime under the common law to "go[] armed to terrify the King's subjects." *Bruen*, 142 S. Ct. at 2141 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686)). To be convicted of this offense, the defendant had to have "the intent to cause terror in others." *Id*. at 2183 (Breyer, J., dissenting) (describing majority's view). That is a much more culpable mental state than § 922(g)(1)'s requirement that the defendant "knowingly" possessed a firearm. *See* 18 U.S.C. § 924(a)(8). Given these differenes, the going-armed-to-terrify offense is much closer to assault than mere possession.

Second, surety laws (essentially a sort of bond imposed on firearm possession) required individualized adjudication for dangerousness, rather than blanket dispossession for prior felonies. England did sometimes limit prospective use of firearms by those considered dangerous through that surety mechanism. Marshall, *supra*, at 717. But a surety was individualized and non-criminal: a justice of the peace could demand that someone for "whom there is probable ground to suspect of future misbehaviour, to stipulate with and to give full assurance to the public, that such offence as is apprehended shall not happen; by finding pledges and securities for keeping the peace, or for their good behaviour." *Id.* (quoting 5 William Blackstone, *Commentaries* *386–87 (St. George Tucker ed., 1803) (1767)); *see also Rahimi*, 61 F.4th at 459–60 (discussing how sureties worked in similar terms); William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829) (citing 1 W. Hawkins, *Pleas of the Crown* 60 (1716); 3 Sir Edward Coke, *Institutes of the Laws of England* 160 (1644)) (same). But unlike § 922(g)(1), surety laws still presumed that a person could have arms. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); Marshall, *supra*, at 716–23; Greenlee, *supra*, at 260. In other words, sureties targeted a different class (the violent, not the felonious) and used a different enforcement mechanism (bonds, not imprisonment). That makes them a poor § 922(g)(1) analogue.

12

Third, England's limited attempts at class-based dispossession were ordinarily religiously-motivated and, in any event, still permitted those targeted to keep arms for self-defense.  For example, in the age of William and Mary (both Protestants), Catholics were restricted in their ability to keep arms because they were presumed loyal to James II (a Catholic trying to retake the throne) and therefore categorically treasonous. Specifically, Catholics could only keep "Arms, Weapons, Gunpowder, [and] Ammunition" if they declared allegiance to the Crown and renounced key parts of their faith. *See Bruen*, 142 S. Ct. at 2142 n.12 (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)); *see also* An Act for the more effectuall preserving the Kings Person and Government by disabling Papists from sitting in either House of Parlyament, 1 Charles II stat. 2, in 5 Stat. of the Realm at 894–96 (1678). But even then, Catholics could keep some arms for self-defense; they could "keep 'such necessary Weapons as shall be allowed . . . by Order of the Justices of the Peace . . . for the Defence of his House or Person.'" *Bruen*, 142 S. Ct. at 2142 n.12 (omissions in original) (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)). Thus, even when England assumed that Catholics were engaged in mass treason, they still had "a right to own arms for personal defense." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 123 (1994).

And even that dispossession-of-religious-minorities-in-public tradition had little carry-over to the American colonies. Class-based dispossession efforts were broadly rejected by Founding-Era Americans as the product of improper animus. *Heller*, 554 U.S. at 593; *Rahimi*, 61 F.4th at 456. Rather, efforts to guarantee firearm rights were the working template. *Heller*, 554 U.S. at 593 (describing the 1689 English Bill of Rights, which guaranteed firearm rights, at least for Protestants, as the "predecessor" to the Second Amendment). Thus, "prevent[ing]"—rather than enabling—the "politically motivated disarmaments" from English history was the basis of the Second Amendment. *Rahimi*, 61 F.4th at 456.

In short, English law never tried to disarm all felons.[6] *See, e.g.*, *Quiroz*, 2022 WL 4352482, *5 (finding no evidence that under English rule, the colonies did not bar firearm possession). Rather, English lawmakers tried to *limit* the use of firearms by those individuals found to be violent and rebellious. And even violent and or rebellious individuals could keep arms for self-defense. That history of generally religiously motivated dispossession was also largely rejected by Americans. Early modern English history therefore does not offer a "distinctly similar historical regulation" to justify § 922(g)(1). *Bruen*, 142 S. Ct. at 2131.

