RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
KATE BERRY
Assistant Federal Public Defender
Nevada State Bar No. 14346
SEAN A. MCCLELLAND
Assistant Federal Public Defender
District of Columbia Bar No. 90001362
200 South Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451
Kate_Berry@fd.org
Sean_McClelland@fd.org

Attorneys for Triston Harris Steinman

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:22-CR-00068-ART-CLB |
| Plaintiff, | **MOTION TO SUPPRESS**[1] |
| v. | **[Evidentiary Hearing Requested]** |
| TRISTON HARRIS STEINMAN, | |
| Defendant. | |

## I.    INTRODUCTION

Triston Harris Steinman was pulled over for allegedly speeding. Within minutes, Mr. Steinman had admitted he was driving too fast and provided the trooper with all documentation necessary to issuing a speeding citation. But the trooper delayed issuing Mr. Steinman a citation to check—and then recheck—whether various felony charges on Mr. Steinman's record had resulted in convictions. The apparent purpose: to investigate whether Mr. Steinman was illegally in possession of an ammunition box. The stop and follow-on steps violated Mr. Steinman's constitutional rights for at least three reasons:

---

[1] This motion is timely filed. ECF No. 32.

*First*, even assuming the stop was initially justified, the investigation into Mr. Steinman's criminal history unlawfully prolonged his detention. The lengthy investigation was unrelated to the stop's mission, it added time, and it was unsupported by any independent reasonable suspicion. The duration of his detention therefore violated Mr. Steinman's Fourth Amendment rights.

*Second*, officers' warrantless seizure of Mr. Steinman's car lacked probable cause. Under Nevada law, Mr. Steinman could legally possess the ammunition box officers purportedly saw. And Mr. Steinman's other alleged conduct was not suspicious, let alone enough to establish probable cause. The warrantless vehicle seizure therefore violated the Fourth Amendment.

*Third*, the search warrant application officers submitted failed to establish probable cause, especially when excised of the unlawfully obtained information from the prolonged stop. And the warrant itself was insufficiently particular and overbroad. The search performed under the warrant is therefore constitutionally infirm.

Each one of these constitutional violations gives the Court an independent basis to suppress the evidence in this case. An evidentiary hearing is requested to perfect these claims.

## II.    BACKGROUND [2]

### A.    Factual Background

Mr. Steinman's traffic stop for speeding lasted over an hour and a half. It started at 3:51 p.m. on August 12, 2022, when Trooper William Boyer of the Nevada Highway Patrol pulled Mr. Steinman over near Wells, Nevada. *See* Exhibit G, Trooper Boyer Bodycam, USAO 524 at

---

[2] The background facts discussed below are drawn from the discovery the government has thus far provided and are presented only for purposes of this motion. Mr. Steinman reserves the right to challenge and supplement these alleged facts with his own investigation and with any information that may be discovered at any evidentiary hearing held in connection with this motion.

00:30–1:46. As Trooper Boyer exited his SUV and approached Mr. Steinman's car from behind, Mr. Steinman remained seated in the driver seat. Exhibit F, Trooper Boyer Dashcam, USAO 520 at 1:01–37. Mr. Steinman turned backwards a couple of times, apparently to look at Trooper Boyer approaching. *Id.* After Trooper Boyer arrived at Mr. Steinman's car, Mr. Steinman provided Trooper Boyer with his driver's license. *See* Exhibit A, Trooper Boyer Report, USAO 1–15 at 10.

Trooper Boyer stated that he pulled Mr. Steinman over for driving too fast: "the reason I stopped you is that you were going 89 in a 70." Exhibit G, USAO 524 at 1:42–46. Mr. Steinman agreed that he had been driving fast, albeit somewhat less quickly than Trooper Boyer had represented. *Id.* at 1:46–49. Trooper Boyer asked Mr. Steinman for the car's registration, which Mr. Steinman provided. *Id.* at 1:53–2:08; *see* Exhibit A at USAO 10.[3] Mr. Steinman also noted that he had more registration documents from Utah at home. Exhibit G, USAO 524 at 2:24–35. Mr. Steinman further offered to provide Trooper Boyer with proof of insurance. *Id.* at 2:35–43. In the process, Mr. Steinman explained that he was moving back to St. George, Utah to be closer to his girlfriend and children after spending the previous six months working in Washington State. *Id.* at 1:56–2:08, 9:31–37, 22:06–29.

Trooper Boyer observed a blanket in Mr. Steinman's back seat and asked what was underneath. *Id.* at 2:09–14. Mr. Steinman explained that it was his personal property. *Id.* at 2:15–24. Trooper Boyer also saw an ammunition box on the passenger-side floor of the car. Exhibit A at USAO 10. Trooper Boyer asked whether Mr. Steinman had guns, which Mr. Steinman said he did not, or ammunition, which Mr. Steinman said he did. Exhibit G, USAO 524 at 2:44–48; *see also id.* at 2:49–52 (same question about guns again).

---

[3] The paper form of the registration document Mr. Steinman provided was apparently expired. Exhibit A at USAO 10. But Trooper Boyer confirmed that the vehicle was properly registered to Mr. Steinman. Exhibit G, USAO 524 at 1:00:18–22 ("The vehicle is registered under his name.").

Trooper Boyer returned to his SUV, where he responded to unrelated inquiries on his radio and cell phone. *E.g.*, Exhibit G, USAO 524 at 4:10–48 (talking to another officer about an "interdiction thing" Trooper Boyer wanted to be a part of). He also ran a driving-records check on Mr. Steinman's driver's license. *Id.* at 2:52–5:41; Exhibit A at USAO 10. That check showed that Mr. Steinman's license was "clear and valid." Exhibit A at USAO 10. Trooper Boyer did not run any criminal history check in connection with that driving records check. *See id.* at USAO 11.

Trooper Boyer returned to Mr. Steinman's car to get Mr. Steinman's insurance information, as well as to check the car's vehicle identification number. *Id.* at USAO 10; Exhibit G, USAO 524 at 5:39–5:59. Mr. Steinman told Trooper Boyer that Mr. Steinman's girlfriend would be sending Mr. Steinman a digital copy of his insurance information. Exhibit G, USAO 524 at 6:00–30. Mr. Steinman also asked if providing the insurance policy number was acceptable proof of insurance. *Id.* at 6:45–7:09. Trooper Boyer said that he could check Mr. Steinman's insurance status from some of the information Mr. Steinman had provided. *Id.*

Trooper Boyer then asked Mr. Steinman to get out of his car and sit in Trooper Boyer's SUV while Trooper Boyer checked Mr. Steinman's insurance information. *Id.* at 7:09–14. Mr. Steinman told Trooper Boyer that he would prefer not to; "That's fine. You can just run it. . . . I would rather just get my ticket and be on my way." *Id.* at 7:11–19. Trooper Boyer's ask then became a demand; "We do have the authority to ask you to step from the car. You do have to follow that order." *Id.* at 7:21–26.

Mr. Steinman complied. *Id.* at 7:40–8:05. He got out of his car and sat in the passenger seat of Trooper Boyer's SUV. *Id.* Within a minute of doing so, he provided digital confirmation of his insurance information to Trooper Boyer. *Id.* at 9:00.

