JASON M. FRIERSON
United States Attorney
Nevada Bar Number 7709
ANDREW KEENAN
Assistant United States Attorney
400 South Virginia Street, Suite 900
Reno, Nevada 89501
(775) 784-5438
Andrew.Keenan@usdoj.gov
*Attorneys for the United States*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TRISTON HARRIS STEINMAN,<br><br>Defendant. | Case No. 3:22-cr-0068-ART-CLB<br><br>**Government's Response to Defendant's Motion to Dismiss (ECF No. 33)** |

Certification: This response is timely.

## INTRODUCTION

Defendant Triston Harris Steinman has been charged with one count of felon in possession of ammunition and one count of possession of unregistered firearms. Defendant now moves this Court to dismiss count one of the indictment against him on the basis that, under the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), his conduct is protected under the Second Amendment. Defendant's argument fails as nothing in *Bruen* casts doubt on the constitutionality of 18 U.S.C. § 922(g)(1) as applied to Defendant, a convicted felon. Moreover, even if the Second Amendment's plain text did extend to such conduct, Section 922(g)(1) falls within the nation's long-standing tradition of disarming

1

citizens who engage in criminal activity or are otherwise not law-abiding. The motion should be denied. *See United States v. Mosz*, Case No. 2:22-cr-00103-ART-NJK, ECF 52 (February 22, 2023).

## RELEVANT BACKGROUND

In December 2022, a grand jury empaneled in the state and District of Nevada indicted Defendant on one count of felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). ECF 14. In March 2023, a superseding indictment was filed, charging Defendant with one count of felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count One) and one count of possession of unregistered firearms in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 (Count Two). ECF 24.

The indictment against Triston Harris Steinman arises from events that occurred in August 2022, namely, his unlawful possession of ammunition, despite his status as a felon, as well as his possession of multiple unregistered firearm silencers.

On August 12, 2022, at approximately 3:51pm, Trooper William Boyer of Nevada Highway Patrol, stopped the defendant's gray BMW sedan for speeding. During a subsequent search of the vehicle, law enforcement recovered, among other items, assorted firearm ammunition, a loaded unserialized semi-automatic 9mm pistol, several AR style rifles, pistols, and firearm parts without serial numbers, approximately seven pounds of marijuana, $12,500 cash, six silencers, firearm optics, assorted rifle and pistol magazines, and tools and jigs for the manufacture and assembly of firearms. In total, approximately 38 firearms were recovered from Defendant's vehicle. At the time of the offense, the defendant had a prior conviction for Assault in the Third Degree from January 5, 2018. For that conviction, the maximum potential sentence was 5 years, but Defendant was sentenced to 10 months' confinement. That conviction arose from an incident in which Defendant shot his brother with a rifle. The facts related to this incident are fully laid out in the government's response to ECF No. 34, Defendant's motion to suppress.

On April 7, 2023, defendant Triston Harris Steinman filed the instant Motion to Dismiss, in which he argues that the Supreme Court's recent decision in *Bruen* renders 18 U.S.C. § 922(g)(1) unconstitutional. As set forth below, the defendant's *Bruen* Motion is premised on a faulty reading of *Bruen* and other Second Amendment jurisprudence, as well as the misplaced assumption that the Second Amendment was intended to arm felons.

**ARGUMENT**

Citing *Bruen*, the defense asks this Court to find that 18 U.S.C. § 922(g)(1)'s prohibition on felons possessing ammunition is unconstitutional. At its heart, however, the *Bruen* Motion is based on the Supreme Court's opinions in *Heller v. District of Columbia*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010). Contrary to the defendant's claims, *Bruen* did not usher in any meaningful change to the Supreme Court's approach to the "plain text" of the Second Amendment (*i.e.*, step one of the analysis) as it relates to the charges here. The defendant's claims are as meritless now as they were immediately following *Heller* and *McDonald*. Even if applying the framework recently clarified by *Bruen*, the defendant's challenge is clearly meritless as possessing a firearm or ammunition while a felon is conduct outside the scope of the Second Amendment's protections. Moreover, even if the Court were to find otherwise, the prohibition on felons possessing firearms falls well within the nation's long-standing tradition of disarming citizens who engage in unlawful activity.

**A.     Defendant Fundamentally Misconstrues the Supreme Court's Second Amendment Jurisprudence.**

The defendant's attempt to wield the Supreme Court's Second Amendment jurisprudence, principally its recent decision in *Bruen*, as a sword against the Indictment is fundamentally at odds with Supreme Court precedent. When undertaking a faithful analysis of *Bruen* and the other

3

Supreme Court precedent on which it is based, the defendant's Second Amendment challenge to the charges in this case necessarily fail.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court recognized that the Second and Fourteenth Amendments protect the right of law-abiding, responsible citizens to possess a handgun in the home for lawful purposes, like self-defense. 554 U.S. at 635. The *Heller* Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms within homes to be kept inoperable and thus unavailable for self-defense. *Id.* at 628–34.

"Like most rights," however, the *Heller* Court emphasized that "the right secured by the Second Amendment is not unlimited." *Id.* at 626. It is "**not** a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* (emphasis added). The *Heller* Court made clear that the opinion should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. Such regulations are "presumptively lawful." *Id.* at 627 n.26. Subsequently, in *McDonald*, a plurality of the Supreme Court "repeat[ed]" its "assurances" that *Heller*'s holding "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons." 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626).

