JASON M. FRIERSON
United States Attorney
District of Nevada
Nevada Bar Number 7709
ANDREW KEENAN
Assistant United States Attorney
400 South Virginia Street, Suite 900
Reno, Nevada 89501
(775) 784-5438
Andrew.Keenan@usdoj.gov

*Representing the United States of America*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 3:22-cr-00068-ART-CLB |
| Plaintiff, | |
| v. | **Government's Response to Defendant's Motion to Suppress (ECF No. 34)** |
| TRISTON HARRIS STEINMAN, | |
| Defendant. | |

Certification: This response is timely filed.

Defendant, Triston Harrison Steinman, seeks to suppress all evidence that followed his stop by law enforcement and the subsequent search of his vehicle, claiming the stop violated his Fourth Amendment rights, the seizure of his vehicle lacked probable cause, and the search warrant was insufficient. His argument fails. Law enforcement had reasonable suspicion to stop Defendant's vehicle, were permitted to conduct a criminal history check of the defendant, had probable cause to believe contraband or evidence of a crime would be located in the vehicle, conducted a search pursuant to a valid warrant, and searched the vehicle in good faith. Defendant also claims statements were made in violation of Miranda, despite the fact that Defendant was never in custody.

Therefore, the Court should deny Defendant's Motion to Suppress.

**Points and Authorities**

I.      Facts

Triston Harris Steinman is a convicted felon and thus a prohibited possessor of firearms and ammunition under 18 U.S.C. § 922(g). In January 2018, following an incident where Defendant was reported to have shot his brother with a rifle, Defendant was convicted of Assault in the Third Degree in the Superior Court of Washington for Pierce County. *See* Exhibit 1.

On August 12, 2022, at approximately 3:51pm, Trooper William Boyer of Nevada Highway Patrol, stopped Defendant's gray BMW sedan traveling south on US 93 in Elko County. *See* Def. Ex. G at 15:51:19; Def. Ex. A at USAO 10. Trooper Boyer had been working as a highway patrol officer with Nevada Highway Patrol for approximately four and a half years at the time. *See* Def. Ex. I at 5. He has conducted thousands of traffic stops over the course of his career. *See id.* at 22.

Defendant, the sole occupant of the vehicle, was stopped on US 93 south of Wells, Nevada. Defendant had been traveling 89 miles per hour in a 70 mile-per-hour zone, which was verified by the trooper's radar using front moving-opposite direction mode. *Id.* at 6; Def. Ex. C at USAO 19-20. At the time Trooper Boyer observed Defendant's vehicle traveling towards him and picked it up on his radar, there were no vehicles behind Defendant. *See* Def. Ex. F at 00:30. The area in which Defendant was driving has a 70 mile-per-hour speed limit between Wells, Nevada, and McGill, Nevada.

After stopping Defendant, Trooper Boyer observed Defendant's excessive movement in the vehicle. *See* Def. Ex. I at 7; Def. Ex. F at 1:02-1:30. Much of the interaction during the stop is captured on Trooper Boyer's body worn camera video. *See generally* Def. Ex. G.

Trooper Boyer approached the vehicle's passenger window. *Id.* at 15:51:46. He told Defendant he stopped him for going 89 miles per hour "in a 70." *Id.* at 15:51:57. Defendant responded, "Oh, was I going 89? I thought I was going 85." *Id.* at 15:52:00. Trooper Boyer requested Defendant's vehicle registration. *Id.* at 15:52:05. Trooper Boyer observed a blanket sprawled across the back seats and asked what was under the blanket. Def. Ex. A at USAO 10. Defendant said it was "just stuff, just my stuff." Def. Ex. G at 15:52:27. When asked if it was something Defendant did not want anyone to see, Defendant responded, "No, just my stuff." *Id.* at 15:52:30. Defendant said he had his Utah registration at his house in St. George, Utah. *Id.* at 15:52:36. Trooper Boyer asked Defendant if he had guns in the car, and Defendant said he did not. *Id.* at 15:52:55. Trooper Boyer, while at the window, observed an ammunition box and asked if Defendant had ammunition. Def. Ex. A at USAO 10; Def. Ex. G at 15:53:00. Defendant said he did have ammunition. *Id.* Defendant provided a Washington drivers license and an expired Washington registration. *See* Def. Ex. A at USAO 10.

Trooper Boyer returned to his patrol car and checked Defendant's license. *Id.* He then returned to Defendant's vehicle, compared the vehicle's VIN to the expired registration, and requested to see Defendant's vehicle insurance. *Id.*; Def. Ex. G at 15:55:52-15:56:32. Defendant did not have proof of insurance in the vehicle. *Id.* Defendant said his girlfriend was going to send him proof of insurance. *Id.* Trooper Boyer asked Defendant to step out of the car. *Id.* at 15:57:23. Defendant initially declined, then complied and sat in the patrol car, while the two continued to wait for proof of insurance. *Id.* at 15:57:23-15:59:14. Trooper Boyer observed the defendant looked nervous and was sweating. *See* Def. Ex. A at USAO 10. Defendant showed the trooper proof of insurance on his phone approximately eight minutes into the car stop. Def. Ex. G at 15:59:14. Trooper Boyer then began working on the

computer inside his patrol car and began writing the citation. *See id.* at 15:59:49. Approximately three minutes after viewing proof of insurance, at 4:02 p.m., Boyer requested a criminal history check. *Id.* at 16:02:11. After requesting the criminal history check, Defendant asked if he was just getting a ticket. *Id.* at 16:02:18. Trooper Boyer responded, "I am issuing you one right now." *Id.* at 16:02:20.

