```
 1
 2                 IN THE UNITED STATES DISTRICT COURT
 3                    FOR THE DISTRICT OF NEVADA
 4
 5   UNITED STATES OF AMERICA,      )
                                    )
 6                Plaintiff,        )   Criminal Case No.
                                    )   3:22-cr-00068-ART-CLB
 7   vs.                            )
                                    )
 8   Triston Harris Steinman,       )   Friday, July 7, 2023
                                    )
 9                Defendant.         )
     _____
10
11        TRANSCRIPT OF ORAL ARGUMENT AND EVIDENTIARY HEARING
                 HONORABLE ANNE R. TRAUM PRESIDING
12                  UNITED STATES DISTRICT COURT
13
14
15
16                    A P P E A R A N C E S
17   For the Plaintiff:          Andrew Keenan
                                 U.S. Attorneys Office - Reno
18                               400 S. Virginia Street, Ste 900
                                 Reno, NV  89501
19
     For the Defendant:          Sean A. McClelland and
20                               Christopher P. Frey
                                 Federal Public Defenders Office
21                               200 S. Virginia Street, Ste 340
                                 Reno, NV  89401
22
23   Official Court Reporter:    Donna Prather
                                 410 S. Virginia Street
24                               Reno, NV  89501
25   Proceedings taken by Certified Stenographic Reporter and
     transcribed using Computer-Assisted Translation
```

```
 1        (Proceedings commenced at 1:37 p.m.)

 2             THE CLERK:  This is the date and time set for oral

 3   argument and an evidentiary hearing in Case

 4   No. 3:22-cr-00068-ART-CLB.  United States of America versus

 5   Triston Harris Steinman.

 6             Counsel, please state your appearances for the

 7   record.

 8             MR. KEENAN:  Good afternoon.  Andrew Keenan for the

 9   government.

10             THE COURT:  Good afternoon.

11             MR. MCCLELLAND:  Sean McClelland for Mr. Steinman

12   here with Chris Frey at counsel table.

13             THE COURT:  Good afternoon to you and to

14   Mr. Steinman.

15             Okay.  We have a couple of motions before us.  We

16   have an evidentiary hearing on the motion to suppress and what

17   I anticipate will be argument on the motion to dismiss.  My

18   intention was to move forward with the motion to suppress

19   first, and then I'll give you a little bit of time to wrap

20   that up, and then we'll move on to the motion to dismiss.

21             So, the government proceeds, I assume.

22             MR. KEENAN:  Yes, we're prepared to go forward.

23             THE COURT:  Okay.  Very good.  Go ahead.

24             MR. KEENAN:  Well, at this time -- well, as a

25   preliminary matter, I believe the parties have agreed to
```

1    stipulate to all of each other's exhibits.  So as far as the

2    government's concerned, at this time I would move to admit

3    Exhibits 1A, B, and C, and 2 through 8.

4           THE COURT:  Okay.  And just another small thing, I'm

5    just looking at the exhibits that I saw from the government.

6    I noticed and certainly appreciate and anticipate having those

7    come in as exhibits in support of there being a speeding

8    violation.

9           MR. KEENAN:  Yes.

10          THE COURT:  But so I welcome that testimony.  I

11   doubt it would be difficult for me to find that there's a

12   speeding violation based on the record, so just in terms of

13   tailoring how much time you spend on that.

14          MR. KEENAN:  Yeah, I will not be dwelling on that.

15          THE COURT:  Okay.  Thank you.

16          MR. KEENAN:  At this time the government calls

17   Trooper William Boyer.

18          THE CLERK:  Good afternoon.  May I have you raise

19   your right hand.

20          **WILLIAM BOYER**, PLAINTIFF WITNESS, SWORN

21          THE CLERK:  Please state your name for the record.

22          THE WITNESS:  William Boyer.

23          THE CLERK:  Please spell your first and last name.

24          THE WITNESS:  W-i-l-l-i-a-m.  Last name B-o-y-e-r.

25          THE CLERK:  Thank you.

1       MR. KEENAN:  Your Honor, if it's okay, I will sit at

2   counsel table so I can --

3       THE COURT:  Yeah, before you proceed, I just want to

4   acknowledge that there was a stipulation as to the exhibits

5   moments ago, so all of those exhibits will be admitted.  Thank

6   you.

7       (Plaintiff's Exhibits 1A B C 2 3 4 5 6 7 8 received.)

8       MR. MCCLELLAND:  And Your Honor, we'd similarly move

9   for the admission of Defense Exhibits 501 through 510.

10      THE COURT:  And is there a stipulation on the

11  defense exhibits?

12      MR. KEENAN:  Yes, no objection.

13      THE COURT:  Okay.  Those will also be admitted.

14      (Defense Exhibits 501 502 503 504 505 506 507 508 509 510

15  received.)

16      THE COURT:  You may proceed, and you're welcome to

17  sit at counsel table.  Thank you.

18      MR. KEENAN:  It appears my computer might shut down

19  in a half an hour, but I will turn it back on when it does.

20      THE COURT:  Okay.

21                  **DIRECT EXAMINATION**

22  BY MR. KEENAN:

23  Q.   Good afternoon.  I'm not sure that you did, but can you

24  please state and spell your name.

25  A.   William Boyer.  First name W-i-l-l-i-a-m.  Last name

```
1   B-o-y-e-r.

2   Q.    Where do you work?

3   A.    Nevada State Police Highway Patrol Division in Wells.

4   Q.    In what capacity?

5   A.    I'm a trooper with the Nevada State Police.

6   Q.    And how long have you been with, let's say, NHP, Nevada

7   Highway Patrol?

8   A.    As of current, just approximately five years.

9   Q.    And let's say up until August 2022, approximately how

10  many traffic stops have you made up until that point?

11  A.    A few thousand.

12  Q.    And approximately how many arrests have you made up to

13  that point?

14  A.    Again, varies between 20 and 30 a year.

15  Q.    And by that time it was about four years in?

16  A.    Yes.

17  Q.    And as part of your job as a trooper with NHP, have you

18  received any specialized training?

19  A.    Yes.

20  Q.    Could you explain what some of that was?

21  A.    On top of the P.O.S.T. Certified Academy and the Nevada

22  Highway Patrol Specific Academy, I attended a criminal

23  interdiction training.

24  Q.    P.O.S.T. certified, is that basic training?

25  A.    Correct.  It's Peace Officer Standards and Training.
```

```
 1    Q.    And as a trooper, where are you currently assigned?
 2    A.    Wells.
 3    Q.    Is that where you were also assigned in August 2022?
 4    A.    Yes.
 5    Q.    And as a trooper out in Wells in that division, what area
 6    do you patrol?
 7    A.    I patrol all around the city of Wells, north, east,
 8    south, and west.
 9    Q.    Some major highways?
10    A.    Yeah, a couple of major highways.  Interstate Route 80,
11    and U.S. Highway 93.
12    Q.    Now I'm going to direct your attention to August 12,
13    2022.  Were you working on that date?
14    A.    Yes.
15    Q.    Approximately what time that day were you working?
16    A.    I started my shift between 12:00 and 2:00 p.m.
17    Q.    And how long are your shifts?
18    A.    About approximately ten hours.
19    Q.    And were you working in a patrol car?
20    A.    Yes.
21    Q.    Do you know what patrol car you were in?
22    A.    Yeah, Unit Number 19060.
23    Q.    And is that number unique to your patrol car --
24    A.    It is.
25    Q.    -- that day?
```

```
 1   A.    Yes.

 2   Q.    And were you working alone that day?

 3   A.    Yes.

 4   Q.    Were you in uniform?

 5   A.    Yes.

 6   Q.    At approximately 3:51 p.m., did you conduct a traffic

 7   stop?

 8   A.    Yes.

 9   Q.    What vehicle did you stop?

10   A.    A gray BMW 325.

11   Q.    And did you come to learn who was driving that vehicle?

12   A.    Yes.

13   Q.    Who was that?

14   A.    Triston Harris Steinman.

15   Q.    And was there anyone else in the car?

16   A.    No.

17   Q.    And do you see the driver of that BMW in the courtroom

18   today?

19   A.    Yes.

20   Q.    And -- well, since you do, could you point that

21   individual out and identify them by a piece of clothing.

22   A.    Mr. Steinman is wearing a white button-up shirt sitting

23   behind the defense desk.

24         MR. KEENAN:  Your Honor, let the record reflect the

25   witness has identified the defendant.
```

```
 1              THE COURT:  Yes, it's noted.
 2   BY MR. KEENAN:
 3   Q.   Now, could you briefly describe the circumstances leading
 4   up to the stop.
 5   A.   I was traveling northbound on U.S. Highway 93, which I
 6   observed a gray BMW sedan traveling towards my location.  I
 7   observed the vehicle -- or a vehicle estimated traveling above
 8   the posted speed limit, which I activated my front radar or my
 9   radar on the front being the opposite direction mode and
10   verified the vehicle to be traveling 89 miles per hour in a
11   75 mile per hour speed zone.
12   Q.   And have you been certified to use radar?
13   A.   Yes.
14   Q.   And like you said, the car you were driving was equipped
15   with radar equipment?
16   A.   Yes.
17   Q.   And at some point, prior to that day that radar had been
18   calibrated at some point?
19   A.   Yes.
20   Q.   And you may have mentioned it, but where exactly was the
21   defendant stopped on that date?
22   A.   Approximately mile marker 56 Elko and U.S. Highway 93.
23   Q.   And on Highway 93, where in relation to other cities or
24   towns is that?
25   A.   It's approximately 18 miles south of Wells.
```

1   Q.   Do you patrol that road often?

2   A.   Yes.

3   Q.   What's the speed limit on that road?

4   A.   70 miles per hour.

5   Q.   And are you aware of any speed limits in Nevada that are

6   over 80 miles per hour?

7   A.   No.

8   Q.   And after you observed the vehicle and activated your

9   radar and observed the radar, what did you do next?

10  A.   I activated my emergency lights, made a U-turn and

11  stopped the vehicle to take enforcement action.

12  Q.   And I'm going to pull up Exhibit 2 and play it from the

13  beginning.

14       (Video played.)

15  BY MR. KEENAN:

16  Q.   Stopping it at the 30 second mark.  Trooper Boyer, is

17  that in the middle of the frame, that vehicle, is that the BMW

18  that you stopped?

19  A.   Yes.

20  Q.   And that was the BMW that your radar indicated was

21  traveling at 89 miles per hour?

22  A.   Yes.

23          MR. KEENAN:  I'm going to continue to play it

24  briefly.

25       (Video played.)

```
 1            MR. KEENAN:  I'm stopping it at 1:04 on the dash cam
 2   video.
 3   BY MR. KEENAN:
 4   Q.   Trooper Boyer, what did you observe next?
 5   A.   I observed movement within the cab of the vehicle.
 6   Q.   After you had pulled behind it?
 7   A.   Correct.
 8            MR. KEENAN:  I'm going to go ahead and continue to
 9   play it briefly.
10       (Video played.)
11            MR. KEENAN:  And stopping it at 1:32.
12   BY MR. KEENAN:
13   Q.   At this time, do you exit your patrol vehicle?
14   A.   Yes.
15   Q.   And prior to that, after pulling up and behind the BMW
16   and before exiting your vehicle, did you observe the
17   individual in the vehicle moving?
18   A.   Yes.
19   Q.   And is that shown on your dash cam video?
20   A.   Yes.
21            MR. KEENAN:  I'm going to pull up Government's
22   Exhibit 3.  And beginning it at the -- well, I'll use the
23   timestamp on the -- 15:51:23 timestamp on the video.
24       (Video played.)
25            MR. KEENAN:  Just stopping briefly at 15:52:12.
```

```
1   BY MR. KEENAN:

2   Q.   Trooper Boyer, does this body cam video depict your

3   interaction with the defendant on August 12?

4   A.   Yes.

5            MR. KEENAN:  I'm going to go ahead and continue

6   playing it from that timestamp.

7       (Video played.)

8            MR. KEENAN:  I'm stopping at 15:52:24.

9   BY MR. KEENAN:

10  Q.   Trooper Boyer, at this point what, if anything, did you

11  observe inside the vehicle?

12  A.   I observed a blanket covering what I thought to be items

13  in the back seat of the vehicle, and I also observed a green

14  ammunition box in the front right floorboard of the vehicle.

15  Q.   And you say the blanket, was the blanket on the actual

16  seat or did it appear above the actual seat?

17  A.   Above.

18  Q.   And could you tell what was underneath it?

19  A.   No.

20  Q.   And the ammo box, could you describe that.

21  A.   From my recollection, I think it was a green -- a

22  general -- just a general ammo box.

23  Q.   One you would buy at the store or?

24  A.   Yeah, maybe -- yeah, absolutely, correct, one that you

25  would buy at the store.
```

1          MR. KEENAN:   Okay.   I'm going to continue playing it

2    from 15:52:24.

3        (Video played.)

4          MR. KEENAN:   I'm stopping it at 15:53:23, the body

5    cam.

6    BY MR. KEENAN:

7    Q.   What are you doing in your vehicle at this point?

8    A.   At this point I'm preparing to run a driver's license

9    check.

10   Q.   And is that what you did?

11   A.   Yes.

12       (Video played.)

13         MR. KEENAN:   Pausing it at 15:53:40.

14   BY MR. KEENAN:

15   Q.   When you run a driver's license check, what does that

16   entail?   What does the results of that check entail?

17   A.   It shows whether the subject's license is clear and

18   valid, if they have any warrants, outstanding warrants or if

19   they have any protection orders.

20         MR. KEENAN:   Okay.   I'm going to continue to play

21   the body cam from 15:53:40.

22       (Video played.)

23         MR. KEENAN:   Just pausing at 15:54:26.

24   BY MR. KEENAN:

25   Q.   What's going on here?

```
1    A.    I received a phone call from my supervisor.

2    Q.    Was it related at all to this traffic stop?

3    A.    No.

4    Q.    It was about some other assignment?

5    A.    Correct.

6           MR. KEENAN:  Okay.  I'm going to continue playing

7    the body cam at 15:54:26.

8         (Video played.)

9           MR. KEENAN:  I'm stopping at 15:55:16, and I'm going

10   to fast forward to 15:55:56.

11   BY MR. KEENAN:

12   Q.    At some point did you return to Mr. Steinman's vehicle?

13   A.    Yes.

14   Q.    Why was that?

15   A.    I was going to check the VIN number on the subject's

16   vehicle and make sure it matched the registration that was

17   provided as well as request the subject's insurance

18   information.

19           MR. KEENAN:  I'm going to play from 15:55:56, the

20   body cam.

21         (Video played.)

22           MR. KEENAN:  Just pausing at 15:58:24.

23   BY MR. KEENAN:

24   Q.    Up until this point, had the defendant shown you any

25   proof of insurance for the car?
```

1    A.   No.

2         MR. KEENAN:  I'm going to continue playing at that

3    timestamp.

4         (Video played.)

5         MR. KEENAN:  Just pausing at 15:58:46.

6    BY MR. KEENAN:

7    Q.   What are you doing on your computer at this point?

8    A.   I'm looking at the vehicle registration in the system and

9    seeing if I can verify any insurance information attached to

10   that registration.

11        MR. KEENAN:  I'm going to continue playing from that

12   timestamp.

13        (Video played.)

14   BY MR. KEENAN:

15   Q.   So at 15:59:15, what's happening here?

16   A.   Mr. Steinman is showing me insurance on his cellular

17   device.

18   Q.   And did you look at that to verify it?

19   A.   Yes.

20        MR. KEENAN:  Okay.  I'm going to continue playing

21   the body cam.

22        (Video played.)

23        MR. KEENAN:  Stopping at 16:00:12.

24   BY MR. KEENAN:

25   Q.   What are you doing on your computer now?

```
 1    A.    I'm accessing my ticket writer application.

 2    Q.    How can you tell?

 3    A.    I see the symbol that is usually there when I log in on

 4    the login screen.

 5          MR. KEENAN:  Okay.  I'm going to continue playing

 6    from that timestamp on the body cam.

 7       (Video played.)

 8          MR. KEENAN:  Stopping at 16:00:36.

 9    BY MR. KEENAN:

10    Q.    When you're talking about the vents, are you referring to

11    the air conditioning in your car?

12    A.    Yes.

13          MR. KEENAN:  Okay.  I'm going to continue playing

14    the body cam.

15       (Video played.)

16          MR. KEENAN:  Just pausing at 16:01:22.

17    BY MR. KEENAN:

18    Q.    What are you doing on the computer at this point?

19    A.    I'm attaching Mr. Steinman's driver's license information

20    to the call details.

21          MR. KEENAN:  I'm going to continue playing the body

22    cam.

23       (Video played.)

24          MR. KEENAN:  Stopping at 16:01:38.

25    ///
```

```
1    BY MR. KEENAN:

2    Q.   Is there anything you noticed about Mr. Steinman's

3    physical appearance during -- at this point in the stop?

4    A.   Mr. Steinman appeared to be sweating, which I noticed

5    prior to that point, but at that point I was also taking note.

6    Q.   Do you remember if the air conditioning was on in your

7    car?

8    A.   It was.

9         MR. KEENAN:  I'm going to continue playing the body

10   cam at 16:01:38.

11       (Video played.)

12       MR. KEENAN:  Stopping at 16:02:14.

13   BY MR. KEENAN:

14   Q.   What is a T-26 investigation?

15   A.   It's referring to a criminal history check.

16   Q.   And you're requesting that from your dispatch?

17   A.   Correct.

18       MR. KEENAN:  I'm going to continue playing at

19   16:02:14.

20       (Video played.)

21       MR. KEENAN:  Just pausing briefly at 16:03:50.

22   BY MR. KEENAN:

23   Q.   Had you completed the traffic citation by this point?

24   A.   No.

25       MR. KEENAN:  Okay.  I'm going to continue playing.
```

```
 1        (Video played.)

 2             MR. KEENAN:  I'm pausing at 16:05:07.

 3   BY MR. KEENAN:

 4   Q.    What's on your computer screen at this point?

 5   A.    That's my ticket writer application.

 6   Q.    And on the right side where it's not blackened out, is

 7   that a signature line?

 8   A.    Yes.

 9   Q.    Is that where you sign the ticket?

10   A.    Yes.

11             MR. KEENAN:  I'm going to continue playing.

12        (Video played.)

13             MR. KEENAN:  I'm pausing at 16:05:23.

14   BY MR. KEENAN:

15   Q.    What are you doing on your computer at this point?

16   A.    I believe I heard the audible sound that said that

17   something had attached to my CAD, and I believe at that point

18   in time is when I received the -- Mr. Steinman's criminal

19   history and I began to review it.

20   Q.    So could you just explain for us how that works with the

21   request for the criminal history check and how it's delivered

22   to you, essentially?

23   A.    I request a criminal history through dispatch.  We can't

24   run criminal history ourselves.  Once they receive the

25   criminal history, they attach it to the CAD.  And then when
```

```
1    they attach it to the CAD, I hear the audible tone that said
2    that something was attached to the CAD.  CAD being the call
3    details.
4    Q.   So you receive like a notification-type thing on your
5    computer?
6    A.   Yes.
7            MR. KEENAN:  I'm going to continue playing from
8    16:05:23.
9        (Video played.)
10           MR. KEENAN:  I'm just going to stop it at 16:06:09.
11   BY MR. KEENAN:
12   Q.   Are you still looking at the criminal history return?
13   A.   Yes.
14   Q.   I'm just going to briefly pull up Exhibit 6, which has
15   already been admitted.
16           What are we looking at here?
17   A.   These are the returns from the records request that they
18   attached to the call details.
19   Q.   So is this a printout of what you were looking at on your
20   screen in your patrol car?
21   A.   Yes.
22           MR. KEENAN:  I'm going to return to Exhibit 3,
23   16:06:09.
24       (Video played.)
25           MR. KEENAN:  I'm pausing at 16:06:18.
```

```
1    BY MR. KEENAN:

2    Q.   What are you communicating with dispatch about?

3    A.   Dispatch advised me that they had attached the criminal

4    history and they were going to basically give me the

5    information over the radio, but I had advised them that I was

6    going to look at that myself.

7    Q.   And had you already been reviewing it yourself?

8    A.   Yes.

9              MR. KEENAN:   I'm going to continue playing the body

10   cam briefly.

11        (Video played.)

12   BY MR. KEENAN:

13   Q.   At 16:07:44, are you still scrolling through that

14   criminal history check?

15   A.   Yes.

16   Q.   I'm going to -- well, did you scroll through the whole

17   thing?

18   A.   Yes.

19   Q.   And did you see items that were listed "felony with a

20   guilty disposition"?

21   A.   Yes.

22   Q.   Did you know what any of them were for?

23   A.   Not -- there was one of them that was a domestic violence

24   with a dangerous weapon enhancement, I believe.  And then

25   there was another one, I think it was for a stolen vehicle --
```

```
 1    or I can't actually remember that one.  But I believe there
 2    was a domestic violence one with a deadly weapon enhancement.
 3                MR. KEENAN:  I'm going to continue playing, briefly.
 4         (Video played.)
 5    BY MR. KEENAN:
 6    Q.   At 16:09:03 on the body cam, what are you doing here?
 7    A.   I return to continue writing the citation.
 8                MR. KEENAN:  I'm going to continue playing.
 9         (Video played.)
10    BY MR. KEENAN:
11    Q.   At 16:10:31, what are you doing here?
12    A.   I'm signing the block for the citation.
13                MR. KEENAN:  Okay.  I'm going to continue playing
14    just briefly.
15         (Video played.)
16                MR. KEENAN:  Stopping at 16:11:34.
17    BY MR. KEENAN:
18    Q.   What did you just do with what appeared to be the
19    driver's license?
20    A.   I scanned the bar code of his driver's license for the
21    information for the citation.
22    Q.   So does it automatically input into a citation?
23    A.   Yes, it auto generates.
24                MR. KEENAN:  I'll continue playing at 16:11:34.
25         (Video played.)
```

```
 1              MR. KEENAN:  Stopping at 16:12:04.  I'll fast
 2   forward a little.
 3              Beginning at 16:13:46.
 4        (Video played.)
 5              THE COURT:  Can I ask a question?
 6              MR. KEENAN:  Yes.
 7              THE COURT:  Just because it's a little cumbersome to
 8   go back over this.  I just wanted to ask, there was just a
 9   thing that was expired, and then oh, you're good, you're fine.
10   Could we just clarify what that was.
11   BY MR. KEENAN:
12   Q.   What did you look at and confirm was okay?
13   A.   After I had told him it was expired, and he had already
14   told me before, I just had forgotten to remember.  But he had
15   told me that he had his Utah registration, which I verified at
16   that moment in the system and that it was indeed correct, and
17   it was valid.
18              THE COURT:  Okay.
19   BY MR. KEENAN:
20   Q.   So originally you were provided an older Washington
21   registration, but the car had since been registered in Utah?
22   A.   Correct.  And during the initial phase of the traffic
23   stop he did say that he had Utah registration.
24              THE COURT:  Okay.  Thank you for that clarification.
25              MR. KEENAN:  You're welcome.
```

```
 1              I'll continue at 16:14:55.

 2         (Video played.)

 3    BY MR. KEENAN:

 4    Q.   By the time you had asked Mr. Steinman if he'd ever been

 5    in trouble before, had you reviewed his criminal history?

 6    A.   Yes.

 7              MR. KEENAN:  I'll continue playing at 16:15:30.

 8         (Video played.)

 9              MR. KEENAN:  Just stopping briefly at 16:16:15.

10    BY MR. KEENAN:

11    Q.   Can you tell what you're doing on your computer at this

12    point?

13    A.   I'm still writing the citation at that point.  I think

14    that screen is for the endorsements restrictions.

15    Q.   What does that mean?

16    A.   Any endorsements restrictions on his driver's license.

17    Q.   Okay.

18         (Video played.)

19              MR. KEENAN:  Just pausing at 16:19:07, and I'll fast

20    forward a little.

21    BY MR. KEENAN:

22    Q.   At this point are you finishing up the ticket?

23    A.   I'm getting pretty close.

24              MR. KEENAN:  I'll fast forward to 16:20:16.

25         (Video played.)
```

```
 1              MR. KEENAN:  I'll stop it at 16:20:50.
 2   BY MR. KEENAN:
 3   Q.   What happens next?
 4   A.   At that point, just for context, I had asked him to
 5   search the vehicle, but I had asked him to step out of the
 6   vehicle and stand by with another officer.
 7   Q.   After the fact?
 8   A.   After the fact.
 9   Q.   And what did you do with the vehicle?
10   A.   Excuse me?
11   Q.   What did you do with the vehicle?
12   A.   I requested it to be tipped off and seized and towed.
13   Q.   And at some point, later did you confirm the conviction
14   you had seen with dispatch?
15   A.   I did.
16   Q.   Or did you request that they confirm them?
17   A.   Yes.
18   Q.   I'll pull up quickly Exhibit 4.  Is this the call detail?
19   A.   Yes.
20   Q.   And does it include notes of your communications with
21   dispatch?
22   A.   Yes.
23   Q.   And do you know when you asked dispatch to verify the
24   convictions?
25   A.   Can you give me a second to look at it?
```

 1              I don't see it on that page.

 2   Q.    Could it have been at 16:26?

 3   A.    Yeah, that's where it is.

 4   Q.    And did dispatch call you back with --

 5              THE COURT:  I'm sorry.  Can you just pinpoint where

 6   it is so I'm looking at what you're looking at.

