RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
SEAN A. MCCLELLAND
Assistant Federal Public Defender
Nevada State Bar No. 16581
200 South Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451
Sean_McClelland@fd.org

Attorney for Triston Harris Steinman

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

TRISTON HARRIS STEINMAN,

Defendant.

Case No. 3:22-cr-00068-ART-CLB

**SENTENCING MEMORANDUM**[1]

## I. INTRODUCTION

Triston Steinman is a 28-year-old electrician's apprentice and the father of two young children. For nearly four years he has been on pretrial supervision under this Court's release order. He has never been found to have violated that order: he worked, stayed sober, and cared for his young family. Three years of probation—making seven years of total supervision in this case—is the right result here.

The PSR's guideline calculation erroneously rests on two enhancements that together add ten offense levels. The record supports neither.

- The first adds six levels for 34 "firearms." That number comes from a lab report that the government produced nearly four years after it was written, and less than three weeks before sentencing (and after the

[1] This sentencing memorandum is timely filed.

objections date besides). And the six suppressors charged in Count 2 should not be added to that number, as Probation proposes: the government has told the Court that it will move to dismiss Count 2 at sentencing. All told, this record does not support any "firearms" enhancement.

- The second adds four levels for a purported drug felony. The State charged that felony and then dismissed it, no factfinder has found him guilty of it, and no laboratory has confirmed that any of the marijuana or THC products underlying that charge was a controlled substance. So the connection-with-another-felony enhancement is inapplicable multiple times over.

With those corrections, Mr. Steinman's total offense level is 17.

But not much turns on these disputes; a non-custodial sentence is warranted here no matter how the guidelines are calculated. On whatever calculation, the Court should impose three years of probation. A sentencing court usually has to predict how a defendant will do on supervision. But this Court has watched Mr. Steinman on supervision for nearly four years. In that time he has stayed sober, worked steadily, gone to therapy, paid his child support, and won back the trust of family members who once had none in him. A prison term now would take away his apprenticeship, his treatment, and the support his children rely on. Three years of probation—seven total years of supervision here—is sufficient, but not greater than necessary, to meet the purposes of sentencing.

## II. BACKGROUND

### A. Mr. Steinman grows up in a home marked by abuse and addiction, and by 15 he is using methamphetamine daily.

Triston Steinman was born in 1998 in Federal Way, Washington, the third of four children. PSR ¶¶ 50–51. When he was young, his family ate dinner together, prayed together, and attended church. *Id.* ¶ 53. But his mother, who struggled with obsessive-compulsive disorder, kept a binder of chores for the children and, when she grew frustrated, abused him verbally and physically, including with whippings. *Id.* She was once arrested for domestic violence against his father. *Id.* And after a surgery she became addicted to painkillers; during her addiction, life around her was "like walking on eggshells." *Id.* ¶ 54.

When Mr. Steinman was 11, his mother left the family and took his sister with her. *Id.* ¶ 55. His parents divorced, and the family stopped going to church. *Id.* ¶ 56. His father raised three boys on his own while working, leaning on friends in the community whenever he had to work. *Id.* ¶ 55. And his mother drifted in and out of his life, and when she was around, she "provided an environment where he could use marijuana." *Id.* ¶¶ 55–56.

Mr. Steinman started smoking marijuana at 12. *Id.* ¶ 81. By 13 he was taking Adderall that had not been prescribed to him, by 14 he had tried cocaine, acid, hydrocodone, Xanax, and codeine syrup, and by 15 he was smoking methamphetamine every day. *Id.* ¶¶ 82–84. When his father learned about the marijuana, he called the police, drug-tested his son, and took his phone, and he later sent him to inpatient treatment in Oregon. *Id.* ¶¶ 56–57, 85. Mr. Steinman quit methamphetamine at 16, after he lost weight and developed stomach pain. *Id.* ¶ 84. Probation scored his childhood at seven of ten on the Adverse Childhood Experiences (ACEs) scale, a score it describes as "an extremely high risk for negative outcomes." *Id.* ¶ 75.

### B. At 18, Mr. Steinman shoots his brother during a fight, serves a ten-month sentence, and goes back to work for his father.

In October 2016, when he was 18, Mr. Steinman and his brother Tanner fought after Tanner stepped on the hood of Mr. Steinman's car, and Mr. Steinman shot him while defending himself. *Id.* ¶ 39. Mr. Steinman admitted the shooting when officers found him the next day. *Id.* As he has described to Probation, Tanner came at him with a crowbar—prompting Mr. Steinman to fire in self-defense, an act that has traumatized Mr. Steinman. *Id.* ¶¶ 39, 59–60. He pleaded guilty to third-degree assault, a Washington felony, and served a ten-month sentence. *Id.* ¶ 39. That conviction is his only prior felony and the predicate for Count 1. *Id.* ¶¶ 11, 39.

After his release on that case, Mr. Steinman went back to work for his father's aerospace-parts business, where he had worked at times as a CNC machinist. *Id.* ¶¶ 59, 99. He obtained a medical-marijuana card and grew marijuana legally. *Id.* ¶ 59. But his marijuana use escalated, and by his early twenties he was smoking up to ten blunts a day. *Id.* ¶ 81. During those years he was in a relationship with Julianna George, with whom he has two children: Lila, now 10, and Malcolm, now 5. *Id.* ¶ 62.

### C. Mr. Steinman moves to Utah for a fresh start and opens a business selling firearm parts and build kits.

In 2021, Mr. Steinman moved to St. George, Utah. *Id.* ¶ 61. His father told Probation that the move was meant "to give the defendant a fresh start and to remove him from negative influences." *Id.* ¶ 71. In Utah, Mr. Steinman started Psalm Arms LLC, a Utah company that sold firearm parts and build kits, including unfinished "lowers," stock adapters, and solvent traps. *See* PSR ¶¶ 16–17. Mr. Steinman openly ran that business; he was its registered agent and, when troopers later searched his car, they found shipping boxes addressed to "PSALM ARMS, TRISTON STEINMAN." USAO 000820–21; PSR ¶ 97.

Federal law does not prohibit a person with a felony conviction from selling firearm parts. Rather, statutes like Section 922(g)(1) bar someone in that position from possessing a full-blown "firearm" or ammunition. 18 U.S.C. § 922(g)(1). And the statute defines "firearm" as a weapon that will, is designed to, or may readily be converted to expel a projectile; the frame or receiver of such a weapon; a silencer; or a destructive device. *Id.* § 921(a)(3). So, apart from silencers and their parts, a part that is not a full frame or receiver is not a firearm. *Id.*; *see id.* § 921(a)(25).

Mr. Steinman's messages from the summer of 2022 show that he thought his business's unfinished lowers (which were never charged in this case) were legal. In particular, much of his business involved so-called "80% lowers." A "lower" is the lower receiver of an AR-style rifle. An "80% lower" is an unfinished lower that has not yet been drilled and machined to hold the trigger and other internal parts. Under ATF's rules at the time, such a lower was generally not

a "firearm."[2] So it was not illegal for someone—even someone with a felony conviction—to buy and sell 80% lowers (or a host of other firearms parts).[3]

Mr. Steinman's was trying to comply with that legal landscape. When his father accused him of sending "illegal gun parts" to the family business, Mr. Steinman answered that "80% lowers in a box isn't illegal." PSR ¶ 17. In support, he further pointed to a licensed dealer that had drilled and painted lowers for him: "they wouldn't have done that if a 80% lower was illegal." *Id.* And he searched the internet for whether a felon could sell parts kits (at the time, the answer was "yes"). *Id.*[4] In short: Mr. Steinman believed—correctly, as to many of the items—that his firearms-parts business that he was running out in the open was legal.