---

[6] It is true that, in a technical sense, some ex-felons could no longer bear arms because (1) they were executed or (2) they forfeited their firearms upon a felony conviction. Marshall, *supra*, at 714. But neither practice suggests that the Framers understood that the right to keep and bear arms excluded all ex-felons. *See also infra* 20 (discussing early American punishment of felons). That is because neither execution nor forfeiture necessarily attended a felony conviction; nor were those punishments primarily motivated by desire to dispossess the defendant of firearms.

As to execution, England let most felons live. Between 1718 and 1769, for instance, about 15.5% of felons convicted in London's chief criminal court received the death penalty. Javier Bleichmar, *Deportation as Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law*, 14 Geo. Immigr. L.J. 115, 126 (1999) (citing A. Roger Ekirch, *Bound For America: The Transportation Of British Convicts To The Colonies* 1718-1775, at 21 (1987)). Execution was even less common in the early United States. *Id.* at 20. In addition, execution's main purpose was not to relieve offenders of their guns. It was instead a separate punishment without consideration of an offender's right to own weapons.

Forfeiture as punishment was ordinarily only retroactive, removing those guns the ex-felon already owned. Even in England, "it did not follow that one could not thereafter purchase and hold new personal property—including a gun." Marshall, *supra*, at 714. And more importantly, the Framers tended to "condemn forfeiture of property, a[t] least in cases of felony, as being an unnecessary and hard punishment of the felon's posterity." 2 James Kent, *Commentaries on American Law* 386 (O.W. Holmes, Jr., ed., 12th ed., Little, Brown, & Co. 1873) (1826).

The inability to hold firearms in death or as part of temporary forfeiture do not, in short indicate a historical tradition of prospectively criminalizing firearm ownership by ex-felons.

### (2)   No Founding Era or Constitutional-Period Tradition Supports the Blanket Prohibition contained in § 922(g)(1).

#### (a)   Founding Era Statutes and Regulations Suggest (At Most) Concern About National Allegiance, Not Criminal History.

Likewise, "there is little evidence of an early American practice" barring all people convicted of a felony from possessing a firearm. *Bruen*, 142 S. Ct. at 2142. That is unsurprising; the new Nation had a more permissive approach to firearm regulation than England. *See, e.g.*, Rawle, *supra*, at 126. And as discussed above, even England lacked such bars.

Perhaps most significantly, no Founding Era statutes or interpretations of the common law barred all ex-felons from possessing firearms. *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting); *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010); *Binderup v. Att'y Gen. of the U.S.*, 836 F.3d 336, 368 (3d Cir. 2016) (en banc) (Hardiman, J., concurring). That there are no such laws is fatal under *Bruen*.

There were, to be sure, a handful of other dispossession efforts—but none that justify the categorical bar imposed by § 922(g)(1). Such restrictions were ordinarily both targeted and regulatory, rather than blanket and criminal. For example, like England, the colonial Virginia government disarmed Catholics (still viewed as traitors to the Crown) who would not "swear an oath abjuring the ecclesiastical authority of the Pope." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007) (citation omitted). But even in disarming Catholics, there were exceptions for firearm possession for self-defense; a justice of the peace could authorize possession "for the defense of his house and person." *Id.* Similarly, following the Declaration of Independence, Pennsylvania ordered that those who did not pledge allegiance to the Commonwealth and renounce British authority be disarmed. *Id.* at 159. But even such dispossession was directed at national allegiance (rather than criminal past) and regulatory (rather than criminal). *Id.*

15

Moreover, even these targeted dispossessions were generally temporary. For example, leaders of the early Massachusetts Bay Colony once briefly disarmed supporters of a banished seditionist. Greenlee, *supra*, at 263 (citations omitted). But those individuals could get their guns returned, at least on some conditions; "[s]ome supporters who confessed their sins were welcomed back into the community and able to retain their arms." *Id.* And in 1787, the participants in Shay's Rebellion—who had attacked courthouses, a federal arsenal, and the Massachusetts militia—were barred from bearing arms for only three years. *Id.* at 268–67. In the meantime, the Commonwealth of Massachusetts acted as the bailee of the rebels' arms, tasked by law with returning the weapons to the rebels after that period. Sec'y of the Commonwealth, *Acts and Resolves of Massachusetts 1786–87*, at 178 (1893).