At least two minutes and fifty seconds later (and around twelve minutes into the stop), Trooper Boyer "decided to request dispatch perform a records query of Steinman's criminal

background." Exhibit A at USAO 11; *see also* Exhibit G, USAO 524 at 11:54–12:02.[4] Trooper Boyer did not do so out of routine, but because he claimed he had "become more suspicious" of Mr. Steinman in light of Mr. Steinman's alleged "excessive sweating," "reluctan[ce] to look at [Trooper Boyer]," and "movement of the left carotid artery on his neck." Exhibit A at USAO 11. Trooper Boyer also noted later in his report that he felt suspicious of Mr. Steinman because of Mr. Steinman's "excessive movement" before initial contact, *id.*, the box of ammunition Trooper Boyer allegedly saw in Mr. Steinman's car, *id.*, the alleged strangeness that Mr. Steinman would live for six months in Washington "without his girlfriend and children present," *id.* at USAO 12, and purported suspiciousness in Mr. Steinman's responses to questions about those topics, *id.* at USAO 11–12.

About sixteen minutes into the stop, Trooper Boyer received the results of the requested criminal history check. Exhibit G, USAO 524 at 15:56–16:05; *see* Exhibit A at USAO 11. Trooper Boyer then spent at least two minutes and fifty-five seconds reviewing those results. Exhibit G, USAO 524 at 16:05–19:00.[5] The criminal history check indicated that Mr. Steinman had "felony entries." Exhibit A at USAO 11. Trooper Boyer sought to "verify" whether those entries had produced convictions. *Id.*

Trooper Boyer asked Mr. Steinman himself if he had any felony convictions. Approximately twenty-four-and-a-half minutes into the stop, Trooper Boyer asked Mr.

---

[4] Trooper Boyer's report indicates that he ordered the criminal history check even later—over five minutes after Mr. Steinman provided the insurance information. Specifically, Trooper Boyer writes that he ordered the check after telling Mr. Steinman that he could "adjust the air conditioning vents," Exhibit A at USAO 11, which he did approximately fourteen minutes into the stop, Exhibit G, USAO 524 at 13:58–14:14.

[5] It is not clear when exactly Trooper Boyer stopped reviewing the records; his bodycam footage generally obscures the computer screen in his police SUV. *E.g.*, Exhibit G, USAO 524 at 17:54. But Trooper Boyer's report suggests that he stopped checking the records to question Mr. Steinman about "the reason he was living in Washington," Exhibit A at USAO 11, which he did approximately nineteen minutes into the stop, Exhibit G, USAO 524 at 19:00–33.

Steinman whether he had "gotten in any trouble" or had any "felonies on [his] record." Exhibit G, USAO 524 at 24:36–25:10. Mr. Steinman acknowledged that he had gotten into trouble when he was younger, *id.* at 24:39–54, but stated that he did not know if there were any felonies on his record, *id.* at 24:56–25:10.

Two things then happened at around the same time. First, Sergeant Cruz Marin—Trooper Boyer's boss—arrived. *Id.* at 29:32–39; *see generally* Exhibit H, Sergeant Marin Bodycam, USAO 525. And, second, Trooper Boyer told Mr. Steinman that, because Mr. Steinman "ha[d] some felonies on [his] background" and had "ammunition in [his] vehicle," Trooper Boyer believed that there was probable cause to search Mr. Steinman's car. Exhibit G, USAO 524 at 29:40–49. Mr. Steinman denied his consent for that search. *Id.* at 30:24–30.

Trooper Boyer ordered Mr. Steinman out of the SUV and directed him to "stand by" as the officers prepared to tow and eventually search Mr. Steinman's car. *Id.* at 31:03–08. As Mr. Steinman waited by his car, Trooper Boyer acknowledged to Sergeant Marin that virtually all of Mr. Steinman's various answers thus far had been truthful: "He's basically hitting the nail on the head on just about everything." *Id.* at 32:49–33:15. There were two exceptions Trooper Boyer noted: that Mr. Steinman "wasn't fully truthful on the felony convictions" and that Mr. Steinman "[had] a girlfriend with two kids that live in Arizona [*sic*] with his dad . . . and they weren't living with him . . . that doesn't make any sense." *Id.*

Notwithstanding his statements to Sergeant Marin, however, Trooper Boyer was still unsure whether Mr. Steinman had any prior felony convictions. Per Trooper Boyer's report, he "requested dispatch verify the felony entries on Steinman's criminal history were actual convictions and not just charges." Exhibit A at USAO 12; *see also* Exhibit G, USAO 524 at 36:23–41:26; *see generally* Exhibit E, Dispatch Call Recordings, USAO 518. The results of the dispatch investigation revealed that many of the criminal-history-check entries were not for felony convictions. Some entries had not resulted in convictions. Exhibit E, USAO 518 at 1:37–

48. Some had been turned into misdemeanors. *Id.* at 00:40–45. Some could not be confirmed day-of. *Id.* at 9:03–24. And some were not even charges at all. *Id.* at 00:33–37.

Trooper Boyer nonetheless called a state court judge to ask for advice on whether he could receive a warrant to search the car.[6] Exhibit G, USAO 524 at 41:27–44:17. The apparent purpose of that call was to see how amenable the judge would be to issue a warrant: "I want to kind of run you through the indicators we're seeing, just to see if you're okay with it before I even go through the process." *Id.* at 41:43–50. Trooper Boyer conceded that it was "unknown" if the observed ammunition box combined with Mr. Steinman's apparent felonies gave officers "actual probable cause, *per se*" to search the car. *Id.* at 42:25–33. So Trooper Boyer thought it would be "cleaner" to seek a warrant. *Id.* at 42:33–37. Trooper Boyer ended the call suggesting he would apply for a warrant from the judge. *Id.* at 43:46–44:17.

At 4:38 p.m.—about forty-eight minutes into the stop—Trooper Boyer formally issued Mr. Steinman his speeding ticket. Exhibit G, USAO 524 at 48:14–43; *see also* Exhibit A at USAO 12. And then, at 5:24 p.m.—over an hour-and-a-half after the stop began—Mr. Steinman received his identification documents back from the officers, was told he was free to leave, and walked away on foot. *See* Exhibit H, USAO 525 at 1:03:10–1:04:40. The troopers seized Mr. Steinman's vehicle, taped it off, and towed it to a garage. *See* Exhibit G, USAO 524 at 50:17–51:30; Exhibit H, USAO 525 at 1:04:48; Exhibit A at USAO 13.