In *Bruen*, the Supreme Court simply "made the constitutional standard endorsed in *Heller* more explicit." 142 S. Ct. at 2134. It elaborated on the test *Heller* and *McDonald* set forth to determine whether a government regulation infringes on the Second Amendment right to possess

4

and carry guns for self-defense, holding: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must **then** justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2129–30 (emphasis added).

The *Bruen* Court recognized that the first step – *i.e.*, analyzing the "plain text" of the Second Amendment and determining whether it covered the conduct in question – was "[i]n keeping with *Heller*." *Id*. at 2126. However, the *Bruen* Court rejected the post-*Heller* test that had developed among the circuit and district courts at the second step of the analysis, in which courts applied so-called "means-end scrutiny" (*i.e.*, strict or intermediate scrutiny) to laws that were found to fall within the Second Amendment's "plain text." *Id*. at 2127. Instead, the Court held that an analysis of the "Nation's historical tradition of firearm regulation," not means-end scrutiny, was the appropriate standard at the second step. *Id*.

Applying this constitutional standard, the Court held unconstitutional a provision of New York's licensing law that required an applicant to prove "proper cause exists" to obtain a license to carry a gun outside his home. *Id. at* 2123. First, the Court held the Second Amendment's plain text covered the conduct at issue. *Id*. at 2134–35. The *Bruen* petitioners were "ordinary, law abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Id*. at 2134. Thus, the Supreme Court concluded, they fell within "the right to keep and bear arms." *Id*. The Court then surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether the licensing law squared with historical tradition. *Id*. at 2135–56. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id*. at 2156. "Apart from a few late-19th-century outlier jurisdictions," the Court summarized, American governments have

not "required law-abiding, responsible citizens to demonstrate a special need for self-protection distinguishable from that of the general community in order to carry arms in public." *Id.* (quotation marks omitted).

Although *Bruen* rejected the means-end scrutiny framework most courts had relied upon to assess the constitutionality of gun regulation (after first finding that the conduct at issue was covered by the Second Amendment), *id.* at 2127., it did not, as the defendant suggests, *see* Motion at 4-5, erase the two-step analysis entirely. *Bruen* also did not, as the defendant again erroneously seems to suggest, hold or even remotely imply that the Second Amendment protections extend to felons (even if nonviolent) who wish to possess firearms. Rather, throughout the opinion and concurring opinions, the Court reinforced *Heller* and *McDonald*'s pronouncement that the Second Amendment belongs to "law-abiding" citizens only. 142 S. Ct. at 2122, 2124-25, 2131, 2133, 2134, 2138, 2150, 2156; *see also id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("'[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'") (*citing Heller*, 554 U.S. at 626). To the extent the concurrence by Justices Kavanaugh and Roberts joined the *Bruen* lead opinion on narrower grounds, their concurrence is binding. *Marks v. United States*, 430 U.S. 188, 193 (1977); *see also United States v. Davis*, 825 F.3d 1014, 1021-22 (9th Cir. 2016) (en banc).

**B.    Being a Felon in Possession of a Firearm or Ammunition Is Not Protected by the Second Amendment.**

The Indictment, which alleges that the defendant violated 18 U.S.C. § 922(g)(1), is not unconstitutional as applied to the defendant. First, the plain text of the Second Amendment does

/ / /

/ / /

/ / /

6

not protect the prohibited conduct: possessing ammunition[1] as a convicted felon. Second, even assuming for the sake of argument that it did, § 922(g)(1) would still be constitutional because the statute is clearly consistent with the nation's long-standing historical tradition of disarming persons considered a risk to society.

### i. The Second Amendment's Plain Text Does Not Encompass Felon Armament.

It is well-established that the plain text of the Second Amendment does not guarantee a right to felon armament. As explained above, in *Heller*, the Supreme Court defined the right protected by the Second Amendment as the right of "law-abiding, responsible citizens" to keep and bear arms for lawful purposes. 554 U.S. at 635. Consistent with that definition, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt" on "longstanding prohibitions on the possession of firearms by felons." *Id*. at 626. The Court described these "permissible" measures as falling within "exceptions" to the protected right to bear arms. *Id*. at 635. In *McDonald*, a plurality of the Court "repeat[ed]" its "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626).

*Bruen* only reinforced the conclusion that the Second Amendment does not extend to possession of firearms by convicted felons. The concurrence of Justices Kavanaugh and Roberts reiterated that "longstanding prohibitions on the possession of firearms by felons" are constitutional. 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *see Marks v. United States*, 430 U.S. 188, 193 (1977). The lead opinion repeatedly described those the scope of the Second Amendment's protection as limited to lawful purposes by "law-abiding" citizens.

---

[1] In assessing a prohibition on the sale of *ammunition*, the Ninth Circuit has acknowledged the right to possess firearms for protection implied a corresponding right to obtain bullets necessary to use them. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).

7

*Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156, 2157, 2158, 2159, 2161. Consistent with that principle, *Bruen* approved "'shall-issue" licensing regimes that "require applicants to undergo a background check or pass a firearms safety course." *Id*. at 2138 n.9; *see id*. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall issue licensing regimes are constitutionally permissible[.]")). Such regimes generally pass constitutional muster because they "are designed to ensure only that those bearing arms . . . are, in fact 'law-abiding, responsible citizens.'" *Id*. at 2138 n.9. This reasoning underscores that § 922(g)(1) – which aims to ensure that "those bearing arms" are "law-abiding, responsible citizens" – accords with the Second Amendment.[2] *Id*.