Approximately four minutes after requesting the criminal history check, at 4:06 p.m., the trooper was already reviewing the defendant's criminal history and viewed several felony entries. *See id.* at 16:06:06; Def. Ex. A at USAO 11; *see also* Exhibit 2 (printout of criminal history viewed by Trooper Boyer in the patrol car). While reviewing it, it appears dispatch advised him that he had received it. *See* Def. Ex. G at 16:06:12; Def. Ex. A at USAO 11. He responded that he would review it himself and continued to do so. *See* Def. Ex. G at 16:06:14. During this period of time, Defendant asked about the ticket and the trooper explained the traffic citation. *See* Def. Ex. G at 16:08:00-16:08:30.

The two then engaged in a casual conversation about Mr. Steinman's family, employment, and cars. *See id.* at 16:09:15-16:14:40. Trooper Boyer continued to work on the citation. *See id.*

Trooper Boyer asked Defendant if he'd ever been in trouble before. *Id.* at 16:14:48. Defendant responded, "A little bit. Nothing major though." *Id.* at 16:14:50. Defendant explained he "got an assault charge" as a young adult. *Id.* at 16:14:56-16:14:04. He said it was not a felony assault. *Id.* at 16:15:05-16:15:06. He further mentioned he thought he had a felony when he was a kid but did not think it "continued over" because he went to rehab. *Id.* at 16:15:14-16:15:20. Trooper Boyer asked if Defendant still shot guns. *Id.* at 16:15:28. Defendant said he did not and explained he only had ammunition because someone gave it

to him. *See id*. at 16:15:30-16:15:40. Trooper Boyer continued to work on the citation and then showed it to Defendant. *See id*. at 16:15:40-16:19:46.

Trooper Boyer ultimately confronted Defendant with the fact that he did have prior felony convictions and asked for consent to search the vehicle. *Id*. at 16:19:54-16:20:24. Defendant then denied having ammunition in the vehicle and said the box was empty. *Id*. at 16:20:24-16:20:27. Defendant did not consent to a search of the vehicle. *Id*. at 16:20:38. Trooper Boyer then later confirmed with dispatch the felony convictions he previously observed. *See* Def. Ex. E; Exhibit 3. Trooper Boyer gave Defendant a speeding ticket, and the vehicle was sealed and towed in anticipation of a warrant. *See* Def. Ex. A at USAO 12-13.

Trooper Boyer swore out an affidavit in support of a warrant to search Defendant's vehicle. *See* Def. Ex. C. On August 12, 2022, a warrant to search the gray BMW 325xi bearing Utah license plate G833SJ and VIN number WBAVD13506KT80023 was signed by Justice of the Peace Kenneth Calton. *See id.* The warrant authorized law enforcement to search for and seize, among other things, illicit firearms. *See id.* at USAO 24-25.

During the search of the vehicle, the following items, among others, were recovered by law enforcement:

1.   two THC vape cartridges in the driver door and one un-serialized semi-automatic 9mm pistol with 17 rounds loaded in the magazine inserted into the pistol, chamber empty, underneath the driver seat;

2.   several AR style rifles, pistols, and firearms parts without serial numbers covered by the blanket in the back seat;

3.   several AR style rifles, pistols, and firearms parts without serial numbers in the trunk of the vehicle;

4.      tools and jigs used for the manufacturing and assembly of firearms;

5.      several plastic bags containing a green leafy substance collectively weighing over 7.102 pounds and testing presumptively positive for marijuana found in the trunk of Steinman's vehicle;

6.      36 fully loaded syringes containing a brown substance testing presumptively positive for THC;

7.      12 canisters containing a waxy substance testing presumptively positive for THC;

8.      spray paint and firearm lubricant;

9.      12,500 dollars U.S. Currency found in Steinman's luggage;

10.      assorted rifle and pistol caliber magazines;

11.      six firearm suppressors or silencers;

12.      firearms optics, sights, and lights;

13.      one plate carrier vest with plates;

14.      two digital scales with a green leafy substance residue, one metal grinder, and one cone filler/loader;

15.      packaging slips, receipts, and boxes with labels containing Steinman's name among other addressees containing assorted firearms parts; and

16.      one Apple iPhone; and

17.      assorted ammunition and boxes containing ammunition, including Blazer CCI ammunition. *See* Def. Ex. A.

In total, assorted ammunition, approximately 38 firearms, approximately 7 pounds of marijuana, and $12,500 were recovered from the vehicle. *See* Def. Ex. A; Exhibit 4.