 7   BY MR. KEENAN:

 8   Q.    The entry -- are you referring to the entry at 16:26:54?

 9   A.    Yes, I am.

10   Q.    And that says with a typo, "verify those are felony

11   convictions, not just charges"?

12   A.    Yes.

13   Q.    And is that a notation that dispatch makes after you make

14   that request?

15   A.    Yes.

16              THE COURT:  Thank you.

17   BY MR. KEENAN:

18   Q.    And did dispatch call you back with the results of that?

19   A.    Yes.

20              MR. KEENAN:  I will pull up Exhibit 7 and play it

21   from the beginning.

22        (Video played.)

23              MR. KEENAN:  Stopping it at 1:57.

24              And pulling up briefly Exhibit 6.

25   ///

BY MR. KEENAN:

Q.   On that call you mentioned the domestic violence to dispatch; is that right?

A.   Yes.

Q.   And I'm turning to the -- what's Bates stamped 728 and 729 on the criminal history printout.  What's titled "Cycle Three", is that what you were referring to that you had observed in your vehicle?

A.   Where is "Cycle Three", I'm sorry?

Q.   Right at the very top.

A.   Okay.  Yep, Cycle Three.  Charge was assault -- if you scroll down a bit further, it says domestic violence enhancement -- or let's see, enhancing factor, domestic violence, class A felony.  Disposition guilty.

Q.   So when you mentioned domestic violence to dispatch before they had told you, that was because you had seen that entry?

A.   Correct.

Q.   And you said the car was -- I believe you said the car was sealed and towed.  What did you do after that?

A.   Once it was towed, I went to the highway patrol substation and authored a request for a warrant affidavit.

Q.   And did you submit that to a justice of the peace?

A.   Yes.

Q.   And I'll just pull up briefly Exhibit 8.

```
 1              Do you recognize this?
 2   A.   Yes.
 3   Q.   What is it?
 4   A.   It's the request for a warrant, search warrant.
 5   Q.   For Mr. Steinman's BMW?
 6   A.   Correct.  It says, "Affidavit in support of application
 7   for search warrant."
 8   Q.   And this is the affidavit that you signed and submitted
 9   to the justice of the peace?
10   A.   Can you scroll up a little bit?  Sorry.
11              Yes, it is.
12   Q.   And was the actual warrant signed?
13   A.   Yes.
14   Q.   And did you search the BMW pursuant to that warrant?
15   A.   Yes.
16   Q.   Was that BMW search prior to obtaining that warrant at
17   all?
18   A.   No.
19   Q.   And could you just briefly summarize some of the items
20   that were recovered during the search?
21   A.   I believe there were 38 firearms, approximately seven
22   pounds of marijuana, and some drug paraphernalia, and some
23   ammo.
24   Q.   Now --
25   A.   Ammunition.
```

1   Q.    -- just going back to your interaction with Mr. Steinman.

2   At any point was he handcuffed?

3   A.    No.

4   Q.    Did you ever pull your gun out on him?

5   A.    No.

6   Q.    Did you ever even frisk him?

7   A.    No.

8   Q.    When you asked him to have a seat in your car, where did

9   he sit?

10  A.    Front, right, passenger side of my vehicle.

11  Q.    And was the passenger -- front passenger door to your

12  vehicle open at first?

13  A.    Yes.

14  Q.    And at some point, did you tell the defendant he was

15  receiving a speeding ticket?

16  A.    Yes.

17  Q.    And when you were waiting for the tow truck, where was

18  the defendant?

19  A.    He was outside of my vehicle, forward of my vehicle, and

20  I believe he was right next to, pretty close to his vehicle,

21  just forward of it.

22  Q.    Was he doing anything?

23  A.    He was talking on his cellular phone.

24  Q.    Was he standing in one place or walking around?

25  A.    He was walking around a little bit.

```
1   Q.   And did he ultimately leave?

2   A.   Yes.

3   Q.   How?

4   A.   On foot.

5   Q.   Just down the road?

6   A.   Walking northbound alongside the road, yes.

7          MR. KEENAN:  In the interest of time, I'm not going

8   to play anymore of the body cam.  I know the Court, -- it's

9   available to the Court, unless there's some portion the Court

10  would like me to play.

11         THE COURT:  No.  It would be helpful just to

12  pinpoint at what point did the tow truck come.  How far along

13  are we when the tow truck comes and then how long did the

14  defendant stick around?

15         MR. KEENAN:  I will open up Exhibit 3.

16      (Video played.)

17         MR. KEENAN:  Actually, go to Exhibit 4.

18  BY MR. KEENAN:

19  Q.   Just looking at --

20  A.   It's on that page.

21  Q.   -- Bates stamp 79 on Exhibit 4, do you know about when

22  the tow truck was requested?

23  A.   I don't exactly remember.  Let's see, I can -- if you let

24  me look at it for a minute.

25         I believe it was approximately 16:43:30.
```

1    Q.    And do you know when they took the vehicle?

2    A.    Let me look at it real quick.

3    Q.    Referring to the bottom -- the very bottom of the Bates

4    stamp 79.

5    A.    Yeah, 17:46:09 hours is when I advised that they had the

6    vehicle.

7    Q.    And when the tow truck ultimately took the vehicle, where

8    was Mr. Steinman?

9    A.    I believe that before the tow truck left with the

10   vehicle, Mr. Steinman had already left.  He was advised that

11   he was not detained.  Once he -- he was advised once I gave

12   him the citation, he was free to leave.  But I also advised

13   that we'd be giving -- we could give him a ride, a courtesy

14   ride, to the nearest town.

15   Q.    But he declined to ride with anyone?

16   A.    I think -- I think ultimately he did ride with another

17   officer, but not initially he did not.

18            THE COURT:  I'm sorry, when was he handed -- when on

19   here is he handed back his license and the --

20            THE WITNESS:  I'd have to review the video, ma'am.

21            THE COURT:  Would you have put it in these notes?

22            THE WITNESS:  It probably wouldn't have been in the

23   notes, ma'am.  Not in the call details.

24            THE COURT:  But the citation is in here?  Maybe I

25   missed it.  When he got the citation, is that in here?

```
 1              THE WITNESS:  It is on body cam.  It's not on the
 2    call details.
 3              THE COURT:  Okay.  That's not something you would
 4    have reported.
 5              Okay.  Thank you.
 6              MR. KEENAN:  I have no further questions unless --
 7              THE COURT:  Very good.  Thank you.
 8              MR. MCCLELLAND:  Starting with the Court, could I
 9    proceed from the lectern, Your Honor, I believe the HDMI cable
10    transmits sound in a way the defense table doesn't.
11              THE COURT:  Absolutely.
12              MR. MCCLELLAND:  Thank you, Your Honor.
13              Thank you, Your Honor.
14              And thank you, Trooper Boyer, for being here.
```

**CROSS-EXAMINATION**

```
16    BY MR. MCCLELLAND:
17    Q.   I'm going to ask a couple background questions for you,
18    Trooper Boyer, and then, of course, ask a couple questions
19    about this stop on August 12.  So by way of background, you
20    testified you're a Nevada Highway Patrol officer; correct?
21    A.   Correct.
22    Q.   You're not a federal law enforcement officer; correct?
23    A.   No.  Correct.
24    Q.   Okay.  And your daily duties as a Nevada Highway Patrol
25    officer is to enforce Nevada law; correct?
```

1    A.    Correct.

2    Q.    And under Nevada law, as you understand it, having

3    ammunition is not illegal; correct?

4    A.    Correct.

5    Q.    And you've been in Wells, Nevada, for how long?

6    A.    Approximately, at that point, it was just over four

7    years, nearly four and a half.  I'm not sure, but I think the

8    warrant said four years, five months.  Actually, it was less

9    than that because I transferred to Wells.  So it would have

10   been at that point approximately two years.

11   Q.    Okay.  And in your two years in Wells, summers are hot;

12   right?

13   A.    They can be.

14   Q.    They can be.

15         And on August 12, 2022, it was about 90 degrees that

16   day; right?

17   A.    I don't know.

18   Q.    Okay.  You previously testified at a preliminary hearing

19   in state court in connection with this matter; correct?

20   A.    Yes.

21   Q.    If I were to tell you that you testified then, about a

22   month after this stop, that it was 90 degrees out, would you

23   agree with that?

24   A.    Yes.

25   Q.    Okay.  So you would say it's 90 degrees on August 12,

1    2022.

2    A.   I would say I don't know.  But if he said, if he threw a

3    number of 90 degrees, I would agree.

4    Q.   Okay.  In your experience, someone can be in possession

5    of ammunition but not firearms as well; correct?

6    A.   As far as Nevada Revised Statute is, there is nothing

7    specific that prevents them from owning ammunition that I know

8    of, plus firearms.

9    Q.   I'm asking, I think, maybe a slightly different factual

10   question.  An individual can have in their possession

11   ammunition but not firearms.

12   A.   Yes.

13   Q.   Okay.  By the same token, someone can have ammunition in

14   their car but not a firearm in the car; correct?

15   A.   Not usually in my experience, but, yeah, it's possible.

16   Q.   All right.  Well, we'll go to the stop on August 12,

17   2022, then and won't try to repeat -- or will try not to

18   repeat Mr. Keenan's direct examination.  But just so we

19   understand the context, you're driving northward on U.S. 93

20   when you see a sedan coming in the opposite direction;

21   correct?

22   A.   Yes.

23   Q.   Okay.  You testified you determined the speed of that

24   sedan by radar; correct?

25   A.   I performed a visual estimate at first and then verified

```
1    by radar.

2    Q.   Okay.  And that's an internal radar that you use;

3    correct?

4    A.   The radar is inside the vehicle, yes.

5    Q.   Okay.  And that's something that you have to activate;

6    right?

7    A.   Yes.

8    Q.   Okay.  And so you activate that and determine that

9    Mr. Steinman is speeding, or the sedan is speeding; correct?

10   A.   Yes.

11   Q.   And then you immediately perform a U-turn and activate

12   your lights; correct?

13   A.   Yes.

14   Q.   Okay.  What sequence was that?  Did you activate your

15   lights and then perform the U-turn?

16   A.   I don't recall.  I think I activated my lights before I

17   made the U-turn.

18   Q.   Okay.  And you don't do any sort of pacing or anything

19   after you make the U-turn; correct?

20   A.   Correct.

21   Q.   Okay.  And indeed, quite quickly, the sedan that you're

22   trying to stop pulls over.

23   A.   Yes.

24   Q.   And you pull up behind the sedan.

25   A.   Yes.
```

```
1   Q.   And as you pull up behind the sedan, you see that the
2   sedan has sort of a tinted rear window; right?
3   A.   I mean, yeah, it's darker than usual.
4   Q.   Right.
5   A.   I couldn't tell you if it was tinted or not.
6   Q.   Right.  So you basically can see silhouettes on the other
7   side of that window; right?
8   A.   I can see through it, yes.
9   Q.   I'm asking, you just see silhouettes; correct?
10  A.   Yes.
11  Q.   Okay.  So it's sort of dark figures?
12  A.   Yes.
13  Q.   Okay.  No facial features that you can recognize.
14  A.   Yes.
15  Q.   Couldn't tell the occupant's hair color, for instance.
16  A.   Correct.
17  Q.   Couldn't see eyes, anything like that?
18  A.   Nope.
19  Q.   Okay.  So you stop, you get out, you approach the car
20  from the passenger side; correct?
21  A.   At the passenger side, yes.
22  Q.   Why do you approach from the passenger side?
23  A.   Officer safety usually.
24  Q.   Okay.  And rather promptly, you tell Mr. Steinman that
25  you stopped him because your speedometer read 89; correct?
```

```
 1   A.    That's what I said on camera.  I was referring to the
 2   actual radar reading.
 3   Q.    Okay.  But the speedometer is different than a radar;
 4   right?
 5   A.    It is.
 6   Q.    Yeah.  And you didn't gauge the speed of the sedan by
 7   pacing; right?
 8   A.    Correct.
 9   Q.    So your speedometer was sort of irrelevant to the radar
10   determination; is it fair to say?
11   A.    Yes.
12   Q.    Okay.  I think you mentioned that you had your radar
13   calibrated.  When was the last time you had it calibrated?
14   A.    I believe it was in May of 2021.
15   Q.    Okay.  So that's over a year prior to the stop here?
16   A.    Yes.
17   Q.    Okay.  Have you ever had your speedometer calibrated?
18   A.    Yes.
19   Q.    When was the last time you had that calibrated?
20   A.    Prior to the incident, it was May 2021; after that, I
21   believe it was January 2023.
22   Q.    So similarly, about -- well, over a year before the stop
23   in question here you had your speedometer calibrated?
24   A.    Yes.
25   Q.    All right.  So either way, you tell Mr. Steinman that
```

 1    you're stopping him for speeding; correct?

 2    A.    Yes.

 3    Q.    Okay.  I guess taking it just one step back.  Before you

 4    even approach, not only can't you see his face or facial

 5    features, but you don't see him open the door or anything;

 6    correct?

 7    A.    Can you repeat that?  I'm sorry.

 8    Q.    Yeah, apologies.

 9          Back before you even approach the passenger side

10    door, do you see Mr. Steinman open any doors to the vehicle?

11    A.    No.

12    Q.    Okay.  Do you see him get out of the front seat and move

13    into the passenger seat?

14    A.    No.

15    Q.    Okay.  So, you get to the passenger side window,

16    Mr. Steinman has already rolled down the window for you;

17    correct?

18    A.    Yes.

19    Q.    Okay.  And when you get there, Mr. Steinman hands you his

20    license; correct?

21    A.    Yes.

22    Q.    And, in fact, he already has it out and ready for you?

23    A.    I think so, yeah.

24    Q.    Yeah.  He also hands you his registration; right?

25    A.    I think I requested his registration, and upon after

1    which he handed it to me.

2    Q.   And Mr. Steinman tells you he's getting a digital copy of

3    his insurance from his girlfriend; right?

4    A.   I don't know how he said that.  I think he said, yeah, he

5    was looking for it somehow.

6    Q.   Trying to get a digital copy, specifically; right?

7    A.   Yeah, I believe so.

8    Q.   How is cell service near Wells?  Spotty?

9    A.   It depends on your carrier.

10   Q.   All right.  If you're about 18 miles out of Wells,

11   sometimes you don't have great cell service; right?

12   A.   Depends on your carrier.  I have great service out in

13   Wells.

14   Q.   All right.  You live in Wells.

15   A.   Yes.

16   Q.   As you're standing at Mr. Steinman's car's passenger

17   window, you testified that you spotted an ammunition box;

18   correct?

19   A.   Yes.

20   Q.   Okay.  Did you ask Mr. Steinman if he had, for instance,

21   a concealed carry permit or anything like that?

22   A.   No.

23   Q.   Okay.  And I believe in direct testimony in response to

24   Mr. Keenan's questions, you testified that you saw items under

25   the blanket in the back seat at this point?

1    A.   I'm not sure if I testified to seeing items.  I thought

2    there were items underneath the blanket, yes.

3    Q.   Okay.  So if you testified that you saw items underneath

4    the blanket, that would be an incorrect statement?

5    A.   I'm not understanding your question.  I believe what I

6    said in Mr. Keenan's examination was that I believed the

7    blanket was covering items in the back seat.

8    Q.   Okay.  But you didn't see items under the blanket;

9    correct?

10   A.   No.  I didn't see actual items, no.

11   Q.   All right.  And while you were standing on the passenger

12   side there, you also didn't see anything that you perceived to

13   be stolen property; right?

14   A.   Not that I could perceive at the time.

15   Q.   Right.  Nothing you thought was stolen property.

16   A.   Correct.

17   Q.   Okay.  Nothing you thought was a controlled substance.

18   A.   Correct.

19   Q.   Okay.  Nothing you thought was drug paraphernalia.

20   A.   I mean, initially, no.  Nothing.

21   Q.   Nothing you saw standing at the passenger side that

22   looked like drug paraphernalia to you.

23   A.   Correct.

24   Q.   Nothing that looked like a firearm to you.

25   A.   Correct.  Nothing.

1    Q.   Nothing that looked like rounds of ammunition.

2    A.   Correct.  Nothing.

3    Q.   Okay.  So out the passenger side window you get the

4    driver's license and registration from Mr. Steinman, and you

5    take that back to your police SUV; correct?

6    A.   Yes.

7    Q.   Okay.  And you start to run a records check on those

8    documents?

9    A.   Yes.

10   Q.   Yeah.  And as you're doing so, you get the interdiction

11   thing call; yes?

12   A.   From my supervisor, yes.

13   Q.   Right.  Who is your supervisor?

14   A.   Sergeant Gulsby.

15   Q.   Sergeant Gulsby.

16            All right.  And what is this interdiction thing?

17   A.   It was a special -- it was like a special event, a

18   special assignment for I believe a week.

19   Q.   Okay.  Special assignment where?

20   A.   Around Wells.  In the Wells district.

21   Q.   Okay.  What sort of special assignment?

22   A.   It was an interdiction assignment.

23   Q.   Okay.  Different from what you usually do in your line of

24   work?

25   A.   Not all too different, no.

1    Q.    But special in some way?

2    A.    Usually, yes.  Yeah, they were bringing their canine

3    units down.

4    Q.    And you testified that the entirety of that call not

5    related to Mr. Steinman; right?

6    A.    Correct.

7    Q.    You don't discuss Mr. Steinman's speeding on the call?

8    A.    No.

9    Q.    Great.  You don't mention Mr. Steinman at all on the

10   call; correct?

11   A.    Correct.

12   Q.    And Sergeant Gulsby, naturally, doesn't mention

13   Mr. Steinman either; correct?

14   A.    Correct.

15   Q.    All right.  After that call is then over, you return to

16   the records check that you were in the middle of performing,

17   safe to say?

18   A.    Yes.

19   Q.    And the results of those -- the check -- well, sorry let

20   me take a step back.

21         That records check involved checking the license,

22   correct?

23   A.    Yes.

24   Q.    Okay.  Including any potential outstanding warrants

25   associated with the individual with the license?

```
1    A.    I believe, yeah, absolutely.

2    Q.    Yeah?

3    A.    Any warrants that he may have had, if he had any, would

4    have been on that same history check.

5    Q.    On the same license check?

6    A.    Correct.  Sorry.

7    Q.    You're also running a registration check at that time,

8    too; right?

9    A.    The registration was already run by dispatch.

10   Q.    Okay.

11   A.    And I don't think I really viewed it.

12   Q.    Okay.  And both the license check and the registration

13   check come back as valid?

14   A.    Again, I don't remember -- I don't recall the

15   registration very well.  I was mainly checking Mr. Steinman's

16   license.

17   Q.    Okay.  So if -- in your previous testimony at the

18   preliminary hearing you testified that the registration was

19   valid out of Utah?

20   A.    Inevitably, that's what I found out, yes.

21   Q.    Okay.  So the registration was valid on the car?

22   A.    Yes.

23   Q.    And Mr. Steinman's license was similarly clear and valid?

24   A.    Yes.

25   Q.    All right.  And in connection with the preliminary
```

 1    hearing in state court in this matter, you testified that at

 2    this point there was nothing raising your suspicion about

 3    Mr. Steinman; is that correct?

 4    A.   I don't recall that on the preliminary report or

 5    transcripts.

 6    Q.   Okay.  There should be a binder there for you.  If you

 7    wouldn't mind turning to Defendant's Exhibit 510.

 8    A.   Is it the one down here?  Is that the one it is?

 9             THE CLERK:  It's a black binder.

10             MR. MCCLELLAND:  I can also pull it up.

11             THE WITNESS:  What page did you want me to turn to?

12             MR. MCCLELLAND:  Page 9, please, Deputy Boyer -- or

13    sorry, Trooper Boyer.  Lines 5 through 10.

14             THE WITNESS:  Is that in a specific tab?

15             MR. MCCLELLAND:  Yeah, it should be Tab 510.

16    Defendant's Exhibit 510.

17             This exhibit has already been admitted.  But just

18    for the sake of clarity, does this appear to be the transcript

19    of the preliminary hearing in state court in this matter?  You

20    can look at page 1 of the document, for instance.

21    A.   It appears that's what it is, yes.

22    Q.   Okay.  If you can flip all the way back to page 91 of the

23    document, that appears to be a court reporter certification --

24    correct? -- that it's a true and accurate recollection -- or

25    true and accurate account of the preliminary hearing?

1    A.    Yes.

2    Q.    Okay.  And in this preliminary hearing you were under

3    oath?

4    A.    Yes.

5    Q.    Okay.  So page 9, starting with line 5 -- well, starting

6    I guess with line 3, you're asked in this case by the state

7    court prosecutor here.  "Okay.  Now after you advised

8    Mr. Steinman of speed and made these observations, what did

9    you do next?"

10          To which you respond, "I returned to my patrol

11    vehicle and requested dispatch provide a records check for

12    Mr. Steinman."

13          Then you're asked, "Okay.  Now without stating

14    specifically, did anything in that records check continue to

15    raise your suspicion of the situation?"

16          To which you respond, "Not at that time."

17    A.    Correct.  Nothing in his records.

18    Q.    Okay.  So there's, at this point, nothing raising your

19    suspicion about Mr. Steinman?

20    A.    Not at that point in time, it was only his driver's

21    license check.

22    Q.    Okay.  And nothing else that's raising your suspicions?

23    A.    There were other things and indicators inside the

24    vehicle, yes.  But they were, I think, talking about

25    specifically the records check itself.

```
 1   Q.    But you testified here that nothing was raising your

 2   suspicion at the time -- right? -- in the preliminary hearing

 3   transcript I just read to you.

 4   A.    In the context of that request, he specifically stated a

 5   records check.  And I said, "nothing in the records check."  I

 6   was referring to anything in the records check.

 7   Q.    So after you run this records check, that comes back

 8   clear and valid, you go back to Mr. Steinman's car; right?

 9   A.    Correct.

10   Q.    And this time you go driver's side; right?

11   A.    Yes.

12   Q.    Okay.  And you previously testified that you go passenger

13   side for officer safety.

14   A.    Usually, yes.

15   Q.    Okay.  This time you approached driver's side.

16   A.    Yes.

17   Q.    And you confirm that his VIN number, vehicle

18   identification number, checks out with the registration check

19   that you had run; right?

20   A.    Yes.

21   Q.    Okay.  And it does check out?

22   A.    I mean, it matched the expired registration, yes.

23   Q.    And also, ultimately, matches the valid Utah

24   registration?

25   A.    Ultimately, yes.  After I had visually verified it was a
```

1    Utah registration, yes, it checked out.

2    Q.    Nothing about the VIN is inconsistent with either of the

3    registration documents?