His messages also show that, when he was stopped on August 12, he knew the rule for unfinished lowers was about to change—and that he tried to finish selling the stock he had while the old rule still applied. Before August 2022, ATF generally treated an undrilled lower as a part, not a receiver—and therefore not a firearm. On August 24, 2022, ATF changed course—

---

[2] At the time, ATF identified that one could legally buy "castings or machined/molded or other manufactured bodies (sometimes referred to as 'blanks,' or '80% receivers') that have not yet reached a stage of manufacture in which they are classified as 'firearm frames or receivers' under the Gun Control Act of 1968." ATF Rul. 2015-1, at 2–3 (Jan. 2, 2015). And its public guidance stated that "ATF has long held that items such as receiver blanks, 'castings' or 'machined bodies' in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacture' which would result in the classification of a firearm." *VanDerStok v. Garland*, 86 F.4th 179, 198 (5th Cir. 2023) (Oldham, J., concurring) (quoting ATF, *Are "80%" or "Unfinished" Receivers Illegal?*), *majority opinion rev'd sub nom. Bondi v. VanDerStok*, 604 U.S. 458 (2025); *see also, e.g.*, Letter from ATF Firearms Technology Branch to Mark Malkowski (Jan. 29, 2004), *reprinted in* J.A. 19, *Bondi v. VanDerStok*, No. 23-852 (U.S. June 25, 2024) (a solid AR-15 receiver casting "without having the critical internal areas machined . . . or crosspin holes drilled, would not constitute a 'firearm'"); 87 Fed. Reg. at 24,653 (excepting from the rule's grandfathering partially complete frames and receivers "that ATF did not classify as firearm 'frames or receivers' as defined prior to this rule"). In short: at the time, it was legal for Mr. Steinman to sell such parts.

[3] *See id.*

[4] Because ATF did not then generally treat 80% kits as firearms, the answer to that question was, as a rule, "yes": someone with a felony conviction could legally sell such parts. *See* ATF Rul. 2015-1, at 2–3 (Jan. 2, 2015); *VanDerStok*, 86 F.4th at 198 (Oldham, J., concurring); Letter from ATF Firearms Technology Branch to Mark Malkowski (Jan. 29, 2004), *reprinted in* J.A. 19, *VanDerStok*, No. 23-852 (U.S. June 25, 2024); *see also* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (effective Aug. 24, 2022) (changing that rule roughly two weeks after Mr. Steinman was arrested).

extending the definition of “frame or receiver” to partially complete frames and receivers. Definition of “Frame or Receiver” and Identification of Firearms, 87 Fed. Reg. 24,652 (effective Aug. 24, 2022). And it was clear Mr. Steinman was trying to avoid non-compliance with that new rule; in July 2022, Mr. Steinman told a buyer he was “trying to get hella shit off in the next two weeks before the federal law bans the 80% lowers.” PSR ¶ 16. In short: Mr. Steinman was trying to follow the law.

The silencers were similar (an issue on which the government has represented it will dismiss the associated count, Count 2). Those were solvent traps—tubes sold as gun-cleaning accessories—and one of the products Psalm Arms sold. *Id.* ¶ 14; ECF No. 90 at 5. At the time, ATF classified these items as silencers. But Mr. Steinman thought drilling mattered. On the day he was stopped here, he told a friend that the solvent traps “weren’t drilled out,” and the friend replied, “Then you are good.” PSR ¶ 16. As with the 80% lowers, in short, Mr. Steinman believed his business was above board. (As detailed below, the Department of Justice has since announced that it will no longer enforce the registration requirement for most suppressors. And the government here is correspondingly dismissing Count 2 as a result.)

### D. Troopers stop Mr. Steinman for speeding near Wells, tow his car, and search it.

On August 12, 2022, a Nevada Highway Patrol trooper stopped Mr. Steinman for speeding near Wells, Nevada. ECF No. 75 at 5–6; PSR ¶ 12. The trooper saw an ammunition box in the car, and a records check showed a felony conviction. ECF No. 75 at 6–7. Mr. Steinman declined to consent to a search. *Id.* at 8. So troopers had the car towed and obtained a warrant. PSR ¶ 13.[5]

---

[5] Mr. Steinman maintains his objection to PSR ¶¶ 45–46, which list a 2013 juvenile referral and a 2017 arrest; the PSR gives no facts for either, and neither led to a charge. Entries like those lack “sufficient indicia of reliability to support [their] probable accuracy.” U.S.S.G. § 6A1.3(a) (2021). Probation responds that including them “does not constitute a finding that the defendant committed the alleged conduct.” PSR at 32. But if Mr. Steinman is ever imprisoned, the Bureau of Prisons will read the labels in those paragraphs when it classifies him—even though nothing is actually behind them. *See* PSR at 3. Rule 32 requires a ruling on the objection to ¶¶ 45–46, or a determination that a ruling is unnecessary. And it requires that the ruling or determination be appended to any copy of the PSR made available to the Bureau

According to the PSR, troopers found "several AR style rifles, pistols, and firearm parts without serial numbers"; "tools used for manufacturing and assembling firearms"; "packaging slips, receipts, and boxes containing assorted firearm parts"; magazines, optics, sights, and lights; six unfinished suppressors; an unserialized 9-millimeter pistol with a loaded magazine; about 446 grams of marijuana, two THC vape cartridges, 26 syringes of a brown substance that "field-tested positive for THC" (141.7 gross grams), 12 canisters of a waxy substance that "tested presumptively positive for THC" (1,330 gross grams), and hemp cones; and two digital scales, a grinder, a cone loader, and $12,500. PSR ¶ 13. The syringe and canister weights include the containers.

The PSR reports no laboratory test of any of the suspected drugs or THC products. *See id.* The only drug-analysis report in the record, which the government has since filed, analyzed just one of sixteen exhibits of plant material (446.4 grams net) and none of the alleged THC products. Gov't Ex. 2, ECF No. 95 at 17 (Washoe County Sheriff's Office Forensic Report #1, USAO 000032).

The arresting trooper's declaration also says there were "38 firearms without serial numbers," in the same sentence as "manufacturing equipment and tools" and "several firearms components, accessories, and suppressors." USAO 000587. It does not identify the 38 items or say how the trooper told firearms from parts. *Id.* Of all these items, ATF examined only the six suppressors (which the PSR lists separately from the 38) and classified them as silencers. USAO 000612–20; PSR ¶ 14.

The discovery the defense received before October 2026 contained no comparable examination of the 38 other items.[6] Troopers did not identify any of those 38 items as stolen, and the government never charged any of them. PSR ¶ 14; *see* ECF No. 24.

---

of Prisons. FED. R. CRIM. P. 32(i)(3)(B)–(C). Only deletion keeps the labels out of the copy the Bureau of Prisons receives. Those paragraphs should be deleted.

[6] As detailed below, the government only provided any examination of the 38 items—from 2022—to the defense on October 14, 2026, after the defense had filed its objections (and after the deadline for objections had passed). *See* Ex. B.

**E. Mr. Steinman wins suppression, the Ninth Circuit reverses, and he pleads guilty without a plea agreement.**

Mr. Steinman was arrested on state charges the day after the stop and spent about three months in custody before the State dismissed its case. PSR at 2; *id.* ¶¶ 43, 96. The federal complaint and indictment charged one count: possessing ammunition after a felony conviction. ECF Nos. 1, 14. A superseding indictment in March 2023 added Count 2, possessing six unregistered silencers. ECF No. 24. Yet no charging document has ever mentioned the 38 items. *See* ECF Nos. 1, 14, 24.

Mr. Steinman moved to suppress, and after an evidentiary hearing this Court granted the motion on multiple independent grounds. ECF No. 34; ECF No. 55; ECF No. 75 at 12. The government appealed in 2023, and the Ninth Circuit reversed. ECF Nos. 62, 75, 76. On July 27, 2026, Mr. Steinman pleaded guilty to both counts without a plea agreement. ECF No. 91; PSR ¶ 4.

**F. On pretrial release for nearly four years, Mr. Steinman stays sober, works steadily, and rebuilds his relationships with his family.**

Mr. Steinman was released on a personal recognizance bond on November 10, 2022, and Pretrial Services in the District of Utah has supervised him under this Court's release order ever since. PSR at 2; *id.* ¶ 6. He has not used marijuana since his arrest, and every drug test he has taken in roughly four years has come back negative. *Id.* ¶¶ 10, 81, 87. His father, who once called the police on him over his drug use, confirms that "as the defendant got older, he got back on track and obtained sobriety." *Id.* ¶ 88. And in August 2025, after nearly three years without a new arrest or violation, Pretrial Services even asked to end his supervision (the Court continued him on supervision). *Id.* ¶ 7.