The historical tradition at the Framing, in other words, did not routinely dispossess ex-felons of their firearms, never mind permanently. "The Founding generation had no laws limiting gun possession by . . . people convicted of crimes." Winkler, *supra*, at 1563 n.67. Indeed, if anything, the tradition was to return seized firearms to defendants after their debt to society had been paid. That tradition conflicts with a permanent, class-based, criminal law like § 922(g)(1).

    **(b)**  **Proposals From State Ratification Conventions Are Historically Dubious and Do Not Address Banning Firearms Based on Criminal History.**

Nor is there a historical tradition derived from state ratification conventions during the constitutional period. There were some proposals to limit firearm possession, but none made it into the final text of the Constitution. And most were rejected in *Bruen*-significant ways.

Academics and jurists agree that if one seeks even debatable "authority before World War I for disabling felons from keeping firearms, . . . one is reduced to three proposals emerging from the ratification of the Constitution." *Kanter*, 919 F.3d at 454 (Barrett, J. dissenting) (quoting Marshall, *supra*, at 712). As the states' conventions debated ratification, several

proposed that the Nation's charter guarantee the right to bear Arms. *Id.*; Greenlee, *supra*, at 265–66; 1 Jonathan Elliott, *The Debates in the Several State Conventions of the Federal Constitution* 328, 335 (2d ed. 1836). Three proposals guaranteeing the right to bear Arms included an arguable limitation on that right:

- First, New Hampshire's convention proposed that citizens not be disarmed "unless such as are or have been in actual rebellion." 1 Elliot, *supra*, at 326.

- Second, Samuel Adams argued at Massachusetts' convention that "the people of the United States, who are peaceable citizens," should not be deprived of their arms. *Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971)).

- And, third, a minority of Pennsylvania delegates—all Antifederalists who opposed ratification[7]—suggested that persons should not be disarmed "unless for crimes committed, or real danger of public injury from individuals." *Id.* at 455 (quoting Schwartz, *supra*, at 662, 665).

Of these, "only New Hampshire's proposal—the least restrictive of the three—even carried a majority of its convention." *Id.*

These proposals, if relevant at all, do not demonstrate a historical tradition of regulation akin to § 922(g)(1). *See, e.g.*, *Kanter*, 919 F.3d at 454 (Barrett, J. dissenting); *United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (en banc) (Sykes, J., dissenting); Marshall, *supra*, at 713; Greenlee, *supra*, at 267; Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1375 (2009).

To begin, these proposals are weak evidence under *Bruen* and *Heller*—and, indeed, under basic statutory interpretation principles. None made it into the language of the Constitution itself. And as *Heller* warns, "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." *Heller*, 554 U.S. at

---

[7] As *Heller* noted, it is "highly problematic" to assume that "the best or most representative reading of" the Second Amendment "would conform to the understanding and concerns of the Antifederalists." 554 U.S. at 590 n.12.

590. That is particularly so for this Amendment; as *Heller* notes, the "various proposals in the state conventions and the debates in Congress" are a "dubious" source for Second Amendment interpretation. *Id.* at 604. That is because the Second Amendment was "widely understood to codify a pre-existing right, rather than to fashion a new one." *Id.*  And so proposals that conflict with existing practices and with the final enacted-text—like the three rejected proposals here—are poor indicators of what that text means.[8]

Perhaps worse still, the three proposals reflect minority (and sometimes minority-of-minority) viewpoints that differ from both other states and from themselves. The other states either accepted the Second Amendment as-drafted or proposed yet broader firearm rights. The conventions in Rhode Island and New York, for instance, proposed an unqualified version of the Second Amendment right without any militia language: "[t]hat the people have a right to keep and bear arms[.]" 1 Elliott, *supra*, at 328, 335. Nor did the four state constitutions—including those of Pennsylvania and Massachusetts—that adopted a parallel right to arms before the Second Amendment contain any textual limitation on that right. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006). Thus, while three proto-Second-Amendment proposals (two of which failed at their own conventions) may have limited who had the right to bear arms, two state conventions and at least four state constitutions went expressly broader than the Second Amendment.