Trooper Boyer then applied for a warrant to search Mr. Steinman's car for everything from drugs to stolen property—even though Trooper Boyer had thus far only observed a box of ammunition in the vehicle. Exhibit C, Warrant Application, USAO 18–25 at 24 (warrant application seeking permission to search for "records or documents identifying

---

[6] The full recording of Trooper Boyer's phone call with the judge has not been provided to Mr. Steinman in discovery. Nor is the phone call referred to at all in Trooper Boyer's report. *See generally* Exhibit A, USAO 10–14. Accordingly, the following description comes from Trooper Boyer's bodycam footage, which relays only his side of the conversation.

ownership/control of vehicle, stolen property, controlled substances, paraphernalia, or illicit firearms"); *but see* Exhibit B, Declaration of Probable Cause, USAO 16–17 at 16 (suggesting that Trooper Boyer only thought he had probable cause to believe there were firearms in the vehicle: "Upon observing possible indicators of criminal activity and learning Steinman was an ex-felon prohibited from possessing firearms as indicated by felony convictions listed in his criminal history, I seized the vehicle and applied for a search warrant, later being approved by a Justice of the Peace of Wells Justice Court."). Trooper Boyer submitted the warrant application to the state court judge that he had called earlier. *See id.* at USAO 25.

That night, around four and a half hours after Mr. Steinman was first stopped, the state court judge issued the warrant to search Mr. Steinman's car. Exhibit C at USAO 18–25; *see* Exhibit A at USAO 13. Officers found ammunition, firearms, and marijuana inside. *See* Exhibit A at USAO 13–14. The next day, officers arrested Mr. Steinman in Wells. Exhibit D, Supplemental Report, USAO 26–31 at 29–30.

### B.     Procedural History

Mr. Steinman was originally charged in state court in connection with the stop. That case proceeded to a preliminary hearing before the matter went federal. *See* Exhibit I, Preliminary Hearing Transcript, *State v. Steinman*, No. EL-JC-CR-F-22-5268 (Nev. Just. Ct. Elko Twp. Sept. 14, 2022).

In October 2022, Mr. Steinman was charged by complaint in this Court with the sole count of felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count One). ECF No. 1. He had his initial appearance in November 2022 and was released pursuant to a personal recognizance bond under the supervision of pretrial services. ECF Nos. 3, 11. Mr. Steinman remains on pretrial release and is living in Utah with his family.

In December 2022, Mr. Steinman was charged by indictment with the same offense charged in the complaint. ECF No. 14. In March 2023, the government filed a superseding indictment further charging Mr. Steinman of felon in possession of unregistered firearms

(silencers) in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 (Count Two). ECF No. 24. Calendar call is scheduled for May 30, 2023, and trial is scheduled for June 6, 2023. ECF No. 22.

## III.   ARGUMENT

Mr. Steinman moves to suppress evidence collected during and as a result of the unlawfully extended traffic stop, the warrantless seizure of his car, and the overbroad search warrant. The stop, the vehicle seizure, and the eventual search were all unconstitutional. Each of these constitutional violations independently warrant suppression.

### A.   The Stop Itself Was Defective.

#### 1.   The Government Bears the Burden of Establishing that Mr. Steinman Was Speeding.

"[W]arrantless searches and seizures are *per se* unreasonable" under the Fourth Amendment. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). When "a law enforcement officer signals a motorist to stop by use of siren or a red light, there has been a seizure which must be justified." *United States v. Robert L.*, 874 F.2d 701, 703 (9th Cir. 1989) (cleaned up). The vehicle and its occupants are seized from the moment the vehicle stops on the side of the road. *Arizona v. Johnson*, 555 U.S. 323, 332 (2009). Such restraint, once imposed, invokes constitutional safeguards. *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).

Discovery indicates that Mr. Steinman was pulled over for speeding. But the evidence thus far produced does not establish either the speed limit in the area Mr. Steinman was driving or the trooper's basis for concluding Mr. Steinman was driving over the speed limit. The government must establish at an evidentiary hearing that Mr. Steinman was speeding to justify the initial stop.

**2.     Trooper Boyer Unlawfully Extended the Stop by Checking—and then Rechecking—Mr. Steinman's Criminal Record.**

Even assuming the stop was initially justified, Trooper Boyer nonetheless unlawfully extended it. Specifically, Trooper Boyer delayed issuing a speeding citation to investigate Mr. Steinman's criminal history. Doing so unconstitutionally prolonged the stop.

Traffic stops are seizures subject to Fourth Amendment safeguards. *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *see also United States v. Evans*, 786 F.3d 779, 784 (9th Cir. 2015). In general, a traffic stop is reasonable if an officer has "probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. But an initially lawful stop can become unconstitutional "if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

Extending a traffic stop to investigate matters beyond the initial traffic violation is one way a stop can become unconstitutional. *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015). That is because, like other types of stops, the "tolerable duration" of a traffic stop is "determined by the seizure's 'mission.'" *Id.* at 354. And the "mission" of a traffic stop is simple: "address[ing] the traffic violation that warranted the stop, and attend[ing] to related safety concerns." *Id.* Once those matters are resolved, the justification for the stop "ends." *Id.* As such, a traffic stop based on a "police-observed traffic violation" will "become[] unlawful" when "prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id.* at 350–51 (internal citation and quotations omitted). Such an extension must be justified, if at all, by "independent reasonable suspicion justifying each prolongation." *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015).

Taken together, an investigation conducted during a traffic stop will therefore fail constitutional muster if it: (1) exceeds the stop's mission; (2) adds time to the stop; and (3) is not supported by independent reasonable suspicion. *See, e.g., United States v. Gorman*, 859

10

F.3d 706, 715 (9th Cir. 2017). The investigation here checks all three boxes. It was therefore an unconstitutional seizure.

### a.    The Investigation into Mr. Steinman's Record Went Beyond the Mission of the Stop.

Trooper Boyer's investigation into previous felony charges against Mr. Steinman exceeded the mission of the traffic stop. During a traffic stop for a minor traffic violation like Mr. Steinman's purported speeding here, an officer can conduct a limited range of "ordinary inquiries"—mostly related to traffic safety—"aimed at ensuring that vehicles on the road are operated safely and responsibly." *Evans*, 786 F.3d at 786 (internal citations and quotations omitted). Doing anything more than "ordinary inquiries," deviates from a traffic stop's mission. *Rodriguez*, 575 U.S. at 355. And non-routine investigations—including "[n]on-routine record checks"—are "paradigm examples" of "unrelated investigations that may not be performed if they prolong a roadside detention absent independent reasonable suspicion." *Gorman*, 859 F.3d at 715.

Trooper Boyer's decision to run a particularized check into Mr. Steinman's criminal history was a "[n]on-routine" investigation into other potential crimes that went well beyond the traffic stop's "mission." *Id.*; *Evans*, 786 F.3d at 787. Trooper Boyer ran a criminal history check after Mr. Steinman had provided all necessary records, Exhibit G, USAO 524 at 11:54–12:02, 16:05–19:00, and after he had verified that Mr. Steinman's records were in order. After running the criminal history check, Trooper Boyer then asked further questions of Mr. Steinman and asked a dispatch officer to run down details about the criminal history, *id.* at 24:36–25:10, 36:23–41:26.

Both steps deviated from the traffic stop's mission. Neither related to whether Mr. Steinman was speeding. By the time Trooper Boyer decided to run the criminal history check, Mr. Steinman had already provided his license, registration, and insurance information, the touchstones of road safety. *See id.* at 1:53–2:08, 2:52–5:41, 9:00; *see also* Exhibit A at USAO

11

10 (noting the records check came back "clear and valid"). With those materials in hand, the stop was effectively done. *Rodriguez*, 575 U.S. at 354 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."). Doing anything further went beyond the stop's mission.