Consistent with *Heller*, *McDonald*, and *Bruen*, the Ninth Circuit has also rejected similar as-applied Second Amendment challenges to § 922(g)(1). In *United States v. Vongxay*, the Ninth Circuit held "that § 922(g)(1) does not violate the Second Amendment as it applies to . . . a convicted felon," because "felons are categorically different from the individuals who have a fundamental right to bear arms." 594 F.3d 1111, 1115, 1118 (9th Cir. 2010). Under *Vongxay*, felons fall entirely outside the "class" protected by the Second Amendment; thus, barring their possession of weapons is "presumptively lawful." *Id*. at 1115; *see also United States v. Phillips*, 827 F.3d 1171, 1174-75 (9th Cir. 2016) (rejecting, as foreclosed by Vongxay, a felon's Second Amendment challenge to his § 922(g)(1) conviction based on nature of predicate felony). *Vongxay* further held that there is no constitutional difference between types of felons, explicitly declining

---

[2] The defendant cites several dissents, concurrences, and non-binding dicta from court of appeal decisions that pre-date *Bruen* to suggest that there is no historical basis to exclude non-dangerous felons from the Second Amendment. But the Chief Justice and Justice Kavanaugh – whose votes were necessary for the *Bruen* majority – clearly did not find these lower court concurrences and dissents persuasive, as it reiterated the constitutionality of a prohibition on felons (of any kind) possessing firearms. Similarly, the lead opinion did not attempt to distinguish between different types of non-law-abiding citizens when it repeatedly stated the Supreme Court was limited to "law-abiding citizens."

"to make a distinction between violent and non-violent felons." 594 F.3d at 1116. And *Phillips* reaffirmed this principle. 827 F.3d at 1173-74.

*Bruen* did not abrogate *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010). *See, e.g., United States v. Delpriore*, No. 18-cr-136, 2022 WL 17490771, at *2-*3 (D. Ak. Oct. 4, 2022); *United States v. Siddoway*, 21-cr-205, 2022 WL 4482739, at *1-*2 (D. Id. Sept. 27, 2022); *United States v. Hill*, No. 21-cr-107, 2022 WL 4361917, at *2-*3 (S.D. Cal. Sep. 20, 2022); *United States v. Nevens*, No. 19-cr-774, 2022 WL 17492196, at *2 (C.D. Cal. Aug. 15, 2022). The Ninth Circuit has "recognized that circuit precedent, authoritative at the time that it issued, can be effectively overruled by subsequent Supreme Court decisions that are closely on point, even though those decisions do not expressly overrule the prior circuit precedent." *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) (internal quotations and citation omitted). A case can be effectively overruled when a higher court "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id.* at 900. "[T]he clearly irreconcilable requirement is a high standard." *Fed. Trade Comm'n v. Consumer Def., LLC*, 926 F.3d 1208, 1213 (9th Cir. 2019) (quoting *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013)). "Although [courts] should consider the intervening authority's reasoning and analysis, as long as [a court] can apply our prior circuit precedent without running afoul of the intervening authority, [it] must do so." *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (quoting *United States v. Orm Hieng*, 679 F.3d 1131, 1140 (9th Cir. 2012)). Defendant suggests that *Bruen* overrules prior Ninth Circuit precedent, such as *Vongxay*. *Bruen* did no such thing. Ninth Circuit law rejecting as-applied challenges to § 922(g)(1) comports with the observation by multiple Justices in the *Bruen* majority that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); *id.* at 2157 (Alito, J., concurring). Because this Court can "apply

9

[Ninth Circuit] precedent consistently with that of the higher authority, [it] must do so." *Fed. Trade Comm'n,* 926 F.3d at 1213.

The four corners of the indictment make clear that the defendant is dangerous because he has been convicted of a felony assault and the nature of this prior conviction demonstrates a history of felony-level violence. The facts of the instant case show that Defendant's criminal conduct now encompasses the possession of ammunition, approximately thirty-eight firearms, including pistols and AR-style rifles, unregistered silencers, firearm parts and accessories, a large quantity of marijuana, and digital scales. In short, Defendant has not shown that his illegal conduct is covered by the plain text of the Second Amendment, and thus has not shown that § 922(g)(1) is subject to a historical traditional analysis. On this ground alone, the Court should deny his motion.

### ii. Section 922(g) Is Consistent with Long-Standing Tradition.

Even if the Supreme Court had not already defined the Second Amendment in a way that excludes any right of convicted felons to possess firearms, the historical record supports the conclusion that Section 922(g)(1)'s restriction of firearm possession by felons is "consistent with the Nations' historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

Defendant seems to take the position that the government must show that there was a substantively identical criminal prohibition in place at the instant that the Second Amendment was ratified. But this is not the inquiry *Bruen* prescribes. On the contrary, the appropriate "analogical reasoning under the Second Amendment is [not] a regulatory straightjacket . . . analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Bruen*, 142 S. Ct. at 2133.

This manner of analysis makes sense because there are sound and sensible "modern regulations that were unimaginable at the founding." *Id.* at 2132. For instance, in the early days

of the Republic, most serious offenses (including murder and robbery) carried a mandatory death sentence. *See, e.g.*, Crimes Act of 1790 §§ 3 and 8-10, 1 Stat. 113-114. Because these crimes were already punishable by the most severe penalty possible, it would have been nonsensical to enact a separate statute providing for a collateral consequence, such as forfeiting firearm rights of a man sentenced to death. Thus, the failure to create an equivalent of § 922(g) at the time the Second Amendment was adopted is not evidence that the Second Amendment forbade doing so.