*/ / /*

6

II.     Law

    a.   <u>Police had reasonable suspicion to stop Defendant for a traffic violation.</u>

First and foremost, Trooper Boyer had reasonable suspicion to stop Defendant's vehicle for a traffic violation. Trooper Boyer previously testified that he verified the speed of Defendant's vehicle to be 89 miles per hour using his radar. At the time, Defendant was traveling in a 70 mile-per-hour zone. Trooper Boyer's observations of Defendant's speeding are corroborated by Defendant's own statement after he was stopped that he believed he was going 85 miles per hour. Defendant, for the above conduct, was lawfully stopped for a violation of NRS 484B.600.

    b.   <u>The traffic stop was not unlawfully prolonged because criminal history checks during a traffic stop are objectively reasonable.</u>

"[C]onducting a criminal records check in connection with a traffic stop is objectively reasonable." *United States v. Taylor*, 60 F.4th 1233, 1241 (9th Cir. 2023). "[B]ecause a criminal history check 'stems from the mission of the stop itself,' it is a 'negligibly burdensome precaution[ ]' necessary 'to complete [the stop] safely.'" *United States v. Hylton*, 30 F.4th 842, 848 (9th Cir.), *cert. denied*, 214 L. Ed. 2d 192, 143 S. Ct. 393 (2022). Officers conducting a traffic stop do not need independent reasonable suspicion to perform the criminal history check. *See id.*

This case is analogous to *Hylton*. 30 F.4th 842. In that case, police conducted a traffic stop and smelled marijuana at about 6:13 a.m. *Id.* at 845. Hylton appeared disoriented and could not produce his license and registration. *Id.* Looking for the license and registration, officers observed a firearm box that contained a firearm in plain view. *Id.* The officers conducted field sobriety tests that were inconclusive, so they called a drug recognition expert.

*Id.* At 6:41 a.m., almost a half hour after the stop, the officers checked defendant's license, registration, insurance, warrants and criminal history. *Id.* Two minutes after the other information was received, the criminal history check came back. *Id.* At 6:49 a.m., Hylton was arrested for being a felon in possession of a firearm. *Id.*

In *Taylor*, the Ninth Circuit relied on *Hylton*, and found an officer did not improperly prolong a stop when he ran a criminal history check after he had asked Taylor to step out of the vehicle. *See* 60 F.4th at 1241.[1] In that case, Taylor also argued officers "knew or should have known that Taylor posed no danger" during the stop. The Court noted, "what matters, under *Hylton*, is that conducting a criminal records check in connection with a traffic stop is objectively reasonable[,]" not what the officers might have subjectively believed. *Id.*

Here, Defendant was lawfully stopped for speeding at approximately 3:51 p.m. The trooper approached the vehicle. Defendant provided his drivers license and an expired Washington registration. Defendant did not have his proof of insurance immediately available. Trooper Boyer returned to his vehicle and began checks on his computer. At about 3:56 p.m., Trooper Boyer returned to Defendant's vehicle, asked for proof of insurance, and compared the VIN to Defendant's Washington registration. At 3:57 p.m., after Defendant was still unable to provide proof of insurance, Trooper Boyer said he would try to run the vehicle to see if proof of insurance "would pop up." He asked Defendant to step out of the

---

[1] Defendant suggests *Taylor* "ultimately conclud[ed] that . . . officers had reasonable suspicion to extend the stop to run the criminal history check." Def. Mo. at 12. In fact, *Taylor* stated "we can approach this issue in two different ways, with both paths leading to the same answer: the officers did not violate the Fourth Amendment." 60 F.4th at 1241. The Ninth Circuit then ultimately reaffirmed the fact that a criminal history check is not a prolongation of a stop that needs to be supported by reasonable suspicion *and* found officers had reasonable suspicion to conduct a criminal history check, "even if, contrary to precedent, the . . . criminal history check were beyond the mission of the traffic stop." *Id.* at 1241-42.

vehicle. Defendant initially refused, but at 3:58 p.m., Defendant and Trooper Boyer sat in the patrol car. Defendant sat in the front passenger seat. Trooper Boyer looked at Defendant's information on his computer and saw title information as he attempted to verify his insurance. At 3:59 p.m., Defendant showed the trooper his phone, which displayed his vehicle's insurance information. Trooper Boyer then asked how long Defendant was living in Washington. Defendant answered and then volunteered information that he received a ticket driving up to Washington as well. At 4:00 p.m., Trooper Boyer began writing the traffic citation and continued to work on his computer. At 4:02 p.m., three minutes after receiving all of Defendant's documentation, Boyer requested dispatch run a criminal history check. At least by 4:06 p.m., he began reviewing Defendant's criminal history on his computer. In *Hylton*, police requested a criminal history check approximately a half hour into the stop. Trooper Boyer requested and began reviewing the criminal history within approximately fifteen minutes. Given the facts of this case, the criminal history check neither prolonged the traffic stop nor went beyond the mission of the traffic stop.

Defendant attempts to distinguish *Hylton* in two ways: the criminal history check was not conducted at the exact same time as other routine checks and officer safety could not have been an issue because Defendant was in the patrol car with Trooper Boyer. It is unclear how a criminal history check during a traffic stop, requested mere minutes after receiving a driver's proof of insurance makes the criminal history check any less objectively reasonable or negligibly burdensome. With regard to officer safety, Defendant was un-frisked, *unrestrained* in the front seat of the patrol car with Trooper Boyer. The situation here poses no less risk of danger than in *Hylton* and *Taylor*. In *Hylton*, the defendant had already exited the vehicle where police observed the gun. 30 F.4th at 845. In *Taylor*, the defendant had already exited the vehicle, removed his fanny pack, and been frisked—the interaction was

calm and friendly. 30 F.4th at 1238. In this case, Defendant's proximity to and close quarters with Trooper Boyer, after not having been frisked, could arguably raise even greater safety concerns than those in *Hylton* and *Taylor*.