4    A.    No.

5    Q.    Okay.  And meanwhile, Mr. Steinman is on the phone

6    getting insurance information from his girlfriend; right?

7    A.    I'm not sure if he was on the phone.  I requested his

8    insurance information when I went to check the VIN, and I

9    believe that's what he was doing.  I'm not exactly sure how he

10   was doing it.

11   Q.    So you hear Mr. Steinman on the phone?

12   A.    I was unconcerned about the noises, per se.  I was

13   keeping a visual eye on Mr. Steinman.  However, what he was

14   doing, however he was getting his insurance information, I

15   couldn't tell you.

16   Q.    So you don't know if he's on the phone or not when you're

17   there inspecting the VIN?

18   A.    He said he was getting his insurance information.

19   Q.    Okay.  Either way, it seems like he's getting his

20   insurance information to you at this point; right?

21   A.    Yeah.  Yes.

22   Q.    Even so, you order him to get out of his car; right?

23   A.    After a while, yes, I did ask him to get out of his car.

24   Q.    Okay.  And in fact, you ordered him to; right?

25   A.    Yes.

```
 1    Q.    As he did, and in the moments thereafter, he at one point
 2    raises his arms; right?
 3    A.    At one point, yes.  I had asked him -- I just asked him
 4    if he had anything on him, and he said no.  And that's why he
 5    raised his hands.
 6    Q.    And he raises his arms in such a way his shirt hikes up a
 7    little bit; right?
 8    A.    Yes.
 9    Q.    And you can inspect from there, from your position, if
10    there's anything in his waistband; right?
11    A.    Correct.
12    Q.    And you don't see anything.
13    A.    No.
14    Q.    And he's wearing basically just shorts.
15    A.    I don't recall.  I believe he -- I believe he was wearing
16    shorts.
17    Q.    Okay.  We can go to the video if you'd like.  He was
18    wearing shorts.
19    A.    Sure.  I mean, I can't recall.
20    Q.    Okay.  But you don't see anything in his waistband in the
21    shorts or pants that he's wearing?
22    A.    No, not in his waistline, I see nothing.  No bulges, no
23    knife clips, nothing.
24    Q.    So you're confident he doesn't have any weapons on him?
25    A.    I felt fairly confident he didn't have any weapons on his
```

1  waistband, yes.

2  Q.   And you do all this visual searching trying to figure out

3  if there's bulging, et cetera, to confirm your own officer

4  safety; right?

5  A.   I do it in lieu of a frisk, yes, and I do that for

6  officer safety.

7  Q.   If you felt concerned, you could frisk him; right?

8  A.   I mean, usually I would request a frisk.  And if

9  there's -- if I had any suspicion that he had any weapons on

10  him, then I would frisk.

11  Q.   Okay.  So the fact that you didn't frisk, safe to say you

12  didn't have any suspicion of weapons on him?

13  A.   Right.  After I visually saw the waistband, I didn't have

14  any suspicion he had any weapons on him.

15  Q.   And at no point at any time in the stop do you pat him

16  down?

17  A.   No.

18  Q.   And while all this is going on, while you're checking the

19  VIN, while you're checking him visually, et cetera, you don't

20  see anything in the car that you perceive to be stolen

21  property?

22  A.   Nothing that I perceived at that moment to be stolen

23  property.

24  Q.   Nothing that looked like stolen property to you?

25  A.   Nothing.

```
 1   Q.   Nothing that looked like a controlled substance?

 2   A.   Nothing.

 3   Q.   Nothing that looked like drug paraphernalia?

 4   A.   No.

 5   Q.   Nothing that looked like a firearm?

 6   A.   No.

 7   Q.   Nothing that looked like rounds of ammunition?

 8   A.   No.

 9   Q.   Okay.  And you don't really return to Mr. Steinman's car

10   before making the decision to seize it; right?

11   A.   Correct.  Yeah.  Once he was in my vehicle, I didn't

12   return to his vehicle until after, after we began to seize the

13   vehicle.

14   Q.   Right.  So this is the last time that you're next to the

15   car?

16   A.   I believe so, yeah.

17   Q.   So at no point have you seen anything that looks like

18   stolen property?

19   A.   Nope.

20   Q.   Nothing that looks like a controlled substance?

21   A.   Nope.

22   Q.   Nothing that looks like drug paraphernalia?

23   A.   No.

24   Q.   Nothing that looks like a firearm?

25   A.   No.
```

1    Q.    And nothing that looks like rounds of ammunition?

2    A.    No, just the ammo box.

3    Q.    But nothing that looks like rounds of ammunition?

4    A.    Correct.

5    Q.    So you bring Mr. Steinman back to the police SUV and

6    order him to sit in the front seat of your vehicle; right?

7    A.    Yeah, I requested.

8    Q.    You're ordering him around at this point.  You order him

9    into the seat; correct?

10   A.    I guess that's a fair statement, yeah.  I -- yeah, it was

11   more of a request.  I present it as a request to sit in my

12   front seat.

13   Q.    And you didn't have to order him into your police

14   vehicle; right?

15   A.    No, I didn't have to.

16   Q.    Yeah.  You ordered him there because you wanted to ask

17   him questions; right?

18   A.    Yes.

19   Q.    Okay.  And rather promptly after getting into the

20   passenger seat of your police SUV, he provides you a digital

21   copy of his insurance information; right?

22   A.    At some point yes, he did.

23   Q.    About a minute after sitting down; right?

24   A.    I don't recall.  I don't recall the actual timeframe.

25   Q.    Not for longer than a minute?

```
 1   A.    I don't recall the timeframe, sir.
 2   Q.    Okay.  We can play the video on that if you'd like.  Let
 3   me just get a good timestamp for that.
 4         So we'll be playing from Defense Exhibit 507, which
 5   I understand to be the same as the Government's exhibit of
 6   Trooper Boyer's body cam, but we've separately submitted them.
 7   I'm just noting for the record it's 507.  And this will be
 8   from -- I'll go from the timestamps on the video rather than
 9   the hour marker.
10         This is going to be from 7:40 to about nine minutes.
11     (Video played.)
12         MR. MCCLELLAND:  All right.  So stopping at 9:01
13   into the video here.
14   BY MR. MCCLELLAND:
15   Q.    This is Mr. Steinman providing you the digital copy of
16   his insurance; right?
17   A.    Yes.
18   Q.    That's about a minute after he sits in your vehicle?
19   A.    Approximately, yes.
20   Q.    Okay.  At this point do you need any more documents from
21   Mr. Steinman to issue a speeding ticket?
22   A.    Nope.
23   Q.    Okay.  But you didn't give him the ticket now; right?
24   A.    Not at this point.  He wasn't --
25         What was the question?  I'm sorry.
```

```
1    Q.    You don't give him a speeding ticket at this moment;
2    correct?
3    A.    Not in this particular moment, no.
4    Q.    Okay.  You take another couple of minutes.  And as
5    Mr. Keenan asked you, at some point there's a screen with a
6    signature line up; correct?
7    A.    Yes.
8    Q.    Okay.  And at that point could you sign the ticket?
9    A.    That's the first tab of the ticket, yes.
10   Q.    Okay.  How many tabs are there?
11   A.    I can't recall.  Maybe around nine.
12   Q.    Okay.  And is that first tab the most involved?
13   Lengthiest?
14   A.    No.
15   Q.    No.
16   A.    Not particularly.
17   Q.    Okay.  But you could sign that tab and then move on to
18   the next tabs.
19   A.    Yes.
20   Q.    Okay.  Ultimately, you give him a speeding ticket about
21   48 minutes after you stop him; correct?
22   A.    I don't recall a timeline on that one, sir.
23   Q.    Okay.  I'll skip ahead to when that appears to happen at
24   48:10 into Exhibit 507.
25              Starting the play at 48:03.
```

```
 1            (Video played.)

 2               MR. MCCLELLAND:  All right.  Stopping at 48:45 of

 3       Exhibit 507.

 4       BY MR. MCCLELLAND:

 5       Q.   That's you handing him his citation; correct?

 6       A.   That, yes.

 7       Q.   All right.  Fair to say, then, 48 minutes into the stop

 8       you give him the citation?

 9       A.   Yeah.  Yes, 48 -- yeah, from the time of the stop to the

10       time the citation was 48 minutes.

11       Q.   Okay.  But he still hasn't had all of his paperwork

12       returned to him at this point; right?

13       A.   Can you replay that?  I may have given it back.  Usually

14       I give it back at that point in time I give him the citation.

15       Q.   Well, here.  How about I play from Exhibit 508, which is

16       Sergeant Marin's body cam returning that information.  This

17       has also been previously admitted.  This is Exhibit 508.

18               And just for context, Trooper Boyer, Sergeant Marin

19       is your boss; correct?

20       A.   He's one of them, yes.

21       Q.   Okay.  And his full name is Sergeant Cruz Marin?

22       A.   Yes.

23       Q.   All right.  And he arrives on scene about half an hour

24       into the stop?

25       A.   I don't recall the timeline.
```

```
1    Q.   He arrives on scene at some point in this stop.  We can
2    pin down exactly when later.
3    A.   Yes.
4    Q.   And he assists you in various tasks related to this stop;
5    right?
6    A.   Yes.
7    Q.   Okay.  And he interacts quite a bit with Mr. Steinman
8    while you are back in your police SUV?
9    A.   I'm sorry, say that again.
10   Q.   He interacts with Mr. Steinman at various points while
11   you're back in the police SUV?
12   A.   He may have.
13   Q.   Okay.  So I'm pulling up Exhibit 508, which, again, is
14   Sergeant Marin's body cam, but should show what we need here.
15        And I'm going to 1:03:10 into that exhibit which he
16   arrives on scene about 30 minutes later, so about an hour and
17   a half into this stop.
18        This is an hour and three minutes.
19   A.   Excuse me, sir.
20   Q.   Yes, of course.
21   A.   It wasn't an hour and a half at the stop.
22   Q.   He arrives about half an hour after the stop begins.
23   A.   Okay.  I thought you said hour and a half.  I'm sorry.
24   Q.   I'm going in the video to about an hour and a half into
25   the stop.
```

```
 1    A.    Okay.

 2    Q.    And I'm starting it at 1:03:05.

 3          (Video played.)

 4              MR. MCCLELLAND:  So I'll pause just for a second.

 5    Pausing at 1:03:48 seconds into Sergeant Marin's body cam.

 6    BY MR. MCCLELLAND:

 7    Q.    Sergeant Marin has opened the passenger side door to your

 8    police SUV; correct?

 9    A.    Yes.

10    Q.    Okay.  And he picked up something from the police SUV?

11    A.    Yes.

12    Q.    Could you tell what that was?

13    A.    My camera.

14    Q.    Okay.

15              MR. MCCLELLAND:  I'll continue from here.

16          (Video played.)

17              MR. MCCLELLAND:  All right.  Pausing at

18    1:04:26 seconds into Sergeant Marin's body cam.

19    BY MR. MCCLELLAND:

20    Q.    And the timestamp in the top right corner there, 5:25:26;

21    is that fair to say, Trooper Boyer?

22    A.    Yes.

23    Q.    Okay.  And you stopped Mr. Steinman about an hour and a

24    half before this; right?  3:51 --

25    A.    More or less.  But yeah, pretty close.
```

```
 1   Q.   You testified, I think, 3:51 is when the stop started.
 2   A.   Oh, yeah, so it would have been over, yeah, absolutely.
 3   Q.   So over an hour and a half?
 4   A.   Yeah.
 5   Q.   And that was Sergeant Marin handing Mr. Steinman
 6   paperwork; correct?
 7   A.   Yes.
 8   Q.   Okay.  Handing Mr. Steinman his paperwork?
 9   A.   Yes.
10   Q.   All right.  I'm going to go back a bit to the
11   conversations and the investigation that you're running in the
12   police SUV earlier in the stop.
13            About three minutes after Mr. Steinman gives you his
14   insurance information, you ask dispatch to run the criminal
15   history check; right?
16   A.   What was the time again, sir?
17   Q.   About three minutes after Mr. Steinman provides the
18   insurance information?
19   A.   I don't recall the actual -- the timeline when I
20   requested the actual criminal history.  I think it was
21   maybe -- yeah, I couldn't recall the actual timeline.
22   Q.   So Mr. Steinman provided his insurance information, as
23   you acknowledged, about nine minutes into the stop?
24   A.   Yes.
25   Q.   You asked dispatch to run the criminal history
```

1   investigation about 12 minutes in?

2   A.   I would have to see the call logs, but that's pretty

3   close, I think.

4   Q.   I'll go to the -- well, I won't play the exhibit again.

5   The Court has already seen that sequence.

6           But it's after he's provided the insurance

7   information.

8   A.   Yes.

9   Q.   Okay.  And you specifically asked to run the criminal

10  history check because you continued to become more suspicious

11  of Mr. Steinman; right?

12  A.   Yes.

13  Q.   Okay.  And dispatch ultimately took about five minutes to

14  get that criminal history check; is it fair to say?

15  A.   I don't recall the time how long it took them.

16  Q.   Okay.  If they got back to you about 16 minutes into the

17  stop, maybe 17 minutes into the stop, that would be about five

18  minutes after you requested; right?

19  A.   So I can't -- I can't opine to that.  I don't know

20  exactly when it was.  But I know that I got the criminal

21  history before they advised me that I received the criminal

22  history.

23  Q.   Okay.  I think you testified that there was a ping on

24  your computer that notified you that you got the criminal

25  history.

```
 1   A.    Yeah, I think it was like an audible ping, yeah,
 2   something like that.  It doesn't really sound like a ping, it
 3   sounds like an audible, somebody falling into water or
 4   something.
 5   Q.    Something falling into water?
 6   A.    Yeah, like a drop.
 7   Q.    Okay.  And you start reviewing that criminal history
 8   check shortly after you receive it?
 9   A.    Yes.
10   Q.    And when you're reviewing the criminal history check
11   returns, you're not filling out the license -- or the
12   citation; correct?
13   A.    Correct.
14   Q.    Okay.  You're working on investigating the criminal
15   history not writing the citation?
16   A.    Not -- yes.
17   Q.    Okay.  And the criminal history check that you were
18   reviewing came back with what you've described as felon
19   entries; right?
20   A.    That's my way of saying, yeah, I observed felonies on his
21   record.
22   Q.    Okay.  But they come in as entries; right?
23   A.    They're on our -- okay.  Can I provide you a little bit
24   of context to that?
25   Q.    Sure.
```

1    A.   An entry is -- it's something in his criminal history

2    would be an entry.  That's how I perceived it or that's how, I

3    guess, tried to show it.  It was an entry on his criminal

4    history, a felony entry on his criminal history.

5    Q.   Okay.  And I'll ask you a little bit more about this in a

6    minute, but you basically later tried to verify these entries;

7    right?

8    A.   Yes.

9    Q.   And around the same time that you get the criminal

10   history check back, you start asking Mr. Steinman about

11   whether he had felony convictions; right?

12   A.   Can you rephrase that question?

13   Q.   Around the time that you get the criminal history check

14   back -- after you get the criminal history check back, I guess

15   is a better way to say it, you start asking Mr. Steinman

16   whether he has felony convictions?

17   A.   At some point, yes, I did.

18   Q.   Okay.  And Mr. Steinman ultimately says he doesn't know

19   if there are felonies on his record; correct?

20   A.   Yes.

21   Q.   And before you could verify the criminal history check

22   entries, you tell Mr. Steinman you're seizing the vehicle.

23   A.   Correct.  I didn't need to verify, that was just an extra

24   step.

25   Q.   But you tell him that before you actually do the

1    verification.

2    A.    Say again.

3    Q.    You tell him that you're seizing his car before you

4    actually do the verification.

5    A.    Correct.

6    Q.    And the language you use is that various factors you tell

7    him, quote, "kind of gives me a little PC to search your

8    vehicle."

9    A.    That sounds accurate.

10   Q.    Okay.  And "little PC here" means little probable cause?

11   A.    Yes.

12   Q.    You then let Mr. Steinman get out of the car; right?

13   A.    Yes.

14   Q.    Okay.  But you tell him to stand by.

15   A.    With an officer, yes.

16   Q.    Right.  And that officer is Sergeant Marin?

17   A.    Yes.

18   Q.    Okay.  While Mr. Steinman was in your SUV, you never tell

19   him that he has the right to an attorney; right?

20   A.    Correct.

21   Q.    You never tell him that he's free to leave.

22   A.    Correct.

23   Q.    You never tell him that he can refuse to answer your

24   questions.

25   A.    Correct.

1   Q.   Now I'm going to ask a little bit about this verification

2   of the criminal history entries investigation.

3           So, after you decide to seize Mr. Steinman's car and

4   let Mr. Steinman out of the vehicle, you ask dispatch to

5   verify that the entries had resulted in convictions; right?

6   A.   Yes, that was just my way of double checking.

7   Q.   Okay.  And it turns out that's a good idea because your

8   dispatch officer tells you that a few of the entries aren't

9   convictions; right?

10  A.   Correct.

11  Q.   Indeed, some weren't even charges; right?

12  A.   Right.  There were entries on there that were -- where

13  she said were just severities of the charges.

14  Q.   Okay.  So she tells you, for instance, that the first

15  entry, taking a vehicle without permission, that wasn't

16  actually a felony.  It was a gross misdemeanor; right?

17  A.   She said it was reduced to a gross misdemeanor, yes.

18  Q.   So it isn't really even a -- well, it's not a felony

19  conviction; right?

20  A.   Well, that one, no.  Not the specific one she's referring

21  to.

22  Q.   And then she told you that another entry about an alleged

23  drive-by shooting hadn't resulted in any kind of disposition;

24  right?

25  A.   Correct.

```
 1    Q.   I'm just going to ask you a little bit about interactions
 2    with Sergeant Marin that we talked about or introduced a
 3    little bit earlier.
 4              Around the time that you tell Mr. Steinman that
 5    you're going to seize his vehicle, Sergeant Marin shows up.
 6    A.   Yes, about that time, approximately.  Just a little bit
 7    before, I think, maybe.
 8    Q.   But you don't talk with Sergeant Marin before deciding to
 9    seize Mr. Steinman's vehicle.
10    A.   I guess that's fair to say, yeah.
11    Q.   Okay.  And again, Sergeant Marin is one of your bosses?
12    A.   Yes.
13    Q.   Okay.  You later talk with Sergeant Marin about your
14    decision to seize Mr. Steinman's vehicle; right?
15    A.   Yes.
16    Q.   And at one point you ask Sergeant Marin whether seeing an
17    ammunition box plus ammunition might be enough for probable
18    cause; right?
19    A.   I'm sorry.  Can you rephrase?  Can you say that again?
20    Q.   Yeah, at one point whether he thinks seeing an ammunition
21    box in a car plus felony convictions would be enough to give
22    you probable cause; right?
23    A.   I believe I was just bouncing it off of him.  I wasn't
24    asking him that specific question.  I think I was just
25    bouncing it off of him.
```

```
 1   Q.    Well, so you're musing to him about these facts?
 2   A.    I don't know what that word means.  But I was basically,
 3   you know, bouncing it off of him, trying to see what he would
 4   maybe say.
 5   Q.    Okay.  Do you often bounce probable cause questions
 6   against other officers, see what they think?
 7   A.    Usually the senior ones, yes.
 8   Q.    Okay.  And Sergeant Marin told you in response to that
 9   bouncing off that if Mr. Steinman did not admit to felony
10   convictions, you'd lack probable cause; right?
11   A.    I don't recall that.  If that's what he said, that's what
12   he said, but I don't recall that.
13   Q.    I'm just going to play a little bit from 507.  I'm going
14   to play from about 1:10 in, starting at 1:9:58 into
15   Exhibit 507.
16         (Video played.)
17   BY MR. MCCLELLAND:
18   Q.    So I'll pause this briefly.  This is Sergeant Marin's
19   arm; correct, Trooper Boyer?
20   A.    Yes.
21   Q.    And you're bouncing the ideas off him at this point?
22   A.    Yes.
23              MR. MCCLELLAND:  Okay.  Playing from here, 1:10.
24         (Video played.)
25              MR. MCCLELLAND:  All right.  I'm stopping that at
```

```
1    1:10:28.

2         (Video played.)

3    BY MR. MCCLELLAND:

4    Q.   Sergeant Marin says, "As soon as he says no, you're out."

5    A.   He's not referring to the felony convictions, but he did

6    say that specifically.

7    Q.   He then follows up that statement by saying, "And he says

8    he doesn't have felony convictions;" correct?

9    A.   I don't know.  I guess I missed that.

10   Q.   Something to that effect.  I'll rewind just a couple

11   seconds here.  This is 1:10:18.

12        (Video played.)

13   BY MR. MCCLELLAND:

14   Q.   He told you no; right?  That's what he says?

15   A.   Yes.

16   Q.   In the course of this stop, you also made a couple of

17   other calls; correct?

18   A.   Yes.

19   Q.   Okay.  You called, for instance, Judge Kenneth Colton of

20   the Wells Justice Court; correct?

21   A.   Yes.

22   Q.   Okay.  That's the same judge you later applied for a

23   warrant from; correct?

24   A.   Yes.

25   Q.   Okay.  And Judge Calton is a lay justice of the peace; is
```

```
 1   that right?
 2   A.   He's the Wells Township Justice of the Peace.
 3   Q.   Okay.  Do you have familiarity with justices of the peace
 4   in rural Nevada?
 5   A.   As far as what?
 6   Q.   Do you know that some of them are lay justices of the
 7   peace?
 8   A.   I just know him as the judge.  I just know he's the
 9   justice of the peace, and he has jurisdiction over the Wells
10   Justice Court, which is he the only one, minus the pro
11   tempore, but he is the judge.
12   Q.   Okay.  But you are aware that some judges in rural
13   Nevada, specifically, some justices of the peace in rural
14   Nevada are not legally trained?
15   A.   I think I know that, yeah.  I would say, yeah, I do know
16   that.
17   Q.   Some aren't admitted to the bar.
18   A.   Yeah.
19   Q.   Some don't have JDs.
20   A.   Don't have degrees, correct.
21   Q.   If I were to tell you that Judge Calton of the Wells
22   Justice Court were a lay justice of the peace, would you argue
23   with that?
24   A.   No.
25   Q.   You didn't identify the call to Judge Calton during the
```

```
 1    stop in your report; right?
 2    A.    Identify the what?
 3    Q.    The call to Judge Calton that you made in your report?
 4    A.    No, I didn't.  Well, I believe I did actually.  Well, I
 5    don't think I said specifically the call, no.  I'd have to
 6    review the report.
 7    Q.    Okay.  Let's review the report then.  That's Exhibit 501.
 8            And we'll go to the substance of the report, which
 9    starts at USAO Bates stamp 10.  This has previously been
10    admitted as well.
11            I'll make it nice and large for us here.
12            Do you identify the call to Judge Calton in that
13    first paragraph of this narrative?
14    A.    No.
15    Q.    Okay.  Second paragraph?
16    A.    Nope.
17    Q.    Okay.  Third paragraph?
18    A.    No.
19    Q.    Okay.  That little tiny chunk of the fourth paragraph at
20    the bottom of USAO 10, any reference to Judge Calton?
21    A.    No.
22    Q.    Okay.  The continuation of that paragraph on the next
23    page.
24    A.    No.
25    Q.    Okay.  Next paragraph, any reference to Judge Calton
```

1   call?