Mr. Steinman found work within weeks of his release and has worked steadily since. He started as a part-time server at Olive Garden and then spent nearly two years as a lead server and bartender at Big Shots, a golf-and-dining venue. PSR ¶¶ 94–95. In April 2024 he became a full-time service technician at Marine United (a boat-and-ship servicing company), where the coworker assigned to train him found that, while he initially "had no experience in the industry,"

he quickly and diligently learned the trade. *Id.* ¶ 93; Ex. A (letters of support, attached hereto) at Woods Letter. A friend then introduced him to ceramic coating for aircraft, and in January 2026 Mr. Steinman started his own detailing business, GlossX. PSR ¶¶ 66, 92. Since June 2026 he has also worked full time as an electrician's apprentice with Bullet Electric, under an apprentice license that runs through June 2027. PSR ¶¶ 90–91. His father told Probation that since the arrest, his son "has been on the right track." *Id.* ¶ 71.

Since 2024, Mr. Steinman has also been in individual and couples therapy with Lee Wulfenstein of Therapy Associates in St. George, and he wants to continue. *Id.* ¶ 77. He lives with his father and his father's partner, Sherri Kohlbeck, who has helped care for his children for most of their lives. *Id.* ¶ 65; Ex. A at Kohlbeck Letter. He pays $400 a month in child support. PSR ¶ 63. Before the mother of his children started interfering with his custody (described below), he had the children about 40 percent of the time, coached Lila's basketball team, and volunteered at her school. *Id.*; Ex. A at M. Steinman Letter. And for about a year he has been in a relationship with Journey Adair, a veterinary technician. PSR ¶ 64.

In nearly four years on pretrial release, Mr. Steinman has had only two negative incidents, and neither led to so much as a petition to revoke his release:

- Mr. Steinman's relationship with Ms. George ended in 2023 under the stress of this case, and the custody dispute that followed has been contentious. PSR ¶¶ 62–63. Mr. Steinman has had to call law enforcement against Ms. George because of her custodial interference several times. *See* PSR ¶ 63; *id.* at 27. In apparent retaliation for Mr. Steinman doing so, in April 2026, Ms. George obtained a protective order that runs until April 2029 and bars his contact with the children. PSR ¶¶ 8, 63. He still pays his support, and he is working to schedule a custody hearing. *Id.* ¶ 63. Probation chose not to interview Ms. George "[g]iven the nature of the dispute and the potential for bias." *Id.* ¶ 49.
- On April 14, 2026, during an argument, Ms. Adair would not open her apartment door, and Mr. Steinman knocked on a window, which unexpectedly shattered. He ultimately pleaded guilty to a reduced charge of misdemeanor criminal trespass for remaining at the residence after he was asked to leave. PSR ¶ 40. He admitted the conduct to his pretrial officer, who reported it to the Court and recommended no action. PSR ¶ 8. He is serving an 18-month term of state probation. *Id.*

> ¶ 40. And Ms. Adair remains his partner and has written to the Court in Mr. Steinman's support. *Id.* ¶ 64; Ex. A at Adair Letter.

Those two incidents are the exception. In nearly four years on release, Mr. Steinman has stayed sober and passed every drug test, worked his way from waiting tables to a licensed electrical apprenticeship, started his own business, kept up with therapy, and kept paying his child support. PSR ¶¶ 10, 63, 77, 90–95. And fourteen people, including family members who once doubted him, have written to the Court about the man he has become. Ex. A.

The sum of Mr. Steinman's time on pretrial release has been to anchor him on a new, productive path. As Jerry Mitchell, who has worked with Mr. Steinman for the past couple of years detailing private aircraft in Southern Utah, has put it:

> I have seen him show up, work hard, help me when I needed him, and continue working productively all the way up to his sentencing. I have heard him speak about his children in a way that has convinced me that there is a good father and a good person there. I can't deny it. I have personally seen him over the last few years become a better man and develop.

Ex. A at Mitchell Letter. In short: Mr. Steinman has already done exactly what we would hope to see from anyone charged with an offense like this one.

## III. ARGUMENT

The Court should sentence Mr. Steinman to three years of probation. The guideline disputes below matter. But they do not decide this case. Probation is the right sentence under any range the Court adopts.

As to the guidelines, Mr. Steinman's range is substantially lower than the PSR makes out. The core problem: the PSR's calculation depends on two enhancements that together add ten levels: six levels for 34 "firearms," PSR ¶ 26, and four levels for possessing ammunition "in connection with another felony offense," *id.* ¶ 27. The record supports neither enhancement. Without them, and without counting the six suppressors in Count 2, Mr. Steinman's proper total offense level is 17.

But however the Court resolves the guidelines, the § 3553(a) factors call for three years of probation. This offense—possessing ammunition after a single prior felony (committed at

18) with no victim and no threat to anyone—sits at the less serious end of § 922(g)(1)'s proscribed conduct. Mr. Steinman survived a childhood of abuse and addiction, and he has spent four years under this Court's supervision showing that he has changed: he is sober, employed, in therapy, and supporting his children. Those four years have already punished and deterred him, and three more years on probation will protect the public while keeping Mr. Steinman in the treatment and work that made the change possible. And a prison term would create an unwarranted disparity, because the Department of Justice no longer enforces the registration requirement against most people who acquire a suppressor today. The Court should impose three years of probation.

### A. Mr. Steinman's total offense level is 17.

The record here does not prove the facts behind either enhancement Probation flags. The government bears the burden of proving those facts by a preponderance of the evidence. *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990); *United States v. Lucas*, 101 F.4th 1158, 1163 (9th Cir. 2024) (en banc). And the evidence it relies on must have "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a) (2021).[7] Those considerations foreclose these two enhancements here.

#### 1. The record does not support any enhancement for the number of firearms.

The first problem is that there are not as many firearms at play here as the PSR suggests. The firearm-count enhancement, U.S.S.G. § 2K2.1(b)(1), counts only "firearms" as defined in 18 U.S.C. § 921(a)(3). U.S.S.G. § 2K2.1 cmt. n.1. That definition covers a weapon that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive," the frame or receiver of such a weapon, a firearm silencer, and a destructive device. 18 U.S.C. § 921(a)(3). It does not cover other parts. *Id.*; *see id.* § 921(a)(25). That is a problem for the government—not least because Mr. Steinman was running a legal parts business, including for the 80% lowers that were legal at the time.

[7] All guideline citations are to the 2021 Guidelines Manual. The PSR applies that Manual because using the current one would raise an ex post facto problem. PSR ¶ 23.

In addressing this issue, the Court should not consider the lab report the government produced the day after the defense objected to this enhancement—and even if it does, the report does not prove 34 firearms. The history here is instructive. The draft PSR applied six levels for "38 firearms." Draft PSR ¶ 24. The defense objected that no one had examined or classified those items. The next day, the government produced a Washoe County Sheriff's Office forensic report dated November 17, 2022—which it had never before given the defense. Gov't Ex. 3, ECF No. 95 at 19–25 (Washoe County Sheriff's Office Forensic Report #2, USAO 000847–53); Ex. B (Oct. 13–14, 2026 emails among government counsel, the probation officer, and defense counsel, attached hereto with unrelated portions redacted). The final PSR now rests the six levels on that report, which the PSR says showed that 34 firearms "were test-fired and fully operational." PSR ¶¶ 18, 26. Relying on that report for such a claim would be error multiple times over.

Moreover, the six suppressors in Count 2 should also be excluded from the count. The government is dismissing Count 2. So the items at play in that count—the suppressors—should not count against Mr. Steinman at sentencing.

**a. The 34 (or 37 or 38) items should not count.**

**(1) The Court should not consider a report that the government did not produce until nearly four years after it was written.**

Start with the late-delayed evidence issue. The Washoe report is not new evidence—but the government did not provide it to the defense until just weeks before sentencing. Unbeknownst to the defense for roughly four years, the government's lab received 38 items from the Nevada State Police (the arresting trooper's agency) and test-fired 34 of them in October 2022. That lab report is from November 17, 2022—two weeks before the grand jury returned the first indictment. ECF No. 95 at 19–23; ECF No. 14.

Yet the government did not produce the report until October 14, 2026, the day after the defense objected that no one had examined the items (and a day after PSR objections were due). Ex. B. On that day—less than a month before sentencing—government counsel wrote that he

had "received the attached report this morning" and did not "know if this report was previously provided." *Id.* It had not been previously provided to the defense in any form.

Given that late disclosure, exclusion is appropriate on at least three different grounds:

(1) Rule 16;

(2) *Brady*; and

(3) Rule 32.

However viewed, the Court should not rely on this late disclosed report at sentencing.