Even if the three proposed limitations somehow inform the actual Second Amendment's meaning, they do not legitimize § 922(g)(1). The proposals would have limited those who

---

[8] Indeed, these three proposals contradict early American practice. For example, New Hampshire's "actual rebellion" limitation, *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting), is in tension with Massachusetts' promise to store and return the firearms of the instigators of Shay's Rebellion. And the Pennsylvania minority's proposal to limit arms to the peaceable conflicts with early American surety laws that permitted the people "reasonably likely to 'breach the peace'" to still carry guns if they could (1) "prove a special need for self-defense" or (2) "post a bond before publicly carrying a firearm." *Bruen*, 142 S. Ct. at 2148.

18

engaged in rebellion or violence against the state from possessing arms.[9] Such limitations concern national allegiance, not criminal history. *See* Marshall, *supra*, at 713 (concluding that "these three formulations do not support a lifetime ban on any 'felon' possessing any arms"); Greenlee, *supra*, at 267 (same); Larson, *supra*, at 1375 (same); *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (same); *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting) (same); *Skoien*, 614 F.3d at 648 (Sykes, J., dissenting) (same). And so, even if they reflected the original public meaning of the Second Amendment proper (as discussed, they do not), they would not justify a ban on gun ownership by ex-felons.

The ratification conventions, in short, suggest near-uniform support for a broad Second Amendment right. What little contrary evidence exists (three failed proposals) is of no evidentiary value specifically for the criminal felon dispossession law here. The Framing does not offer a tradition to support § 922(g)(1).

### (3)   Depriving Felons of Their Right to Bear Arms Does Not Comport With 19th-Century History.

American 19th century history—both before and after the Civil War—also confirms that § 922(g)(1) does not reflect the "Nation's historical tradition of firearm regulation."[10] *Bruen*, 142 S. Ct. at 2135. During the 19th century, the United States regulated—but did not ban—firearm possession by those feared to be violent. *Id.* at 2148. The regulations that did exist were primarily temporary and targeted, as was true in earlier historical periods as well. *Id.*

---

[9] Given Founding Era practice, the Pennsylvanian Antifederalists' proposal is best read to not be a blanket prohibition on allowing convicted criminals to bear arms. *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (noting that "no one even today reads this provision to support the disarmament of literally all criminals, even nonviolent misdemeanants").

[10] *Bruen* separately discusses pre- and post-Civil War 19th-century American history. *See* 142 S. Ct. at 2145–54. Because much of the relevant history is thematically similar during those periods, Mr. Steinman combines those discussions here in the interest of brevity.

(identifying that 19th-century surety laws allowed people likely to breach the peace to still keep guns for self-defense or if they posted a bond).

As discussed above, targeted, regulatory restrictions are not similar to § 922(g)(1), which imposes a permanent, broad, class-based criminal ban. There is no evidence of a precursor to such an approach. To the contrary, the relevant 19th century history contains at least two instances in which attempts to disarm a class of offenders were rejected as inconsistent with the right to bear arms.

First, as with Shay's Rebellion, post-Civil-War Congresses declined to categorically disarm southern militia members who fought against the Union. *See Whether the Second Amendment Secures an Individual Right*, 28 Op. O.L.C. 126, 226 (2004). The reason: many in Congress feared that doing so "would violate the Second Amendment." *Id.*; *see Bruen*, 142 S. Ct. at 2131 ("[I]f some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality."). Congress' decision to protect the Second Amendment came at the same time it overrode a presidential veto to pass a statute that divested former southerners of voting rights. First Supplementary Reconstruction Act of 1867, ch. 30, 15 Stat. 14 (1867).