While the Ninth Circuit has recently held that, to ensure officer safety, officers can sometimes perform routine criminal history checks during traffic stops, but that is not what occurred here. In *United States v. Hylton*, the Ninth Circuit reasoned that "because a criminal history check 'stems from the mission of the stop itself,' it is a 'negligibly burdensome precaution[]' necessary 'to complete [the stop] safely.'" 30 F.4th 842, 848 (9th Cir. 2022) (alterations in original) (quoting *Rodriguez*, 575 U.S. at 356); *see also United States v. Taylor*, 60 F.4th 1233, 1240–42 (9th Cir. 2023) (noting that *Hylton* permits some criminal history checks but ultimately concluding that, on the facts of that case, officers had reasonable suspicion to extend the stop to run the criminal history check).[7]

But *Hylton* is distinguishable here for a simple reason: Trooper Boyer did not just run a routine check on Mr. Steinman's criminal history. Instead, long after determining that Mr. Steinman had been speeding, Trooper Boyer ran a particularized and context-dependent criminal history check, doing so only because he had "become more suspicious" of Mr. Steinman. Exhibit A at USAO 11. And then Trooper Boyer made additional, particularized inquiries into entries that check produced.

None of that fits the *Hylton* mold. The criminal history check *Hylton* blessed was routine: it was run simultaneously with "a check on [the defendant's] license, registration, insurance, and open warrants." *Hylton*, 30 F.4th at 845. The check here was not. Trooper Boyer ran it after he had checked all of Mr. Steinman's other paperwork. *See* Exhibit A at USAO 11;

---

[7] While this Court is bound to apply *Hylton*, given its tension with *Evans*, *Gorman*, and (even more importantly) *Rodriguez*, *Hylton* should be read narrowly.

*compare* Exhibit G, USAO 524 at 9:00 (Mr. Steinman giving Trooper Boyer his insurance information, the last information needed to finalize the citation), *with id.* at 11:54–12:02 (Trooper Boyer apparently requesting the criminal history check). And officer safety could not have been at issue; Mr. Steinman was, at Trooper Boyer's insistence, sitting unrestrained in Trooper Boyer's car. Running the criminal history check was therefore a new, unrelated investigation that, as discussed below, prolonged the stop and was not supported by reasonable suspicion.

### b.      Trooper Boyer's Inquiries Prolonged the Stop.

Trooper Boyer's investigation into Mr. Steinman's criminal history extended the stop. The sole inquiry on this front is whether the extra investigation "add[ed] time"—any time—to the stop. *Rodriguez*, 575 U.S. at 356–57 (rejecting the notion that "*de minimis*" prolongations are acceptable). When that time is added is "immaterial"; a prolongation is constitutionally problematic even if the investigation "occurred before the officer issued a ticket." *Evans*, 786 F.3d at 786 (internal citations, quotation marks, and alterations omitted). All that matters is "the added time"—"not at what point, in the chronology of the stop, that time was added." *United States v. Landeros*, 913 F.3d 862, 866 (9th Cir. 2019). Anything beyond the time "reasonably required" to complete the initial stop is impermissible. *Evans*, 786 F.3d at 784 (quoting *Caballes*, 543 U.S. at 407).

Trooper Boyer's investigation added time. Trooper Boyer had everything he needed to complete the traffic stop at the very latest when Mr. Steinman gave him all documentation, approximately nine-minutes in. *See* Exhibit G, USAO 524 at 9:00. But rather than promptly complete the citation and give it to Mr. Steinman, Trooper Boyer waited nearly forty more minutes to do so. *See id.* at 48:14–43.

That is more than enough to constitute an extension under *Rodriguez*. *See Evans*, 786 F.3d at 786 (concluding that an eight-minute check was an unlawful extension); *United States v. McCowan*, 547 F. Supp. 3d 966, 975 (D. Nev. 2021) (same for 40 seconds of questioning),

13

1    *appeal dismissed*, No. 21-10204 (9th Cir. Jan. 14, 2022); *Clark*, 902 F.3d at 410 n.4 (same for

2    20 seconds of questioning). Trooper Boyer's nearly-forty-minute extension indisputably

3    prolonged Mr. Steinman's seizure.

> ### c.    Trooper Boyer Lacked Independent Reasonable Suspicion to Extend the Stop to Investigate Details of Mr. Steinman's Criminal History.

6    Finally, Trooper Boyer lacked independent reasonable suspicion to extend the stop.

7    "Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which,

8    when considered with objective and reasonable inferences, form a basis for particularized

9    suspicion.'" *Landeros*, 913 F.3d at 868 (quoting *United States v. Montero-Camargo*, 208 F.3d

10   1122, 1129 (9th Cir. 2000) (en banc)). Observations of ordinary lawful conduct, and

11   observations that would apply to "a very large category of presumably innocent travelers," are

12   insufficient. *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam).

13   Two considerations appeared the most significant to Trooper Boyer's reasonable

14   suspicion assessment: the box of ammunition he allegedly saw in Mr. Steinman's car and the

15   purported strangeness of Mr. Steinman living apart from his girlfriend. Exhibit A at USAO 11–

16   12; *see* Exhibit G, USAO 524 at 32:49–33:15.

17   First, the empty box of ammunition did not provide reasonable suspicion. Possessing

18   ammunition is presumptively lawful. *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967–68

19   (9th Cir. 2017) (identifying that possessing ammunition lies within the "core" of the Second

20   Amendment right). Having ammunition therefore does not establish reasonable suspicion of

21   criminal activity. *See United States v. Brown*, 925 F.3d 1150, 1154 (9th Cir. 2019) (concluding

22   that, because it is presumptively legal to carry a gun, gun possession alone did not give officers

23   reasonable suspicion to investigate that possession's legality).

24   Indeed, possessing ammunition is lawful under Nevada law even if a person has a felony

25   conviction. The relevant Nevada statute prohibits only firearm possession—not ammunition

26   possession. Nev. Rev. Stat. § 202.360(1) (prohibiting certain persons only from "possess[ing]

. . . any firearm"); *see also id.* § 202.253(3) (defining firearm as "any device designed to be sued as a weapon from which a projectile may be expelled through the barrel by the force of any explosion or other form of combustion").

Second, Mr. Steinman's living situation also did not establish reasonable suspicion. Plenty of people temporarily live and work away from their significant others and children. Indeed, that is why many travelers travel. *See generally Reid*, 448 U.S. at 441 (noting that observations that apply to "a very large category" of travelers cannot establish reasonable suspicion); *cf. United States v. Robinson*, No. 4:19-cr-00143-DCN, 2020 WL 912744, at *3 (D. Idaho Feb. 25, 2020) (concluding that travel plans to sightsee without seeking to visit anyone in particular is not objectively suspicious). Having family across the country is no reason to suspect criminality.