Contrary to the defendant's assertion, it does not matter that the felon-in-possession statutes are "of mid-20th century vintage." *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. As the *Bruen* Court made clear by reaffirming what was already explicit in *Heller*, there have existed in this country "longstanding prohibitions on the possession of firearms by felons." *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. *Heller*'s point in endorsing felon-in-possession laws was not that they had existed in their modern form since the nation's founding, but that they were analogous enough to historical regulations to be deemed "longstanding." *See* 544 U.S. at 626–27. And indeed, well-established and representative historical analogues to § 922(g) have existed throughout the nation's history.

For centuries, the gun rights of certain groups have been categorically limited to promote public safety. Thomas M. Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, explained that some classes of people were "almost universally excluded" from exercising certain civic rights, including "the idiot, the lunatic, and **the felon**, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868) (emphasis added). The Second Amendment incorporates "a common-law tradition that permits restrictions directed at citizens

who are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue, Law & Contemp. Probs.*, Winter 1986 at 146 (1986)); *see also United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("'Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right . . . limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (quoting Saul Cornell, "Don't Know Much About History": The Current Crisis in Second Amendment Scholarship, 29 N. Ky. L. Rev. 657, 679 (2002))).

In addition to felons falling outside the scope of the Second Amendment's protection of the right of law-abiding, responsible citizens to possess firearms, a comprehensive review of historical tradition confirms legislatures' authority to prohibit felons from possessing firearms. Beginning in England and lasting at least through the founding era, history is replete with "representative historical analogue[s]" for Section 922(g)(1) that shed light on the scope of the Second Amendment and the power of legislatures. *Bruen*, 142 S. Ct. at 2133-34 (emphasis omitted). Two types of historical laws are particularly pertinent: (a) laws categorically disqualifying groups from possessing firearms based on a judgment that the group could not be trusted to adhere to the rule of law; and (b) laws authorizing capital punishment and estate forfeiture for felonies. By the time of the Second Amendment's ratification in 1791, there was an established tradition of legislatures exercising broad authority to categorically disqualify people from possessing firearms based on a judgment that certain individuals could not be trusted to adhere to the rule of law. First, because the Second Amendment "'codified a right inherited from our English ancestors,'" English legal tradition sheds light on the scope of the "'right secured by the Second Amendment'"—which, as with the English right, "'is not unlimited.'" *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626). Among the limits well-established in

England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the rule of law. *See, e.g.*, 1 W. & M., Sess. 1, c. 15, in 6 The Statutes of the Realm 71-73 (1688) (codifying an "Act for the better securing the Government by disarming Papists and reputed Papists," which provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person"). This example is particularly relevant because the same Parliament "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," which similarly drew a religion-based distinction, among other limitations. *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593); *see* 1 W. & M., Sess. 2, c. 2, in 6 The Statutes of the Realm 143 (1688) (specifying that that "Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law").

The American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were viewed as not dependable adherents to the rule of law. For example, during the French and Indian War, Virginia imported the English tradition of disarming Catholics who refused to take a loyalty oath. See 7 The Statutes at Large; Being A Collection of All the Laws of Virginia 35-39 (1820) (1756 Va. law).

Over the course of the Revolutionary War, American legislatures passed numerous laws "disarming non-violent individuals because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact"—often specifically targeting those who failed to demonstrate loyalty to the emergent American government. *Range v. Att'y Gen.*, 53 F.4th 262, 277 (3d Cir. 2022), reh'g *en banc* granted, opinion vacated, 56 F.4th 992 (3d Cir. 2023). An early example is a 1775 Connecticut law providing that any person convicted of "libel[ing] or

defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, at 1993 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 Journals of the Continental Congress 1774-1789, at 205 (1906) (resolution of March 14, 1776). At least six of the governments enacted legislation in this vein, requiring oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479-84 (1886) (1776 Mass. law); 7 Records of the Colony of Rhode Island and Providence Plantations in New England 567 (1862) (1776 R.I. law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 N.C. law); Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776, at 90 (1777) (1777 N.J. law); 9 The Statutes at Large of Pennsylvania from 1682 to 1801, at 112-13 (1903) (1777 Pa. law); 9 The Statutes at Large; Being A Collection of All the Laws of Virginia 282 (1821) (1777 Va. law). Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, to serve on juries, and to hold public office—further reinforcing the longstanding connection between armsbearing and these related rights. *See, e.g.*, 1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282. The Constitution's ratification debates support this understanding of the Amendment's text. Indeed, the historical background of the Second Amendment's adoption provides particularly persuasive evidence that the founders understood that the constitutional right to bear arms is compatible with broad legislative authority to disarm

14

groups legislatures did not trust to follow the law. And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Id.* at 758, 761 (emphasis added). These proposals recognize the prevailing historical tradition of broad legislative power to disarm people who fell outside the trustworthy, law-abiding citizenry—so the proposals cannot be "shoehorn[ed] . . . into the silo of dangerousness." *Folajtar v. Attorney Gen.*, 980 F.3d 897, 908-09 (3d Cir. 2020).

As the Ninth Circuit has observed, most scholars of the Second Amendment agree "that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry]' that would protect society through 'defensive use of arms against criminals, oppressive officials, and foreign enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals).'" *Vongxay*, 594 F.3d at 1118 (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue* at 146, and Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995)).[3] "Felons 'were excluded from the right to arms' because they were deemed unvirtuous." *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012) (quoting Reynolds, *A Critical Guide to the Second Amendment* at 480).