Defendant suggests "tension" between *Hylton* and *United States v. Evans*, 786 F.3d 779 (9th Cir. 2015) (finding a felon registration check to determine whether a felon is properly registered needed to be supported by independent reasonable suspicion), *United States v. Gorman,* 859 F.3d 706 (9th Cir. 2017) (finding, as the government conceded, an officer unlawfully prolonged a traffic stop by requesting a drug sniffing dog and asking the El Paso Intelligence Center to compare defendant's home address with its database related to drug and weapons smuggling, money laundering, and human trafficking, a "non-routine record check"), and *Rodriguez v. United States*, 575 U.S. 348 (2015) (holding a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution, while citing favorably to a Tenth Circuit case which recognized an officer safety justification for criminal record checks). In short, a criminal history check is a far-cry from requesting a drug-sniffing dog and investigating a driver's home address in a smuggling, money laundering, and human trafficking database, as in *Gorman*. *Hylton* clearly distinguished *Evans* and relied on *Rodriguez* itself to find criminal history checks stem from the mission of the stop and constitute a negligibly burdensome precaution in order to complete the stop safely. *Hylton,* 30 F.4th at 847-48.

There is no "tension" between these cases. Ninth Circuit precedent, detailed in *Hylton* and cited in *Taylor*, establishes criminal history checks during traffic stops need not be justified by independent reasonable suspicion because they are objectively reasonable, do not go beyond the mission of a traffic stop, and constitute a negligibly burdensome precaution necessary to complete the stop safely.

c.  <u>Any potential prolongation of the stop was justified by Trooper
Boyer's independent reasonable suspicion of criminal activity.</u>

Even if police were, "contrary to precedent," not entitled to check Defendant's criminal history, Trooper Boyer had independent reasonable suspicion to check Defendant's criminal history. *Taylor*, 60 F.4th at 1242. Reasonable suspicion "is not a particularly high threshold to reach" and is less than probable cause or a preponderance of the evidence. *United States v. Taylor*, 60 F.4th 1233, 1241 (9th Cir. 2023) (quoting *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc)). The standard allows officers to make "commonsense judgments and inferences about human behavior." *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Officers may "draw on their own experience and specialized training" to arrive at conclusions "that might well elude an untrained person." *Valdes-Vega*, 738 F.3d at 1078 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Even if each factor, standing alone, may not be proof of any illegal conduct, the Court may find the factors amount to reasonable suspicion. *See United States v. Sokolow*, 490 U.S. 1, 9 (1989) ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."); *see also Terry v. Ohio*, 392 U.S. 1, 22 (1968) (*"*Through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation.").

For example, nervous, evasive behavior, while insufficient standing alone, remains a pertinent factor in determining reasonable suspicion. *See Wardlow*, 528 U.S. at 124 ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"). A box of ammunition, found in a defendant's closet with missing rounds and no accompanying firearm, has also contributed to a finding of reasonable

11

suspicion for a warrantless probation search of a suspect's vehicle. *United States v. Jones*, 123

F. App'x 773, 774 (9th Cir. 2005), *as amended* (Aug. 31, 2005) (unpublished).

Prior to the criminal history check, Trooper Boyer observed excessive movement in

the vehicle just after the stop, which he viewed as a possible indicator of someone producing

a weapon or concealing contraband. *See* Def. Ex. A. He observed an ammunition box on the

floor of the car. Defendant told Trooper Boyer that Defendant had ammunition in the vehicle

but did not have a firearm. Trooper Boyer observed a blanket covering items in the back

seat.[2] He observed Defendant was reluctant to exit his vehicle. He observed Defendant was

sweating, looked nervous, and was anxious to receive his ticket and be on his way. Taken

together, especially given Trooper Boyer's training and experience, the totality of

circumstances amounted to independent reasonable suspicion of criminal activity that

justified a criminal history check.[3] *See* Def. Ex. A (outlining Trooper Boyer's suspicions).

        d.  <u>Police had probable cause to seize and to search Defendant's vehicle</u>.

The Fourth Amendment protects "the right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Con. Amend.

IV. The Supreme Court has long recognized that it is reasonable for police to search a car

without a warrant if they have probable cause. *See California v. Acevedo*, 500 U.S. 565, 569

---

[2] Defendant states *Vasquez v. Lewis*, 834 F.3d 1132, 1138–39 (10th Cir. 2016), "conclude[ed] that 'blankets and a pillow obscuring items in the backseat' could not give rise to reasonable suspicion of contraband[.]" In fact, the Tenth Circuit considered the officers' statements that the car had items covered in blankets and that the car was uncharacteristically empty; rather than concluding the blankets and pillow could not give rise to reasonable suspicion, the Court did "not give much weight to these seemingly contradictory facts" and found, based on the totality of circumstances, officers did not have reasonable suspicion. *Id.* at 1138.