2   A.   No.

3   Q.   Remainder of this page, any reference to the Judge Calton

4   call?

5   A.   No.

6   Q.   This first top bit of this page, any reference to the

7   Judge Calton call?

8        MR. KEENAN:  Your Honor, I'm just going to object to

9   relevance at this point.

10       THE COURT:  Overruled.

11  BY MR. MCCLELLAND:

12  Q.   Any reference to the Judge Calton call in entries 10

13  through 16 here on this page?

14  A.   No.

15  Q.   All right.  Following paragraph, any reference to Judge

16  Calton?

17  A.   No.

18  Q.   Any reference to Judge Calton in the following paragraph?

19  A.   Nope.

20  Q.   Any reference to Judge Calton in the next one, the one

21  starting at "approximately 1619 hours?"

22  A.   No.

23  Q.   Any reference to Judge Calton in the little chunk of the

24  paragraph here at the bottom of the page on USAO Bates stamp

25  12?

1   A.   No.

2   Q.   Any reference to Judge Calton in the remainder of that

3   paragraph on Bates stamp 13?

4   A.   No.

5   Q.   How about the next paragraph, any reference to Judge

6   Calton?

7   A.   No.

8   Q.   Okay.  The following paragraph there is a reference to

9   Judge Calton; correct?

10  A.   Correct.

11  Q.   Okay.  And that references Judge Calton that you -- or

12  that references that you received approval from Judge Calton

13  on a search warrant at approximately 7:52 p.m.; correct?

14  A.   Correct.

15  Q.   Okay.  Doesn't note that you called Judge Calton at that

16  point; right?

17  A.   Correct.

18  Q.   Okay.  Just for the sake of completeness, we'll go

19  through the remainder here and see if there's any other

20  references to the call.

21       Any references to the call with Judge Calton?

22  A.   No, and I'm confident it won't be in there, sir.

23  Q.   Okay.  So safe to say you didn't identify the call with

24  Judge Calton in your report?

25  A.   Correct.

1    Q.    Okay.  So on this call with Judge Calton, you talk about

2    probable cause; right?

3    A.    I believe I was discussing it with him, yes.

4    Q.    Was there anyone from the District Attorney's office on

5    that call with Judge Calton?

6    A.    No.

7    Q.    Anyone from the U.S. Attorneys Office?

8    A.    No.

9    Q.    Any court reporter?

10   A.    I don't know who's on the other line on Judge Calton's

11   cellular phone, I only know I was speaking to Judge Calton.

12   Q.    Okay.  So you called him on his cell phone?

13   A.    I called the number for Mr. Calton, or Judge Calton.

14   Q.    And you understand that to be his cellular phone?

15   A.    I don't know.  I just called his number.

16   Q.    You testified just a second ago you didn't know who was

17   on the cell phone with Judge Calton?

18   A.    Excuse me.  I'm sorry for saying that, sir.  I don't know

19   if it was a cell phone, a land line.  I just have a number for

20   Judge Calton, and that's what I called.

21   Q.    And you have that saved in your personal phone?

22   A.    Yes.

23   Q.    Okay.  But as far as you could tell, no one else spoke on

24   that call, aside from you and Judge Calton?

25   A.    Correct.

1   Q.   Okay.  So there's no member of the public defender's

2   office on that call?

3   A.   Correct, that I know of.

4   Q.   No court reporter?

5   A.   Nope.

6   Q.   Why did you have Judge Calton's number?

7   A.   I think I got it from another trooper.

8   Q.   Okay.  What other trooper?

9   A.   I don't know.  I don't know how I got the number.

10  Q.   Is it common for troopers to have Judge Calton's number?

11  A.   Yes.

12  Q.   Okay.  You weren't calling Judge Calton during the stop

13  to ask for a telephonic search warrant; right?

14  A.   Correct.

15  Q.   Okay.  And, in fact, you couldn't have because there

16  didn't seem to be a court reporter present; correct?

17  A.   I'm sorry, I missed that.

18  Q.   Yeah.  Have you called a judge for a telephonic search

19  warrant before?

20  A.   Yes, I believe I have.

21  Q.   And are you aware that there are procedures for -- for

22  asking for a telephonic search warrant under Nevada law?

23  A.   Yeah.  I have not requested a telephonic warrant from

24  Judge Calton.  I believe I requested one from a judge when I

25  was working in Ely, Nevada.

1   Q.   Thank you, Trooper Boyer.  Not quite my question.  My

2   question is are you aware that there are procedures for

3   requesting a telephonic search warrant?

4   A.   Yes, though I don't really know what they are.  I

5   couldn't tell you what they are.

6   Q.   Okay.  So are you aware that there's maybe a particular

7   Nevada statute on point for asking for telephonic search

8   warrants?

9   A.   I honestly don't know.

10  Q.   Okay.  Would it surprise you to hear that telephonic

11  search warrants require, for instance, a court reporter?

12  A.   No, it wouldn't surprise me.

13  Q.   Okay.  Would it surprise you to hear that you would have

14  to swear an oath to be telling the truth when you're asking

15  for a telephonic search warrant?

16  A.   Yes.  No, I'm sorry, it wouldn't surprise me.

17  Q.   Wouldn't surprise you.

18          But there was no court reporter present on this

19  call?

20  A.   No.

21  Q.   And you didn't swear an oath?

22  A.   No.

23  Q.   Okay.  But you were talking with Judge Calton about

24  whether you had probable cause; right?

25  A.   I don't think I was asking him if I had probable cause at

 1    that time.  I was asking him if he would entertain a review of

 2    the search warrant application.

 3              MR. MCCLELLAND:  Okay.  I'm going to play a little

 4    bit of that call.  And, unfortunately, we only have your side

 5    of the call from the body cam.  We don't have Judge Calton's

 6    responses.  So I'm going to ask you if you can recall some of

 7    his responses.  But first I'll play from the video.

 8              Starting about 41:14 into Exhibit 507.

 9         (Video played.)

10              MR. MCCLELLAND:  Pausing for a second.

11    BY MR. MCCLELLAND:

12    Q.   Just to be clear, this is the phone call with

13    Judge Calton?

14    A.   It could be.  I would say yes.  I called somebody else at

15    some point in time too.

16              MR. MCCLELLAND:  Yeah, I'm going to ask you about

17    that call as well, but we'll play through the Judge Calton

18    call first.  I'll pause maybe in another 10 seconds to see if

19    you can confirm that this is the Judge Calton call.

20         (Video played.)

21              THE WITNESS:  If I said judge, it is.

22    BY MR. MCCLELLAND:

23    Q.   Okay.

24    A.   I said judge, yeah.

25              MR. MCCLELLAND:  I'll back this up again because it

```
1    seems like the audio is a smidge delayed.  But we'll go back

2    to -- this is starting from 41:06.

3         (Video played.)

4    BY MR. MCCLELLAND:

5    Q.   So that's your call with Judge Calton; right?

6    A.   Yes.

7    Q.   Okay.  And you ask him a number of questions on that

8    call; right?

9    A.   Yes.

10   Q.   You ask him for advice on whether you have probable

11   cause; right?

12   A.   I don't think I was asking for advice on probable cause.

13   I just told him what I had, and I asked him if he would

14   entertain a review of the search warrant.

15   Q.   Okay.  And you told him at some point that you don't know

16   if you have actual probable cause per se; correct?

17   A.   Correct.  Yeah, I said it's unknown if I have actual

18   probable cause per se.

19   Q.   What does he say about that?

20   A.   I don't recall what he said about that.  I don't think he

21   said anything specific about it at all.

22   Q.   There's a fairly long pause on your body cam, a series of

23   fairly long pauses, you don't think he says anything in

24   particular about probable cause after you mentioned the

25   probable cause point.
```

```
 1    A.    I honestly can't recall what he said in that moment, if
 2    he said anything.
 3    Q.    Have you had previous calls with Judge Calton?
 4    A.    Yes.
 5    Q.    Okay.  Does he usually let you bounce ideas off probable
 6    cause with him?
 7    A.    I've never discussed probable cause with Judge Calton,
 8    I've just had other conversations.
 9    Q.    You discussed probable cause with Judge Calton on this
10    call.
11    A.    On this call I was discussing what I had, and I was
12    asking if he would entertain a review of the search warrant.
13    Q.    Is it your typical practice to have ex parte calls with
14    judges?
15    A.    I don't know what ex parte is, but it's --
16    Q.    One-on-one calls with judges without attorneys present.
17    A.    Is it typical?
18    Q.    Yeah.
19    A.    It's not typical.
20    Q.    Why did you do it now then?
21    A.    Nothing told me -- I thought that it was probably a good
22    idea to ask him if that was a good idea.
23    Q.    Why is that?
24    A.    I felt that from what I had, I was uncomfortable making
25    the decision that I had probable cause to search at that point
```

```
 1    in time and I felt that it was better for him to make that
 2    determination.
 3    Q.   So you're uncertain if you have probable cause at this
 4    point?
 5    A.   Yeah, I was unsure.
 6    Q.   You've already seized his vehicle; right?
 7    A.   Correct.
 8    Q.   But you're unsure that you have probable cause.
 9    A.   Correct.
10    Q.   And so you call the judge that's ultimately going to
11    issue the warrant to figure out if you have it?
12    A.   I -- sir, I called him to see if he'd review the search
13    warrant.  That's what I called him for.  I called and I told
14    him exactly what I had.  And he -- and I asked him if he'd
15    entertain a review of the search warrant.  So to me, if he's
16    going to say yes, that means that there's enough for me to
17    continue to seize the vehicle for the search warrant.
18    Q.   During the course of this stop you don't call the DA's
19    Office?
20    A.   No.
21    Q.   You don't call the U.S. Attorneys Office.
22    A.   No.
23    Q.   You call Judge Calton.
24    A.   Yes.
25    Q.   Later in the call you asked him to provide an e-mail
```

```
 1   address for you to send the application; correct?
 2   A.   I think I had an e-mail address on file for him, so I
 3   just wanted to make sure whichever one he said is what I had.
 4   Q.   So, specifically, you ask him to text you the right
 5   e-mail address; right?
 6   A.   I might have asked him, yeah.  I don't recall.  But
 7   that's not exactly what happened.  I actually handed him the
 8   warrant in person.
 9   Q.   Okay.  Did he eventually text you about anything?
10   A.   No, he didn't text me.
11   Q.   Okay.  Has he texted you outside of this?
12   A.   No, he doesn't text me.  We don't -- we're not on a
13   friendly basis per se.  We are not -- we don't really text
14   between each other for any reason other than work.
15   Q.   And when you called him, you didn't speak first with the
16   judicial assistant or anything; right?
17   A.   No, I didn't -- I didn't speak to anybody before I spoke
18   to him.
19   Q.   You just got straight through to Judge Calton.
20   A.   Yes.
21   Q.   All right.  No clerk that you chatted with before?
22   A.   Correct.  Nothing.
23   Q.   Just Judge Calton.
24        Have you talked with Judge Calton since about
25   probable cause on stops?
```

```
1    A.   No.

2    Q.   This was a sort of one off?

3    A.   I don't know what you mean by that.  But, yeah, it was a

4    one-time thing.

5    Q.   Okay.  You later talk with Sergeant Marin about calling

6    the judge, and we can play the chunk, but it's safe to say he

7    seems sort of unfazed.  Is it typical practice among NHP

8    officers to call judges about probable cause?

9    A.   I don't know.  I don't know if -- I don't really know of

10   any other troopers that discuss probable cause with other

11   judges.

12   Q.   Okay.  Are you aware of Sergeant Marin ever talking about

13   probable cause with the judge?

14   A.   I don't know.  No, I don't know.

15   Q.   Has Sergeant Marin ever told you I called the judge, and

16   he thinks we're good to go?  Anything like that?

17   A.   No, he's never told me that.

18   Q.   Okay.  But you told Sergeant Marin that after you got off

19   the phone with the call.

20   A.   Yes.

21   Q.   That you had spoken with Judge Calton and that you would

22   then later submit a warrant application.

23   A.   Yes.

24   Q.   Okay.  You also had a couple of calls with an individual,

25   looks like Kelly Barny; is that right?
```

```
1    A.    Yes.

2    Q.    Ultimately, two calls; correct?

3    A.    Yes.

4    Q.    Okay.  Who is Kelly Barny?

5    A.    He's another trooper.

6    Q.    Okay.  Is he more senior to you?

7    A.    Yes.

8    Q.    Okay.  Do you typically call him for advice?

9    A.    Yes.

10   Q.    Does he have any sort of supervisory power over you?

11   A.    No.

12   Q.    But you call him for advice because he's more senior?

13   A.    Yes.

14   Q.    You didn't note any of those calls with Kelly Barny in

15   your report either, did you?

16   A.    No.

17   Q.    And those calls with Kelly Barny are also on your

18   personal cell phone; right?

19   A.    Yes.

20   Q.    And so if we were to play the body cam footage, we'd only

21   get your side of those conversations, safe to say?

22   A.    Safe to say.

23   Q.    You have Kelly Barney's number in your phone; right?

24   A.    Yes.

25   Q.    Is Kelly calling you from Kelly's personal cell phone?
```

1    A.    I don't know.  Maybe -- yeah, yeah, he was.

2    Q.    Okay.  The first call that you have with Kelly seems to

3    happen about an hour and 15 minutes into the stop.  It's not

4    too long, so I think we'll play that as well.

5          THE COURT:  Excuse me.  Can you just set up to

6    remind us exactly what exhibit this is on so we have a clean

7    record to be able to find this.  Thank you.

8          MR. MCCLELLAND:  Of course, Your Honor.

9          This is Exhibit 507, again, at about an hour and

10   15 minutes into Exhibit 507.

11         THE COURT:  Thank you.  And I'm starting it

12   specifically at 1:15 into 507.

13      (Video played.)

14   BY MR. MCCLELLAND:

15   Q.    All right.  So that's your first call with Kelly Barny;

16   right?

17   A.    Yes.

18   Q.    Okay.  And you describe to Kelly various things that you

19   found suspicious about the stop; right?

20   A.    Yes.

21   Q.    And at one point you ask -- is it Trooper Barny?

22   A.    Yes.

23   Q.    You ask Trooper Barny whether you have probable cause;

24   right?

25   A.    I don't think I specifically asked him probable cause.  I

1    can't remember.

2    Q.    All right.

3    A.    I guess I was probably referring to, you know, what he

4    thought about all of the suspicion I thought I had.

5    Q.    You ask him at some point, "Would that give me probable

6    cause?"

7    A.    Oh, I think I said, yeah, I'm not sure if that gives me

8    probable cause, yeah.

9    Q.    What did Kelly say to that?

10   A.    I can't -- try not to put words in his mouth.  But

11   basically what he relayed to me or how I perceived it was that

12   he thought it did but that submitting for the warrant was what

13   he would do.

14   Q.    But, again, you didn't write about this conversation with

15   Officer Barny, Trooper Barny rather, in your report; right?

16   A.    Right, I didn't write about it.

17   Q.    So this is you recollecting 11 months after the fact what

18   he might have said.

19   A.    Yes.

20   Q.    Towards the end of that call you tell Trooper Barny that

21   you'd have to look that one up.  What were you referring to?

22   A.    I don't recall.  I honestly cannot recall.

23   Q.    Trooper Barny then calls you back a couple minutes later;

24   right?  We'll play that call too.

25   A.    Yeah, sure, go ahead.

```
 1              MR. MCCLELLAND:  All right.  This is Exhibit 507,
 2   starting around 1:23.
 3              I'll start at 1:23:48 on Exhibit 507.
 4        (Video played.)
 5   BY MR. MCCLELLAND:
 6   Q.   All right.  So that's your second call with Trooper
 7   Barny; correct?
 8   A.   Yes.
 9   Q.   And this time you're asking for help writing the warrant
10   application; is that right?
11   A.   I think there was one part of it, yeah.
12   Q.   Sounds like a couple questions about what to put in the
13   application, fair to say?
14   A.   Generally, yes.
15   Q.   Okay.  And ultimately, the warrant application you submit
16   is 503, Defendant's Exhibit 503 in this binder; is that right?
17   A.   Sorry.  What's that?
18   Q.   Ultimately, the warrant application that you submit is
19   Exhibit 503 in Defendant's Exhibit binder; correct?  This has
20   previously been admitted.
21   A.   Yes.
22   Q.   That's the warrant application that you type out and
23   submit to Judge Calton.
24   A.   Yes.
25   Q.   Okay.  And in the course of your call with deputy -- or
```

1   sorry, Trooper Barny, you ask Trooper Barny if you should say

2   firearms in the warrant application; right?

3   A.   Yes.

4   Q.   Okay.  And you ultimately do put on the first page of the

5   warrant application that the evidence sought to be found in

6   constituting evidence that demonstrates a criminal offense is

7   or may be committed for a prohibited person possessing

8   firearms; correct?

9   A.   Yes.

10   Q.   So you ended up agreeing with Trooper Barny in the

11   recommendation of putting firearms.

12   A.   Yes.  I was referring to the terminology.

13   Q.   Okay.  What did Kelly say about this warrant application

14   writing process?

15   A.   I don't know.  I couldn't even begin to describe what he

16   said.

17   Q.   Okay.  And that's because it's a long time ago?

18   A.   I mean, yeah.  I mean, in my perception, basically what

19   we -- what that phone call was all about was basically the

20   process.

21   Q.   And this is another call from your personal cell phone to

22   Trooper Barny's personal cell phone.

23   A.   Yes.

24   Q.   And it's another call that you didn't note in your

25   report.

1    A.    Correct.

2    Q.    Okay.  And you talk with Trooper Barny about whether you

3    should put drugs in the warrant application or not.

4    A.    I don't recall.  I think I was going to do that anyway.

5    Q.    You tell Trooper Barny that you don't think there would

6    be drugs.

7    A.    Oh, okay.  Yeah.  Well, I mean, in my previous experience

8    it's not just one criminal activity, one type of criminal

9    activity that you find evidence of.  You find evidence of

10   several.

11   Q.    Sure.  Thank you, Trooper Boyer.  That's slightly

12   different than what I'm asking.  You tell Kelly that you don't

13   think there would be drugs.

14   A.    Not necessarily.

15   Q.    You told Trooper Barny that you did not think that there

16   would be drugs?

17   A.    Yes.

18   Q.    And, in fact, when you were at Mr. Steinman's vehicle you

19   had not observed anything you thought to be controlled

20   substances; correct?

21   A.    Correct.

22   Q.    And you had not observed anything that you thought might

23   be drug paraphernalia; correct?

24   A.    Correct.

25   Q.    And just to round it out, you didn't observe anything

 1    that you thought might be stolen property; correct?

 2    A.   Correct.

 3    Q.   And nothing that you thought might be rounds of

 4    ammunition; correct?

 5    A.   Correct.

 6    Q.   But ultimately, the warrant -- the proposed warrant that

 7    you attach to the warrant application --

 8    A.   Mm-hmm.

 9    Q.   -- it's been marked as Defendant's Exhibit 504,

10    previously admitted by stipulation --

11    A.   Mm-hmm.

12    Q.   -- ultimately that search warrant requests authorization,

13    and then Judge Calton signs it, but requests authorization to

14    look for evidence of records or documents identifying

15    ownership, control -- ownership/control of the vehicle, stolen

16    property, controlled substances, paraphernalia, or illicit

17    firearms which may be found in Mr. Steinman's car; correct?

18    A.   Correct.

19    Q.   And you eventually submit this proposed search warrant

20    attached to Defendant's Exhibit 503 which is the application;

21    correct?

22    A.   Correct.

23    Q.   And you submit that to Judge Calton.

24    A.   Correct.

25    Q.   That's the same judge you previously had the call with.

```
 1    A.    Yes.
 2    Q.    Okay.  And you said that you personally delivered it to
 3    Judge Calton?
 4    A.    Yes.
 5    Q.    Where did you personally deliver it?
 6    A.    We were in the Wells Justice -- or we were actually at
 7    the NHP substation in Wells that shares the building with
 8    Judge Calton's office.
 9    Q.    And you personally handed it to Judge Calton?
10    A.    Yes.
11    Q.    Okay.  Not to a judicial assistant?
12    A.    No.
13    Q.    Not to a clerk?
14    A.    Nope.
15    Q.    Directly to Judge Calton?
16    A.    Directly.
17              MR. MCCLELLAND:  Pass the witness, Your Honor.
18              THE COURT:  Thank you.
19              I just have a few really quick questions and let me
20    interject in that way.  The government can address follow up
21    if needed, and then we can do more follow up if needed.  One
22    question I had for you, is I think in your experience you said
23    I've been doing this for five years, and you arrest 20 to
24    30 -- make 20 to 30 arrests per year.
25              THE WITNESS:  Correct.  That's approximate.
```

```
1              THE COURT:  Okay.  And how many tickets do you give
2    in a year?
3              THE WITNESS:  It varies.  It's not as many as
4    traffic stops, ma'am.  I would probably say it's about, you
5    know, maybe half to -- it's about -- if we're talking about a
6    ratio, it's probably about half.
7              THE COURT:  How many traffic stops do you do a year?
8              THE WITNESS:  It varies.  I think I've stopped, my
9    first year was 1400.  My second year was approximately a
10   thousand.  But usually is more or less a thousand, ma'am.
11             THE COURT:  Okay.  And then when you say half, a
12   thousand-plus stops, maybe 500 tickets, is that what you're --
13             THE WITNESS:  Correct.
14             THE COURT:  Okay.  When you stop someone for a
15   ticket, how long does it usually take to give a citation?
16             THE WITNESS:  Just writing the citation, usually a
17   round figure is 15 minutes.
18             THE COURT:  Okay.  And when you say 15 minutes,
19   that's like from the time that the driver is stopped until the
20   time that the driver is pulling away?
21             THE WITNESS:  I guess that would be an accurate --
22   or yeah, I guess that would be an okay assumption.  It's give
23   or take, ma'am.  Usually when I stop the vehicle, depending on
24   what documents I get and when I get them, kind of depends on
25   how long the stop takes.
```

1            THE COURT:  Uh-huh.  So if someone gives you a valid

2     driver's license and a valid registration, and you run those

3     two things --

4            THE WITNESS:  Yes.

5            THE COURT:  -- how long does that take once you get

6     back to your car?

7            THE WITNESS:  Yeah, also in the course of me asking

8     for their documents, ma'am, and when I receive them, I usually

9     immediately return to my vehicle --

10           THE COURT:  Mm-hmm.

11           THE WITNESS:  -- with those documents.

12           THE COURT:  And you submit the driver's license

13    and -- you -- I think you said, and correct me if I'm wrong, I

14    think you said the driver's license and the registration are

15    sort of, like, two separate checks.

16           THE WITNESS:  They are.

17           THE COURT:  So you run the driver's license.

18           THE WITNESS:  We provide the -- right.  We provide

19    the information, the -- sorry, the registration, we provide

20    that information to dispatch first.