For one, Rule 16 required the government to disclose the 2022 report long before October 2026. The government must disclose "the results or reports of any physical or mental examination and of any scientific test or experiment" if "the item is within the government's possession, custody, or control," "the attorney for the government knows—or through due diligence could know—that the item exists," and "the item is material to preparing the defense or the government intends to use the item in its case-in-chief at trial." FED. R. CRIM. P. 16(a)(1)(F). The duty continues: "A party who discovers additional evidence or material before or during trial must promptly disclose its existence" if the material was subject to a prior request or order. FED. R. CRIM. P. 16(c). And the government accepted those duties in writing in March 2023. It agreed to provide "[a]ll statements, documents, and objects . . . required to be disclosed under Rules 16(a)(1)(A)-(F)," and it acknowledged "a continuing duty to provide disclosures up to and through trial." ECF No. 27 at 2, 4.

This report—on items the government attributes to Mr. Steinman's car—fell within that framework. It was relevant to the suppression litigation, to trial preparation, and to his decision whether to plead. And the government now relies on it at sentencing. *See* FED. R. CRIM. P. 16(a)(1)(F)(iii). That makes the report subject to Rule 16—and its late disclosure a Rule 16 violation. *See id.*

That Rule 16 violation is a problem for the government. When a party fails to comply with Rule 16, the Court may "prohibit that party from introducing the undisclosed evidence." FED. R. CRIM. P. 16(d)(2)(C). Such exclusion is warranted here.

Likewise under *Brady*. The report contains information favorable to Mr. Steinman on punishment. Various of the 38 items would not fire. ECF No. 95 at 23–24. And more broadly, the lab performed no firearms examination of any of them. *See id.* Those facts are particularly concerning because, before the report was disclosed, the government wanted to sentence Mr. Steinman on all 38 items—and Probation apparently agreed wholesale without second-guessing the number. *See* Draft PSR ¶ 13 (Probation seemingly just agreeing—without any independent investigation—to the government's claim that this case actually involved "38 firearms"), ¶ 24 (Probation again seeming just agreeing wholesale to the same claim; recommending an enhancement for "38 firearms"). Yet the report now makes plain that various of the 38 items are not even capable of test firing—and the remaining items were not analyzed for their operability. ECF No. 95 at 23–24. All that is exculpatory.

Failing to disclose the report therefore ran afoul of *Brady*. *See generally Brady v. Maryland*, 373 U.S. 83 (1963); *see specifically, e.g.*, *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013) (granting habeas relief where prosecutor withheld material that could have affected a sentencing decision; "evidence must be disclosed if it is 'material either to guilt *or to punishment*'" (quoting *Brady*, 373 U.S. at 87) (emphasis added by *Milke*)). That likewise warrants exclusion. *See United States v. Cloud*, 102 F.4th 968, 981 (9th Cir. 2024) (affirming exclusion of government evidence as a "less drastic" remedy than dismissal for a *Brady* violation).[8]

If more were necessary, Rule 32's schedule also supports excluding the report. Under that rule, parties must state their objections to the PSR in writing within 14 days, and after that the Court may allow a new objection only "for good cause." FED. R. CRIM. P. 32(f)(1), (i)(1)(D).

[8] If the government's *Brady* obligations somehow required reiteration, the Rule 5(f) order Judge Baldwin issued in this case likewise required the government to produce "all information or evidence known to the government relating to guilt or punishment that might reasonably be considered favorable to the defendant's case." ECF No. 8; *see id.* ("If doubt exists, it should be resolved in favor of the defendant with full disclosure being made."). That order specifically warned that the consequences of a violation would include "exclusion of evidence." ECF No. 8. Under whatever lens, then, exclusion is necessary here to address this *Brady* violation.

That schedule exists to provide "focused, adversarial development of the factual and legal issues relevant to determining the appropriate Guidelines sentence." *Burns v. United States*, 501 U.S. 129, 134 (1991). The government did not object to the draft PSR. PSR at 31. But by producing new evidence to support an enhancement after the objection deadline, it sought to do the same thing as a late objection: a change in the record on which the guidelines are calculated. That is improper. *See United States v. Hodge*, 902 F.3d 420, 429–30 (4th Cir. 2018) (rejecting similar government efforts because the government "has already been given one full and fair opportunity to offer whatever" support "it could assemble" (quoting *United States v. Parker*, 30 F.3d 542, 553 (4th Cir. 1994))); *United States v. Melvin*, 183 F.4th 322, 327 (4th Cir. 2026) (an "earnest desire" to secure an enhancement is not good cause); *United States v. Vélez-Vargas*, 32 F.4th 12, 14 (1st Cir. 2022) (seeing "good reason not to allow such a backfill").

Nothing in the record shows good cause for the government's (four-years-late) disclosure here. Government counsel's email gives no reason beyond that he had just received the report. Ex. B. But the report had existed since November 2022—without disclosure to the defense. And the defense could not have found it on its own; it learned of the report only after it objected that no examination existed. So the Court should decide the firearm-count enhancement on the record as it stood before the government's late production. On that record, the only support for the count of 38 firearms is a trooper's field count (repeated in the property report that lists him as the collecting officer), which does not carry the government's burden. *See* PSR ¶ 14; USAO 000587; Gov't Ex. 1, ECF No. 95 at 9–12 (Nevada Department of Public Safety Property Report, USAO 000184–87).[9] That alone warrants rejecting the six-level enhancement.

---

[9] The PSR's purported 38-item count is unreliable on its own terms. The PSR's itemized list of the 38 "firearms" adds up to only 37, and none of them is a suppressor. PSR ¶ 14. Yet Probation's response to the defense objection says the 38 items "included, but were not limited to six unfinished suppressors." *Id.* at 31. The two accounts cannot both be right. And it seems that Probation's response is wrong: the property report the government has now filed logs the six suppressors separately, as "FIREARM ACCESSORIES," apart from the items it lists as firearms. ECF No. 95 at 13 (USAO 000188, pkg. 59).

The late disclosure violated Rule 16. It violated *Brady*. And it violated Rule 32. However viewed, the report should be excluded.

**(2) Even with the report, the government has not proven 34 firearms.**

Even if the Court considers the Washoe report, it does not carry the government's burden. The report reflects no firearms examination. Indeed, in performing so-called "test firings," the report specifically disclaims having conducted the sort of full firearms examination that would confirm whether any of the items were, in fact, fully operational. So the does not prove that any of the items contained therein was an "firearm" as defined by federal law.

The report identifies each item only by a lab number and an agency item number, and it describes each as "[a] box containing a" rifle, pistol, or firearm. ECF No. 95 at 19–22. The report lists two methods, "NIBIN entry and correlation" and "Test firing - range," and it was signed by a "Laboratory Assistant." ECF No. 95 at 23. The report's appendix explains that a full firearms examination—not done here—checks whether a gun functions and may include tests of its safeties, internal components, trigger pull, and barrel length. And the report further warns that a test fire—all that was performed here—alone does not answer that question: "Only test firing a firearm does not determine a firearm's functionality and operability. A full Firearms Examination, as described above, would have to be completed to make this type of determination." ECF No. 95 at 24. The lab did not perform such a full examination. *See* ECF No. 95 at 23. So the report does not show what the PSR says it shows: that the 34 items the lab test-fired were "fully operational." PSR ¶ 18.[10] That defeats application of the enhancement.

Were there any doubt, *Lucas* involved stronger proof than the government offers here, and the en banc Ninth Circuit vacated anyway. There, the question was whether a magazine that was never recovered was a large-capacity magazine under § 2K2.1(a)(4)(B). 101 F.4th at 1160–61. The government offered photographs and video from the time of the offense and a government expert's analysis, and the expert qualified his conclusion because no one had

[10] As identified above, four of the 38 items "were incapable of firing." ECF No. 95 at 23.

physically examined the magazine. *Id.* The en banc court sent the case back for the district court to decide whether that proof met the preponderance standard. *Id.* Here, the record is thinner: a trooper's field count and a lab assistant's test-fire log—no actual examination of any kind. That fails under *Lucas*.