Second, what few class-based dispossession laws appeared at the state level were commonly rejected as unconstitutional. The Texas legislature had once, for instance, directed that people convicted of unlawfully using a pistol be disarmed and fined. *Jennings v. State*, 5 Tex. Ct. App. 298, 298 (Tex. 1878). But the Texas Court of Appeals—then the state's highest criminal court—promptly held that statute unconstitutional in *Jennings v. State*:

> The Legislature has the power by law to regulate the wearing of arms, with a view to prevent crime, but it has not the power to enact a law the violation of which will work a forfeiture of defendant's arms. While it has the power to regulate the wearing of arms, it has not the power by legislation to take a citizen's arms away from him. One of his most sacred rights is that of having

20

arms for his own defence and that of the State. This right is one of the surest safeguards of liberty and self-preservation.

*Id.* at 300–01. While *Jennings* interpreted Texas's state constitution, not the federal Second Amendment, the Texas constitution is more restrictive of gun rights than the federal constitution. *Compare* Tex. Const. art. 1, § 23 (giving the legislature "power, by law, to regulate the wearing of arms, with a view to prevent crime"), *with* U.S. Const. amend. II (not giving that power); *see also Bruen*, 142 S. Ct. at 2153 (identifying that 1870s Texas had unusually strict firearms regulations). That *Jennings* would hold a class-based ban unconstitutional, then, reveals that the 19th-century view of the firearms right foreclosed categorical dispossession of the sort imposed by § 922(g)(1).

Mass disarmament for people convicted of an offense finds no support in the 19th-century. Section 922(g)(1) finds no *Bruen*-sufficient tradition in that period, either.

> **(4)    Although 20th-Century History Is Irrelevant to the Second Amendment's Scope, That History Confirms § 922(g)(1) Is Incompatible with The Nation's History and Tradition of Firearm Regulation.**

Section 922(g)(1) also cannot be justified by 20th century history. Such history is not only irrelevant under *Bruen*, if considered it does not support § 922(g)(1). The scope of the statute's prohibition started with its own enactment in 1968. That is not enough to establish a tradition for the regulation.

Because laws disarming anyone convicted of a felony did not appear until the 1900s, they cannot show this Nation's history and tradition of firearm regulation. As *Bruen* explains, "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 n.28. So this Court need not even review 20th-century evidence; it can (and should) rely solely on the historical periods identified in *Bruen*. *Id.* at 2135–36.

21

But even if considered, § 922(g)(1)'s 20th-century pedigree is short-lived. The statute itself was only enacted in its modern form in 1968—177 years after the Second Amendment was ratified (and 100 years after the Fourteenth Amendment was). *See* Marshall, *supra*, at 698–99. And its predecessor statute, first enacted in 1938, is different in a handful of significant ways. *See* Federal Firearms Act (FFA), ch. 850, § 2(e), 52 Stat. 1250, 1251 (1938). The 1938 statute criminalized only receiving a firearm in interstate commerce by those convicted of a "crime of violence," which meant "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking," or various forms of aggravated assault. *Id.* §§ 1(6), (2)(e), 52 Stat. at 1250–51. 1968 was the first time that Congress sought to criminalize possessing any firearm that had ever traveled in interstate commerce by those convicted of *any* felony. Marshall, *supra*, at 698–99. One fifty-five-year-old statute is not enough to establish a tradition.

### c.    The Execution of Felons and the "Virtuous Citizen" Theory Does not support § 922(g)(1).

There are no other traditions that would justify § 922(g)(1). The government may argue that two other American practices—(1) execution of felons and (2) a desire for a virtuous citizenry—show that § 922(g)(1) is historically grounded. But those arguments lack historical support and are incompatible with modern constitutional doctrine. *Kanter*, 919 F.3d at 453–64 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 912, 916–21 (Bibas, J., dissenting).

For one, that some ex-felons were once stripped of all rights through execution is irrelevant to determining a regulation's constitutionality. "[W]e wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding." *Kanter*, 919 F.3d at 461–62 (Barrett, J., dissenting). Were it otherwise, ex-felons would have no constitutional rights at all. And yet they do. *E.g.*, *Lara*, 815 F.3d at 609; *Entler*, 872 F.3d at 1039.