The purported indicia of "perceived nervousness" fare no better. Exhibit A at USAO 11. Each was an eminently reasonable response to being pulled over for speeding and ordered to sit in a patrol car. *See, e.g.*, *United States v. Bowman*, 884 F.3d 200, 214–16 (4th Cir. 2018) (rejecting arguments that nervous trembling, carotid pulsing, failure to make eye contact, and inability to sit still gave rise to reasonable suspicion to extend a stop); *Robinson*, 2020 WL 912744, at *3 ("[G]eneral signs of a nervous demeanor—such as a pulsing carotid artery—is common in encounters with law enforcement even when there has been no criminal activity." (citing *United States v. Chavez-Valenzuela*, 268 F.3d 719, 726 (9th Cir. 2001), *overruled on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005))). No surprise Mr. Steinman was "sweating": it was August in Wells, Nevada. Exhibit A at USAO 11; Fed. R. Evid. 201(b)(1), (2) (allowing judicial notice about "generally known" facts, as well as ones that "can be accurately and readily determined" from appropriate sources).[8] No surprise Mr. Steinman had

---

[8] Historical weather data indicates that it was approximately 90 degrees Fahrenheit in Northeastern Nevada at the time Mr. Steinman was stopped on the afternoon of August 12,

an "accelerated pulse" and was "reluctan[t]" to make "eye contact": being detained by police, and being forced to sit in a police car, is stressful. Exhibit A at USAO 11. And no surprise Mr. Steinman "request[ed] to receive his citation so he could leave": he had already acknowledged he was speeding and wanted to get on with his journey. *Id.* None of these points suggests criminal activity in any particularized way.

Finally, the remainder of Trooper Boyer's purported bases for reasonable suspicion are either belied by video footage, innocuous, or both. Trooper Boyer asserts, for instance, that Mr. Steinman made "excessive movement" at the stop's outset. *Id.* But dashcam video shows Mr. Steinman seated firmly in the driver seat, with minimal discernable movement (and what little there was appeared to be Mr. Steinman merely looking back at Trooper Boyer's SUV). Exhibit F, USAO 520 at 1:01–37. It was also not suspicious that Mr. Steinman had a blanket in the car's backseat, Exhibit A at USAO 11; Mr. Steinman was, after all, moving across the country, *see, e.g.*, *Vasquez v. Lewis*, 834 F.3d 1132, 1138–39 (10th Cir. 2016) (concluding that "blankets and a pillow obscuring items in the backseat" could not give rise to reasonable suspicion of contraband; denying officers qualified immunity for searching a car on those grounds). Likewise for Mr. Steinman's "perceived resistance" and "frustrations" about getting out of his car; all Mr. Steinman did was ask for his speeding ticket and inquire about the reason for ordering him into a police vehicle. Exhibit A at USAO 11; *see* Exhibit G, USAO 524 at 7:09–26. Trooper Boyer's alleged observations (even if accepted as true) do not establish reasonable suspicion.

---

2022. *See Elko, NV Weather History – Aug. 12, 2022*, Weather Underground, https://www.wunderground.com/history/daily/us/nv/wells/KEKO/date/2022-8-12; *see also, e.g.*, *Sacramento Homeless Union v. Cnty. of Sacramento*, No. 2:22-cv-01095-TLN-KJN, 2022 WL 3019735, at *15 (E.D. Cal. July 29, 2022) (noting that a court can take judicial notice of historical weather data).

Since each of these considerations fails to provide reasonable suspicion of criminal activity independently, they also fail to do so collectively. *United States v. Thomas*, 211 F.3d 1186, 1192 (9th Cir. 2000). Viewed in their totality, "they still add up to zero." *Id.*

\*\*\*

Trooper Boyer went beyond the stop's mission to investigate Mr. Steinman's criminal history. Doing so added time—nearly forty minutes—to the stop. Nothing about the facts confronting Trooper Boyer gave him reasonable suspicion to prolong the encounter in that (or any other) way. As such, Trooper Boyer's investigation into Mr. Steinman's prior felony charges was unconstitutional.

**B.     Law Enforcement's Warrantless Seizure of Mr. Steinman's Vehicle was Unsupported by Probable Cause.**

Troopers did not have reasonable suspicion to detain Mr. Steinman, let alone probable cause to seize his property. NHP seized Mr. Steinman's car without a warrant and without probable cause to believe there was evidence of a crime or contraband inside. The seizure of the car was therefore unconstitutional.

Preventing someone from using a car (such as by towing it away) is a seizure under the Fourth Amendment. *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005); *see United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986) (per curiam) (concluding that towing a vehicle to a police lot constituted a seizure). Doing so without a warrant is *per se* unreasonable. *Cervantes*, 703 F.3d at 1141. And the government bears the burden of proving the seizure nonetheless comports with the Fourth Amendment. *Id.*

As relevant here, a warrantless vehicle seizure requires probable cause to believe that the vehicle contains contraband or evidence of a crime—the same standard as a warrantless vehicle search. *Miranda*, 429 F.3d at 862; *Cervantes*, 703 F.3d at 1138–39, 1141; *cf. Chambers v. Maroney*, 399 U.S. 42, 50–51 (1970) (reasoning that seizing a vehicle while awaiting a warrant, like a warrantless vehicle search, requires probable cause); *United States v. Rodgers*,

656 F.3d 1023, 1028 (9th Cir. 2011) (quotation omitted). In reviewing whether circumstances gave rise to such a likelihood, a court is confined to those "objective facts" "known to the officer at the time." *Id.* at 1029.

Officers here seized Mr. Steinman's car purportedly because they thought it contained contraband firearms. *See* Exhibit B, Declaration of Probable Cause, USAO 16–17 at 16 ("Upon observing possible indicators of criminal activity and learning Steinman was an ex-felon prohibited from possessing firearms as indicated by felony convictions listed in his criminal history, I seized the vehicle and applied for a search warrant, later being approved by a Justice of the Peace of Wells Justice Court."). But officers lacked probable cause to believe Mr. Steinman had firearms. As discussed above, Trooper Boyer had only observed an ammunition box in the car. But that was something Mr. Steinman was allowed to possess under Nevada law. *See* Nev. Rev. Stat. § 202.360(1). Mr. Steinman's prompt acknowledgment that he had ammunition should have dissipated any further concern about his vehicle's contents. Exhibit G, USAO 524 at 2:44–48. And even if it did not, Trooper Boyer could have only suspected that Mr. Steinman had that ammunition in the car, not as-yet-unseen firearms. *See United States v. Nora*, 765 F.3d 1049, 1059–60 (9th Cir. 2014) (concluding that seeing a defendant enter his home carrying one gun did not give probable cause to believe there were other guns inside).

And, as discussed, nothing else about the stop could have given officers reasonable suspicion that Mr. Steinman was engaged in criminal conduct—let alone probable cause that the car itself contained contraband. There was nothing suspicious (never mind criminal) about Mr. Steinman's living situation, sweating, request for a ticket, carotid-movement, car blanket, or any of the other alleged observations by Trooper Boyer. *See generally Chavez-Valenzuela*, 268 F.3d at 726. All those observations would be normal for any traveler trekking through Wells, Nevada in the middle of August. There was therefore no objective probable cause to believe that there was any contraband in the vehicle, let alone what type of contraband was in

18

the vehicle. Troopers wanted to go on a fishing expedition based on a hunch. That does not satisfy the probable cause standard.