Historical records support this conclusion. "*Heller* identified as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 554 U.S. at 604). That report recognized the permissibility of imposing a firearms disability on convicted criminals and made no distinction

---

[3] *Vongxay* acknowledges that scholars disagree on whether common law supports bans on felon gun possession. 594 F.3d at 1118 (citing C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 714–28 (2009)). However, as demonstrated below, the historical evidence establishes that felons have always been subject to limitations and prohibitions on their right to possess firearms.

15

as to the type of criminal, stating that "citizens have a personal right to bear arms '***unless for crimes committed***, or real danger of public injury.'" *Id*. (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)) (emphasis added). Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution, recommending "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." Schwartz, *The Bill of Rights* at 674–75, 681. In the same vein, "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *Skoien*, 614 F.3d at 640.

In this respect, the right to bear arms is analogous to other civic rights that have historically been subject to forfeiture by individuals convicted of crimes, including the right to vote;[4] the right to serve on a jury;[5] and the right to hold public office.[6]  Just as Congress and the States have required persons convicted of felonies to forfeit other civic rights, § 922(g)(1) permissibly imposes a firearms and ammunition disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale Cty. Sherriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in judgment).

Relying on the historical record, no court of appeals has sustained an as-applied challenge to § 922(g)(1) as to an individual convicted of a crime labeled and punishable as a felony.[7] Indeed,

---

[4] *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974).
[5] 28 U.S.C. § 1865(b)(5).
[6] *Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998).
[7] One court of appeals decision has considered and rejected a post-*Bruen* challenge to the constitutionality of Section 922(g)(1), although that disposition is presently under review by the *en banc* court.  *See Range v. Att'y Gen.*, 53 F.4th 262 (3d Cir. 2022), reh'g *en banc* granted, opinion vacated, 56 F.4th 992 (3d Cir. 2023).  Over 120 district-court decisions have done the same.  *See United States* v. *Pena*, No. 2:22-cr-366, Dkt. No. 95 (C.D. Cal. Mar. 21, 2023); *United States* v. *Hoeft*, No. 4:21-cr-40163, Dkt. No. 103 (D. S.D. Mar. 21, 2023); *United States* v. *Davis*, No. 1:23-cr-10018, Dkt. No. 49 (D. Mass. Mar. 17, 2023); *United States* v. *Rice*, No. 3:22-cr-36, Dkt. No.