[3] Defendant also suggests rechecking the criminal history extended the stop. Def. Mo. at 10. Any "rechecking" followed the trooper's initial observation of Defendant's criminal record, including felonies for assault, which further supported any independent reasonable suspicion and probable cause that existed by that point.

(1991); *Carroll v. United States*, 267 U.S. 132, 151 (1925). The Supreme Court sees "no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." *Chambers v. Maroney*, 399 U.S. 42, 52 (1970).

"Probable cause exists when, under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Luong,* 470 F.3d 898, 902 (9th Cir.2006) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). "Probable cause determinations may be based in part on reasonable inferences." *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (citing *United States v. Gourde,* 440 F.3d 1065, 1071 (9th Cir.2006) (en banc)). "Untruthful and evasive" answers given to police can support probable cause. *See Devenpeck v. Alford*, 543 U.S. 146, 149, 155-156 (2004). Furthermore, although only of "marginal relevance" to the totality of circumstances, "a suspect's criminal history 'can be helpful in establishing probable cause.'" *United States v. Perkins*, 850 F.3d 1109, 1120 (9th Cir. 2017).

Under certain circumstances, the presence of ammunition or other firearm-related items, even on a defendant's person, may give rise to probable cause to believe a gun may be found in a car. *See United States v. Spencer*, 1 F.3d 742, 743, 746 (9th Cir.1992) (as amended) (holding that probable cause exists to believe that gun is in car where recent occupant is wearing empty shoulder holster and was seen making concealing movements under the car's front seat before exiting vehicle); *United States v. Baker*, 850 F.2d 1365, 1367, 1369 (9th Cir.1988) (finding probable cause exists to believe that gun is in car where recent occupant is found to have ammunition and gun magazines on his person).

All of the facts that already supported Trooper Boyer's reasonable suspicion also contribute to the probable cause he had to believe the vehicle contained contraband or evidence of a crime. But in addition, by the time police seized the vehicle, Trooper Boyer observed defendant's criminal history that included felony assault conviction with a deadly weapon enhancement;[4] Defendant was untruthful when he had told Trooper Boyer he did not have a felony assault charge; and Defendant had denied having ammunition in the vehicle after already admitting to it multiple times. Whether Trooper Boyer knew he had probable cause at the time is irrelevant to the determination. The subjective intent of law enforcement officers is irrelevant where the circumstances surrounding the investigatory stop objectively satisfy either probable cause or reasonable suspicion. *United States v. Orozco*, 858 F.3d 1204, 1210 (9th Cir. 2017). By the time the vehicle was sealed and seized in anticipation of the warrant, the circumstances objectively satisfied probable cause to search the vehicle. Police therefore could have lawfully searched the vehicle for evidence or contraband pursuant to the automobile exception to the warrant requirement or seized the vehicle and applied for a warrant. *See Chambers v. Maroney*, 399 U.S. 42, 52 (1970).

Alternatively, at least as soon as Trooper Boyer observed Defendant's criminal history showing a felony conviction, Trooper Boyer had probable cause to believe Defendant violated 18 U.S.C. § 922(g)(1), felon in possession of ammunition, and that evidence of that felony crime would be located in the vehicle. Boyer saw a box of ammunition in the car. Defendant said he had ammunition in the vehicle. The trooper observed a felony conviction on Defendant's criminal history. Based on those facts alone, Trooper Boyer had probable

---

[4] Trooper Boyer later attempted to confirm Defendant's felony convictions out of an abundance of caution. Prior to that, he had reviewed Defendant's criminal history and saw what appeared to be felony convictions. A copy of the criminal history viewed by Trooper Boyer is attached as Exhibit 2.

cause to search the vehicle for contraband and evidence of felon in possession of ammunition.

Although the searching officers were employed by Nevada Highway Patrol, rather than the federal government, the government is unaware of any provision of Nevada law that prohibits state officers from investigating federal crimes.  And even if state law included such a restriction, it would not give rise to any rights under the federal Fourth Amendment, or otherwise support suppression of evidence uncovered in the search of a car based on probable cause that it contained evidence of a federal crime.

The existence of probable cause of a violation of federal law rendered the search in this case lawful under the Fourth Amendment without regard to Nevada law. A police search of a car, whose driver and sole occupant is a prohibited person, containing ammunition indicating activity that is illegal under federal law, is just as constitutional in Nevada as it is elsewhere in the United States. State law does not appear to have limited the officers' authority to conduct the search, and even if it did, it would be irrelevant to the Fourth Amendment analysis.

Under Nevada law, Nevada Highway Patrol troopers, as sworn personnel of the Department of Public Safety "have the powers of a peace officer."  Nev. Rev. Stat. § 289.270. Although Nevada statutory law does not speak clearly to authority to search, "[a]ny peace officer may detain any person whom the officer encounters under circumstances which reasonably indicate that the person has committed, is committing or is about to commit a crime."  Nev. Rev. Stat. § 171.123.  And a peace officer may make a warrantless arrest:

> (a) For a public offense committed or attempted in the officer's presence.
> (b) When a person arrested has committed a felony or gross misdemeanor, although not in the officer's presence.