21           THE COURT:  Mm-hmm.

22           THE WITNESS:  They do that, that's usually

23    automatic.  Sometimes they don't attach it.  So if they don't

24    attach it, then usually I'll run it again and I'll verify it

25    myself.  And then after that I will run the driver's license.

```
 1              THE COURT:  And the driver's license, that's a call
 2    or an electronic thing?  You're not calling -- you're not
 3    calling dispatch about the driver's license, you're running
 4    it.
 5              THE WITNESS:  There's two different ways to do it.
 6    Sometimes we call and sometimes we can do it ourselves.
 7    Depending if our loaned out computers have service.
 8              THE COURT:  Oh, because you sometimes don't have --
 9              THE WITNESS:  Because sometimes we don't have
10    service.
11              THE COURT:  So what information do you get back,
12    again, from the driver's license run?  Check?
13              THE WITNESS:  So we get, obviously, the driver's
14    license information.  We get any wants and warrants --
15    outstanding wants and warrants.  We get possible TPO
16    violations.  We get information that may pertain to the
17    subject, that may not necessarily pertain to the subject.  And
18    then, yeah, sometimes we will get -- what do you call it? --
19    we get like a concealed carry permit hit if it's there.
20              THE COURT:  Okay.  And then do you -- okay.  Then
21    you're waiting for information from -- on the registration.
22    Okay.  So do you routinely run a criminal history check when
23    you do the driver's license check and the registration check?
24              THE WITNESS:  Not routinely.
25              THE COURT:  Okay.  When do you do it?
```

```
1                THE WITNESS:  When I have suspicion.  It depends on
2      the indicators that I see.  It depends on the responses that I
3      get.
4                THE COURT:  Okay.
5                THE WITNESS:  If I get certain things that don't
6      necessarily either make sense or are not normal to the public
7      or a normal traffic stop, then I'll run a criminal history.
8                THE COURT:  Okay.  That's helpful.
9                What -- there was -- so I may be confusing my facts,
10     so forgive me if that's true, did you -- did the -- did
11     Mr. Steinman tell you that he was going to St. George.
12     A.   He did.  I think what you're referring to is there was a
13     couple times where I did say Arizona, that was my mistake.  It
14     was a mix up.
15               THE COURT:  Do you recall when you said that?
16               THE WITNESS:  I think when I called -- I think when
17     I called the judge and when I called Kelly, the trooper,
18     Trooper Barny, when I was basically establishing the direction
19     of travel.
20               THE COURT:  From.
21               THE WITNESS:  From Washington state.
22               THE COURT:  To Arizona.
23               THE WITNESS:  To St. George, Utah.
24               THE COURT:  But you said Arizona.
25               THE WITNESS:  Yeah, accidentally.
```

1            THE COURT:  Okay.  And then you said that a couple

2   times, but it's not in the search warrant application.

3            THE WITNESS:  Arizona, I don't believe so.

4            THE COURT:  Okay.

5            Okay.  That's all.  Thank you.

6            MR. KEENAN:  Just a few follow ups.

7                    **REDIRECT EXAMINATION**

8   BY MR. KEENAN:

9   Q.   I'll start if I could play Exhibit 3.

10           Just from 16:57:45 because there was some questions

11  about the conversation with your supervisor.

12       (Video played.)

13           MR. KEENAN:  Just stopping at 17:01:10.

14  BY MR. KEENAN:

15  Q.   When your supervisor says once he says "no, you're out,"

16  do you think he's referring to the justice of the peace?

17  A.   No, he's referring to consent.  He says -- he's referring

18  to when I asked for consent and he said no, then you're out.

19  That's what I believe he was referring to.

20  Q.   So it means you need to do something else if you want to

21  search that car?

22  A.   Correct.  I think that's a very accurate assumption.

23  Q.   And there was quite a few questions about the

24  conversation you had with Judge Calton as well as Barney.  And

25  it's, I think, safe to say now that those conversations

1    weren't documented in your report; right?

2    A.   Yeah, they weren't documented.

3    Q.   It is documented on your body cam though; right?

4    A.   Yes.

5    Q.   Would there be any reason for you to indicate those in

6    your report?

7    A.   I didn't see a reason to document those in my report.  I

8    think they were just less than a technicality.  They were

9    trivial phone conversations that didn't -- I mean, did they

10   affect my decision?  Yes.  But I had pretty much already

11   decided to seize the vehicle.

12   Q.   And you had -- you said you made that decision, but you

13   still sought the -- you talked it over with at least three

14   people on this body cam; correct?

15   A.   Yes.  Well, two people, I'm sorry.  Oh, three people

16   you're right.  Yep.

17             MR. KEENAN:  I have no further questions for the

18   witness.

19             THE COURT:  Thank you.

20             Can you just remind me who the three people are?  Is

21   that Judge, Kelly, and Marin -- and Sergeant Marin?

22             MR. KEENAN:  That's who I was referring to.

23             THE COURT:  Somehow I missed who Hernandez is.  Is

24   there a reference to a Hernandez in here?

25             MR. MCCLELLAND:  I understood the body cam to refer

```
 1    to a Hernandez, Your Honor.  I also don't know who Hernandez
 2    is.
 3              THE COURT:  Who is Hernandez?
 4              THE WITNESS:  Sergeant Hernandez is the sergeant of
 5    the investigative division, ma'am.  And I didn't call him.  He
 6    was not spoken to prior to issuing a search warrant.
 7              MR. KEENAN:  We could just play that portion of the
 8    body cam where the name comes up again.
 9              Just starting Exhibit 3 at 16:58:50.
10              THE COURT:  Thank you.
11         (Video played.)
12              THE WITNESS:  Excuse me, sir.  In your previous
13    question where your regarding speaking to George Hernandez, I
14    can't exactly recall if I spoke to him prior to submitting for
15    the warrant or after submitting the warrant and searching the
16    vehicle.  I'm sorry, that was -- I don't have that
17    recollection.
18              THE COURT:  Okay.  Just, you spoke to him that day,
19    and you're not sure exactly when you spoke to him.
20              THE WITNESS:  Correct.
21              THE COURT:  But it was sometime before you had this
22    conversation with your Sergeant Marin who is standing there.
23              THE WITNESS:  Sergeant Hernandez was spoken to after
24    Sergeant Marin, after I spoke to Sergeant Marin.  I spoke to
25    Judge Calton first, then I spoke to Trooper Kelly Barny
```

```
1   second, and then I spoke to -- or at some -- throughout those

2   conversations, I was speaking with Sergeant Cruz Marin.

3   Sergeant Hernandez was spoken to off camera.

4            THE COURT:  Okay.  In this clip, are you speaking to

5   Marin?

6            THE WITNESS:  Yes.

7            THE COURT:  Okay.

8            MR. KEENAN:  I'll just play this maybe just to

9   clarify.

10           THE COURT:  It's -- very brief, yes.  Thanks.

11       (Video played.)

12           MR. KEENAN:  Well, I didn't hear it that time.

13  BY MR. KEENAN:

14  Q.   But is it safe to say that if you had a conversation

15  during -- at some point during this car stop with Sergeant

16  Hernandez it would be recorded on the body cam?

17  A.   Yes.

18           Is that what you're referring to?  If there was a

19  conversation with Sergeant Hernandez, it would be on the body

20  cam.

21  Q.   If it were in reference to this traffic stop, it would be

22  recorded between the beginning of this body cam video and what

23  we just played up to at 17:01:22?

24  A.   I'm not exactly understanding your question.  But any

25  conversation with Sergeant Hernandez was not recorded.  I did
```

1   talk to him at some point that night.  I can't remember if it

2   was before or after the warrant was approved.  But at some

3   point I did talk to him just to let him know that I was going

4   to be searching the vehicle, and that the suspect may still be

5   inside city limits.  I think that's the only thing that I

6   talked to him about.

7           MR. KEENAN:  Nothing further.

8           THE COURT:  Okay.  Thank you.

9           Defense, anything?

10          MR. MCCLELLAND:  Nothing further, Your Honor.

11          THE COURT:  Okay.  Let me just see -- can I ask,

12  there's a -- so my notes refer to a conversation with

13  Hernandez that I also didn't hear the second time, but I'm

14  certain I heard it the first time, so I'm not sure what

15  happened there.

16          There was a little -- my notes also refer to

17  something that you said, like, we usually interdict going

18  south.  It was something along those lines that you said in

19  that conversation.  I just want to get some context about what

20  you're talking about.

21          THE WITNESS:  Oh, yes, ma'am, I'll give you some

22  context.  When it comes to narcotics and really any

23  interdiction, for the most part a lot of what we get comes

24  from northbound traffic.

25          THE COURT:  Okay.

 1           THE WITNESS:  But in my training and experience, and

 2    specifically stated in my training and experience from the

 3    class, from specialized advanced training I mean to say, is

 4    that we don't interdict just northbound traffic or eastbound

 5    traffic, we interdict all traffic because, obviously, criminal

 6    activity travels and sometimes the direction doesn't matter.

 7           THE COURT:  Okay.

 8           THE WITNESS:  I'm sorry, I guess that wasn't a very

 9    good explanation.

10           THE COURT:  So, you're usually interdicting

11    northbound traffic.  He was traveling south.

12           THE WITNESS:  I don't -- I wouldn't say I usually

13    interdict northbound, ma'am.

14           THE COURT:  Okay.

15           THE WITNESS:  And especially at this point in time

16    because I was fairly new at the whole process in the first

17    place, which is why I was interdicting southbound as well.

18           THE COURT:  Okay.

19           THE WITNESS:  But yes, he was southbound.

20           THE COURT:  Okay.  And so the term interdict, what

21    does that refer to?

22           THE WITNESS:  It's just looking for criminal

23    activity that's not readily apparent, ma'am.

24           THE COURT:  Any criminal activity?

25           THE WITNESS:  Any type of criminal activity.

```
 1                THE COURT:  Not usually, like, drug activity?

 2                THE WITNESS:  I mean, a lot of it is drugs is what

 3     we get out of it.  But it's an all crimes approach to

 4     criminal -- to interdiction.

 5                THE COURT:  Okay.

 6                THE WITNESS:  So.

 7                THE COURT:  One other question I failed to ask you

 8     earlier, and I'll, of course, allow for follow up.  But have

 9     you got a search warrant before?

10                THE WITNESS:  Yes.

11                THE COURT:  About how many?

12                THE WITNESS:  At this point in time, I think that

13     was my first search warrant, ma'am.

14                THE COURT:  Okay.  And have you ever searched a car

15     without a search warrant?

16                THE WITNESS:  For PC, yes, ma'am.

17                THE COURT:  Mm-hmm.  Do you sometimes get consent?

18                THE WITNESS:  Sometimes, yes.

19                THE COURT:  And sometimes you don't get consent, but

20     you have probable cause and so you search the car there and

21     then without a search warrant.

22                THE WITNESS:  Yes.

23                THE COURT:  Okay.  No further questions.  Thank you.

24                MR. MCCLELLAND:  No further questions from us

25     either, Your Honor.
```

```
1                THE COURT:  Okay.

2                MR. KEENAN:  Nor the government.

3                THE COURT:  All right.  So I want to allow argument.

4    It may just be that everyone kind of needs a couple minutes

5    break, like, five minutes.  And then I anticipate having

6    argument and then maybe another break.  I'm sorry to keep

7    going so long, but we have to keep going.  So let's just take

8    like a five-minute break, just a little breather, and then

9    we'll come right back.  And then I'll hear argument first on

10   the motion to suppress and then on the motion to dismiss.

11               Okay.  Thank you.

12               Oh, and you -- thank you so much for your testimony.

13   And you may step down.

14               THE WITNESS:  Thank you, ma'am.

15        (Break taken 4:22 p.m. to 4:38 p.m.)

16               THE CLERK:  This is to reflect we're back on record

17   in 3:22-cr-00068-ART-CLB.

18               THE COURT:  Okay.  So defense, this is your motion,

19   so I'll let you begin with the argument and have the last word

20   after the government.  Go ahead.

21               MR. MCCLELLAND:  Fantastic.  Thank you, Your Honor.

22   Would you like me to present from the lectern or is seated at

23   counsel table all right?

24               THE COURT:  I would prefer the lectern.

25               MR. MCCLELLAND:  All right.  I sort of do too.
```

1            MR. KEENAN:  Your Honor, before Mr. McClelland

2    begins, may I tell the witness that he can go?

3            THE COURT:  Oh, please.  Yes, that's fine.

4            MR. MCCLELLAND:  Well, thank you, Your Honor.

5            So, naturally, there are a number of issues with the

6    traffic stop and follow-on investigation in this case.  But

7    I'll start with what I think is the easiest and simplest

8    resolution which is warrant overbreadth.  There's no dispute

9    that the majority of the categories identified in the warrant

10   there is no probable cause for.  And there's good reason for

11   that, because Trooper Boyer, as he testified today, had never

12   seen stolen property, didn't see anything that he thought

13   might be a controlled substance, didn't see anything he

14   thought might be drug paraphernalia, didn't see anything that

15   he thought might be individual rounds of ammunition, didn't

16   see anything that he thought might be firearms.

17           So the fact that the warrant purports to authorize a

18   search for documentation with respect to the ownership and

19   control of the vehicle, stolen property, controlled

20   substances, paraphernalia, or illicit firearms, necessarily

21   makes the warrant defective.

22           The government, again, concedes as much as that at

23   least three of those five categories there is no probable

24   cause supporting, that the majority of those categories are

25   unsupported in the search warrant tends to suggest that the

1    warrant is overbroad, and we think, then, the warrant

2    overbreadth issue is pretty handily survived *Spilotro*.

3             Now the government in its response briefing raises

4    in a footnote basically an argument about severance and the

5    ability to sever, I take it, the firearms category from the

6    warrant from all the other categories in the warrant.

7             A couple reasons that is an ineffective argument

8    even if considered from the footnote, one, as in *Spilotro*, the

9    illicit firearms category is simply lumped into all of the

10   other categories identified in the warrant and so can't be

11   severed for that reason.  And then beyond that, naturally,

12   there's no evidence of firearms presented to Trooper Boyer.

13   Prior to seeking the warrant, he only observed an ammunition

14   box.  And as I think we lay out pretty detailed in our

15   briefing, the presence of an ammunition box doesn't imply

16   firearms.  And indeed, Trooper Boyer acknowledged you can have

17   ammunition in a car but not firearms.

18             THE COURT:  Can I just stop you there to clarify?

19             MR. MCCLELLAND:  Yeah.

20             THE COURT:  So that argument basically is if you

21   have this list of things and you actually do sever the things

22   that the government would want to sever, what you're left with

23   is just the firearms.  And are you saying there's no probable

24   cause for that?

25             MR. MCCLELLAND:  Well, so I'm saying I think two

```
 1   things, Your Honor.  One is I take that to be the government's
 2   severance argument is that, ah, just ignore that there are, in
 3   the government's view, at least three of the five categories
 4   without probable cause.  You can sustain it on the warrant --
 5   or on the firearms identification in the warrant alone.  And
 6   the response to that is, well, the firearms category, even if
 7   there is probable cause for it, and we contest that --
 8             THE COURT:  Mm-hmm.
 9             MR. MCCLELLAND:  -- but even if there is probable
10   cause for illicit firearms, the warrant simply lumps illicit
11   firearms in together with all of the other categories that the
12   government concedes there's no probable cause for.  And under
13   Spilotro, the lumping together means that you can't perform
14   the severance analysis.  By the same token, it destroys good
15   faith reliance on the warrant, because you can't have good
16   faith reliance on a facially overbroad warrant.
17             THE COURT:  Okay.
18             MR. MCCLELLAND:  I'll address one other flavor of
19   the good faith reliance argument that the government raises.
20   So naturally, the government raises the good faith reliance
21   argument, but there are exceptions to good faith reliance, one
22   of which, as I just mentioned, is facial overbreadth can't be
23   relied on in good faith.  But the second is in absence of a
24   neutral magistrate approving the search warrant.  And I think
25   the facts developed during the evidentiary hearing today
```

 1    strongly suggest that there is a neutral magistrate problem

 2    that the government needs to surmount as well.  I don't think

 3    it's any innovation to say that it's highly unusual for a

 4    police officer to call ex parte any sort of judicial officer.

 5           THE COURT:  Can I just stop you on that.

 6           MR. MCCLELLAND:  Yes, Your Honor.

 7           THE COURT:  Because I think what you're saying, in a

 8    sense, every search warrant application is ex parte --

 9    right? -- because it's a one-sided application process where

10    it's just the person who is seeking the warrant or whoever is

11    supporting that person, like, they're on -- you know, law

12    enforcement side or DA or whatever.  That's always a one-sided

13    operation where there's no one else involved from a defense

14    perspective; right?  So, can you just clarify what you mean by

15    it's off the record is what we heard, but maybe you can just

16    clarify.

17           MR. MCCLELLAND:  Yes, Your Honor.  And if we were

18    dealing with a situation in which Trooper Boyer just submitted

19    a warrant application, naturally, I don't think we would have

20    a neutral magistrate problem at issue with the good faith

21    reliance argument.  We have the facial overbreadth argument,

22    but we wouldn't have the neutral magistrate one.

23           The issue I think with Trooper Boyer's

24    communications here is not that he submitted an application,

25    that's, as the Court identifies, fairly routine.  What I don't

think is routine is asking the Court effectively for an
advisory opinion prior to the application.  And there is, I
mean, all sorts of, in the federal system, like Article III
sort of concerns about issuing advisory opinions period.  Full
stop.  But even in this sort of ad hoc justice of the peace
setting, the notion that an officer would go and basically run
a theory by the judicial officer, in this case a lay justice
of the peace, to see, you know, basically test out the theory
of probable cause prior to submitting an on-the-record warrant
application, I think raises at the least serious neutral
magistrate concerns.

        And that's, you know, not to question -- of course,
you know, Trooper Boyer it sounds like was presented with his
first search warrant situation.  Doesn't totally know what to
do.  And so his mind, it sounds like, goes first to, well, I'm
going to call the judge who issues the search warrant.

        But even if that's understandable from Trooper
Boyer's internal perspective, it's troubling, I think, from a
neutral magistrate perspective because the judge is involving
himself in these proceedings in a way that's unusual.

        But even setting aside the neutral magistrate
problem, which, you know, we think the government will have a
challenging time grappling with, the facial overbreadth of the
warrant dooms the warrant.  And that's, in my view, probably
the cleanest way to resolve the myriad problems at issue in

```
 1    this motion to suppress that whatever else happened here,
 2    there is a facially overbroad warrant that the government
 3    concedes is at least 60 percent deficient, and that the
 4    remaining categories there can't be severed and therefore
 5    can't be relied on in good faith.
 6              I'll try and walk through the remaining categories
 7    as quickly as I can.  I think the briefing on them was quite
 8    thorough, and I'm cognizant of time, but I do just want to hit
 9    a couple of points that are relevant, and I think were further
10    developed in the course of the evidentiary hearing.  So I'll
11    start sequentially with the initial stop and the justification
12    for the initial stop, namely, the speeding radar gun.  I think
13    through the course of testimony as compared to the body cam,
14    there's actually a bit of ambiguity there.  The trooper
15    testified that he used a radar gun but then immediately tells
16    Mr. Steinman in the moment that he engaged by speedometer.
17    But as the officer testified as well, he never actually gauged
18    speed by using pacing, and so it's unclear I think from the
19    record exactly how Trooper Boyer determines that Mr. Steinman
20    is speeding, an issue --
21              THE COURT:  So it would be your position that -- on
22    your client's statements about -- your client's admissions of
23    speeding you would say don't count for some other reason?
24              MR. MCCLELLAND:  Yeah, so Mr. Steinman's statements
25    about going whatever speed --
```

```
 1              THE COURT:  Yeah.
 2              MR. MCCLELLAND:  -- he was going don't count because
 3    the stop needs to be justified at its inception --
 4              THE COURT:  Okay.
 5              MR. MCCLELLAND:  -- and the government needs to
 6    demonstrate that Trooper Boyer had at least reasonable
 7    suspicion to perform the traffic stop.
 8              Even setting that issue aside whether the initial
 9    stop is justified, the prolongation I think became even
10    clearer after the course of this evidentiary hearing that the
11    prolongation is a problem.
12              So a couple of facts that I think came out through
13    Trooper Boyer's testimony that are relevant on that issue.  In
14    response to this Court's questioning, for instance, he
15    testified that he doesn't run criminal history checks as a
16    routine part of his stops.  Rather, he only runs them when he
17    thinks he has additional suspicion to run the criminal history
18    stop.  So I think that takes us firmly out of *Hylton*/Taylor
19    world and squarely into *Gorman*, *Evans*, *Rodriguez* world,
20    whereby Trooper Boyer's own testimony, this is a new,
21    unrelated investigation that he thinks he needs to justify
22    with reasonable suspicion.  This isn't something that he sits
23    down, runs the driver's license check, runs the registration
24    check, runs the criminal history check.  He runs the criminal
25    history check independently.
```

1          And indeed, a couple of other points about that

2     driver's license check I think bear on this question too.  So

3     to the extent that the government argues that you need to run

4     the criminal history check to ensure officer safety, it's

5     clear from Trooper Boyer's testimony that, in fact, the

6     driver's license check reveals basically all you need to know

7     about officer safety, namely, if there's outstanding wants or

8     warrants with respect to this particular driver.

9          Additional factors that similarly shore up officer

10    safety before the criminal history check was run here, Trooper

11    Boyer visually inspected Mr. Steinman, insured that

12    Mr. Steinman had no firearms or weapons of any sort in his

13    waistband, no bulges on his pants, nothing indicating a

14    weapon, and indeed Trooper Boyer was so confident in that

15    assessment that he didn't pat down Mr. Steinman, and, as the

16    video shows, had Mr. Steinman sit in the front passenger seat

17    of his car without taking any, really, any additional

18    precautions.

19         In line with Trooper Boyer's statements with respect

20    to running the criminal history check, the record now, I

21    think, is also quite clear that he runs the criminal history

22    check definitively after he has every single document he needs

23    to finish the speeding ticket.  He does that and further

24    reinforces that this is a new, unrelated investigation.

25         So, naturally, I suspect Mr. Keenan will rely

1    heavily on *Hylton* and *Taylor*, but the fact that this is a new

2    criminal history check run, by the trooper's own admission,

3    because he thought he had more suspicious stuff, that takes us

4    firmly out of that world.

5         Moving on to the warrantless seizure argument.  Here

6    again, many of the same factors.

7         Oh, sorry, one second.  One additional stuff -- a

8    couple additional points on prolongation.  So it's clear that

9    this criminal history check is run outside the admission of

10   the initial traffic stop.  And just to wrap up the

11   prolongation discussion, it, therefore, needed to be supported

12   by reasonable suspicion, as Trooper Boyer recognized.

13        But really at the point he decides to run the

14   criminal history stop, he doesn't have, well, really anything

15   of the sort.  The government's briefing relies on just a

16   subset of factors, I think it's five factors that we address

17   fairly in depth in -- well, both our opening brief and our

18   reply brief.  But just to walk through them really quickly,

19   the government cites, for instance, purported excessive

20   movement after the stop began.  I think the testimony reveals

21   that it was actually fairly hard to see what Mr. Steinman was

22   doing.  It was a tinted window.  Trooper Boyer couldn't make

23   out, for instance, facial features, anything other than dark

24   silhouettes.  And even if there was some degree of movement in

25   the vehicle, and I think the body cam fairly shows that

there's something, but you can't quite tell what, that doesn't

suggest that Mr. Steinman is engaged in anything criminal.  It

suggests that he's just been pulled over and is moving.

And indeed, it turns out that when Trooper Boyer

shows up at the car, there's a pretty obvious explanation for

the potential movement, which was Mr. Steinman had his ID

ready and provided that directly to Trooper Boyer.

The second point that the government relies on is

the presence of the ammunition box.  But as I think cases like

*United States v. Nora* make fairly clear, the presence of an

ammunition box can't daisy chain into an assumption that

there's anything more in the vehicle.  And indeed, whatever

the status of possession of ammunition is under federal law --

and I know we'll have a brewing discussion in a minute -- but

whatever the legality of possessing ammunition is under

federal law, Trooper Boyer was unequivocal, not a crime under

state law.  And that's a problem for a whole host of reasons,

some of which I'll get into in the warrantless seizure

context, but the basic point is he's not tasked with enforcing

federal law.  He needs to premise things that he thinks is

suspicious on state law, otherwise cases like *U.S. Currency*

and the case out of the Northern District of California that

we supplied -- that we cite in our reply briefing, well, those

cases wouldn't make any sense; right?  The rules in those

cases provide that you need to premise any search on purported

1    single violations.  So they can't provide reasonable suspicion

2    or, as I'll discuss in a minute, probable cause for the

3    warrantless seizure.  Okay.  That's the second point with

4    respect to reasonable suspicion that the government relies on.