The government's late production also kept the defense from having its own expert examine the items—further reason to exclude the report.[11] A continuance would not cure that harm. In *Melvin*, for instance, the government offered a new basis for an enhancement only after the defense's objections had defeated its first one. 183 F.4th at 324. The district court granted a continuance so that the defense could respond—and the Fourth Circuit still vacated the sentence and ordered resentencing without the enhancement. *Id.* at 325, 330–31. The court explained that the late argument undercut defense counsel, who had "constructed their sentencing strategy and expectations on the unimpeachable assumption that the Government had no objections to the presentence report." *Id.* at 327. The Fourth Circuit has enforced the same rule when the government seeks new support for an enhancement after its original support fails: the government may not "change its position" once "one of its original choices . . . cannot do the job." *United States v. Winbush*, 922 F.3d 227, 231 (4th Cir. 2019) (quoting *Hodge*, 902 F.3d at 430); *see United States v. Benton*, 24 F.4th 309, 313 (4th Cir. 2022). And the First Circuit refused to let the government "press seriatim alternative grounds for sentencing that could have been pressed simultaneously," because "the prejudice . . . of starting from scratch is obvious." *Vélez-Vargas*, 32 F.4th at 15.

The same is true here. As explained above, the government produced the report only after the defense objected that no examination existed. Mr. Steinman cannot fairly be asked to postpone—and will not seek to postpone—a sentencing he has waited more than four years for, just to make up for the government's failure to disclose. *See* PSR at 2. The investigating agency

---

[11] The defense has tried to arrange an independent examination of the seized items by a firearms expert. But because the government produced the report less than three weeks before sentencing, the defense has been unable to arrange that examination before the hearing.

has had the report since 2022. A continuance would only extend that delay. The Court should exclude the report instead. *See* FED. R. CRIM. P. 16(d)(2)(C).

* * *

On this record, the government has not proven that the offense involved 34 (or 37 or 38) firearms. The six-level enhancement should not apply.

**b. The six suppressors should not be counted as firearms either: the government will move to dismiss Count 2.**

The six suppressors are the only subject of Count 2, and the government will move to dismiss that count at sentencing. ECF No. 95 at 2 n.2; PSR ¶ 5. Government counsel has also told Probation that he will ask the Court not to consider that count for sentencing: "Based on a new policy, I'm going to ask the court not to consider it for sentencing." Ex. B (Oct. 13, 2026, 11:35 a.m. email). And the government's sentencing memorandum does not ask the Court to count the suppressors; its account of the offense does not mention them. *See* ECF No. 95 at 6. Despite all that, Probation would still count the suppressors as relevant conduct under U.S.S.G. § 1B1.3(a)(2). PSR at 32–33.

But the government bears the burden of proving every fact that raises the offense level, relevant conduct included. *Howard*, 894 F.2d at 1090. On top of the dismissal, the government has said it will ask the Court not to consider that count at sentencing. And it has identified no other basis for counting the suppressors. Ex. B; *see* ECF No. 95 at 2–7. So the suppressors should not count. With the suppressors set aside and the 34 items unproven, § 2K2.1(b)(1) does not apply at all.

**2. The record does not support four levels for possessing ammunition "in connection with another felony offense."**

The four-level enhancement in-connection-with-another-felony enhancement fails because the record does not establish any other felony offense. The enhancement applies if the defendant possessed a firearm or ammunition "in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). "Another felony offense" means a federal, state, or local offense "punishable by imprisonment for a term exceeding one year, regardless of whether a criminal

charge was brought, or a conviction obtained." *Id.* cmt. n.14(C). The enhancement applies only "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense." *Id.* cmt. n.14(A).

The commentary presumes that connection only "in the case of a *drug trafficking offense* in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia." *Id.* cmt. n.14(B) (emphasis added). Otherwise, the government must show that the firearm was possessed "in a manner that permits an inference that it facilitated or potentially facilitated—*i.e.*, had some potential emboldening role in—a defendant's felonious conduct." *United States v. Routon*, 25 F.3d 815, 819 (9th Cir. 1994). And where the other felony is drug possession rather than trafficking, the court must find a connection between the firearm and the possession itself: "it is not self-evident that possessing a firearm emboldens a person to possess narcotics for personal use." *United States v. Grimaldo*, 993 F.3d 1077, 1082 (9th Cir. 2021) (vacating a sentence because the district court made no such finding); *accord United States v. Bishop*, 940 F.3d 1242, 1252 (11th Cir. 2019) ("mere proximity between a firearm and drugs possessed for personal use cannot support the § 2K2.1(b)(6)(B) enhancement without a finding that the gun facilitated or had the potential to facilitate the defendant's drug possession").

For its part, the PSR claims these "firearms" were possessed in connection with "Possession with Intent to Sell Controlled Substances." PSR ¶ 27.[12] In answering the defense objection, Probation pointed to two state charges, both of which were dismissed here: possession with intent to sell under NEV. REV. STAT. § 453.337 and possession of more than one ounce of marijuana under § 453.336(5). *Id.* at 32. Neither theory supports the enhancement, for at least five reasons.

*First*, Probation identifies no fact showing an intent to sell; it recites what troopers seized and the charges the State filed. *Id.* The government must prove that offense by a

[12] As discussed above, the government has not proven that these items are "firearms" under 18 U.S.C. § 921(a)(3). But even assuming they somehow counted on that score, this enhancement is independently deficient for all the reasons set out below.

preponderance of the evidence. *See Howard*, 894 F.2d at 1090. Given the lack of intent evidence, it cannot do so.

*Second*, and for similar reasons, no factfinder has ever found an intent to sell the alleged marijuana, and Mr. Steinman has never admitted one. Elko County dismissed analogous charges. PSR ¶ 43. And the government here never charged anything about alleged marijuana (perhaps, one might assume, because it involved the least culpable drug in the criminal justice system). *See* ECF No. 24. So Mr. Steinman has never been found actually guilty of this offense.

*Third*, the record does not establish that the alleged marijuana or the THC products were controlled substances. The only drug-analysis report analyzed one of sixteen exhibits of plant material: a single plastic packet. ECF No. 95 at 17. For that packet, the lab identified delta-9 THC as "the primary cannabinoid" and reported marijuana was "[i]ndicated," but it explained that "[i]dentification could not be confirmed because quantitation is outside the scope of work that the Division offers for drug analysis." *Id.* The lab performed "[n]o further analysis" on the other fifteen exhibits, and none on the syringes, the canisters, or the vape cartridges. *Id.* The syringes "field-tested positive for THC," the canisters "tested presumptively positive for THC," and the PSR reports no test of any kind on the vape cartridges. PSR ¶ 13.[13] That there were only presumptive tests and an unconfirmed identification—rather than confirmed laboratory results—alone defeats any suggestion that these were controlled substances.

But even if one assumed that field and presumptive tests dispositively prove the existence of THC (they do not), THC is not categorically illegal. Hemp—cannabis and its

[13] *See, e.g.*, *Kovacic v. Oconto County*, No. 23-C-642, 2025 WL 2709522, at *6–10 (E.D. Wis. Sept. 23, 2025) (identifying that a field test "cannot differentiate between legal hemp and marijuana as it is only designed to detect the presence of THC, of which legal hemp still contains" minimal amounts, and holding that whether officers who relied on such a test had probable cause was a jury question; ultimately granting qualified immunity because probable cause was "at least arguable"); *Fritz v. State*, 223 N.E.3d 265, 277 (Ind. Ct. App. 2023) (reversing a marijuana conviction where "[t]he only evidence presented to show that the substance was, in fact, marijuana was [the officer's] opinion testimony, based on his experience, and the results of a field test showing that the substance contained THC"); *see also, e.g.*, *United States v. Solorio*, 669 F.3d 943, 948 (9th Cir. 2012) (a "presumptive field test" is "a preliminary test that would indicate whether the substance was probably methamphetamine, but which was not definitive").

derivatives with no more than 0.3 percent delta-9 THC on a dry-weight basis—has not been "marihuana" under federal law since 2018. 21 U.S.C. § 802(16)(B); 7 U.S.C. § 1639o(1) (as in effect in August 2022). The Ninth Circuit has concluded that hemp-derived THC products—including many consumer products sold as intoxicants—fall within that exclusion. *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 690–91 (9th Cir. 2022) (reasoning, on a preliminary-injunction record, that delta-8 THC products "are lawful" under the statutory definition of "hemp"). Nevada had a parallel exemption. NEV. REV. STAT. § 453.096(2) (as in effect in August 2022). Yet nothing in the record establishes the delta-9 THC concentration of any item; the lab did not measure it. ECF No. 95 at 17. And the weights do not fill that gap: the figures for the syringes and canisters include the containers, and no weight shows a concentration. PSR ¶ 13. Without proof that these substances were illegal, the enhancement cannot apply.