But even if execution could theoretically be a meaningful "tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, the historical facts disprove its use as a tool of categorical

22

dispossession. By the Founding Era, execution was not the dominant form of punishment even in England, *see supra*, n.6, and it was even less common in the United States, *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting). As James Wilson, a leading Framer sometimes called the "craftsman of the Constitution,"[11] told a Virginia grand jury in 1791, "how few are the capital crimes, known to the laws of the United States, compared with those known to the laws of England!" John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment* 52 (2012) (citation omitted); *see Heller*, 554 U.S. at 607 (identifying that American history governs over British if the two conflict); *Bruen*, 142 S. Ct. at 2138–39 (same). The new Nation was also comparatively restrained when it came to forfeiture. 2 James Kent, *Commentaries on American Law* 386 (O.W. Holmes, Jr., ed., 12th ed., Little, Brown, & Co. 1873) (1826). Neither England nor (especially) the United States applied either punishment automatically to those convicted of felonies. Section 922(g)(1)'s automatic bar thus finds no support in these traditions.

As for virtue, there is no primary source evidence conditioning the right to possess firearms with a person's virtuousness. While historians have cited one another to support the "virtue" theory, they have identified no supporting Founding Era materials beyond the three proposals from state conventions discussed above. *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 916 (Bibas, J., dissenting) (describing academic work about a virtuousness limitation as a "matryoshka doll"). And as discussed, those proposals failed, most even at their own state conventions.

Even on its own terms, the "virtue" theory does not justify categorical ex-felon dispossession. To the extent the history suggests that early modern America stripped the unvirtuous of certain rights, that rule applied only to civic rights (such as jury service or voting),

---

[11] Nicholas Mosvick, *Forgotten Founders: James Wilson, Craftsman of the Constitution*, Nat'l Const. Ctr. (July 13, 2020), *available at* https://constitutioncenter.org/blog/forgotten-founders-james-wilson-craftsman-of-the-constitution.

23

not individual rights (such as the freedom of speech). *Kanter*, 919 F.3d at 462–63 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 916 (Bibas, J., dissenting). As several Third Circuit judges have identified:

> [T]his virtuous-citizens-only conception of the right to keep and bear arms is closely associated with pre-*Heller* interpretations of the Second Amendment by [scholars] . . . who rejected the view that the Amendment confers an individual right and instead characterized the right as a "civic right . . . exercised by citizens, not individuals . . . who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia."

*Binderup*, 836 F.3d at 371 (Hardiman, J., concurring) (citation omitted). And so, by rejecting the civic-right view of the Second Amendment, *Heller* forecloses such a virtue-limitation. *See, e.g.*, *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting). Per *Heller*, the right to keep and bear arms is "an individual right," 554 U.S. at 595, so it cannot be limited on virtuousness grounds, *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting). So-called "virtue" theory is thus inconsistent with the Second Amendment in both history and doctrine.

*     *     *

For a firearm regulation to pass constitutional muster, the Second Amendment requires historical grounding. There is none for § 922(g)(1). The statute's permanent criminalization of possessing firearms and ammunition for an entire class of individuals—those with previous felony convictions—is a 20th-century creation. That is not enough under *Bruen*. The statute is therefore unconstitutional.

Count One, which seeks to use that statute to punish Mr. Steinman for possessing items core to the exercise of his Second Amendment right, should therefore be dismissed.

/ / /

/ / /

/ / /

## IV.   CONCLUSION

Mr. Steinman respectfully requests the Court dismiss Count One.

DATED this 7th day of April, 2023.

RENE L. VALLADARES
Federal Public Defender

By:  */s/ Kate Berry*

KATE BERRY
Assistant Federal Public Defender
SEAN A. MCCLELLAND
Assistant Federal Public Defender

1

## <u>CERTIFICATE OF ELECTRONIC SERVICE</u>

2

The undersigned hereby certifies that she is an employee of the Federal Public Defender

3

for the District of Nevada and is a person of such age and discretion as to be competent to serve

4

papers.

5

That on April 7, 2023, she served an electronic copy of the above and foregoing Motion

6

to Suppress by electronic service (ECF) to the person named below:

7

8

JASON FRIERSON
United States Attorney

9

ANDREW KEENAN
Assistant United States Attorney

10

400 South Virginia Street, Suite 900
Reno, NV 89501

11

12

13

*/s/ Christine Kuhl*

Employee of the Federal Public Defender

14

15

16

17

18

19

20

21

22

23

24

25

26