In fact, the officers admitted they did not have probable cause to search the car (and there can be no probable cause for a seizure where there is no probable cause for a search). At the state court preliminary hearing, Trooper Boyer expressly disavowed having probable cause for a search:

| [Defense counsel:] | At this time [when the citation was issued] do you have probable cause to search the vehicle? |
|---|---|
| [Trooper Boyer:] | No. |

Exhibit I, Preliminary Hearing Transcript at 46:22–24; *see generally id.* at 47:1–48:5 (in response to a legal-conclusion objection, multiple related questions with similar answers from Trooper Boyer denying he had probable cause). And his boss, Sergeant Marin, said essentially the same thing during the stop, too:

| Trooper Boyer: | My original frame of thought: would [Mr. Steinman's reference to the ammunition] not give me PC to search the vehicle? . . . . Having observed that there was an ammo box on the front floor? . . . . |
|---|---|
| Sergeant Marin: | I don't know if he is a convicted felon or not. Is he convicted? . . . . As soon as he says no, you're out. |

Exhibit G, USAO 524 at 1:10:01–25.

The lack-of-probable-cause issue even spurred officers to preemptively call the judge to see if he could resolve the question for them pre-application. Trooper Boyer's side of the conversation with the judge (a conversation he did not identify in his report, *see* Exhibit A at USAO 10–14) suggested that he had deep concerns on the subject. Per Trooper Boyer, it was "unknown" if officers had "actual probable cause, *per se*" to search the car. Exhibit G, USAO 524 at 42:25–33. And so officers wanted to "just to see if [the judge was] okay with it before I

19

even go through the process." *Id.* at 41:43–50. And they apparently did not think they had probable cause to arrest Mr. Steinman, either. He was, after all, allowed to leave the scene where his vehicle was seized.

The officers' apparent conclusion that they could not perform either a warrantless search or an arrest is telling. It was also correct. They lacked probable cause to believe Mr. Steinman had contraband of evidence of a crime in his car. Nothing the officers observed suggested he had anything illegal under the laws they were tasked with enforcing. That foreclosed them from seizing the car just as much as it stopped them from searching it roadside. *See Miranda*, 429 F.3d at 862; *Cervantes*, 703 F.3d at 1138–39, 1141; *cf. Chambers* 399 U.S. at 50–51. As a result, it was unconstitutional for them to seize and tow the car while they applied for a search warrant.

### C.   The Search Warrant Was Deficient.

The warrant authorizing the car search was also unlawful. The affidavit used to obtain the warrant was unsupported by probable cause, especially after excising the information unconstitutionally gathered during the traffic stop. It also misrepresented the order of the criminal history investigation. And the terms of the issued warrant lacked requisite specificity. The search warrant was therefore (at least) triply unconstitutional.

#### 1.   The Warrant Affidavit Failed to Establish Probable Cause and Contained Material Misrepresentations.

The affidavit law enforcement submitted in support of the vehicle search warrant suffers from two independent problems. First, it failed to establish probable cause, especially after removing the information from the unlawfully-prolonged traffic stop. And, second, it materially misrepresented the sequence of Trooper Boyer's investigation into Mr. Steinman's criminal history—a key step in the felon-in-possession investigation.

### a.   Especially After Excising the Evidence from the Unconstitutional Stop, the Warrant Affidavit Does Not Establish Probable Cause to Search the Car.

As to the first, the affidavit lacked probable cause to justify the far-reaching search of Mr. Steinman's car. That is especially so because it was infected by information unlawfully obtained during the prolonged stop. Particularly without that information, the warrant affidavit fails to establish probable cause for any aspect of the search. As a result, the warrant is constitutionally defective.

For a search warrant to properly issue, the affidavit submitted to receive it must be supported by "probable cause." U.S. Const. amend. IV. As in the warrantless search context, officers must identify a "fair probability" that "contraband or evidence is located in a particular place." *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007). To determine whether officers have done so, courts review the officers' supporting affidavit in light of "the totality of the circumstances," drawing "reasonable inferences" from the information officers provide. *Id.*

But not all statements in the supporting affidavit are properly considered. In particular, a search warrant affidavit cannot rely on illegally obtained evidence. *Nora*, 765 F.3d at 1058. If the supporting affidavit contains such information, a court must excise it in evaluating whether the affidavit provides probable cause for a search. *Id.* Only if the remaining evidence provided in the affidavit would be sufficient on its own, does the warrant pass constitutional scrutiny. *Id.* And this Court "make[s] that determination without the usual deference owed to the magistrate's initial finding of probable cause." *Id.* If, after taking away the "facts that are no longer on the table," the application fails to establish probable cause, it is constitutionally defective. *Kelley*, 482 F.3d at 1051.

The warrant application here fails to provide the requisite probable cause. For starters, most of the categories of purported contraband identified in the application are unsupported by any information—let alone information suggesting a fair probability of contraband—in the affidavit. By its terms, the warrant application (and subsequent warrant) sought to search for

items as far ranging as vehicle records, stolen property, and drugs. Exhibit C at USAO 24 ("records or documents identifying ownership/control of vehicle, stolen property, controlled substances, paraphernalia, or illicit firearms"). But the only facts in the accompanying affidavit concerning Mr. Steinman and his car were about ammunition. *Id.* at USAO 20–21 ¶¶ 10, 13; Exhibit I, Preliminary Hearing Transcript at 46:22–24, 47:1–48:5 (similarly acknowledging lack of probable cause). Nothing in the affidavit established probable cause for the categories of materials the warrant authorized a search for. That makes the warrant constitutionally suspect. *Kelley*, 482 F.3d at 1050.

The same is true of the firearm aspect of the warrant. For one, the affidavit suggested (at most) that there might be *ammunition* in the car, not *firearms*. *See* Exhibit C at USAO 20–21 ¶¶ 10, 13; *cf. Nora*, 765 F.3d at 1059–60. And there was a clear reason why the ammunition might be the end of the car's contents: ammunition possession is legal in Nevada regardless of prior felony convictions. Nev. Rev. Stat. § 202.360(1). Possessing ammunition therefore does not imply having a firearm, at least not for Nevada officers like Trooper Boyer.

Furthermore, the only information about ammunition comes from the unconstitutionally prolonged traffic stop, and should therefore be excised from the Court's consideration. As discussed above, the stop was unlawfully extended to investigate Mr. Steinman's criminal history. Any information derived from that unlawful prolongation was therefore "no longer on the table" for warrant-application purposes. *Kelley*, 482 F.3d at 1051. And that unlawfully-acquired information was the only conceivable basis for the requested "illicit firearms" search. *See* Exhibit C at USAO 21. It was only after that check that officers could have believed that any ammunition (and therefore any firearms, the actually searched-for items) in the car would be contraband. *Cf. Brown*, 925 F.3d at 1154. With, or without, that information, the affidavit lacked probable cause to believe ammunition—and, by extension, firearms—might be in the car.

As a consequence, the warrant affidavit was insufficient across the board. Because it was unsupported by probable cause, the search that followed was unconstitutional.