16

40 (N.D. Ind. Mar. 17, 2023); *United States* v. *Davis*, No. 1:21-cr-206, Dkt. No. 86 (E.D. Cal. Mar. 14, 2023); *United States* v. *Kilgore*, No. 1:21-cr-277, Dkt. No. 40 (E.D. Cal. Mar. 14, 2023); *United States* v. *Lindsey*, No. 4:22-cr-138, Dkt. No. 25 (S.D. Iowa Mar. 10, 2023); *United States* v. *Tribble*, No. 2:22-cr-85, Dkt. No. 48 (N.D. Ind. Mar. 10, 2023); *Leonard* v. *United States*, No. 1:22-cv-22670, Dkt. No. 15 (S.D. Fla. Mar. 10, 2023); *United States* v. *Therrien*, No. 1:21-cr-10323 (D. Mass. Mar. 6, 2023); *United States* v. *Price*, No. 1:19-cr-824, Dkt. No. 105 (N.D. Ill. Mar. 3, 2023); *United States* v. *Belin*, No. 1:21-cr-10040, Dkt. No. 65 (D. Mass. Mar. 2, 2023); *United States* v. *Clark*, No. 1:20-cr-49, Dkt. No. 61 (N.D. Ind. Mar. 2, 2023); *United States* v. *Braster*, No. 1:20-cr-66, Dkt. No. 42 (N.D. Ind. Mar. 2, 2023); *United States* v. *Barnes*, No. 1:22-cr-43, Dkt. No. 42 (S.D.N.Y. Feb. 28, 2023); *United States* v. *Beard*, No. 4:22-cr-92, Dkt. No. 58 (S.D. Tex. Feb. 27, 2023); *United States* v. *Smith*, No. 2:22-cr-20351, Dkt. No. 35 (E.D. Mich. Feb. 24, 2023); *United States* v. *Barber*, No. 3:22-cr-65, Dkt. No. 58 (D. Ak. Feb. 21, 2023); *United States* v. *Ross*, No. 2:22-cr-20049, Dkt. No. 34 (E.D. Mich. Feb. 15, 2023); *United States* v. *Price*, No. 1:21-cr-164, Dkt. No. 122 (N.D. Ill. Feb. 13, 2023); *United States* v. *Gleaves*, No. 3:22-cr-14, Dkt. No. 116 (M.D. Tenn. Feb. 6, 2023); *United States* v. *Bacchus*, No. 2:22-cr-450, Dkt. No. 120 (C.D. Cal. Feb. 2, 2023); *United States* v. *Isaac*, No. 5:22-cr-117, Dkt. No. 27, 2023 WL 1415597 (N.D. Ala. Jan. 31, 2023); *United States* v. *Taylor*, No. 3:22-cr-22, Dkt. No. 32, 2023 WL 1423725 (E.D. Ky. Jan. 31, 2023); *United States* v. *Barber*, No. 4:20-cr-384, Dkt. No. 118, 2023 WL 1073667 (E.D. Tex. Jan. 27, 2023); *United States* v. *Hester*, No. 1:22-cr-20333, Dkt. No. 39 (S.D. Fla. Jan. 27, 2023); *United States* v. *Brown*, No. 2:20-cr-260, Dkt. No. 186, 2023 WL 424260 (E.D. Pa. Jan. 26, 2023); *United States* v. *Rush*, No. 4:22-cr-40008, Dkt. No. 46, 2023 WL 403774 (S.D. Ill. Jan. 25, 2023); *Davis v. United States*, No. 5:22-cv-224, Dkt. No. 1, 2023 WL 373172 (E.D. Ky. Jan. 24, 2023); *Battles v. United States*, No. 4:23-cv-63, Dkt. No. 2, 2023 WL 346002 (E.D. Mo. Jan. 20, 2023); *United States v. Gordon*, No. 1:14-cr-312, Dkt. No. 170, 2023 WL 336137 (N.D. Ga. Jan. 20, 2023); *Shipley v. Hijar*, No. 3:23-cv-11, Dkt. No. 3, 2023 WL 353994 (W.D. Tex. Jan. 20, 2023); *United States* v. *Smith*, No. 2:19-cr-505, Dkt. No. 183 (C.D. Cal. Jan. 19, 2023); *United States* v. *Serrano*, No. 3:21-cr-1590, Dkt. No. 65 (S.D. Cal. Jan. 17, 2023); *United States* v. *Tucker*, No. 2:22-cr-17, Dkt. No. 30, 2023 WL 205300 (S.D. W. Va. Jan. 17, 2023); *United States* v. *Robinson*, No. 4:22-cr-70, Dkt. No. 39, 2023 WL 214163 (W.D. Mo. Jan. 17, 2023); *United States* v. *Whittaker*, No. 1:22-cr-272, Dkt. No. 33 (D.D.C. Jan. 12, 2023); *United States* v. *Spencer*, No. 2:22-cr-561, Dkt. No. 24 (S.D. Tex. Jan. 12, 2023); *United States* v. *Garrett*, No. 1:18-cr-880, Dkt. No. 144 (N.D. Ill. Jan. 11, 2023); *United States* v. *Moore*, No. 3:20-cr-474, Dkt. No. 100, 2023 WL 154588 (D. Or. Jan. 11, 2023); *United States* v. *Jordan*, No. 3:22-cr-1140, Dkt. No. 39, 2023 WL 157789 (W.D. Tex. Jan. 11, 2023); *Campiti* v. *Garland*, No. 3:22-cv-177, Dkt. No. 27 (D. Conn. Jan. 10, 2023); *United States* v. *Coleman*, No. 3:22-cr-8, Dkt. No. 117, 2023 WL 122401 (N.D. W.Va. Jan. 6, 2023); *United States* v. *Medrano*, No. 3:21-cr-39, Dkt. No. 65, 2023 WL 122650 (N.D. W.Va. Jan. 6, 2023); *United States* v. *Olson*, No. 1:22-cr-20525, Dkt. No. 33 (S.D. Fla. Jan. 5, 2023); *United States v. Good*, No. 1:21-cr-180, 2022 WL 18107183 (W.D. Mo. Nov. 18, 2022), report and recommendation adopted, 2023 WL 25725 (W.D. Mo. Jan. 3, 2023); *United States v. Wondra*, No. 1:22-cr-99, 2022 WL 17975985 (D. Idaho Dec. 27, 2022); *United States* v. *Jones*, No. 5:22-cr-376, Dkt. No. 59 (W.D. Okla. Dec. 23, 2022); *United States v. Williams*, No. 1:21-cr-362, 2022 WL 17852517 (N.D. Ga. Dec. 22, 2022); *United States v. Dawson*, No. 3:21-cr-293, 2022 WL 17839807 (W.D.N.C. Dec. 21, 2022); *United States* v. *Goins*, No. 5:22-cr-91, Dkt. No. 32 (E.D. Ky. Dec. 21, 2022); *United States* v. *Mugavero*, No. 3:22-cr-1716, Dkt. No. 29 (S.D. Cal. Dec. 19, 2022); *United States* v. *Roux*, No. 1:22-cr-19 (D. N.H. Dec. 16, 2022); *United States v. Hunter*, No.