(c) When a felony or gross misdemeanor has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it.
(d) On a charge made, upon a reasonable cause, of the commission of a felony or gross misdemeanor by the person arrested.
(e) When a warrant has in fact been issued in this State for the arrest of a named or described person for a public offense, and the officer has reasonable cause to believe that the person arrested is the person so named or described.

Nev. Rev. Stat. § 171.124

None of those provisions distinguishes between state and federal offenses, and none purports to deny state officers the authority to enforce federal law, or search for federal contraband or evidence of federal crimes.

Given that the "general rule is that local police are not precluded from enforcing federal statutes," *Gonzales v. Peoria*, 722 F.2d 468, 474 (9th Cir.1983), overruled on other grounds by *Hodgers–Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir.1999), nothing indicates that the officers here violated state law by conducting a search based on probable cause of federal contraband or evidence of a federal crime.

In any event, even if Nevada law prohibited state officers from investigating violations of federal law, the relevant question "is not whether the search was authorized by state law," but "rather whether the search was reasonable under the Fourth Amendment." *Cooper v. California,* 386 U.S. 58, 61 (1967). Whether or not state officers have *state statutory* authority to investigate a federal crime "[does] not alter the content of the Fourth Amendment." *Virginia v. Moore*, 553 U.S. 164, 172 (2008). Accordingly, as long as a search comports with the Fourth Amendment, the resulting evidence is not subject to Fourth Amendment suppression even if the search may have violated state law.  *See Moore,* 553 U.S. at 172 ("[W]hether or not a search is reasonable within the meaning of the Fourth Amendment . . . has never 'depend[ed]' on the law of the particular State in which the search occurs.") (citing

*California v. Greenwood*, 486 U.S. 35, 43 (1988)); *Elkins v. United States*, 364 U.S. 206, 224 (1960) ("The test [for suppression under the Fourth Amendment] is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed."); *see also United States v. Turner*, 553 F.3d 1337, 1346 (10th Cir. 2009) ("[W]e reject Mr. Turner's claim that because possession of ammunition is not a crime under state law, state law enforcement could not seize the ammunition and detain him on that basis. Even if state law prohibits state police from arresting for a federal offense (and we are not convinced that it does), that fact alone does not render the arrest a violation of the Fourth Amendment.")

The Ninth Circuit has repeatedly recognized and applied this principle. *See, e.g., Martinez-Medina v. Holder*, 673 F.3d 1029, 1036 (9th Cir. 2011) (no Fourth Amendment violation where officer seized defendant without authority under Oregon law); *Edgerly v. City & Cty. of San Francisco*, 599 F.3d 946, 956 (9th Cir. 2010) (no Fourth Amendment violation where arrest was improper under California law); *United States v. Brobst*, 558 F.3d 982, 990 (9th Cir. 2009) (no Fourth Amendment violation regardless of whether seizure complied with Montana law). For example, in *United States v. Chavez-Vernaza*, 844 F.2d 1368 (9th Cir. 1987), the Court declined to suppress financial records that state officers had seized in violation of Oregon law. In rejecting *Chavez-Vernaza's* argument that the records should be excluded because of the state-law violation, this Court was unequivocal: "evidence seized in compliance with federal law is admissible without regard to state law." *Id.* at 1374.

Likewise, in *United States v. Cormier*, 220 F.3d 1103 (9th Cir. 2000), the Ninth Circuit rejected Cormier's argument that a violation of state law vitiated his consent to search because "evidence will only be excluded in federal court when it violates federal protections, such as those contained in the Fourth Amendment, and not in cases where it is tainted solely

under state law."[5] *Id.* at 1111. *See also United States v. Becerra-Garcia*, 397 F.3d 1167, 1174 (9th Cir. 2005) ("[W]e and several of our sister circuits have declined to consider state law in determining the reasonableness of seizures."); *United States v. Miranda-Guerena*, 445 F.3d 1233, 1238 (9th Cir. 2006) (McKeown, J., concurring) ("[F]ederal law, not Arizona law, is determinative of the admissibility of evidence in this case."); *United States v. Castro*, 874 F.2d 817 (9th Cir. 1989) (unpublished) ("Evidence seized in violation of state law may nevertheless be admitted.").

*United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942 (9th Cir. 2009) does not alter the analysis. In that forfeiture case, state officers obtained a state warrant to search a medical marijuana dispensary without revealing in the supporting affidavit that the dispensary was permitted to distribute marijuana under state law, and without alleging any violation of federal law. 590 F.3d at 948. The Ninth Circuit held that the state search warrant was not supported by probable cause of a *state* violation because of the affidavit's legal and factual omissions, and was not supported by probable cause of a *federal* violation because the affidavit "never . . . indicated that it was pursuing a violation of federal law." *Id.* at 948. The Court recognized that "there may have been probable cause to search [the dispensary] for a violation of federal law," but the magistrate had not been asked to make that determination. *Id.* Instead, the officers had sought a warrant predicated solely on probable cause of a violation of state law. *See id.*

---

[5] In two narrow circumstances, the Ninth Circuit has said that federal law affirmatively "requires the incorporation of state law." *Cormier*, 220 F.3d 1103, 1111 (9th Cir. 2000) (citing *United States v. Mota*, 982 F.2d 1384 (9th Cir. 1993) (searches incident to arrest); *United States v. Wanless*, 882 F.2d 1459 (9th Cir. 1989) (inventory searches)). To the extent those decisions have continuing vitality after *Moore*, neither circumstance is implicated here.