5         The third point that having a blanket in the back

6    seat, I think there was also some inconsistent testimony from

7    Trooper Boyer on this.  In response to Mr. Keenan's questions

8    Trooper Boyer says that he could see items under the blanket.

9    But it's fairly clear from his report and his testimony on

10   cross-examination, as makes sense when you have a blanket, you

11   can't actually see the items that are underneath the blanket.

12   And indeed, the presence of a blanket alone means you have a

13   blanket in a car not that you are hiding things.

14        And indeed, even if there was some sort of hiding

15   problem at issue with the blanket in the car, I think there's

16   also a fairly innocuous explanation to that, which is, as

17   Mr. Steinman repeatedly told Trooper Boyer, he's moving.

18   Makes sense to put a blanket over items in a car that you are

19   moving even if they are not innocuous items, you don't want

20   burglars breaking in and stealing your possessions.

21        The fourth point that the government relies on for

22   both the reasonable suspicion and, I take it, the probable

23   cause analysis is that Trooper Boyer found it suspicious that

24   Mr. Steinman asked why he was being ordered out of his car.  I

25   think the body cam and testimony is fairly clear on that.

1    Mr. Steinman asked, as I think it's his right to do, why he's

2    being ordered out of the car and then promptly complied with

3    it.  He didn't resist, other than ask the source of authority,

4    which Trooper Boyer ultimately supplied was *Pennsylvania v.*

5    *Mimms*, but told him case law in the moment, and even that sort

6    of vague implication of unspecified case law was enough for

7    Mr. Steinman to say, okay, I accept your authority and step

8    out of the car.

9           And then fifth and finally, the government relies on

10   the purported sweating and purported nervousness of

11   Mr. Steinman in response to being pulled over in August in

12   Wells, Nevada.  I mean, a couple of points on that is Trooper

13   Boyer confirmed it's hot in Wells, Nevada.  Indeed, the body

14   cam shows Trooper Boyer and Sergeant Marin wearing

15   short-sleeved shirts.  Maybe they are acclimated well to the

16   climate of Wells, Nevada.  But as someone traveling from

17   Washington state, then it makes pretty clear sense that

18   someone might be sweating in the middle of August in Wells,

19   Nevada.

20          And indeed, it's actually kind of hard from the body

21   cam to tell if there are -- there is sweating.  But, you know,

22   we credit the testimony that someone might be sweating in

23   August Nevada -- sorry, in Wells, Nevada, in the middle of

24   August.

25          And then beyond that, I think the body cam is quite

1    clear that Mr. Steinman is quite composed.  He doesn't use any

2    profanity, I think as far as the body cam goes, until after

3    being put into the SUV and being asked fairly substantial

4    questions.  While he's being ordered about prior to that, he's

5    quite compliant.  And indeed, the -- in the preliminary

6    hearing testimony that's been admitted into evidence, Trooper

7    Boyer describes him as very compliant in response to initial

8    questioning.

9          But even if we are to accept the nervousness

10   argument that the government raises and Trooper Boyer

11   purported to identify, nervousness doesn't suggest criminal

12   activity.  I think that's pretty squarely resolved by

13   *Chavez-Valenzuela* that we cite in our briefing.

14         All told then, we're sort of in a situation where

15   individually all the factors are zeros, and so, collectively,

16   à la *United States v. Thomas*, a sum of zeroes is zero.  So

17   even viewed in their totality, not enough for reasonable

18   suspicion let alone probable cause.

19         So I said that was going to be a brief discussion of

20   the prolongation reasonable suspicion analysis, but I think

21   that feeds very well into the warrantless seizure, because I

22   take the government to argue basically the same factors as if

23   they now provide probable cause.  But if they can't provide

24   reasonable suspicion, they also don't provide probable cause.

25         In our briefing, I think we get into a bit of a

sparring match with respect to authorization, the search for the federal law stuff.  I think that's all fairly squared away today that Trooper Boyer didn't perceive himself to be doing any of that.  He didn't apply for a federal search warrant. There's no indication whatsoever that he's looking for federal crimes in the course of this stop.  So we're squarely in *U.S. Currency* territory, and that's specifically for the purposes of the record, *United States v. $186,416 of U.S. Currency*. That's the world that we're governed by, and so he can't sort of bootstrap his way back into a proper search even though state law didn't let him perform it.

Beyond that, the next issue, of course, is the search warrant itself.  Went into some detail earlier on in my presentation here about the warrant and the lack of both probable cause within the warrant and then the warrant's overbreadth and the failure to sever, and the inability to rely on good faith on it, so I won't rehash those arguments again.  But at bottom, this case is pretty squarely within *Spilotro* world on the warrant.  Just to note again, and I think if the Court's looking for, you know, the easiest way to write a 3-page order on this, I think the warrant requirement issue and the overbreadth issue is probably the simplest, cleanest way to do so.

Finally, there's a *Miranda* issue that we also raised in our briefing.  I think the testimony today further confirms

 1   that Trooper Boyer's interaction with Mr. Steinman was in the
 2   form of orders and involved fairly substantial detention.  I
 3   should note at this point that the government only disputes
 4   the custodial prong of the *Miranda* argument.  Doesn't dispute
 5   that this was an interrogation, for good reason.  All of the
 6   questions that Trooper Boyer was asking Mr. Steinman in the
 7   course of, specifically, the SUV discussion, but, more
 8   broadly, were designed to illicit incriminating responses.  So
 9   this is an interrogation.  The question is whether it's
10   custodial.  And the bringing into the car, the requiring to
11   sit in the car for a fairly substantial period of time, even
12   if the car door is open, he's still under compulsion by the
13   officer to be in a place that he doesn't want to be.
14           THE COURT:  So in your -- just to clarify, when does
15   the custody start, in your opinion, on the timeline?  Does it
16   start when he's ordered out?  Or, I guess, does it start when
17   the interrogation and custody coincide in the car?  What
18   changes?  Can you just pinpoint that?
19           MR. MCCLELLAND:  Yeah, so, ultimately, I'm not sure
20   it entirely matters, but I think the custody likely starts at
21   the ordering out of the car.  And it's certainly at play with
22   the ordering in the front passenger seat.
23           I say it doesn't totally matter because there wasn't
24   a substantial amount of questioning between the ordering out
25   of the car and the ordering to sit in the front passenger

1    seat.  Most of that was Mr. Steinman confirming by raising his

2    arms and showing his waistband that he didn't have any weapons

3    on him.  And the problematic, from our viewpoint of the

4    interrogation, is all in the SUV about, you know, felony

5    convictions and such.  Certainly by the time that he's in the

6    SUV, it's our view that he's in custody.  And we think

7    actually that custody extends past any leaving the SUV because

8    he's ordered to stand by in, safe to stay, a fairly

9    inhospitable situation.  18 miles I think Trooper Boyer

10   testified from the metropolis of Wells, Nevada, in the middle

11   of August in the desert while he has his property seized from

12   him.  And indeed, he's deprived of his paperwork up until

13   about an hour and a half into the stop.

14          Naturally, if someone has the key documentation that

15   you need to go about your daily life, to get, for instance, a

16   plane flight out of Wells, a reasonable person wouldn't feel

17   free to leave in that sort of situation.  So Mr. Steinman

18   isn't free to leave until he, in fact, leaves by walking down

19   the road after he's received his documentation back from the

20   officers.

21          THE COURT:  Okay.  So on that point, just on that

22   little point --

23          MR. MCCLELLAND:  Mm-hmm.

24          THE COURT:  -- that -- the case law you're referring

25   to that as sort of like the -- I think it's *Florida v. Royer*,

```
 1    but is there a Ninth Circuit case that sort of is -- you're

 2    hanging your hat on for Miranda on the custody point?  That's

 3    one question.  And if you want to address that when you come

 4    back.  And then just the upshot of that would be the exclusion

 5    of his statements in the car --

 6              MR. MCCLELLAND:  That's correct.

 7              THE COURT:  -- is that your position?

 8              MR. MCCLELLAND:  That's --

 9              THE COURT:  If there is a Miranda violation, then

10    the consequence of that is that the incriminating answers to

11    questions about criminal history would be excluded.

12              MR. MCCLELLAND:  Yeah.  So I think a couple of

13    responses to that, Your Honor.  One, with respect to custodial

14    analysis in Miranda, I mean, I think you're right, Florida v.

15    Royer is the landmark supreme court case that we're invoking

16    there.  Rhode Island v. Innis, also we cite in our briefing,

17    and Stansbury v. California -- well, Rhode Island v. Innis for

18    the interrogation chunk, and then Stansbury v. California for

19    the custodial chunk.  More broadly, some cases are

20    United States v. Craighead and United States v. Kim I think

21    are decent examples.  They deal with a somewhat different

22    factual scenario of in-home -- custodial in-home

23    interrogation, but I think the same analysis about freedom to

24    leave and the like is probably applicable to this roadside

25    bit.
```

```
1           And I'll acknowledge, we didn't brief Craighead or

2   Kim in our briefing, but we'd be happy to provide a more

3   detailed discussion if the Court's curious.

4           THE COURT:  Okay.

5           MR. MCCLELLAND:  And then with respect to what would

6   be suppressed with respect to the Miranda violation.  So the

7   Court's correct, we would be seeking to suppress

8   Mr. Steinman's statements during the custodial interrogation

9   in the SUV.  And as a consequence, the decision to seize the

10  vehicle.  Because by the time that Trooper Boyer seizes the

11  vehicle, the only possible basis for him to suspect that

12  ammunition or firearms or any sort of contraband in the

13  vehicle would be incriminating is Mr. Steinman's statements

14  with respect to the felony convictions.

15          THE COURT:  Mm-hmm.

16          MR. MCCLELLAND:  It's only after he decided to seize

17  the vehicle that he's able to confirm them through the

18  dispatch records check that he does.  So we think that

19  actually the Miranda custodial problem, if the Court resolves

20  this case on that ground, would also render deficient the

21  seizure itself through sort of a, you know, the only reason

22  for the seizure was the felony convictions.  The only

23  conceivable one is the felony convictions.  He's only able to

24  get elements of that from Mr. Steinman's statements.

25          With that, Your Honor, unless the Court has any
```

1  additional questions with respect to any of the arguments, we

2  would ask that the Court suppress evidence collected during

3  and as a result of this stop.

4          THE COURT:  Okay.  Thank you.

5          So I'll come back to you and give you some rebuttal

6  after I hear from the government.

7          Go ahead, Mr. Keenan.

8          MR. KEENAN:  I'll start with the reasonable

9  suspicion to stop for speeding.  I think it's been briefed.  I

10  mean, the facts are laid out and I don't think it's unclear

11  from the record in one bit.  The testimony today was that the

12  trooper observed 89 miles per hour on the radar.  And as

13  Your Honor asked with regard to the defendant's statements,

14  they're absolutely corroborative of what he saw.  I mean, if

15  he sees 89 on the radar gun, goes up and tells someone, I

16  saw -- I had you going 89, and they say, oh, I thought it was

17  85, that certainly corroborates what they observed.  He had

18  reasonable suspicion to stop the defendant for speeding.

19          There's nothing to suggest that the radar wasn't

20  working.  He's trained to use it.  There was no other car

21  around behind the defendant when this radar situation would

22  have happened.  There was reasonable suspicion for speeding.

23          As far as the criminal history check, obviously, we

24  have some disagreement here.  The suggestion that the driver's

25  license check tells you everything is just not true.  It

doesn't tell you if someone has been convicted of a crime.
For that matter, it will tell you warrants but not criminal
history.  It's just -- the suggestion that that should dispel
any sort of officer safety concern because the person may not
have a warrant, I mean, certainly someone may not have a
warrant, but they could have recently -- somewhat recently
committed a murder.  That wouldn't show up on a driver's
license check.  That would show up on a criminal history
check.  Or it could show that someone was convicted of
resisting arrest the week before.  These are things that are
relevant to officer safety that wouldn't show up on a driver's
license check.

And, you know, *Hylton* and *Taylor* are extremely
informative.  As far as I can tell, this notion that it has to
be routine isn't really what at least I get from reading those
cases.  It's that it's a negligibly burdensome precaution.
That's consistent with the mission of the stop, and that
mission being to conduct it safely.  That sort of safety -- I
mean, and it relies on *Rodriguez*.  They rely on *Rodriguez* and
this notion that these car stops are especially fraught with
danger where you can be pulling someone over, you may not
know, like in this case, that there's a loaded gun underneath
the driver's seat.  You may not know that there's 37 other
guns in the car.  It's something you're walking into and you
just don't know.

1    And the courts have found that running this criminal

2    history check is a negligibly burdensome precaution necessary

3    and consistent with the mission of stop being to conduct that

4    stop safely.

5    You know, there's some notion that, you know,

6    because, obviously, there wasn't a safety concern because he

7    didn't frisk the defendant or because he was not in his car,

8    these concerns I don't know that you can say they just -- they

9    start and stop that easily.  For instance --

10    THE COURT:  I guess just one little, just trying to,

11    like, think about the facts, the things that I heard.  He did

12    say that he doesn't usually run a criminal -- it's absolutely

13    true that he has a dangerous job.  And it's absolutely true

14    you never know who you're going to be talking to -- right? --

15    or what they have in the car.  So I understand that.  But

16    here, just factually, he said that he doesn't usually run a

17    criminal history check.  Whether it takes one minute or

18    90 minutes, he doesn't usually do it.  And he did it based on

19    his suspicion.  But it -- but he also said in the preliminary

20    hearing that he wasn't afraid of the person.  He didn't

21    feel -- I don't know if he said the word I didn't feel unsafe,

22    he wasn't afraid of this person.  He has this conduct that

23    indicates he's not afraid of the person which just gets us

24    into that zone of well, what is the purpose of the check?  Is

25    it routine officer safety within the mission of à la

1    *Rodriguez*, or is it some adjunct that's sort of really

2    motivated purely by investigator motive.  And he testified

3    that it wasn't investigatory motive.

4         MR. KEENAN:  Yeah.  And I would agree with that

5    characterization of the facts here.  I would say with respect

6    to certainly with probable cause, reasonable suspicion, the

7    subjective intent of the officers never matter.  And I don't

8    know that his subjective intent, at least in this case,

9    matters in a *Hylton-Taylor* analysis.  What *Hylton* and *Taylor*

10   do are stand for the fact that an officer may do this.  It

11   doesn't say they have to do it if they're afraid.  Like the

12   subjective motivations of the officers are never addressed in

13   these cases.

14        And, for instance, I believe it's in *Taylor*, the

15   officer had already been told that the person was a felon who

16   was on parole.  And then it was still okay for him to

17   reference the computer database to look at that individual's

18   criminal history.  So if we think about the motivations,

19   like -- or his subjective intent or knowledge in that

20   situation, he would have already known that this person was

21   potentially dangerous, but he was still permitted to run that

22   check.  So I don't know that the rationale for allowing these

23   checks turns on the subjective motivations of the --

24        THE COURT:  And I'm not trying to pin this on the

25   subjective.  I'm trying to look at what was he factually

        doing.  And there is this distinction in the case law.  And

        *Hylton* and *Taylor* are sort of in one basket, and then we do

        have the sort of *Gorman/Rodriguez*, which is you can do routine

        checks that are consistent with what you usually do.  And we

        have an officer saying, I don't usually do this, this is about

        an investigation.  So those are just -- I understand we sort

        of may have kind of some period of the stop where there's kind

        of running on parallel tracks and we're seeing if one should

        end or start.

                    MR. KEENAN:  Right.

                    THE COURT:  But that was his testimony.

                    MR. KEENAN:  Right.  And I think the check itself is

        different from *Evans*, for instance, which just is designed to

        figure out if someone registered as a felon at a particular

        address.  It's not to actually uncover the history of that

        individual which would be relevant to officer safety.  So

        it's, it's -- in and of itself the check is pretty much only

        an investigatory purpose rather than informative as to officer

        safety which is the entire justification for the check.  So I

        think that's the reason.

                    THE COURT:  I think I've lost you there.  You're

        telling me that the check was for investigation.

                    MR. KEENAN:  In *Evans*, the check itself.

                    THE COURT:  But I have an officer who was on the

        stand saying that the check was for investigation.  It's a

1    non-routine check.  The reason he put him in the car was not

2    for officer safety, it was to ask him questions for his

3    investigation because he was --

4              MR. KEENAN:  Suspicious.

5              THE COURT:  -- suspicious.  Right, so I understand

6    maybe the suspicion is good enough to do this all until the

7    suspicion is dispelled; right.  I get that.  But it

8    distinguishes it sort of from a routine quicky check like is

9    happening in *Hylton* and *Taylor*.  And it does -- it's not an

10   *Evans* check, but it's more like an *Evans* check in the sense

11   he's kind of digging around.

12             MR. KEENAN:  I guess the distinction I'm making is

13   with the check itself.

14             THE COURT:  Like the kind of check.

15             MR. KEENAN:  Yes, the type of check.  And one has

16   been justified for officer safety reasons, the other has no

17   real purpose that would be relevant to officer safety, which

18   is how the courts are defining the mission of this stop.  So I

19   think that's where we land in different buckets.

20             THE COURT:  Okay.  And the reason this check is

21   relevant to officer safety is what?

22             MR. KEENAN:  Because it reveals someone's criminal

23   history.  For instance, in this case, it revealed that this

24   individual --

25             THE COURT:  Doesn't someone's criminal history

 1    always, like -- I mean --

 2              MR. KEENAN:  So a felon --

 3              THE COURT:  -- every criminal history check reveals

 4    criminal history.  And we have cases that are distinguishing

 5    between these checks, but they all reveal criminal history.

 6              MR. KEENAN:  Well, the *Evans* check isn't criminal

 7    history.  It's a felon registration address database.  I don't

 8    know that it even tells you what they're convicted of.

 9              THE COURT:  I see.

10              MR. KEENAN:  So it really, it doesn't give

11    background --

12              THE COURT:  Right.  But *Gorman* is a criminal history

13    case.

14              MR. KEENAN:  -- of a different crime.

15              THE COURT:  Isn't *Gorman* a criminal history case?

16              MR. KEENAN:  I'm sorry.

17              THE COURT:  Isn't Gorman a criminal history case,

18    like a non-routine criminal history check?

19              MR. KEENAN:  I'd have to check.

20              THE COURT:  I may be mistaken about that.

21              MR. KEENAN:  So in a similar way, *Gorman* is a human

22    trafficking database --

23              THE COURT:  Mm-hmm.

24              MR. KEENAN:  -- that deals with smuggling, money

25    laundering, and human trafficking.  I don't know that that

necessarily gives you background.  It's more like *Evans* than

the check itself, or the information that the check provides

is much more like *Evans* than the background information of

*Hylton* and *Taylor*.  Like a typical, your typical criminal

history check.  So these are, like -- these two, *Evans* -- or

*Gorman* and *Evans* are investigatory-type databases, and another

is what's this person's history?  So I think that's where they

fall into different buckets.

THE COURT:  But you would agree that what this

person's history is part of a criminal investigation and not

part of a traffic investigation that's relevant to safe

driving?

MR. KEENAN:  The information itself I think is

relevant to -- to -- well, obviously, relevant to both.

THE COURT:  Mm-hmm.

MR. KEENAN:  But I think the reason one has been

deemed by the Ninth Circuit to be allowable and consistent

with the mission of the stop is because of the information

that it provides.  I don't think it's the subjective

motivation of the trooper or the suggestive investigatory

purpose, it's the information itself.

THE COURT:  Okay.

MR. KEENAN:  Well, that being said, I do believe

that at the time that the criminal history check was run that

we would submit that there was reasonable suspicion to suspect

```
 1   that firearms were in the vehicle.  And I think the briefing
 2   touches on this.  And, you know, the -- the defense for some
 3   reason never mentions the totality of the circumstances, which
 4   I think is important here.  If you pick apart every
 5   potentially innocent behavior and look at them one by one, of
 6   course, you'd also say, well, this isn't probable cause, it's
 7   a blanket.
 8            THE COURT:  No, I think I understand.  I think it
 9   kind of boils down to if you put these things together, you
10   have ammunition, felony status, blanket, and some sweaty
11   nervousness.
12            MR. KEENAN:  And some inconsistent answers, we would
13   argue, for probable cause in terms of having ammo and then oh,
14   no, the box is empty, which I think is in the warrant itself
15   as well.
16            THE COURT:  Yes.  Right.  Whether that adds up to
17   reasonable suspicion.
18            MR. KEENAN:  And certainly --
19            THE COURT:  And then ultimately, whether even if it
20   adds up to reasonable suspicion, it kind of gets us over the
21   fence to probable cause.
22            MR. KEENAN:  Right.  And I think there is -- I guess
23   the dividing line between what we're looking at is before the
24   criminal history check is run whether there's reasonable
25   suspicion.  And the facts before that reasonable suspicion, I
```

1    think that came out today, were the blanket, answer, the ammo

2    box, the sweating and the nervousness.  There's been some

3    suggestion in some of the reports and whatnot there was sort

4    of overcompliance that, you know, just give me my ticket,

5    which does -- I realize does seem slightly unusual in a

6    traffic stop when I think typically people are trying to get

7    out of tickets.  I think both of those things happened during

8    this stop.  But that being said, we would rely on the --

9    primarily on the blanket, the nervousness, the ammo box, the

10   admission to having ammo in the vehicle I think is

11   particularly relevant.

12           THE COURT:  Mm-hmm.

13           MR. KEENAN:  And then that's when that criminal

14   history check is run.  And then once -- the information

15   provided after that are the felony assault conviction for

16   domestic violence, and then the inconsistent answers about the

17   ammo in the vehicle, and some slightly misleading, vague

18   answers, some untruthful answers about criminal history.  I

19   think with respect to that, I would point to at least to the

20   question I believe was, was it a felony assault charge?  The

21   answer was no.  And it was certainly listed in this criminal

22   history printout, particularly in the indictment in this case.

23   But -- and the trooper believed that to be deceptive.

24           So those facts and the totality of the

25   circumstances, and, again, as I alluded to earlier, I think it

1    was clear from the testimony, this officer, this trooper, did

2    not know if he had probable cause.

3              THE COURT:  That's definitely clear.

4              MR. KEENAN:  And he was -- and was not afraid to ask

5    multiple people what they thought of it.

6              THE COURT:  Everyone.

7              MR. KEENAN:  I think that is behavior we should

8    encourage.

9              THE COURT:  It is behavior we should encourage, but

10   it is a very odd posture because there's an aspect of

11   laundering probable cause through a warrant.  He knows -- I

12   mean, I asked him.  He knows that he can go into the car if he

13   has probable cause.  I also -- I mean, I taught this, and I

14   would always say, look, if someone gets a warrant, God bless,

15   that's wonderful.  But one of the aspects in the way the law

16   works is that once you get the warrant, there's so much

17   deference to the warrant.  But he already had sort of this

18   private conversation, which is really unusual, with the judge.

19   But the reason he's getting the warrant is to sort of, I

20   understand, look, you might often have a situation where

21   you're, like, uhh, is it probable cause?  Isn't it probable

22   cause?  I'll just let the judge decide.  This is different

23   than that because it's not like I'll just let the judge

24   decide.  He testified that he was asking the judge about

25   process.  But, I mean, I heard, at least the half of the

1    conversation I could hear, he's not asking him about process,

2    he's saying what do you think?  Is this probable cause?  And

3    he keeps asking the same question, is it good enough?  So that

4    has a different flavor than just, like, I'll put all this in

5    front of the magistrate judge, and I'll live with what the

6    magistrate judge says.

7            MR. KEENAN:  And I think, again, we're sort of

8    getting into subjective motivations, and at least with respect

9    to probable cause, you know -- I don't mean to say no, that's

10   just -- I apologize.