*Fourth*, even if the products were controlled substances, the record shows a heavy user, not a seller. At the time, Mr. Steinman smoked up to ten blunts a day, and he told Probation that his marijuana use contributed to the offense. *Id.* ¶¶ 81, 86. He had held a medical-marijuana card and grown marijuana legally. *Id.* ¶ 59. The PSR itself credits that account: "At the time of the instant offense, the defendant admittedly struggled with personal drug use." *Id.* at 27. That equally forecloses "intent to sell."

Agents extracted Mr. Steinman's entire phone, and the PSR quotes nearly thirty of his messages, but not one of those messages concerns selling marijuana or THC. *Id.* ¶¶ 16–17. Nor do the two scales and the cash show sales: a daily user can weigh his own supply, and the PSR attributes Mr. Steinman's 2022 income to his business, not to drugs. *Id.* ¶¶ 13, 97. The only mention of distribution is a friend's prediction, after the stop, that the drugs, guns, and cash would give "them enough evidence to convict you with intent to distribute." *Id.* ¶ 16. And even then, the same friend called the conduct "simple weed and weapon possession." *Id.* A friend's guess about how police might charge a case is not evidence of what Mr. Steinman intended.

*Fifth*, what remains is possession for personal use. That does not support the enhancement even if Nevada law made such possession a felony. The commentary presumes a

connection between guns and drugs only for trafficking offenses. U.S.S.G. § 2K2.1 cmt. n.14(B). For a possession offense, the court must find that the firearm facilitated, or had the potential to facilitate, the possession itself; proximity alone does not support that finding. *Grimaldo*, 993 F.3d at 1082. And nothing in the record supports that finding: the ammunition that Mr. Steinman pleaded guilty to possessing sat in a car with his own cannabis, and nothing suggests it played any "emboldening role" in that possession. *Routon*, 25 F.3d at 819. In plain terms: Mr. Steinman had ammunition and he had cannabis—but nothing shows that the ammunition helped him possess the cannabis.

In short: the record contains no conviction for any marijuana offense, no finding of intent to sell, no confirmed laboratory identification of any controlled substance, and nothing tying any marijuana to the ammunition. The four-level enhancement should not apply.

* * *

The upshot: Mr. Steinman's base offense level is 20, no specific offense characteristic applies, and a three-level reduction for acceptance of responsibility brings his total offense level to 17. PSR ¶¶ 25, 33–34.[14] In Criminal History Category II, his guideline range is 27–33 months. U.S.S.G. ch. 5, pt. A. The Court should calculate the guidelines accordingly.

**B. The guidelines also permit a downward departure for Mr. Steinman's youth and childhood trauma.**

Two departures also fit this case. Age, "including youth," may warrant a departure where "considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.1. Mental and emotional conditions may warrant a departure on the same showing. *Id.* § 5H1.3. Here, the condition is the effect of the childhood

[14] Mr. Steinman uses base offense level 20 here without conceding it. Probation and the government rest that level on U.S.S.G. § 2K2.1(a)(4)(B), which requires proof that the offense involved a semiautomatic firearm capable of accepting a large-capacity magazine or a firearm described in 26 U.S.C. § 5845(a). PSR ¶ 25; ECF No. 95 at 3. But as discussed, the government has failed to prove this offense involved a "firearm." Because the sentence Mr. Steinman asks for does not depend on the base offense level, he preserves his objection to that base offense level without pressing it further.

adversity that Probation's ACE assessment documents. PSR ¶¶ 75–76. And the Court may depart for a combination of characteristics, none of which would suffice alone, if each is "present to a substantial degree" and together they make the case exceptional. U.S.S.G. § 5K2.0(c)(2)(A).

Both characteristics—Mr. Steinman's youth and the effects of his childhood trauma—are present here to an unusual degree. Mr. Steinman was 24 at the time of the offense, after a childhood that Probation scored at seven of ten on the ACE scale. PSR ¶¶ 43, 75. Probation itself identifies that history as a reason to vary. *Id.* ¶ 120. For good reason: The Sentencing Commission's 2024 amendment to § 5H1.1 ties youth to the same risk factors present here: "[c]ertain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships." U.S.S.G. app. C, amend. 829 (Nov. 1, 2024). And it recognizes that young people can change: "[y]outhful individuals also are more amenable to rehabilitation." *Id.* Youth and trauma together, followed by four years of sustained change, make this case exceptional. A downward departure is warranted.

**C. The § 3553(a) factors call for three years of probation.**

Whatever range the Court adopts, it should impose three years of probation.[15] That sentence is "sufficient" "but not greater than necessary" to meet the goals of 18 U.S.C. § 3553(a). Especially on top of the four years of supervision he has already endured, that is a substantial sentence. *See Gall v. United States*, 552 U.S. 38, 48 (2007) ("[O]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their

---

[15] Probation is an available sentence. Both counts are Class C felonies, so the statute permits one to five years of probation on each. 18 U.S.C. §§ 3559(a)(3), 3561(a), (c)(1); PSR ¶ 109. The guidelines do not authorize probation when the range falls in Zone D. U.S.S.G. § 5B1.1 cmt. n.2; PSR ¶ 110. But the Zone D bar is advisory like the rest of the guidelines. In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court upheld 36 months of probation for a defendant whose range was 30–37 months, a higher range than Mr. Steinman's at offense level 17. *Id.* at 41, 43.

liberty."). The question is whether the § 3553(a) factors support the sentence on "the facts presented." *Id.* at 49–50.

Six factors matter most here:

- the nature and seriousness of the offense, § 3553(a)(1), (a)(2)(A);
- Mr. Steinman's history and characteristics, § 3553(a)(1);
- deterrence and just punishment, § 3553(a)(2)(A)–(B);
- protection of the public, § 3553(a)(2)(C);
- needed treatment in the most effective manner, § 3553(a)(2)(D); and
- the need to avoid unwarranted sentencing disparities, § 3553(a)(6).

Each supports three years of probation.

### 1. Nature, circumstances, and seriousness of the offense (§ 3553(a)(1), (a)(2)(A)).

*First*, the offense is serious, but it is less aggravated than the PSR's calculation suggests. To be sure, Mr. Steinman, a person with a felony conviction, possessed ammunition and six unregistered suppressors. PSR ¶ 4. He does not minimize any of that. But ten levels of the PSR's calculation come from the two enhancements discussed above, not from the counts of conviction. *Id.* ¶¶ 26–27.

Count 1 is a status crime. The relevant statute—Section 922(g)(1)—is "the prototypical status offense": it criminalizes possessing a weapon while having a certain status. *United States v. Leviner*, 31 F. Supp. 2d 23, 26 (D. Mass. 1998). It is also constitutionally suspect.[16]

---

[16] The en banc Ninth Circuit has upheld § 922(g)(1) as applied to a person with nonviolent felony convictions, and that decision binds this Court. *United States v. Duarte*, 137 F.4th 743 (9th Cir. 2025) (en banc), *cert. denied*, No. 25-425 (U.S. Jan. 20, 2026). But *Duarte* also held that people with felony convictions remain among "the people" the Second Amendment protects. *Id.* at 754–55 ("[A defendant]'s status as a felon does not remove him from the ambit of the Second Amendment; he is one of 'the people' who enjoys Second Amendment rights."). And other courts of appeals have held the statute unconstitutional as applied to people with nonviolent felony records. *See, e.g.*, *Range v. Att'y Gen.*, 124 F.4th 218, 232 (3d Cir. 2024) (en banc) (false statement to obtain food stamps); *Williams v. Att'y Gen.*, No. 24-1091, ___ F.4th ___, slip op. at 2, 21 (3d Cir. Oct. 13, 2026) (en banc) (second DUI); *United States v. Cockerham*, 162 F.4th 500, 504, 507 (5th Cir. 2025) (failure to pay child support), *cert. denied*, No. 25-1029 (U.S. June 8, 2026); *United States v. Hembree*, 165 F.4th 909, 918 (5th Cir. 2026) (methamphetamine possession); *United States v. Luna*, No. 25-40272, ___ F.4th ___, slip op. at 3–5 (5th Cir. Aug. 24, 2026) (simple drug possession). Mr. Steinman

The statute reaches a wide range of conduct, from carrying a gun to a robbery to keeping ammunition in a car. An offense that involves no use or threat of a weapon is at the less serious end of that range. Here, no one was threatened or hurt, and the PSR identifies no victim. PSR ¶ 19. Troopers did not identify any of the items as stolen, and none of the items the lab test-fired produced a lead in the national database, which labs search "to determine potential leads between firearms and crime scenes." *Id.* ¶ 14; ECF No. 95 at 22, 24. And the government chose to charge ammunition, not the 38 items, in its complaint, its indictment, and its superseding indictment. ECF Nos. 1, 14, 24.