### b.   The Affidavit Materially Misrepresents the Criminal History Investigation.

The affidavit also materially misrepresents Trooper Boyer's investigation into Mr. Steinman's criminal history. It says Trooper Boyer knew Mr. Steinman had felony convictions before Trooper Boyer asked Mr. Steinman about them. But Trooper Boyer did not know that at the time. He only later confirmed those convictions. So he could not have understood Mr. Steinman's response as "deceptive." Mr. Steinman also did not state he did not have felony convictions, he simply stated he was not sure. And omitting the later investigation mistakenly suggests greater knowledge of the criminal history than Trooper Boyer had. Those are key links in the affidavit's causal reasoning. The affidavit is therefore defective.

A material misrepresentation in a warrant affidavit renders any follow-on search invalid. *Franks v. Delaware*, 438 U.S. 154 (1978). "Misrepresentations can be affirmative or based on omission." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 435 (9th Cir. 2010). Affirmative misrepresentations are material when there is no probable cause absent consideration of the misrepresented facts. *Id.* A misrepresentation based on an omission is material when the omitted facts "cast doubt on the existence of probable cause." *Id.* (cleaned up). With that lens, an affidavit can violate Franks "by reporting less than the total story, thereby . . . manipulating the inferences a magistrate will draw." *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir.), *amended*, 769 F.2d 1410 (9th Cir. 1985) (cleaned up).

To determine whether misrepresentations doom an affidavit, a court excludes any misrepresentations, adds in any information improperly omitted, and then evaluates whether the resulting set of information establishes probable cause. *Crowe*, 608 F.3d at 435. If the reconstructed affidavit is not enough to establish probable cause, "the search warrant must be

voided and the fruits of the search excluded to the same extent as if probable cause were lacking." *Franks*, 438 U.S. at 156; *United States v. Dozier*, 844 F.2d 701, 705 (9th Cir. 1988).

And if there is doubt as to the presence of material misrepresentations, the court can properly hear evidence on the subject. In particular, a defendant is entitled to a *Franks* hearing if he makes "a preliminary showing" that the warrant affidavit contained material misrepresentations or omissions. *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1110 (9th Cir. 2005), *amended on denial of reh'g*, 437 F.3d 854 (9th Cir. 2006). Doing so does not "require clear proof of deliberate or reckless omissions or misrepresentations," but only a "substantial showing that supports a finding of intent or recklessness." *Id.* at 111. This preliminary showing is less than a preponderance of the evidence, the standard that applies at the hearing to prevail on a *Franks* claim. *United States v. Hall*, 113 F.3d 157, 159 (9th Cir. 1997).

There are both affirmative and omission-based misrepresentations here. The affirmative ones are about the sequencing of the investigation. Per the affidavit, Trooper Boyer knew Mr. Steinman had felony convictions before Trooper Boyer asked Mr. Steinman about them: "[Trooper Boyer] requested a criminal history check . . . , which included felony convictions" and then "asked [Mr. Steinman] if he had any felony conviction." Exhibit C at USAO 21 ¶¶ 11–12. But Trooper Boyer had not attempted to "verify" those convictions with his dispatch officer until considerably later. Exhibit A at USAO 12; *see also* Exhibit G, USAO 524 at 36:23–41:26. And even then, the dispatch investigation was ambiguous. Most (if not all) of the entries either could not be confirmed or had not resulted in felony convictions. Exhibit E, USAO 518 at 00:33–37, 00:40–45, 1:37–48, 9:03–24.

The misrepresentation-by-omission problem is about the investigation that followed. The affidavit does not say that Trooper Boyer had to post-hoc verify the entries on Mr. Steinman's criminal history. *See* Exhibit C at USAO 21 ¶¶ 11–12. It was that investigation, not the initial criminal history check, that apparently revealed the "felony convictions." *Id.* ¶ 11.

Not referring to that investigation thus ignores key steps taken long into Mr. Steinman's detention.

Those misrepresentations are material. Representing that the convictions were confirmed earlier than they were mistakenly suggests that Mr. Steinman's response read as "deceptive" (and, in any case, Mr. Steinman's statements were not deceptive—he said he was not sure whether he had felony convictions). *Id.* ¶ 12. And omitting the subsequent criminal-history investigation mistakenly suggests that Trooper Boyer was certain of Mr. Steinman's conviction status all along. *Id.* Stripped of those erroneous representations, the only relevant allegation in the affidavit is the observed box of ammunition. *Id.* ¶ 10. And that is insufficient for reasonable suspicion, let alone probable cause. *Brown*, 925 F.3d at 1154; Nev. Rev. Stat. § 202.360(1).

Independent of the facial deficiencies in the affidavit, the warrant also fails in light of its various material misrepresentations.

### 2.      The Warrant Is Insufficiently Particular and Is Overbroad.

For related reasons, the search warrant that ultimately issued was also insufficiently particular and overbroad. Without reason to believe there would be evidence of contraband vehicle records, stolen property, drugs, or firearms, the warrant authorized a free-form investigation into all those things. It therefore acted like a general warrant to search for anything incriminating in the vehicle: a rummaging expedition.

The Fourth Amendment requires particularity in search warrants: "[n]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. To satisfy that requirement, a warrant must both "describe the place to be searched or things to be seized with sufficient particularity" and be no broader than the probable cause on which it is based." *United States v. Weber*, 923 F.2d 1338, 1342 (9th Cir. 1990) (quotation marks omitted).

The Fourth Amendment similarly forbids overbreadth. *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009). An overbroad warrant is effectively a general warrant, something "specially prohibited by the Fourth Amendment." *Andresen v. Maryland*, 427 U.S. 463, 492 (1976). A warrant is overbroad—and therefore unconstitutional—when it describes the places to be searched or the things to be seized in such vague terms that it invites "'exploratory rummaging in a person's belongings.'" *Id.* at 480 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). To avoid that problem, a warrant must therefore "leave the executing officers no discretion as to what items are to be seized." *United States v. Holzman*, 871 F.2d 1496, 1508 (9th Cir. 1989), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990); *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir. 1982) ("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." (internal quotation marks omitted)).

In the seizure context, courts look to three factors: (1) whether probable cause existed to seize all items of a category described in the warrant; (2) whether the warrant provided objective standards by which executing officers could differentiate items subject to seizure from those which were not; and (3) whether the government could have described the items more particularly. *See United States v. Spilotro*, 800 F.2d 959, 960 (9th Cir. 1986); *see also United States v. Kow*, 58 F.3d 423, 426 (9th Cir. 1995). The search warrant authorizing the un-cabined examination of Mr. Steinman's car fails under each factor.

First, and perhaps most significantly, there was no probable cause to believe that the categories of items-to-be-seized were actually contraband. In particular, the warrant authorized the search for and seizure of a host of items: "records or documents identifying ownership/control of vehicle, stolen property, controlled substances, paraphernalia, or illicit firearms." Exhibit C at USAO 24. But as discussed, the supporting affidavit was insufficient on each; it only meaningfully referenced ammunition, not any of the items in the warrant. *Id.* at USAO 20–21; *see also Nora*, 765 F.3d at 1059–60. That means the warrant was unsupported

by probable cause on any of the items-to-be-searched. That fails the requirement that probable cause support the seizure of "all items" in a warrant-identified category. *Spilotro*, 800 F.2d at 963.