1:22-cr-84, 2022 WL 17640254 (N.D. Ala. Dec. 13, 2022); *United States v. Spencer*, No. 2:22-cr-106, 2022 WL 17585782 (E.D. Va. Dec. 12, 2022); *United States* v. *Dotson*, No. 3:22-cr-1502, Dkt. No. 26 (S.D. Cal. Dec. 12, 2022); *United States* v. *Tran*, No. 3:22-cr-331, Dkt. No. 63 (S.D. Cal. Dec. 12, 2022); *United States* v. *Fencl*, No. 3:21-cr-3101, Dkt. No. 81 (S.D. Cal. Dec. 7, 2022); *United States* v. *Perez-Garcia*, No. 3:22-cr-1581, Dkt. No. 70 (S.D. Cal. Dec. 6, 2022); *United States* v. *Walker*, No. 2:19-cr-234, Dkt. No. 83 (E.D. Cal. Dec. 6, 2022); *United States* v. *Grinage*, No. 5:21-cr-399, Dkt. No. 51, 2022 WL 17420390 (W.D. Tex. Dec. 5, 2022); *United States* v. *Wagoner*, No. 4:20-cr-18, Dkt. No. 262, 2022 WL 17418000 (W.D. Va. Dec. 5, 2022); *United States* v. *Gay*, No. 4:20-cr-40026, Dkt. No. 412 (C.D. Ill. Dec. 5, 2022); *Shelby-Journey-Egnis* v. *United States*, No. 2:21-cr-20535, Dkt. No. 53 (E.D. Mich. Dec. 5, 2022); *United States* v. *Glaze*, No. 5:22-cr-425, Dkt. No. 23 (W.D. Okla. Dec. 1, 2022); *United States* v. *Ford*, No. 4:21-cr-179, Dkt. No. 52, 2022 WL 17327499 (W.D. Mo. Nov. 29, 2022); *United States* v. *Jones*, No. 4:20-cr-354, Dkt. No. 78, 2022 WL 17327498 (W.D. Mo. Nov. 29, 2022); *United States* v. *Jacobs*, No. 2:22-cr-160, Dkt. No. 28 (C.D. Cal. Nov. 28, 2022); *United States* v. *Cage*, No. 3:21-cr-68, Dkt. No. 41, 2022 WL 17254319 (S.D. Miss. Nov. 28, 2022); *United States* v. *Willis*, No. 1:22-cr-186, Dkt. No. 36 (D. Colo. Nov. 23, 2022); *United States* v. *Teerlink*, No. 2:22-cr-24, Dkt. No. 33, 2022 WL 17093425 (D. Utah Nov. 21, 2022); *United States* v. *Brunson*, No. 3:22-cr-149, Dkt. No. 66 (S.D. Cal. Nov. 18, 2022); *United States* v. *Hill*, No. 4:22-cr-249, Dkt. No. 42 (S.D. Tex. Nov. 17, 2022); *United States* v. *Blackburn*, No. 1:22-cr-209, Dkt. No. 28 (M.D. Pa. Nov. 17, 2022); *United States* v. *Mitchell*, No. 1:22-cr-111, Dkt. No. 43 (S.D. Ala. Nov. 17, 2022); *United States* v. *Dumont*, No. 1:22-cr-53 (D. N.H. Nov. 14, 2022); *United States* v. *Baker*, No. 2:20-cr-301, Dkt. No. 179, 2022 WL 16855423 (D. Utah Nov. 10, 2022); *United States* v. *Carpenter*, No. 1:21-cr-86, Dkt. No. 38, 2022 WL 16855533 (D. Utah Nov. 10, 2022); *United States* v. *Gray*, No. 1:22-cr-247, Dkt. No. 22, 2022 WL 16855696 (D. Colo. Nov. 10, 2022); *United States* v. *Moore*, No. 2:21-cr-121, Dkt. No. 81 (W.D. Pa. Nov. 9, 2022); *United States* v. *Reese*, No. 2:19-cr-257, Dkt. No. 193 (W.D. Pa. Nov. 8, 2022); *United States* v. *Young*, No. 2:22-cr-54, Dkt. No. 47 (W.D. Pa. Nov. 7, 2022); *United States* v. *Butts*, No. 9:22-cr-33, Dkt. No. 33 (D. Mont. Oct. 31, 2022); *United States* v. *Burton*, No. 3:22-cr-362, Dkt. No. 48 (D. S.C. Oct. 28, 2022); *United States* v. *Carleson*, No. 3:22-cr-32, Dkt. No. 39 (D. Ak. Oct. 28, 2022); *United States* v. *Grant*, No. 3:22-cr-161, Dkt. No. 44, 2022 WL 16541138 (D. S.C. Oct. 28, 2022); *Walker* v. *United States*, No. 3:20-cv-31, Dkt. No. 16, 2022 WL 16541183 (S.D. Cal. Oct. 28, 2022); *United States* v. *Law*, No. 2:20-cr-341, Dkt. No. 60 (W.D. Pa. Oct. 27, 2022); *United States* v. *Borne*, No. 1:22-cr-83, Dkt. No. 35 (D. Wyo. Oct. 24, 2022); *United States v. Minter*, No. 3:22-cr-135, Dkt. No. 33 (M.D. Pa. Oct. 18, 2022); *United States v. Melendrez-Machado*, No. 3:22-cr-634, Dkt. No. 32, --- F. Supp. 3d ----, 2022 WL 17684319 (W.D. Tex. Oct. 18, 2022); *United States* v. *Raheem*, No. 3:20-cr-61, Dkt. No. 389, 2022 WL 10177684 (W.D. Ky. Oct. 17, 2022); *United States* v. *Ridgeway*, No. 3:22-cr-175, Dkt. No. 32, 2022 WL 10198823 (S.D. Cal. Oct. 17, 2022); *United States* v. *Trinidad*, No. 3:21-cr-398, Dkt. No. 99, 2022 WL 10067519 (D.P.R. Oct. 17, 2022); *United States* v. *Carrero*, No. 2:22-cr-30, Dkt. No. 50, 2022 WL 9348792 (D. Utah Oct. 14, 2022); *United States* v. *Ortiz*, No. 3:21-cr-2503, Dkt. No. 91 (S.D. Cal. Oct. 14, 2022); *United States* v. *Riley*, No. 1:22-cr-163, Dkt. No. 37, 2022 WL 7610264 (E.D. Va. Oct. 13, 2022); *United States* v. *Price*, No. 2:22-cr-97, --- F. Supp. 3d ----, 2022 WL 6968457, at *6-9 (S.D. W.Va. Oct. 12, 2022); *United States* v. *King*, No. 7:21-cr-255, Dkt. No. 50, 2022 WL 5240928 (S.D.N.Y. Oct. 6, 2022); *United States* v. *Daniels*, No. 1:03-cr-83, Dkt. No. 69, 2022 WL 5027574 (W.D.N.C. Oct. 4, 2022); *United States v. Charles*, No. 7:22-cr-154, Dkt. No. 48, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022); *United States v. Williams*, No. 3:21-cr-478, Dkt. No. 76 (S.D. Cal. Sept.