But the Court did not foreclose the possibility that the state officers could have obtained and executed a warrant to search for evidence of a federal crime if they had submitted an affidavit that alleged a federal violation.  More importantly, the Court did not address a situation such as this where a warrantless search for contraband and evidence of a federal crime would have been justified by the automobile exception. Here, the probable cause and reasonableness of a search for contraband and evidence of felon-in-possession of ammunition, a federal crime, did not dissipate simply because police decided to seek a state search warrant for the vehicle.

> e.   Police, though they could have searched under the automobile exception to the warrant requirement, searched Defendant's vehicle pursuant to a valid search warrant.

Probable cause exists where the totality of the circumstances indicates a "fair probability that ... evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). This standard does not require the affidavit to establish that the evidence is in fact in the place to be searched, or even that it is more likely than not to be there. *United States v. Fernandez*, 388 F.3d 1199, 1254 (9th Cir. 2004), *modified* 425 F.3d 1248 (9th Cir. 2005). Rather, the issuing judge "need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *Id*. (quotation omitted).

Here, the warrant affidavit included sufficient facts for the issuing judge to have concluded it would be reasonable to search Defendant's BMW for evidence of a crime. In the warrant, Trooper Boyer noted his observations of Defendant: that Defendant appeared "substantially overly nervous," that Defendant was sweating excessively, that Defendant appeared to have an accelerated pulse. He indicated Mr. Steinman told the trooper he had "stuff" under a blanket in the rear seat. The affidavit listed the trooper's observation of an ammunition box on the front right passenger floorboard and Defendant's response that there

was ammunition in the vehicle. He noted Defendant's prior felony convictions. Trooper Boyer explained, when he asked Defendant if he had any felony convictions, Defendant "replied there wasn't any or that he did not think there were any." He documented that, after having already admitted to having ammo in the vehicle, Defendant later denied having ammunition, claiming the box was empty. Finally, he described Defendant's nervous behavior while waiting for the vehicle to be towed. For the reasons outlined above, the affidavit supported a finding of probable cause.

Nothing in Trooper Boyer's affidavit was a misrepresentation, let alone a material one. Defendant claims Trooper Boyer was unaware of Defendant's criminal history when he asked about it. First, that is not true. While he did not *confirm* the felony convictions until after, Trooper Boyer had already reviewed the criminal history and observed felonies prior to asking that question. Second, whether he learned before or after that Defendant was deceptive in his response about his criminal history is immaterial to the fact's contribution to probable cause. One way or the other, prior to swearing out his affidavit, Trooper Boyer was aware of felony convictions and understood Defendant to have been deceptive in his reply about having a felony conviction or not knowing about his felony conviction.

Defendant also suggests he never said he did not have felony convictions. At 4:15 p.m., Defendant said he got an assault charge as a teenager or young adult. When asked if it was a felony assault, he said, "No." When asked if he had any felonies on his record, Defendant said, "I don't know exactly actually. Because I think I had a felony when I was a kid, but I don't think it continued over because I did rehab so. . ." The search warrant affidavit states Defendant "replied there 'wasn't any or that he did not think there were any.'" These statements do not conflict such that Trooper Boyer misrepresented anything. In short,

20

the warrant affidavit does not misrepresent any material facts–facts were not misrepresented, and even the alleged misrepresentations would be immaterial.

> f.  Police searched Defendant's vehicle in good faith reliance on the search warrant.

"Evidence seized pursuant to a facially valid search warrant which later is held to be invalid may nevertheless be admissible if officers conducting the search acted in good faith and in reasonable reliance on the warrant." *United States v. Leon*, 468 U.S. 897, 926 (1984). For the good faith reliance exception to apply, the officers must have relied on the search warrant in an objectively reasonable manner. *United States v. Clark*, 31 F.3d 831, 835 (9th Cir.1994). The affidavit "must establish at least a colorable argument for probable cause" for the exception to apply. *United States v. Luong*, 470 F.3d 898, 903 (9th Cir.2006).

Four circumstances exist that render the good faith exception per se unreasonable:

> (i) where an affiant misleads the issuing magistrate or judge by making a false statement or recklessly disregarding the truth in making a statement; (ii) where the magistrate or judge wholly abandons her judicial role in approving the warrant, acting only as a "rubber stamp" to the warrant application rather than as a neutral and detached official; (iii) where the warrant is facially deficient in detail as to the place to be searched or the things to be found that the officers could not reasonably presume it to be valid; or (iv) where the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith.

*United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007) (citing *Leon,* 468 U.S. at 923-26).

In *Crews*, officers relied in good faith upon a reasonable nexus between the crime of felon in possession of a firearm and an apartment. 502 F.3d at 1137. Officers never observed Crews enter or exit the apartment for which they obtained the warrant. They had already recovered a firearm, yet believed other evidence of firearm possession may be in the apartment. "[T]he affidavit was not so lacking in indicia of probable cause as to render

21

reliance upon it objectively unreasonable." *Id.* at 1136. The Ninth Circuit also found the affidavit was not misleading as to material facts and omissions. *See id.* at 1138-39.