11           THE COURT:  That's okay.

12           MR. KEENAN:  You know, he presents the facts, and

13   those are viewed from the standpoint of an objectively

14   reasonable police officer.  So ultimately, whether he knew he

15   had probable cause or not is irrelevant to the analysis.

16           I think the notion that he is potentially doctoring

17   up probable cause is at least belied by the fact that he had

18   never done this before.  He doesn't know what kind of

19   deference a search warrant gets from the testimony.  Like, how

20   would he know?  And I think the best explanation --

21           THE COURT:  Well, he was trained on this, which is

22   why he's so nervous about getting it right.  And he was

23   trained on -- he knew there was an exception you don't need a

24   warrant if you actually have probable cause.

25           MR. KEENAN:  And I think that's commendable that

1    he -- and I think the easiest explanation for calling, and I

2    think the testimony today was I wanted to see if it was even

3    going to be entertained.  Because he doesn't want to tow a

4    car, have the defendant walk along the side of the road if a

5    search warrant is ultimately going to get denied.

6              THE COURT:  I understand that --

7              MR. KEENAN:  It's practical.

8              THE COURT:  I understand that it wasn't all just

9    practical.  Practical might be are you there tonight?  You

10   know, are you leaving?  Can I get this done?  That's sort of

11   like a logistical question.  Whereas he is getting a little

12   bit of a sneak peak of how that's going to go out.

13             But I do want to ask specifically, do you -- is it

14   your position that that automobile was seized on the side of

15   the road and that that was a warrantless seizure?

16             MR. KEENAN:  Well, yeah.  It was seized in

17   anticipation of the warrant.

18             THE COURT:  Do they need probable cause to get that,

19   to do that?

20             MR. KEENAN:  Yeah, I think that's fine.

21             THE COURT:  That's consistent with your briefing,

22   I'm just making sure.

23             MR. KEENAN:  Yeah.  And all the facts that

24   ultimately went into this warrant are already established by

25   the time that car is seized.

```
 1              THE COURT:  Yes.
 2              MR. KEENAN:  So it's not inconsistent with anything,
 3     I think, that we've argued factually, legally, or otherwise.
 4     The probable cause was established before that vehicle was
 5     towed, so I don't know that --
 6              THE COURT:  Mm-hmm.
 7              MR. KEENAN:  -- that we've really grappled with that
 8     issue for that very reason.  If there were additional facts
 9     learned later, I think maybe the analysis --
10              THE COURT:  But would it be your position that if
11     probable cause exists, then the warrant is irrelevant?
12              MR. KEENAN:  No.
13              THE COURT:  Why?
14              MR. KEENAN:  Well, certainly they wouldn't have
15     searched this car without a warrant.
16              THE COURT:  Why?  They have probable cause.
17              In the hypothetical -- I'm just giving you a
18     hypothetical; I'm not saying they did.  If they have probable
19     cause on the side of the road, is the warrant or the defects
20     in the warrant, you know, because you admit there are defects
21     in the warrant, but is that still relevant if they had
22     probable cause, or does that just all fall away because once
23     you have probable cause you're good?
24              MR. KEENAN:  Certainly the exclusionary rule
25     analysis, I think that it's an important question because --
```

1    so I think the question is do we want to penalize them for

2    having even gotten the warrant when they had all the probable

3    cause before?  And just because the warrant, like, lacks some

4    specificity, does it undo the probable cause that they already

5    had?  I don't think the probable cause dissipates when they

6    get a warrant.  So the facts don't go away.  So technically,

7    they could have still searched that vehicle.

8              Again, like I said, I don't know that they would

9    have.

10             THE COURT:  The defect -- right, the defects might

11   go away with the warrant.  If you admit that there's a

12   defective warrant, I'm trying to figure out if I even need to

13   address the defective warrant because if you have probable

14   cause, I'm done.

15             MR. KEENAN:  Understood.

16             THE COURT:  Right?  Okay.

17             MR. KEENAN:  And I think it goes both ways.  I mean,

18   if -- and I'm not saying the warrant was defective.  Certainly

19   we would concede that it should be excised in terms of the

20   search for drugs, paraphernalia, stolen property, as was

21   mentioned.  But it's certainly lawful and valid and includes

22   probable cause to search for firearms.

23             And I'm not sure, and I'm unclear on the law, and it

24   seems to me a somewhat new argument that somehow it can't be

25   severed in any way.  And that's news to me.  But, again, I

1    haven't heard any law on it, but it's certainly not in any of

2    the law that I've seen that allows warrants to be severed.

3           And so I would -- I would say two ways.  So there

4    was probable cause for the warrant.  It can be -- for what

5    there wasn't probable cause can be severed from it.  And the

6    warrant was executed absolutely, we would argue, in good

7    faith.

8           THE COURT:  So what about just -- I'm also a little

9    unclear on how the *Evans* works sequentially and in combination

10   with the good faith.  They've made an argument that good faith

11   doesn't apply because there's an overbreadth problem.  But is

12   it your position that if the -- and good faith only comes if

13   we -- so we have a defective warrant in some way.  And the

14   question is what -- that severance is a remedy.  And good

15   faith is also a remedy; right?  So, but how do they work

16   together?  Just spell that out for me in terms of my -- like,

17   if I have my warrant and I've made my ruling that there's

18   something wrong and I'm using my red pen to say what's left.

19          MR. KEENAN:  Right.

20          THE COURT:  You tell me.

21          MR. KEENAN:  So what's left are all the facts and a

22   judge that says you can search for firearms, and an affidavit

23   that says I want to search for evidence of ex-felon in

24   possession of firearms, I believe.  I'm sort of half quoting.

25   But if you take out at least in terms of the warrant itself,

1   references to what there -- we would concede there is not

2   probable cause established by the affidavit, which is

3   essentially everything except firearms or -- I forget, firearm

4   related items.  But even if it's just firearms, it's not

5   overbroad.  So once those things are excised, and we can

6   pretend they don't exist in the warrant, is that warrant

7   overbroad?  And I believe the defense is arguing that just

8   saying firearms is overbroad.

9          THE COURT:  I think it's partly that sort of it's

10  not like you have one part of the warrant on one part about

11  one kind of thing and another part of the warrant on another.

12  You know, they're all lumped together with a simple sentence.

13  One of the problems with that simple sentence that I have, and

14  I'm not sure I've found.  But it seems to me that on good

15  faith we have, like, a little factor test.  But there is

16  something happening here which is I think relevant to some of

17  the case law I've seen on sort of interactions, the interplay

18  between severance and good faith, is just this question of,

19  you know, what was served to the magistrate and approved by

20  the magistrate was a warrant for guns and drugs and stolen

21  stuff.

22         MR. KEENAN:  Correct.

23         THE COURT:  That's what the magistrate had the

24  opportunity to review.  And so there's a question of severance

25  and lumping things together; right?  That's the sort of

```
 1    conflict of whether the magistrate would have approved the
 2    sort of much thinner warrant that we would be left with after
 3    getting rid of what we're not -- what's, you know, after
 4    redacting the problem areas of the warrant -- right?  -- which
 5    is there is nervousness -- I mean, the things we're talking
 6    about, nervousness, ammunition, and that's -- that's the whole
 7    thing, and no connection to guns -- I mean, no connection to
 8    drugs, stolen property, paraphernalia.
 9            MR. KEENAN:  Well, I think that notion is
10    interesting.  Because, I mean, excising of that actually makes
11    it a better warrant not a thinner warrant.  It would be
12    limited to searching for a more narrow set of items which
13    would be better and would have been better in this case.  I
14    think Your Honor's correct to suggest that I think maybe that
15    gets us into whether it was sort of the other factors, not
16    overbreadth, but maybe, like, whether someone actually read
17    this type thing or just signed off on it.
18            I think that's the analysis that that would sort of
19    interplay with.
20            THE COURT:  Mm-hmm.
21            MR. KEENAN:  I think once it's severed, though, one,
22    there's probable cause.  And that was -- I don't think there's
23    any -- been any suggestion that it was tainted by sort of
24    earlier conversations with the judge.
25            And I guess I just want to mention, while I'm
```

1    thinking of it, this trooper spoke to, like we said, at least

2    three people.  And all those conversations are on body cam,

3    and all of them contain identical, pretty much identical sets

4    of facts that he's relaying to these people.  And I believe

5    they're also the same ones that went into the warrant.

6                THE COURT:  I agree with that.

7                MR. KEENAN:  So this is someone seeking help,

8    relaying the same facts that are true, not misrepresenting to

9    any one of the four people if you include the actual judge --

10               THE COURT:  Mm-hmm.

11               MR. KEENAN:  -- and trying to do the right thing and

12   submitting that warrant to the judge, albeit his first warrant

13   to the judge.  So, and, again, I hate to say it again, but,

14   you know, if we're looking at the justification for the

15   exclusionary rule to deter unlawful police conduct, I guess my

16   question in this case would be, certainly with respect to the

17   warrant and the way this was handled, what are we trying to

18   deter?  And I hope it's not trying to ask people for help and

19   going to get a warrant instead of just rummaging through

20   someone's car.  Granted they could have because there was

21   probable cause, but that's that.

22               I guess I don't want to get too far afield.  There

23   was -- the defense has cited the *Nora* case to suggest some

24   sort of overbreadth.  That case involved -- I believe they saw

25   someone with a gun, arrested them, and then they got a warrant

```
1    for guns at the person's house.  It had nothing to do with
2    ammunition.  It does stand for the proposition that, you know,
3    if you specifically see someone with a gun and recover that
4    gun, you can't just get a warrant to search their residence
5    for guns.  You know, I think it's a completely different
6    analysis from what we've argued with respect to the link
7    between ammunition and firearms.  That's just one gun to
8    assume there's more guns.  I think ammunition has a different
9    relationship with firearms.
10              THE COURT:  But there's these cases, and I'm going
11   to fail to remember the names of them, but there are these
12   cases where you have some particular fact about the
13   ammunition, for example, is the ammunition on the person?
14   Does the person have a fanny pack that's unzipped and it's
15   sort of -- it's like kind of crying out, or a strap crying out
16   like there might be something going on here.  We don't have
17   that in this case.  This is the absence of facts that kind of
18   point that there's not always -- there may be a dotted line
19   between ammunition and firearms.  There's not a straight line,
20   and we haven't filled in the dots between the two here.
21              MR. KEENAN:  So -- and what's interesting about
22   those cases is the ammunition and magazines I think that were
23   on the person, they weren't in the vehicle.  So actually
24   there's probably less probable cause to suggest that a gun was
25   in the vehicle when those are found on the actual person.  So
```

 1    in this case, in our case, we have an admission that there's

 2    ammo in the vehicle itself.  And in these -- that other case,

 3    there was just ammo on this person who got out of a vehicle,

 4    but they still had probable cause to go into the car to search

 5    for guns.

 6               So I think, at least in terms of the link to the

 7    vehicle, we're in a much better position here than those

 8    cases.

 9               With respect to the gun versus firearm, the defense

10    made some suggestion that these were magazines and a holster

11    which more closely relate to, I guess, firearm possession than

12    ammunition.  You know, a revolver, you don't have a magazine,

13    you just put ammunition right in the gun, the same way you put

14    a magazine in some -- in a pistol.  So I don't see a

15    meaningful distinction that is worthy of distinguishing those.

16               THE COURT:  Mm-hmm.

17               MR. KEENAN:  And I think this -- if you look at the

18    broad justification for why that link exists, and also in

19    those cases we had some additional sort of levels of suspicion

20    that I think we also have here in terms of the excessive

21    movement.

22               THE COURT:  His excessive movement?

23               MR. KEENAN:  Excuse me?

24               THE COURT:  The excessive movement?  Like, before

25    the car stopped?

1           MR. KEENAN:  As the -- right as the car was stopped,

2    which I failed to mention in terms of the reasonable suspicion

3    before.

4           THE COURT:  Okay.

5           MR. KEENAN:  But I think it's -- you know, it's

6    pretty -- that's more than just driving.  Watching the video,

7    I think it's clear that's more than just grabbing a driver's

8    license.  There's -- having watched it a few times, there's

9    much more than just I'm going to go get my driver's license.

10          And as the defense pointed out, you can't see what's

11   in there.  All you see is a person moving around.  And I think

12   that raises even more sort of concerns for safety, which is

13   sort of part of this whole analysis that I thought I'd

14   mention.

15          And I guess lastly, so we don't go over and over,

16   there is some suggestion about the misrepresentations in the

17   search warrant.  I think it's pretty clear from the body cam

18   that there are no misrepresentations.  And to the extent it's

19   relevant when the convictions were verified versus when he

20   read a printout, that there's no reason to distrust that it's

21   a felony guilty disposition.

22          THE COURT:  Mm-hmm.

23          MR. KEENAN:  Whether that changes sort of the search

24   warrant analysis is certainly immaterial.  But it doesn't, to

25   me, seem like any sort of inconsistency or misrepresentation.

 1          And I believe it was probably only raised to try and

 2    work some sort of good faith argument.

 3          I think I've touched on most of this, but I guess

 4    just to --

 5          THE COURT:  There's one argument that I think you

 6    haven't touched on and I think it's important.  He testified

 7    that he was enforcing Nevada law.  There's this legal issue

 8    about whether he can as sort of in the here and now make this

 9    about federal law when he wasn't, A, tasked with doing that.

10    And we have some case law in the Ninth Circuit that addresses

11    that.

12          MR. KEENAN:  Yeah.  And I think it sort of -- I

13    mean, there's a couple cases that go different ways.

14    Certainly the *U.S. Currency*, I'll call it the *U.S. Currency*

15    case --

16          THE COURT:  Yes.

17          MR. KEENAN:  -- is the least favorable in terms of

18    state and federal law.  What I would say about that case,

19    which I think is a meaningful way to distinguish it, is in

20    that case they searched a dispensary pursuant to a search

21    warrant.  That was their only basis for even getting into that

22    dispensary to conduct the search.  They were relying solely,

23    solely upon the state search warrant that made no mention of a

24    federal law violation.  And because of that, they couldn't

25    then rely on federal law to justify their search.

1        This case is different because of the automobile

2   exception.  I think we talked about this, and it's similar to

3   what we were saying before, where that probable cause existed

4   for the federal law violation as soon as he saw a felony

5   conviction on the criminal history printout.  And he could

6   have searched that car without a warrant.

7        THE COURT:  But could he?  I thought that was part

8   of the analytical question.  Could he, could he -- he can go

9   into that car based on a federal law violation on the side of

10  the road there?

11       MR. KEENAN:  So it -- I think it's ambiguous whether

12  that's permissible under state law, but it doesn't change --

13  the law that we cited, it doesn't change the analysis under

14  the Fourth Amendment as to whether that search would have been

15  reasonable.  And because it is a federal crime to have

16  ammunition if you have previously been convicted of a felony,

17  that makes -- that would have made that search reasonable as

18  soon as he heard the admission that there was ammo and then

19  saw that this person had previously been convicted of a

20  felony.

21       So the difference between this and the *U.S. Currency*

22  case is that that -- the automobile exception that would have

23  allowed them to search pursuant to a federal law violation

24  existed.  Whereas, in the *U.S. Currency* they were only

25  operating on a state search warrant that never mentioned a

1    federal law.

2            THE COURT:  I'm just -- okay.  I'm kind of missing.

3    My -- I may be missing something, but my understanding of

4    probable cause is that probable cause is probable cause no

5    matter where it shows up.  It can show up in the automobile

6    exception, and that's like full-on regular probable cause.

7    And it can show up in a warrant.  And it is the same, actual

8    same probable cause.  So I'm just not sure why it being on a

9    piece of paper versus being on the side of the road.  The only

10   way that the person could go into the dispensary would have

11   been if they said this violates federal law, and that's

12   exactly what -- the only way that this trooper can get into

13   that car is to say, look -- is to say -- maybe he has probable

14   cause to think that there's a firearm.  Okay.  But he -- if

15   the only basis is that he -- I mean, has -- he does have

16   probable cause to believe that there's ammunition in the car.

17   Like, if that's a crime --

18            MR. KEENAN:  Right.

19            THE COURT:  -- that's clear.  But the only basis for

20   him to say that that's enough probable cause is federal law,

21   so I'm a little bit lost on the paper distinction between

22   those two cases.

23            MR. KEENAN:  Well, the distinction I'm making is the

24   only way for them to have conducted that state search warrant

25   in *U.S. Currency* is by getting a warrant, and that's not the

```
 1    case here.
 2              THE COURT:  Okay.
 3              MR. KEENAN:  I think it's a meaningful distinction
 4    simply because the reasonableness of that search was then
 5    evaluated by whether a warrant was valid, and for that reason
 6    only.  Because otherwise they wouldn't have ever been able to
 7    get in there.
 8              THE COURT:  Okay.  I'm going to ask defense about
 9    this question, so I want to ask you first.  You cited to
10    Virginia v. Moore, which goes to whether -- not whether
11    something's a crime, but whether you can seize or must cite in
12    lieu of seizing.  Do you think that that's relevant here?
13              MR. KEENAN:  I have Virginia v. Moore over here, if
14    I can just grab it.
15              THE COURT:  Okay.
16              MR. KEENAN:  So we submit that the -- that Moore
17    stands for the proposition that a violation of state law -- in
18    that case it was making an arrest that wasn't permissible
19    under state law affected the Fourth Amendment analysis.
20              THE COURT:  Right.  But in Moore there was no debate
21    that what they were talking about was a crime.  The only
22    debate was what you do about the crime.  Here we're talking
23    about whether it's a crime, if we're just talking -- I'm just
24    for a moment, of course, we're focusing just on the
25    ammunition.  Here the question is whether it's a crime.
```

```
 1              MR. KEENAN:  Right.  And I see that as a distinction
 2    sort of without a difference, because I think this stands more
 3    for the proposition of how we analyze the Fourth Amendment
 4    sort of with an eye towards a potential state law violation.
 5    Less so than for sort of what it explicitly, factually is
 6    talking about.
 7              THE COURT:  Okay.
 8              MR. KEENAN:  And then, I guess briefly, I'll touch
 9    on the Miranda issue.
10              THE COURT:  Sure.
11              MR. KEENAN:  And I would note the defense never
12    argues that the answer -- I don't think the answers couldn't
13    be considered for probable cause.  They did allege the Miranda
14    violation, but I don't know that it was ever specifically tied
15    to a determination of probable cause.
16              That being said, defense also failed to mention the
17    Berkemer v. -- I don't how to that.  I'll spell it though.
18    B-e-r-k-e-m-e-r v. McCarty.
19              THE COURT:  Right.  Stands for Miranda for a typical
20    traffic stop.
21              MR. KEENAN:  Right.  And I think what's sort of --
22    when I was listening to your argument, what's sort of being
23    conflated is the notion that just because you're not free to
24    leave means you're in custody for Miranda purposes.  And
25    that's not necessarily true because in a Terry stop, you
```

1    actually are not free to leave.  And that's why it's certainly

2    more nuance than that, and it has to be sort of this

3    functional equivalent of being under arrest.

4            THE COURT:  Mm-hmm.

5            MR. KEENAN:  And the factors I think that came up

6    today that would suggest there was no functional equivalent of

7    an arrest are that Mr. Steinman was never cuffed, searched,

8    placed in the back of a patrol car.  He sat in the front of

9    the patrol car with the door open until an air conditioning

10   issue came up I think.  While they waited for the tow truck,

11   he was wandering around, talking on the phone, I think sitting

12   on the hood of his car for a little bit.  These are absolutely

13   not things that I think we think of when we think of someone

14   who is under arrest.  In fact, they're the complete opposite.

15           This is a *Terry* stop.  He was not free to leave, but

16   he was not in custody.

17           And I assume the defense would argue this isn't an

18   ordinary traffic stop.  I would agree.  At some point this

19   definitely did not -- this became not an ordinary traffic

20   stop --

21           THE COURT:  Mm-hmm.

22           MR. KEENAN:  -- I think at the point where they're

23   seizing his vehicle.  And -- but nonetheless he was still not

24   in custody.  He was told he was free to leave.  He was asked,

25   do you want a ride somewhere?  Do you want to walk?  I think,

1   even though his subjective sort of view on it is not relevant,

2   but even Mr. Steinman seemed to believe for almost the entire

3   time that he was just getting a ticket.  And he was told he

4   was getting a ticket multiple times.  And these are things we

5   associate with traffic stops, not arrests.

6           THE COURT:  Okay.

7           MR. KEENAN:  I guess lastly, just some sort of

8   miscellaneous things with the blanket.  There was not

9   inconsistent testimony.  I believe I asked if he could see

10  what was under the blanket.  And the answer was no, but he

11  believed that there were things under the blanket.  Not that

12  he could see it.

13          THE COURT:  Mm-hmm.

14          MR. KEENAN:  But it wasn't on the seat of the car,

15  but it was raised up, which led him to believe there were

16  things under it, but he couldn't see what they were.  There's

17  not an inconsistency there.

18          I think that's it.  Let me just check.

19          Okay.  Nothing further on this.

20          THE COURT:  Okay.

21          MR. KEENAN:  Thank you.

22          THE COURT:  Thank you very much.

23          All right.  Do you want to wrap up?

24          MR. MCCLELLAND:  Yes, Your Honor.

25          So I'll start with the Court's question about

 1    *Virginia v. Moore*, and it's thankfully, I think, a pretty

 2    short answer.  It doesn't apply.  Where in *U.S. Currency* world

 3    deals with an entirely different sort of fact pattern.  I

 4    think in many ways the *United States v. Talley* case that we

 5    cite out of the Northern District of California in our reply

 6    briefing, I mean, in many ways you could search and replace

 7    the word "marijuana" with "ammunition" in that case --

 8                THE COURT:  Mm-hmm.

 9                MR. MCCLELLAND:  -- and resolve this one.  It

10    applies, I mean, the *United States Currency* rule to an

11    automobile search very squarely on fours with the general fact

12    pattern that we have here.

13                THE COURT:  Mm-hmm.

14                MR. MCCLELLAND:  Notwithstanding the fact that the

15    car here was seized roadside, not searched roadside, but basic

16    contours analysis still apply.

17                A couple of additional thoughts, and I'll be as

18    brief as I can.  With respect to the warrant and the validity

19    of the warrant and how that interplays with probable cause to

20    seize the vehicle, a couple of thoughts.  One, the warrant

21    analysis and excising categories I think is really more of a

22    *Franks* issue.  So we do raise a *Franks* argument in our

23    briefing with respect to the warrant application.  And when

24    there's a *Franks* problem with misrepresentations or admissions

25    in a warrant application, you know, you basically Frankenstein

the right application back together, and sometimes that
involves excising stuff from the application.  But the
overbreadth analysis, à la *United States v. Spilotro* -- I'm
probably mispronouncing that, *Spilotro*, maybe -- the
overbreadth analysis doesn't excise categories out of the
warrant.  Instead, you're looking at, as I think Mr. Keenan
pretty nicely keyed in on, you're not excising categories out
of the warrant, because in many ways that would fix the
overbreadth problem.  If there's an overbreadth problem,
there's an overbreadth problem.  And so the question is not
excision, it's severance.  And I'm sorry to hear that
Mr. Keenan hadn't heard of the simply lumping rule from
*Spilotro*, but we cite *Spilotro* at pages 18 through 19 of our
reply briefing, and I think pretty clearly lays out how in a
warrant like this one, which I think it's worth emphasizing is
two paragraphs long, that's Defense Exhibit 504, when the
warrant lumped categories with clearly no probable cause with
other categories in the same sentence and doesn't
differentiate them, then *Spilotro* says you can't do severance.
And by the seam token, you can't do good faith reliance on
such a facially overbroad warrant.

     I think there's an interesting question about how
much difference there is between the statement you can't do
severance and you can't do good faith reliance, but *Spilotro*
says doesn't matter, you can't do either.