Even if the Court considers Count 2, which the government has said it will move to dismiss, that offense is less serious today than it was when the government charged it. Count 2 charges possession of six unregistered silencers under the National Firearms Act. ECF No. 24. Since January 1, 2026, Congress has set the Act's making and transfer taxes on silencers at $0. Pub. L. No. 119-21, § 70436, 139 Stat. 72, 247–48 (2025); *see* Changes to National Firearms Act Tax Remittance Provisions, 91 Fed. Reg. 25,112 (May 8, 2026). In August 2026, a federal district court held that, with the tax gone, the Act's registration requirements for silencers can no longer rest on Congress's taxing power, and it enjoined their enforcement as to the plaintiffs and their members. *Silencer Shop Found. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 6:25-cv-00056, 2026 WL 2255460, at *1–2 (N.D. Tex. Aug. 5, 2026). Then, in October 2026, the Department of Justice announced that it would stop enforcing the registration requirement for suppressors.[17] Four days later, government counsel here told Probation that "[b]ased on a new policy," he would ask the Court not to consider Count 2 at sentencing. Ex. B (Oct. 13, 2026, 11:35 a.m. email); *see id.* (12:17 p.m. email pointing Probation to news reports of a "DoJ new policy on silencers").

---

does not challenge his conviction; the constitutional question bears on how serious a § 922(g)(1) offense is.

[17] Associated Press, *Justice Department Won't Enforce Registration Rules on Silencers and Certain Guns After Court Ruling*, ABC News (Oct. 9, 2026), https://abcnews.com/Politics/wireStory/justice-department-enforce-registration-rules-silencers-guns-after-137144657.

In short: Congress has eliminated the tax that undergirded the registration scheme, a federal court has held that the scheme correspondingly can no longer rest on the taxing power, and the Executive Branch thus has stopped enforcing it against most people. Those changes blunt how serious the offense is and, therefore, diminish what punishment it calls for.

The circumstances of the offense also reduce its seriousness: Mr. Steinman's messages show a young man trying to stay within rules he did not fully understand. At 24, he had moved to Utah to get away from negative influences and had started a business selling firearm parts, which federal law does not bar a person with a felony conviction from doing. PSR ¶¶ 43, 61, 71; *see* 18 U.S.C. §§ 921(a)(3), 922(g)(1). As discussed above, he identified to his father that unfinished lowers were legal, searched online whether a felon could sell parts kits, and tried to finish his sales before the rule changed. PSR ¶¶ 16–17. And Mr. Steinman had good reason to think his business lawful: he was right that unfinished lowers "in a box" were legal at the time. 87 Fed. Reg. at 24,652. All that demonstrates a man who was trying to follow firearms law—albeit imperfectly.

Mr. Steinman's conduct after the stop also supports probation. The day he was stopped (and before his arrest), he told a friend that one of his three options was to "go on the run." PSR ¶ 16. But he did not run. He was arrested the next day, held for about three months, and then released on his own recognizance. *Id.* at 2; *id.* ¶ 15. He has remained on release for nearly four years—so successfully that Pretrial Services even recommended that he be removed from supervision wholesale. *Id.* ¶¶ 6–10. And once the suppression litigation ended, he pleaded guilty without a plea agreement. *Id.* ¶ 4. The nature, circumstances, and seriousness of the offense support three years of probation.

**2. History and characteristics of the defendant (§ 3553(a)(1)).**

*Second*, Mr. Steinman's history and characteristics support three years of probation. A sentencing court considers a defendant "as he stands before the court on the day of sentencing." *Pepper v. United States*, 562 U.S. 476, 492 (2011) (quoting *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000) (per curiam)). So evidence of rehabilitation is "highly relevant" to his

history and characteristics, to deterrence, to protecting the public, and to his need for treatment. *Id.* at 491 (postsentencing rehabilitation). Here, that evidence comes from four years under this Court's own supervision. All that supports probation for Mr. Steinman.

As discussed above, Mr. Steinman was 24 when he committed this offense. And he did so after a childhood of abuse, abandonment, and early addiction that Probation itself scores at seven of ten on the ACE scale. PSR ¶¶ 43, 75. The Commission now recognizes that "[a]ge-appropriate interventions and other protective factors may promote desistance from crime," and that "in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing." U.S.S.G. app. C, amend. 829. Mr. Steinman's is such a case.

The defense acknowledges that three parts of Mr. Steinman's adult record might be concerning to the Court: the 2016 shooting, the April 2026 trespass conviction, and the custody dispute with Ms. George. Each would be addressed by probation. The shooting happened ten years ago, when he was 18, was committed in self defense, and is the only felony on his record. PSR ¶¶ 39, 42. The trespass is a misdemeanor that his pretrial officer reported to the Court without recommending any action. *Id.* ¶¶ 8, 40.[18] And the custody dispute is a family-court matter in which Mr. Steinman himself has had to call law enforcement several times, and in which Probation declined to interview Ms. George because of "the potential for bias." *Id.* ¶¶ 49, 63. None of them outweighs what Mr. Steinman has done in the four years since his arrest.

Those four years show a different man. Mr. Steinman stopped using marijuana the day of his arrest and has passed every drug test since. *Id.* ¶¶ 10, 81, 87. He went from waiting tables to repairing boats to coating aircraft to becoming a licensed electrical apprentice, and he started

---

[18] In substance, the trespass is the kind of minor offense the criminal history rules count only when the sentence is substantial. A trespassing conviction counts only if the sentence was "a term of probation of more than one year or a term of imprisonment of at least thirty days." U.S.S.G. § 4A1.2(c)(1). Mr. Steinman does not dispute that his conviction formally qualifies, because the state court imposed 18 months' probation; his 364-day jail term was suspended, and a suspended term does not count as imprisonment. PSR ¶ 40; U.S.S.G. § 4A1.2(b)(2). But the point changes nothing: with or without it, Mr. Steinman is in Criminal History Category II. *See* PSR ¶¶ 39–42; U.S.S.G. ch. 5, pt. A.

a new business along the way. *Id.* ¶¶ 66, 90–95. He has been in therapy for two years and wants to continue. *Id.* ¶ 77. He pays his child support. *Id.* ¶ 63. And he lives with his father, who in the past called the police on him but who now writes in his unqualified support. Ex. A at M. Steinman Letter.

Fourteen people have written to the Court for Mr. Steinman, and the most telling letters come from people who did not think well of him before:

- Ms. Kohlbeck, who has helped raise his children and in whose home he now lives, writes that she did not trust him for years: "I am not writing this letter because I have always believed Triston was a good man. I am writing because I have watched him work to become a better one." Ex. A at Kohlbeck Letter.
- Her sister, Karen Wavrunek, a manager at AT&T, says that five years ago she "likely would have supported the harshest possible consequences," but that she now sees a different man: "[t]he first time I saw him after he had embraced sobriety, I hardly recognized him." Ex. A at Wavrunek Letter.
- The coworker who trained him as a technician admits that when they met, "I couldn't care less about him." Ex. A at Woods Letter. But the two became friends as Mr. Steinman learned the trade—and his coworker believes he has substantially improved his life. *Id.*[19]

Others describe how Mr. Steinman now helps the people around him:

- His friend Andrew Luke, a single father, credits Mr. Steinman's talks with his teenage daughter, who had been caught with marijuana at school, with helping her get back on track: "Those conversations carried weight because they came from someone who understood firsthand how mistakes can follow a person." Ex. A at A. Luke Letter.
- His father describes a son who, since this offense, has "cut ties with the people whose influence was unhealthy for him," attends church, and keeps steady work. Ex. A at M. Steinman Letter. And he explains who

---

[19] *See also* Ex. A at K. Luke Letter (senior financial analyst; "I would never have guessed the background he had"); Ex. A at Weaver Letter (church volunteer who served weekend jail time at 18 and went on to an honorable discharge: "if Triston was given the same chance that I received, he would succeed"); Ex. A at J. Steinman Letter (uncle and registered nurse: "a good human being, a devoted father, and a family-oriented person").