Second, there was no objective basis to differentiate the items subject to seizure from other, benign objects in the car. The biggest culprit on this front is the authorization to search for and seize "stolen property." Exhibit C at USAO 24. Courts have long held that such language "places no inherent restriction on what the officer may lawfully seize." *United States v. Giresi*, 488 F. Supp. 445, 458 (D.N.J. 1980); *accord VonderAhe v. Howland*, 508 F.2d 364, 367–70 (9th Cir. 1974); *United States v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982); *cf. Junkert v. Massey*, 610 F.3d 364, 367, 371 (7th Cir. 2010) (expressing concern that a generic reference to "stolen property" might permit officers to "blithely rummage" through a defendant's possession; ultimately granting qualified immunity to officers on other grounds). It is easy to see why: because "the illicit nature of 'stolen property' is not usually apparent at first glance," such language impermissibly allows an officer to "seize all items of property that he thinks are stolen." *Giresi*, 488 F. Supp. at 458. The same problem affects the other warrant categories, too; the illicit nature of vehicle records, drugs, paraphernalia, and firearm-related items is not "apparent at first glance"; a defendant can, after all, lawfully possess all those things in the state of Nevada. *Id.* The blanket authorization to search for them therefore provided no objective basis for officer conduct.

And, finally, the government could have described the items-to-be-seized more particularly. That the government did not (and, on these facts, could not) be more specific reveals both the lack of specificity in the warrant and the lack of probable cause undergirding its issuance.

These problems are fatal. *Id.* at 967–68. The search warrant lacks requisite specificity. It was effectively a general warrant to look for anything that might be incriminating in Mr. Steinman's car. The search conducted under the warrant was therefore unconstitutional.

27

### D.     The Government Must Show the Use of Mr. Steinman's Statements Complied with *Miranda*.

Mr. Steinman's statements during the approximately hour-and-a-half traffic stop also warrant constitutional scrutiny. In particular, before conducting a custodial interrogation, officers must warn a suspect of certain Fifth and Fourteenth Amendment rights and obtain a valid waiver of those rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The government bears the burden of proving that any statements it intends to use at trial comply with these requirements. *United States v. Crews*, 502 F.3d 1130, 1139-40 (9th Cir. 2007). As such, absent a valid waiver, *Miranda* and its progeny bar the use of statements made (1) in connection with an interrogation (2) while the defendant is in custody. *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). Interrogation means questioning or "its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). And a person is in custody when under formal arrest or comparable restraint on freedom of movement. *Stansbury v. California*, 511 U.S. 318, 322 (1994).

Mr. Steinman endured the sort of questioning that qualifies as an interrogation for *Miranda* purposes: Trooper Boyer's questions were expressly designed to ferret out potential criminal conduct. *See Innis*, 446 U.S. at 301. As a result, the only question is whether Mr. Steinman was in custody when he was being asked those questions. And there is reason to believe he was. Notably, he was ordered out of his car and forced to sit in Trooper Boyer's SUV. Exhibit G, USAO 524 at 7:09–14. And he was kept there for nearly half an hour, *see id.* at 31:03–08; and then directed to "stand by" on the side of the road for another hour more, *id.*; *see* Exhibit H, USAO 525 at 1:03:10–1:04:40. All the while, he was watched by officers. *See* Exhibit G, USAO 524 at 36:23–41:26. If the government intends to use any of Mr. Steinman's statements obtained during the stop, then, it bears the burden of proving their use satisfies *Miranda*.

1

**E.      The Fruits of These Constitutional Violations Warrant Suppression.**

2      The Court should suppress all fruits of these constitutional violations. In particular, the

3  government cannot show either a lawful continued seizure of Mr. Steinman himself (which

4  yielded information used to seize and then search his vehicle, *see* Exhibit C at USAO 18–23) a

5  lawful seizure of his car, or a lawful search. And so all evidence collected—including both the

6  items returned from search warrant and any statements made by Mr. Steinman during the

7  seizure and search—warrant suppression.

8      To protect a defendant's rights against unreasonable seizures, evidence seized as a result

9  of a Fourth Amendment violation may not constitute proof against the defendant. *Wong Sun v.*

10  *United States*, 371 U.S. 471, 484–85 (1963). That exclusionary rule "prohibits the introduction

11  of tangible materials seized during an unlawful search, and of testimony concerning knowledge

12  acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536 (1988)

13  (internal citations omitted). "Beyond that, the exclusionary rule also prohibits the introduction

14  of derivative evidence both tangible and testimonial that is the product of the primary evidence,

15  or that is otherwise acquired as an indirect result of the unlawful seizure." *Id.* at 536–37. And

16  the rule has a related prophylactic role, as well: by refusing to admit evidence obtained through

17  unlawful police conduct, "the courts hope to instill in those particular investigating officers, or

18  in their future counterparts, a greater degree of care toward the rights of an accused." *Michigan*

19  *v. Tucker*, 417 U.S. 322, 447 (1974). As a result, the government has the burden to show that

20  the evidence is not "the fruit of the poisonous tree." *United States v. Johns,* 891 F.2d 243, 245

21  (9th Cir.1989) (quotations omitted).

22      Here, officers would not have concluded that Mr. Steinman possessed contraband, and

23  would not have towed, received a warrant to search, or discovered the contents of his car but

24  for unconstitutionally extending the stop to investigate the particulars of Mr. Steinman's

25  criminal history. Nor would they have been able to search the vehicle had Mr. Steinman not

26  been unlawfully dispossessed of it during the stop. Taking all those steps therefore produced

"knowledge acquired during an unlawful [seizure]," or "derivative evidence . . . acquired as an indirect result." *Murray*, 487 U.S. at 536–37. Thus, the Court should suppress all evidence collected as a result of these Fourth Amendment violations.

## IV.   CONCLUSION

Mr. Steinman respectfully requests the Court hold an evidentiary hearing and suppress all evidence collected in violation of his Fourth Amendment rights.

DATED this 7th day April, 2023.

RENE L. VALLADARES
Federal Public Defender

By:  */s/ Kate Berry*

KATE BERRY
Assistant Federal Public Defender
SEAN A. MCCLELLAND
Assistant Federal Public Defender

30

1

## CERTIFICATE OF ELECTRONIC SERVICE

2   The undersigned hereby certifies that she is an employee of the Federal Public Defender

3 for the District of Nevada and is a person of such age and discretion as to be competent to serve

4 papers.

5   That on April 7, 2023, she served an electronic copy of the above and foregoing Motion

6 to Suppress by electronic service (ECF) to the person named below:

7

8      JASON FRIERSON
      United States Attorney
9      ANDREW KEENAN
      Assistant United States Attorney
10      400 South Virginia Street, Suite 900
      Reno, NV 89501

11

12

13          */s/ Christine Kuhl*
          Employee of the Federal Public Defender

14

15

16

17

18

19

20

21

22

23

24

25

26