courts of appeals "have consistently upheld applications of § 922(g)(1) even to nonviolent felons." *United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012) (collecting cases). And several courts of appeals have recognized that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment. *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *see also United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010). In fact, on November 16, 2022, the Third Circuit upheld the constitutionality of § 922(g)(1) under the Court's decision in *Bruen*, finding that history and tradition demonstrates that "the people" entitled to bear arms under the Second Amendment include only the "law-abiding citizens of the polity," and not those who, like Defendant here, have disregarded the rule of law by committing felony or felony-equivalent offenses. *Range*, 53 F.4th at 266.

---

30, 2022); *United States v. Harper*, No. 5:21-cr-4085, 2022 WL 8288406 (N.D. Iowa Sept. 9, 2022), report and recommendation adopted, 2022 WL 4595060 (N.D. Iowa Sept. 30, 2022); *United States v. Campbell*, No. 5:22-cr-138, Dkt. No. 64 (W.D. Okla. Sept. 27, 2022); *United States v. Siddoway*, No. 1:21-cr-205, Dkt. No. 54, 2022 WL 4482739 (D. Idaho Sept. 27, 2022); *United States* v. *Perez*, No. 3:21-cr-508, Dkt. No. 78 (S.D. Cal. Sept. 26, 2022); *United States v. Collette*, No. 7:22-cr-141, Dkt. No. 66, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022); *United States v. Delpriore*, No. 3:18-cr-136, Dkt. No. 287 (D. Ak. Sept. 23, 2022); *United States* v. *Coombes*, No. 4:22-cr-189, Dkt. No. 39, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022); *United States v. Hill*, No. 3:21-cr-107, Dkt. No. 70, 2022 WL 4361917 (S.D. Cal. Sept. 20, 2022); *United States v. Rojo*, No. 3:21-cr-682, Dkt. No. 50 (S.D. Cal. Sept. 14, 2022); *United States v. Cockerham*, No. 5:21-cr-6, Dkt. No. 31 (S.D. Miss. Sept. 13, 2022); *United States* v. *Jackson*, No. 0:21-cr-51, Dkt. No. 114, 2022 WL 4226229 (D. Minn. Sept. 13, 2022); *United States v. Havins*, No. 3:21-cr-1515, Dkt. No. 62 (S.D. Cal. Sept. 12, 2022); *United States v. Patterson*, No. 7:19-cr-231 (S.D.N.Y. Sept. 9, 2022); *United States v. Doty*, No. 5:21-cr-21, Dkt. No. 34 (N.D. W.Va. Sept. 9, 2022); *United States v. Burrell*, No. 3:21-cr-20395, Dkt. No. 34, 2022 WL 4096865 (E.D. Mich. Sept. 7, 2022); *United States v. Randle*, No. 3:22-cr-20, Dkt. No. 34 (S.D. Miss. Sept. 6, 2022); *United States v. Ingram*, No. 0:18-cr-557, Dkt. No. 1714, --- F. Supp. 3d ---, 2022 WL 3691350 (D. S.C. Aug. 25, 2022); *United States v. Nevens*, No. 2:19-cr-774, Dkt. No. 121 (C.D. Cal. Aug. 15, 2022); *United States v. Farris*, No. 1:22-cr-149, Dkt. No. 29 (D. Colo. Aug. 12, 2022); *United States v. Adams*, No. 1:20-cr-628 (S.D.N.Y. Aug. 10, 2022); *United States v. Ramos*, No. 2:21-cr-395, Dkt. No. 31 (C.D. Cal. Aug. 5, 2022); *United States* v. *Doss*, No. 4:21-cr-74, Dkt. No. 126 (S.D. Iowa Aug. 2, 2022); *United States v. Maurice*, No. 7:22-cr-48 (S.D.N.Y. Jul. 14, 2022). As of the time of filing, the United States is not aware of any court to have ruled in favor of such a challenge.

Many colonies did not require dangerousness for disarmament. As Defendant acknowledges and as mentioned above, there were colonial-era laws disarming those who defamed acts of Congress, failed to swear allegiance to the state, or refused to defend the colonies. *Folajtar*, 980 F.3d at 908 & n.11 (reviewing colonial laws from Connecticut, Pennsylvania, and Massachusetts). Moreover, as noted above, "at their ratification conventions, several states proposed amendments limiting the right to bear arms to both law abiding and 'peaceable' citizens." *Id*. at 908 (reviewing proposed amendments in Pennsylvania, New Hampshire, and Massachusetts). Even if some of the laws at the Founding were concerned about dangerousness, "dangerousness was one reason to restrict firearm possession, but it was hardly the only one." *Id.* at 909. Accordingly, § 922(g)(1)'s prohibition on felons bearing arms, including ammunition, is firmly rooted in this nation's history.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court deny the defendant's *Bruen* Motion.

**DATED** this 26th day of April, 2023.

Respectfully submitted,

JASON M. FRIERSON
United States Attorney

*/s/ Andrew Keenan*
ANDREW KEENAN
Assistant United States Attorney