None of the four circumstances precluding good faith reliance are present here. They do not reflect "[s]uch clear indicia of bad faith" that would render good faith unreasonable. *Id.* at 1138. There is nothing to suggest the magistrate abandoned his judicial role in approving the warrant. This is not the type of bare bones warrant that would call for a "rubber stamp." The warrant is not deficient in identifying the places to be searched and things to be seized, at least in terms of "illicit firearms." The warrant authorized the search of a specific vehicle, driven by a felon, for illicit firearms based on, among other things, Defendant's criminal history, his behavior during the stop, his deceptive and conflicting answers to questions, and the observation of an ammunition box on the floorboard. The warrant did not lack particularity such that a deputy could not reasonably have relied on it. The warrant was not so lacking in indicia of probable cause as to render reliance upon the warrant unreasonable. A colorable argument for probable cause could be made for the place to be searched and for "illicit firearms," as listed on the warrant.[6]

---

[6] The government concedes the search warrant affidavit failed to establish probable cause to search for controlled substances, paraphernalia, and stolen property. These items in the warrant may be severed from the document. *See United States v. Gomez-Soto,* 723 F.2d 649, 654 (9th Cir. 1984) ("This court has embraced the doctrine of severance, which allows us to strike from a warrant those portions that are invalid and preserve those portions that satisfy the fourth amendment.") Nonetheless, the marijuana, for example, was seized because it was in plain view during the lawful execution of the search warrant. Given the quantity of marijuana, it was immediately apparent that the marijuana was contraband. *See* NRS 453.336. The same principle would apply for other contraband in the vehicle, such as the silencers and ammunition. *See* NRS 202.350; 18 U.S.C. § 922(g)(1). Nevertheless, the affidavit incorporated in the warrant sought evidence of the crime of prohibited person possessing firearms. For that reason, ammunition, silencers, and other firearm equipment necessarily also fall within the scope of the warrant; Defendant does not argue otherwise.

Case 3:22-cr-00068-ART-CLB   Document 41   Filed 04/26/23   Page 23 of 24


Trooper Boyer could have searched the vehicle without a warrant. Instead, out of an abundance of caution, he chose to present the facts to a magistrate for the magistrate to decide if he had sufficient probable cause to search the vehicle. In doing so, police demonstrated good faith and relied on the signed search warrant to conduct their search.

g.   Defendant's statements were not made in violation of *Miranda* because they were not the product of a custodial interrogation, namely because he was never in custody.

Defendant was never in custody, and therefore, none of his statements were made in violation of *Miranda*. "Not all restraints on freedom of movement amount to custody for purposes of Miranda." *Howes v. Fields*, 565 U.S. 499, 509 (2012). The usual traffic stop is akin to a *Terry* stop, which means an officer may ask the detainee a moderate number of questions to determine his identity and to obtain information that confirms or dispels their suspicions. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). "The similarly noncoercive aspect of ordinary traffic stops" has prompted the Supreme Court "to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." *Id.* at 440.

Defendant asserts he was in custody because he was "ordered out of his car and forced to sit in Trooper Boyer's SUV." Def. Mo. at 28. Unsurprisingly, Defendant makes no argument he was in custody prior to that point, thus none of the statements made prior to that could have been in violation of *Miranda*. Defendant was not in custody under *Berkemer*.

The mere fact that Defendant was asked to step out of his vehicle and sit in the front seat of the patrol car did not render him in custody for purposes of *Miranda* either. *See e.g., United States v. Anthony*, 330 F. App'x 661, 662 (9th Cir. 2009) (unpublished). At no point was Defendant "informed that his detention would not be temporary." *Berkemer*, 468 U.S. at 442. At no point was Defendant "subjected to restraints comparable to those associated with a formal arrest." *Id.* at 441. Defendant was advised he was receiving a speeding ticket

multiple times. He was sitting unrestrained in the *front* seat of the patrol car with a single

police officer. The patrol car door remained open for a period of time. Initially, the trooper

told Defendant he could leave the door open or close it. Def. Ex. G at 15:58:17. The door

only shut after the trooper told Defendant he could close it to keep the cool air in the car.

Defendant was never searched, handcuffed, or restrained in any way. While the test is

objective rather than subjective, Defendant even acknowledged sitting in the patrol car was

more comfortable for both the trooper and Defendant. At the end of the traffic stop,

Defendant was not arrested and was free to leave.

Defendant was simply not subjected to custodial interrogation. Other statements

made by Defendant were spontaneous. For example, Defendant's statement that he only had

ammunition because someone gave it to him was not the product of an express question or

responsive to any question reasonably likely to illicit an incriminating response. *See Rhode*

*Island v. Innis*, 446 U.S. 291, 302 (1980).

III.    Conclusion

For the foregoing reasons, this Court should deny the Motion to Suppress.   The

government reserves the right to supplement this response with additional evidence and

authorities at any hearing on the motion.

DATED: April 26, 2023.

Respectfully submitted,

JASON M. FRIERSON
United States Attorney

*/s/ Andrew Keenan*
ANDREW KEENAN
Assistant United States Attorney