 1          So that's -- I mean, I think that's the relevant

 2     discussion with respect to the warrant overbreadth issue.

 3          And I think the way that it ties in with the

 4     roadside seizure issue, so assuming, and this is assuming a

 5     whole host of things, assuming that the roadside seizure was

 6     supported by probable cause, the warrant overbreadth issue is

 7     still material because the roadside seizure being supported by

 8     probable cause, by the government's own concession, would not

 9     have allowed an invasive search for multiple different

10     categories.  So to the extent that the officers could have

11     done a roadside search, it would have been substantially

12     narrower than the search that they ultimately performed on the

13     vehicle.

14          So the fact that the warrant that at issue here is

15     unsupported by probable cause, and in many ways I take the

16     government to be conceding that it is at least in some way

17     deficient, even if there is severance arguments or what have

18     you, that's material to the ultimate search of the vehicle.

19          And the fact that there was a search that was

20     authorized for more than there was probable cause for is its

21     own Fourth Amendment violation that warrants suppression.

22          Couple of thoughts also on the prolongation front.

23     I mean, at the end of the day, *Hylton* and *Taylor* and *Evans* and

24     *Gorman* and *Rodriguez*, they are what they are.  But I think the

25     Court's questioning to Mr. Keenan keyed in on a couple of key

points, which is I think given their, to my mind, fairly
obvious tension, this is *Hylton* and *Taylor's* obvious tension
with Gorman *and* Rodriguez, one should read them fairly
narrowly.  But, of course, you know, we can't we do much about
the tension between those cases in this room.  We have to
somehow find a way to thread the needle.  And I think that the
easiest way to thread the needle with *Hylton* and *Taylor* are
basically that *Hylton* and *Taylor* say you can run criminal
history checks when those criminal history checks are routine
in basically two ways.  One, they're routine in the sense that
they are run as part of a routine, as in something that you
commonly do, à la a driver's license check or a registration
check.  If you're doing it as a routine, I think that's one
category of one sort of checkmark that you need to get into
*Hylton* and *Taylor*.  And then the second form of routine is
that it has to be non-particularized.  So you can't run it
because you're doing an investigation into this person in
particular.

          And, of course, as the testimony here I think made
fairly clear, fails on both of these checkboxes.  Trooper
Boyer was quite explicit in response to the Court's
questioning that he does not run this as part of routine.
It's not his practice to do it.  Doesn't run criminal history
checks every time he performs a stop.

          And then, two, that he ran the criminal history

 1    check for a particularized reason, that is, to investigate

 2    Mr. Steinman.

 3         Naturally, I mean, there may be other ways to thread

 4    the *Hylton* and *Taylor* analysis, but given the facts of *Hylton*

 5    and *Taylor* and the sorts of checks at issue in *Evans* and

 6    *Gorman*, which I think the Court keyed in on --

 7         THE COURT:  Isn't there also an aspect how

 8    burdensome of a criminal history check we're talking about?

 9    Because at least factually in *Hylton* and *Taylor* this is a,

10    like, a two-minute thing.

11         MR. MCCLELLAND:  I think that's correct.  Yeah, I

12    think there is a negligently burdensome element to this.  And

13    in *Hylton* and *Taylor* we have, as the Court said, very, very

14    brief criminal history checks.  And I think the government

15    highlighted *Taylor* involving sort of a follow-on check later

16    in the stop.  But I think it's worth noting that the facts in

17    *Taylor* involve what I think is best described as a routine

18    criminal history check as part of the other sort of routine

19    checks at the outset.  Wherein, if I'm remembering the facts

20    of *Taylor* correctly, the officer asks Mr. Taylor whether he

21    has a criminal history very early on in the stop.

22         I think in many ways the points with respect to

23    *Gorman* and *Evans* and the sorts of checks that are run there, I

24    mean, it's really hard to differentiate the sorts of checks

25    and the information that those checks would provide with the

```
 1    sort of detailed criminal history investigation that Mr. -- or
 2    that Trooper Boyer spends a substantial amount of time on;
 3    namely, the checks at issue in Gorman and Evans, right, they
 4    might not be garden variety criminal history checks, but they
 5    still reveal stuff about officer safety, presumably.  And the
 6    Ninth Circuit still says, nope, that's outside the mission of
 7    a traffic stop.
 8              Going to another series of points that the
 9    government identified.  I think the government took issue with
10    the citation to Nora, which is the, you know, one gun does not
11    imply multiple guns case.  Naturally we're dealing with
12    different sorts of implication drawing here.  We're dealing
13    with, at bottom, an implication of ammunition implying guns.
14    That's somewhat different, I guess, than gun implies guns.
15    But in many ways, I think that difference inures to our
16    benefit in the sense that if you have one gun, it's
17    conceivable that there's multiple.  But Nora forecloses that
18    kind of reasoning.  If you have ammunition, you have
19    ammunition.  Doesn't necessarily mean that you have a gun in
20    the car.  And Trooper Boyer testified to that too.
21              If the Court doesn't have any additional questions,
22    we would ask that the Court suppress evidence collected in and
23    during and as a result of this stop.
24              THE COURT:  Okay.  I have no further questions on
25    the motion to suppress.
```

1        Do you want to have argument on the motion to

2   dismiss?

3        MR. MCCLELLAND:  Mindful that we are quite late on

4   Friday, I do have thoughts on the motion to dismiss, but --

5        THE COURT:  I mean, I can tell you that one of the

6   first things that the government cited on the motion to

7   dismiss was my earlier opinion in *Mosz*.  I'm not sure -- I

8   understand this is an evolving legal issue, and I take it

9   seriously, but I'm also not inclined at this point to divert

10  from what I said in *Mosz*.  So I don't know that an argument is

11  fruitful on this.  I'm inclined to deny.

12       MR. MCCLELLAND:  Understood, Your Honor.  In that

13  case, we'll let everyone get on with their Fridays.

14       THE COURT:  So, I guess I'm wondering should we take

15  a break?  Let's take a break.

16       If you could stick around for a little bit, and it

17  might be a little bit, like 20 minutes plus or so, while I

18  change my travel reservations, and then deliberate a little

19  bit, I would appreciate that.  So we'll be in recess.  Thank

20  you so much for sticking around.

21     (Break taken 6:01 p.m. to 7:14 p.m.)

22       THE CLERK:  This is to reflect that we're back on

23  record in Case No. 3:22-cr-00068-ART-CLB.

24       THE COURT:  Okay.  So just going back to where we

25  left off, I'm going to deny the motion to dismiss.  I had said

1          that, but just to be clear.

2                  And then I'm going to grant the motion to suppress

3          and suppress the evidence found in the vehicle.  I'm going to

4          make an oral ruling.

5                  So, a traffic stop is permissible if the police have

6          reasonable suspicion that the traffic stop violation occurred.

7          *United States v. Willis*, 431 F.3d 709, Ninth Circuit 2005.

8                  There is sufficient basis here of speeding based on

9          Mr. Steinman's admissions alone, but also based on Officer

10         Boyer's testimony and the evidence submitted on that point.  I

11         understand the defense's position that there may have been

12         inconsistencies in his testimony and what he represented when

13         he approached and spoke to Mr. Steinman, but I do find that it

14         does appear that Mr. Steinman was speeding, he admitted as

15         much, and that there was a lawful stop of the car.

16                 Whether the duration of a traffic stop is reasonable

17         is determined by the seizure's mission to address the traffic

18         violation that warranted the stop and attend to related safety

19         concerns.  That comes from *Rodriguez v. United States*, 575

20         U.S. 348 at 354 from 2015.  And authority for the seizure ends

21         when the tasks tied to the traffic infraction are reasonably

22         should have been completed.

23                 Here, the traffic stop was unreasonably prolonged

24         when Mr. Steinman was removed from his vehicle for the purpose

25         of interrogation.  As Officer Boyer testified, he didn't frisk

1    Steinman.  And officers, of course, can remove individuals

2    from their cars during stops.  And here we have an officer who

3    admittedly did so not for the purpose of officer safety, but

4    as he testified, in order to conduct an investigation and to

5    question Mr. Steinman in his car.  And so there was nothing

6    objectively reasonable about that decision, and it also

7    interfered with the completion of the traffic citation or

8    traffic mission.

9         The seizure was further unreasonably prolonged by

10   the detailed questioning of Mr. Steinman, which, again,

11   distracted from Trooper Boyer's ability to actually verify his

12   information and complete and then issue the citation.

13        I understand that subjective motivations of the

14   officer are irrelevant, but not only was Officer Boyer not

15   motivated by his personal safety concerns, it would have been

16   unreasonable and somewhat odd to put someone who's, for -- if

17   you were fearful for your own safety, to put them unrestrained

18   in the front seat of a police car and then to question them

19   extensively about their criminal history for purposes of

20   officer safety.

21        He -- Officer Boyer admitted that he put

22   Mr. Steinman in the car because he wanted to question him, and

23   that was the reason, and to engage in this unrelated

24   investigation based on the fact that he had seen the

25   ammunition in the car.

1    The process of issuing the citation was slowed down

2    significantly by the questioning and by the criminal history

3    checks which together took a long time.

4    Let me just get into a little bit more detail on the

5    criminal history checks because there is an initial question

6    is whether some criminal history check is allowed as part of a

7    traffic stop.  If the first criminal history check -- so --

8    and the government cites to two cases, *Hylton* and *Taylor*,

9    suggesting that at least that initial criminal history check

10   was a routine or allowable portion of a traffic stop in the

11   name of officer safety.  I don't agree with that.  On the

12   facts of this case, I don't believe that that was the basis

13   for the criminal history check on the factual basis that we

14   have here.  But I still find -- what I find unreasonable is

15   the slow playing of the citation process, and that slow

16   playing started earlier and then it lasted really, you know,

17   90 minutes.

18   That first criminal history check was not routine.

19   Officer -- I mean, Trooper, excuse me, Trooper Boyer testified

20   that it was not routine.  And in light of that, it does appear

21   that this case is controlled not by *Hylton* but by *Rodriguez*

22   and *Gorman*.

23   Even if that initial criminal history check was

24   permissible, I'm still left with the fact that Trooper Boyer

25   is prolonging the whole process of the traffic mission through

1    his interrogation and research on his criminal history.  And

2    so -- and it was after the first criminal history check,

3    assuming that that was permissible, it was after that initial

4    criminal history check that Mr. Steinman was interrogated

5    about his -- whether he was a felon and about the box of

6    ammunition.  So even if the criminal history check stays, the

7    prolongation immediately after is a problem.

8         There's no blanket prohibition on looking for

9    evidence of other crimes during a traffic stop, but such

10   inquiries may not measurably extend the duration of a stop

11   unless the officer has a reasonable suspicion ordinarily

12   demanded to justify detaining an individual.  The Ninth

13   Circuit has specified that non-routine record checks and dog

14   sniffs are paradigm examples of unrelated investigations that

15   may not be performed if they prolong a roadside detention

16   absent independent reasonable suspicion.  That's from *United

17   States v. Gorman*, 859 F.3d 715.

18        The concept of reasonable suspicion, and as I said

19   earlier, we know that Trooper Boyer is suspicious from the

20   very beginning, so I need to examine whether there was

21   reasonable suspicion here.  The concept of reasonable

22   suspicion like probable cause is not readily or even usefully

23   reduced to a neat set of legal rules.  The standard is lower

24   than probable cause but nonetheless requires an objective

25   articulable justification and it must be more than a hunch.

1    Reasonable suspicion exists when an officer is aware of

2    specific articulable facts that when considered with objective

3    and reasonable inferences form a basis for a particularized

4    suspicion.

5          Particularized suspicion has two elements.  The

6    assessment must be based on the totality of the circumstances.

7    And two, the assessment must arouse a reasonable suspicion

8    that the particular person being stopped has committed or is

9    about to commit a crime.  Based on the totality of the

10    circumstances, I do not see reasonable suspicion here.

11          There's not reasonable suspicion for a firearm, and

12    there's certainly not reasonable suspicion for any of the

13    other items in the warrant.  Mr. Steinman is stopped in Wells,

14    Nevada, in August.  There's earlier testimony from Trooper

15    Boyer that it was 90 degrees that day, and he -- Mr. Steinman

16    reported that he'd been driving since -- all day.  And there

17    is nothing outside the norm of his behavior.  There's some

18    degree of nervousness or discomfort which is normal in the

19    context of being pulled over by a police officer and ordered

20    out of a police car.  And I think we're left -- what we're

21    left with here is that there was a box of ammunition which is

22    legal to possess in Nevada, even for a felon.  And I find that

23    a box of ammunition in the vehicle of an individual who's

24    clearly moving is not sufficient to support reasonable

25    suspicion of a firearm being in the vehicle.

The cases the government cites are distinguishable with respect to ammunition because in those cases the ammunition was on the body of a person suggesting a much greater likelihood of the firearm having recently been used or possibly being -- and thus possibly being in close proximity.

It is hard to say exactly where the mission of the traffic stop should have been completed because there was this long prolongation during the course of issuing the citation. And Trooper Boyer testified, it normally takes 15 minutes. We are, even with some irregularities regarding information provided by the driver, it seems that that was exceeded -- well-exceeded here early on when Trooper Boyer got all of the information. And it's clear that he slow played the time it took to safely investigate the traffic citation and asked questions and conducted an investigation that added time to the stop.

When he had all of the information that he needed to issue a citation, which was not that many minutes into the stop, and maybe around the 15-minute mark or just a minute or so after, he didn't issue the citation. And so then the sort of waiting for the ticket to fall is sort of happens over a long period of the remaining time until 90 minutes when the paperwork is ultimately returned.

After Officer Boyer signed off on the citation and scanned the barcode of the driver's license, confirmed the

1    registration was valid, finished the tasks associated with the

2    citation, the remainder of the detention was even more

3    untethered to the original possible traffic mission and the

4    tasks associated with that, including an officer safety

5    justification.

6              The interrogation following that first criminal

7    history check regarding whether Mr. Steinman had been in

8    trouble, by then Officer Boyer was already aware of his

9    criminal history and it was that interrogation or questioning

10   was clearly untethered to the mission of the traffic stop.

11             Also, the second more in depth criminal history

12   investigation and questioning confirming the dispositions of

13   criminal history entries was clearly unrelated to the mission

14   of the stop and was non routine and was not justified by

15   reasonable suspicion.

16             The Court cannot find that reasonable suspicion

17   justified any prolongation of the stop.  And reluctance to sit

18   in a police vehicle and some degree of nervousness alone carry

19   little weight because encounters with police officers are

20   necessarily stressful for all individuals whether --

21   regardless of their criminal history.

22             The weight of authority supports the defense's

23   position that the state court officers cannot justify the

24   search or the prolongation by relying on the proposition that

25   they could have been enforcing an exclusively federal law.

1    Officer Boyer's own testimony makes that point very clear

2    about what he understood the law to be, while his own personal

3    perspective is -- that's not a subjective perspective, it is a

4    reflection of how well this fact is known in Nevada that they

5    understand their mission and the bounds of their job because

6    he is only tasked with enforcing Nevada law.

7         The two district courts that have considered the

8    issue have found that state officers' post hoc justification

9    that federal law supported probable cause are insufficient

10   when the conduct at issue is lawful under state law.

11        The Ninth Circuit has previously held that local

12   police officers did not have probable cause based on alleged

13   violations of federal law when the officers were at the time

14   investigating a violation of state law.  And that comes from

15   United States versus -- what we call currency -- $186,416 in

16   U.S. Currency, 590 F.3d 942, Ninth Circuit 2010.

17        Two district courts have considered similar issues

18   and found that post hoc justifications that federal law

19   supported probable cause are insufficient when the conduct is

20   lawful under state law.  Those cases, which we've discussed

21   today, are *Tally* and *Jones*.  *Tally* is at 467 F. Supp 3d at

22   836, and that's out of the Northern District of California

23   2020.  And in *Tally*, the Court held that the officers could

24   not rely on a container of marijuana to believe that the

25   vehicle contained contraband when marijuana is legal under

1    state law but not federal law.

2            And in *Jones*, *U.S. v. Jones*, which is 438 F. Supp 3d

3    1038, Northern District of California 2020, the officers could

4    not rely on the smell of marijuana to provide reasonable

5    suspicion of probable cause when marijuana is legal under

6    state law but illegal under federal law.

7            Nevada law does not authorize Trooper Boyer to

8    enforce federal law to seize property for a punitive violation

9    of federal law.  State officers must be authorized to do so by

10   state law.  And that's under *Kerr v. California*, 374 U.S. 23,

11   1963, stating, "The lawfulness of arrest for federal offenses

12   is to be determined by reference to state law."

13           There was no probable cause to seize the vehicle.

14   Even assuming there was no unlawful prolongation, nothing in

15   the testimony or evidence that I heard or reviewed gave

16   Officer Boyer sufficient information to rise to the level of

17   probable cause.  So that is to say, even assuming that he had

18   the reasonable suspicion at the beginning or at some point he

19   eventually got reasonable suspicion, he never sort of turned

20   the corner to have enough for probable cause.

21           The seizure of his vehicle was based on his hunch

22   that because he had ammunition and was nervous and a felon, he

23   would also have a gun.

24           The warrant is also problematic for a couple of

25   reasons.  The exclusionary rule has traditionally barred from

1    trial physical, tangible materials obtained either during or

2    as a direct result of a constitutional violation, and the

3    exclusionary rules applies to warrants obtained through

4    reliance on illegally acquired facts.  Steinman's felony

5    status is only disclosed during the first records check.  If

6    that was unlawful, there was no probable cause because the

7    criminal history was necessary to get to the probable cause.

8    Even if that initial records check was lawful and the

9    prolongation only started after that, then there is still a

10   problem because of the further questioning about his criminal

11   history and what Trooper Boyer perceived as incorrect or

12   misleading answers.  So that particularly goes to paragraphs

13   12 and 13 of the search warrant because those paragraphs

14   describe Steinman's responses that Trooper Boyer perceived as

15   deceptive and suspicious.  And those representations in the

16   search warrant bolstered his statement of probable cause.

17          The Court further agrees that defendant -- with the

18   defendant that the search warrant was impermissibly overbroad

19   in violation of constitutional safeguards.

20          In determining whether a description is sufficiently

21   precise, the Ninth Circuit has concentrated on several

22   factors.  One, whether probable cause existed to seize all

23   items of a category described in the warrant; whether the

24   warrant provided objective standards by which executing

25   officers could differentiate items subject to seizure from

1   those which were not subject to seizure; and three, whether

2   the government could have described the items more

3   particularly.  And that's coming from *United States v.*

4   *Spilotro*, 800 F.2d 959, Ninth Circuit, 1986.

5         The government concedes that there was no probable

6   cause to seize controlled substances, paraphernalia, and

7   stolen items.  Particularly with respect to the stolen items,

8   there was no objective standard by which executing officers

9   could differentiate which items were stolen and which were not

10   stolen.  And courts have expressed particular concern with

11   respect to the category of stolen items because it's hard for

12   officers to know because, unlike contraband, their illicit

13   nature is not apparent but must be indicated by other ways to

14   show that it's stolen or because it matches a description of

15   something that is stolen.  And none of that exists here,

16   obviously.

17         The government also could have described items with

18   more particularity.  For example, if there are drugs at issue,

19   what drugs are suspected to be at issue.  They could have been

20   named.

21         I do not find that the warrant established probable

22   cause for the seizure of firearms.  But even assuming it did,

23   most categories of the warrant were overbroad.  And the normal

24   remedy for an overbroad warrant is to sever, but severance

25   does not apply here because the severance or partial

1    suppression -- because when the valid portion of the warrant

2    is a relatively insignificant part of an otherwise invalid

3    search.  And that's said in *United States v. SDI Future*

4    *Health*, 568 F.3d 707, Ninth Circuit, 2009.

5              Because the warrant in this case was facially

6    invalid, no reasonable agent could have relied on it.

7              This case has some complications, when we combined

8    in terms of a remedy, when we combined the overbreadth issue

9    with the unconstitutionally obtained information based on the

10   prolonged interview, we have sort of a situation where some

11   portions of the warrant are -- should be excised based on

12   severance, other portions of the warrant -- of what remains

13   should be redacted or excised based on the constitutional --

14   based on the prolongation violation.  And it's -- as a result,

15   there's really not enough to save a warrant.  And it would be

16   also extremely difficult, perhaps impossible, to know what's

17   left of the warrant if you were actually tasked with executing

18   this warrant, either hypothetically or, you know, in real

19   life.

20             So to be clear, I am suppressing on multiple

21   independent grounds.  There was a prolonged detention

22   unsupported by reasonable suspicion that far exceeded the

23   scope of a normal traffic stop and mission.  There was no

24   probable cause to seize the vehicle.  The warrant is invalid

25   and cannot be saved by severance or good faith.  I'm not going

1    to -- based on those rulings, I find it unnecessary to reach

2    the *Miranda* issue.

3           So, with that, I am very, very grateful for

4    everyone's courtesy and patience in working very late on a

5    Friday night.  And so, with that, if there's anything else for

6    me to address, let me know.  Otherwise, we'll be in recess.

7           MR. MCCLELLAND:  Thank you.

8           MR. KEENAN:  Thank you, Your Honor.

9           MR. MCCLELLAND:  Nothing further from us.

10     (Proceedings concluded at 7:35 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

<b><u>INDEX</u></b>

2

<b><u>PLAINTIFF'S WITNESSES:</u></b>                                    <b><u>PAGE</u></b>

3

**WILLIAM BOYER**
          DIRECT EXAMINATION BY MR. KEENAN                    4
4         CROSS-EXAMINATION BY MR. MCCLELLAND                 30
          REDIRECT EXAMINATION BY MR. KEENAN                  89

5

6

<b><u>EXHIBITS</u></b>                                      <b><u>MARKED</u></b>   <b><u>RECEIVED</u></b>

7
ON BEHALF OF THE PLAINTIFF:
    1A -    Basic Radar Certification (USAO              4
8           000844)
    1B -    Radar Test and Measurement                   4
9           Certification (USAO 000845)
    1C -    Radar Certification Worksheet                4
10          (USAO 000846)
    2 -     Trooper Boyer's Dashcam Video                4
11          (USAO 000520)
    3 -     Trooper Boyer's Bodycam Video                4
12          (USAO 000524)
    4 -     Call Detail Report (USAO                     4
13          000074-000083)
    5 -     Radio Recording (USAO 000519)                4
14  6 -     Criminal History Printout (USAO              4
            000721-000731)
15  7 -     Phone Recording (USAO                        4
            000018-000025)
16  8 -     Search Warrant Materials (USAO               4
            000018-000025)
17
ON BEHALF OF THE DEFENSE:
18  501 -   Boyer Report (USAO 1-15)                     4
    502 -   Declaration of Probable Cause                4
19          (USAO 16-17)
    503 -   Affidavit in Support of and                  4
20          Application for Search Warrant
            (USAO 18-23)
21  504 -   Search Warrant (USAO 24-25)                  4
    505 -   Supplemental Reports (USAO 26-31)            4
22  506 -   Boyer Dashcam (USAO 520)                     4
    507 -   Boyer Bodycam (USAO 524)                     4
23  508 -   Marin Bodycam (USAO 525)                     4
    509 -   Dispatch Phone Recording (USAO               4
24          518)
    510 -   Preliminary Hearing Transcript,              4
25          September 14, 2022

1        **REPORTER'S CERTIFICATE**

2

3            I, DONNA J. PRATHER, do hereby certify that the

4    above and foregoing, consisting of the preceding 164 pages,

5    constitutes a true and accurate transcript of my stenographic

6    notes and is a full, true, and complete transcript of the

7    proceedings to the best of my ability.

8            Dated this 18th day of July, 2023.

9

10

11           DONNA J. PRATHER, RMR, CRR, CCP, CBC
             Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25