> would bear the cost of a prison term: "The weight of that sentence would land on two children who did nothing wrong." *Id.*[20]

Mr. Mitchell—Mr. Steinman's supervisor who took a chance on him—also describes a reliable worker and a good father:

- Mr. Steinman is dependable under deadline pressure. In a business where "last-minute requests are very common," Mr. Mitchell writes, "[t]here have been plenty of times when I have been in a bind, under pressure, or dealing with last-minute deadlines, and Triston has come through for me." Ex. A at Mitchell Letter.
- Mr. Mitchell knows that Mr. Steinman's love for his children is genuine. He has heard it in conversations held "when there was no reason for him to be trying to impress me": "I have heard the way he talks about his children, the things he worries about, and what he wants for them." *Id.*

Probation agrees that Mr. Steinman has changed: he "appears to have made positive changes since the instant offense, including maintaining employment and abstaining from illicit substances." PSR at 27. His history and characteristics support three years of probation.

**3. Deterrence and just punishment (§ 3553(a)(2)(A)–(B)).**

*Third*, Mr. Steinman has already been punished in the four years since his arrest, and three years of probation will deter him from any further offenses. For one, he spent about three months in custody after his arrest here. PSR at 2; *id.* ¶ 96. He then spent nearly four years under federal pretrial supervision, reporting, testing, and living with a possible prison term he could not plan around. *Id.* at 2; *id.* ¶ 6. Much of that time was during the government's appeal. Through all of it, he kept working, kept testing clean, and kept supporting his children.

A three-year term of probation adds three more years of reporting, testing, home visits, and travel restrictions. *See Gall*, 552 U.S. at 48. The Court can also revoke probation and resentence him if he violates its conditions. And the Ninth Circuit has recognized the

---

[20] *See also* Ex. A at R. Luke Letter (retired aircraft mechanic; Mr. Steinman unloaded a relative's moving truck before Mr. Luke arrived to help); Ex. A at Dobbins Letter (cousin; Mr. Steinman was "visiting our shared grandparents very often, and encouraged me to do the same"); Ex. A at Young Letter (his former crew lead: "a hard working man with a good head on his shoulders"); Ex. A at Jones Letter (friend of 16 years; Mr. Steinman fixed his car for free so he could keep getting to work and school); Ex. A at Adair Letter ("even when we are arguing, he still makes sure I am okay").

seriousness of that dynamic, emphasizing that "[s]ection 3553(a) . . . does not require the goal of general deterrence be met through a period of incarceration"—but can instead accomplish the same deterrent effect via a probationary sentence of the sort asked for here. *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010); *see also United States v. Autery*, 555 F.3d 864, 876 (9th Cir. 2009) (affirming probation where the court warned that a violation could bring "the maximum penalty allowed by law"). In short, if the Court imposes the requested sentence, Mr. Steinman will ultimately experience seven years of restrictions on his liberty, with prison available for any violation. That is substantial punishment for this offense. This factor supports three years of probation.

**4. Protection of the public (§ 3553(a)(2)(C)).**

*Fourth*, three years of probation protects the public. The Court does not need to predict what Mr. Steinman will do under supervision. It has watched him under supervision for nearly four years. In that time he has committed no firearm offense, failed no drug test, and worked steadily. PSR ¶¶ 10, 87, 90–95. His one new conviction is the misdemeanor trespass discussed above. PSR ¶ 40. And in August 2025, after nearly three years without a violation, a request was made to end his supervision altogether. PSR ¶ 7. He is, in brief, a virtually perfect supervisee.

And indeed, the Ninth Circuit has affirmed sentences of probation or minimal custody against guideline ranges as high as or higher than the proper guideline range here.[21] In each, the court of appeals deferred to a district judge who was "in a superior position" to judge the defendant. *Whitehead*, 532 F.3d at 993 (quoting *Gall*, 552 U.S. at 51). This Court is in that position, with nearly four years of supervision to draw on. If any risk remains, it will show during the probation term, and the Court can address it then. This factor supports three years of probation.

---

[21] *E.g.*, *Autery*, 555 F.3d at 867, 876; *Edwards*, 595 F.3d at 1008, 1016–18; *United States v. Ruff*, 535 F.3d 999, 1001–04 (9th Cir. 2008); *United States v. Whitehead*, 532 F.3d 991, 992–93 (9th Cir. 2008) (per curiam).

**5. Needed treatment in the most effective manner (§ 3553(a)(2)(D)).**

*Fifth*, probation provides the treatment Mr. Steinman needs in the most effective manner. Probation's own assessment calls for "a trauma-informed approach to supervision and intervention planning, with particular attention to cognitive-behavioral restructuring, emotional regulation skill development, and access to appropriate behavioral health services." PSR ¶ 76. Mr. Steinman is already receiving that care, from a therapist he has seen for two years, in the community where he works and his children live. *Id.* ¶ 77. Probation recommends mental-health treatment as a condition of supervision. *Id.* at 29–30. And Congress directs courts to consider a defendant's need for treatment "in deciding whether to impose probation," even as it bars lengthening a prison term for that purpose. *Tapia v. United States*, 564 U.S. 319, 330, 332 (2011).

A prison term would end the therapy, the apprenticeship, the detailing business, and his ability to pay child support. PSR ¶¶ 63, 90, 92. And it would take him out of St. George, where he has stayed sober and worked steadily since his arrest. His father has said the move to Utah was meant "to remove him from negative influences." *Id.* ¶ 71. Mr. Mitchell believes that "living here has given him an opportunity to distance himself from many of the influences that affected him earlier in life." Ex. A at Mitchell Letter. And because Mr. Steinman "is particularly responsive to his surroundings," Mr. Mitchell writes, prison would likely put him back in "exactly the type of environment he . . . has left behind." *Id.*[22] This factor supports three years of probation.

**6. Avoiding unwarranted sentencing disparities (§ 3553(a)(6)).**

*Sixth*, three years of probation avoids unwarranted disparities. Section 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §

---

[22] A prison term would also cost $54,900 a year, against $6,222 a year for supervision. PSR ¶ 114. That cost matters because § 3553(a) requires a sentence "sufficient, but not greater than necessary," to meet the purposes of sentencing. 18 U.S.C. § 3553(a). Where probation meets those purposes, the added cost of prison is unnecessary.

3553(a)(6). The disparity that matters most here concerns Count 2. The Department of Justice no longer enforces the registration requirement against most people who acquire a suppressor today (as discussed above). So a sentence driven in part by Count 2—as a count of conviction or, as Probation proposes, as relevant conduct—would punish Mr. Steinman for conduct the government no longer pursues against most others. This factor supports three years of probation.

* * *

The § 3553(a) factors, individually and together, call for three years of probation. The Court should impose that sentence.

### D. The Court should not impose the proposed search condition.

The PSR recommends a condition allowing a probation officer to search Mr. Steinman's person, home, car, and electronic devices on reasonable suspicion. PSR at 30. Its only case-specific reason is that "the instant offense involved the seizure of numerous firearms and illicit substances." *Id.* A discretionary condition must rest on an "individualized determination," and the government bears the burden of justifying it. *United States v. Betts*, 511 F.3d 872, 878, 881 (9th Cir. 2007); *United States v. Weber*, 451 F.3d 552, 558–59 (9th Cir. 2006). But the 2022 seizure does not justify the condition now. Nothing in the PSR suggests that any search was needed in the nearly four years of supervision since, and every drug test has come back negative. PSR ¶¶ 10, 87. The Court should decline to impose the condition.[23]

## IV. CONCLUSION

The record supports neither enhancement that drives the PSR's calculation, and Mr. Steinman's total offense level is 17. Whatever the range, nearly four years of sobriety, work, and treatment under this Court's supervision show that prison is not needed. The Court should

---

[23] The PSR also recommends a $1,000 fine. PSR at 26. The Court should not impose one. Mr. Steinman's net worth is negative, his adjusted gross income was about $22,000 in each of the last two years, and he pays $400 a month in child support. *Id.* at 22; *id.* ¶¶ 63, 102. A fine would only come out of the support his children rely on. *See* 18 U.S.C. § 3572(a)(2); U.S.S.G. § 5E1.2(d)(3).

impose a sentence of three years of probation on Count 1, and on Count 2 if it is not dismissed, to run concurrently.

Dated: October 28, 2026.

RENE L. VALLADARES
Federal Public Defender

By: */s/ Sean A. McClelland*

SEAN A. MCCLELLAND
Assistant Federal Public Defender